**In the Matter Of:**

RAGEH vs UNIVERSITY OF NORTH CAROLINA

1:24-CV-336

**ABDULRAHMAN RAGEH**

*October 30, 2025*

EXHIBIT 3



800.211.DEPO (3376)
EsquireSolutions.com

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM
Civil Action No. 1:24-CV-336

ABDULRAHMAN RAGEH,

       Plaintiff,

  vs.

UNIVERSITY OF NORTH CAROLINA
AT CHAPEL HILL, JAN NIKLAS ULRICH,
ALICE ZHANG, and DONALD BUDENZ in
their official capacities,

       Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION
OF
ABDULRAHMAN RAGEH

October 30, 2025
10:02 a.m.

UNC-CH Office of University Counsel
123 West Franklin Street, Suite 600
Chapel Hill, North Carolina 27599

Christy Whisner, Notary Public No. 202511500071


Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 2 of 348

APPEARANCE OF COUNSEL


On Behalf of the Plaintiff:
Kirton M. Madison, Esquire
MADISON LAW, PLLC
8936 Northpointe Executive Park Drive
Suite 240-260
Huntersville, NC 28078
kmadison@madlawpllc.com


On Behalf of Defendant UNC-CH:
Zach Padget, Esquire
Kirsten Stevenson, Esquire
OFFICE OF UNIVERSITY COUNSEL
The University of North Carolina at Chapel Hill
123 W. Franklin Street, Suite 600A
Chapel Hill, NC 27599-9105
padget@unc.edu


On Behalf of Defendants:
Lindsay Vance Smith, Esquire
NC DEPARTMENT OF JUSTICE
114 W. Edenton Street
Raleigh, NC 27602
lsmith@ncdoj.gov


Gregory S. Connor, Esquire
CONNOR LAW GROUP
1000 Environ Way, Suite 1340
E54 Building
Chapel Hill, NC 27517
gc@connorlaw.com


Other Appearances:

None



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 3 of 348

INDEX TO EXAMINATIONS

| Examination | Page |
|---|---|
| Examination by Mr. Padget | 5 |
| Examination by Mr. Connor | 242 |
| Examination by Mr. Madison | 294 |

- - -

| Exhibit | Description | Page |
|---|---|---|
| Number 1 | Curriculum Vitae | 11 |
| Number 2 | Contract Prairie Eye Center | 23 |
| Number 3 | Email chain re iris lesion photos | 29 |
| Number 4 | January 5 email | 40 |
| Number 5 | Emails UNC_4200 | 63 |
| Number 6 | Emails UNC_003179 | 85 |
| Number 7 | Responses | 92 |
| Number 8 | Letter UNC_003275 | 96 |
| Number 9 | Email UNC_0003217 | 106 |
| Number 10 | Transcription Rageh00415 | 118 |
| Number 11 | Email UNC_631-632 | 123 |
| Number 12 | Email UNC_0003389 | 131 |
| Number 13 | Records UNC Health Care | 151 |
| Number 14 | Handwritten notes | 167 |
| Number 15 | Email UNC_0006701 | 173 |
| Number 16 | Email March 21, '23 | 179 |
| Number 17 | Email October 18, '25 | 188 |


Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 4 of 348

| Exhibit | Description | Page |
|---|---|---|
| Number 18 | Emails UNC_2803-2809 | 190 |
| Number 19 | Emails Aug. '23 UNC_7259 | 197 |
| Number 20 | Cease and Desist UNC_7575 | 203 |
| Number 21 | No-Contact Order | 206 |
| Number 22 | Email March 4, '24 | 212 |
| Number 23 | No-Contact Order Feb. 28, '24 | 216 |
| Number 24 | Case Summary UNC_7960 | 219 |
| Number 25 | Email 3:54 UNC_7544 | 222 |
| Number 26 | Email 4/18/24 UNC_7850 | 225 |



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Deposition of Abdulrahman Rageh

October 30, 2025


ABDULRAHMAN RAGEH

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. PADGET:

Q. Dr. Rageh, good morning.

A. Good morning.

Q. My name is Zach Padget. I'm here today representing the University of North Carolina at Chapel Hill, which I'll probably abbreviate today as UNC. And we're here today because you filed a lawsuit against UNC and some of its employees and I'll ask you a few questions. Just for the record, can you state your full name.

A. Abdulrahman Cameise(ph) Abdulrahman Rageh.

Q. Today, as I'm sure your attorney has told you, is a day for -- to give me an opportunity to talk with you directly, ask questions about your case, about some questions I have about some of your documents, and some of the underlying claims you've made. I just want to discuss a few things at the top, ground rules. Have you ever been deposed?



800.211.DEPO (3376)
EsquireSolutions.com

A.    No.

Q.    No, okay.  So, just so you know, and you're aware as you were just sworn in, your deposition is under oath.  And, as you would imagine, because of this you are required to answer my questions completely and truthfully.  I'm not gonna ask you any questions about any conversations you've had with your attorney, but otherwise I'm gonna ask you questions about most other things related to this case.

A.    I'm ready.

Q.    Okay.  You may hear your attorney make objections throughout this, it's a normal part of depositions.  It's done for the purpose of creating a record.  But there's no judge for -- to rule on them and even if you hear an objection, in most instances you're still required to answer the question, okay.

You'll notice we have our court reporter here today, she's transcribing everything we say so there may be times when I ask you a question, like you are now, like most people do, is where you nod your head or shake your head, if you do that I may just ask you if that's a yes or a no.  It's not being argumentative, it's just making sure that



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 7 of 348

there's a record of what you said one way or the other.  All right?

If you don't understand a question or if it's a bad question or if you -- or you're just not clear what I'm asking, let me know, and I'm happy to say it again.  However, if you answer my question, I'm gonna assume you understood it.  Does that make sense?

A.    I'm gonna have clarification questions, if that's okay?

Q.    That's fine.

A.    Yeah.

Q.    Now we're gonna be here for a while. There may be some times when we're kind of discussing a wide variety of topics and I try and narrow us back in on some of the discussions I want to have.  But I also don't want you to be uncomfortable so if you need to take a break, just let me know.  We'll probably take a number of 'em throughout the day.  The only thing I ask you on those situations is if I've asked you a question, you answer it, and then we take a break for whatever you need.

A.    Yeah.  Same for you.

Q.    Okay.  Well, you're not gonna ask me any



800.211.DEPO (3376)
EsquireSolutions.com

questions, but ---

A.    No, no, you can take a break.

Q.    Okay.  I appreciate that.

A.    Yeah, you can take a break if you want.

Q.    Any reason today why you can't give truthful testimony?

A.    No.

Q.    Do you have a weapon or a firearm on you?

A.    Like weapon?

Q.    Yes.

A.    My weapon is the truth.

Q.    Any other weapon?

A.    What do you mean by other weapon?

Q.    I don't know, a knife, firearm, anything like that?

A.    I'm not that kind of person.

Q.    Okay.  You stated your full name, can you also provide us your date of birth and current age?

A.    July 25, 1982.

Q.    So you're 42, roughly?

A.    Yeah.

Q.    All right.  Well, tell me a little bit about where you're from, where you grew up, a little bit ---

A.    Egypt.



800.211.DEPO (3376)
EsquireSolutions.com

Q. --- about your background.

A. Cairo, Egypt.

Q. Okay. Have you ever been a party to a lawsuit before?

A. Like the civil and criminal charges raised by UNC individuals.

Q. Okay. You're talking about the no-contact orders brought by Dr. Sheeran and Dr. Albert?

A. Yeah, they -- they do like a no-contacts, contempt of no-contact, and cyberstalking. A lot of funny stuff.

Q. A lot of funny stuff?

A. Yeah.

Q. Okay. Other than that, have you been involved in any other lawsuits as a plaintiff or a defendant?

A. No.

Q. Have you ever testified before? I think you mentioned you haven't been in deposition, have you testified in court?

A. For the same things.

Q. For the same things, okay. For the same -- the two -- the trial -- or the civil claims you talked about a moment ago for ---

A. Right.



800.211.DEPO (3376)
EsquireSolutions.com

Q. Okay. What's your current address?

A. Springfield, Illinois.

Q. What's your actual address in Springfield, Illinois?

A. 3013 Barrybrook Court.

Q. And how long have you been there?

A. Since March 20- -- 2023.

Q. Do you live with anyone else?

A. No.

Q. Are you married?

A. Yes.

Q. What's your wife's name?

A. Merfat Samir.

Q. How long have you been married?

A. Three-plus years. 2021.

Q. And where does she live?

A. Cairo, Egypt.

Q. What does she do in Cairo?

A. She's a housewife.

Q. Do you have children?

A. I have a one year two months baby, so he's like 14 months or so.

Q. Okay. I'm gonna show you what I'm gonna mark as Exhibit 1, which is one of your CVs. That is your CV.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 11 of 348

(DEFENDANT'S EXHIBIT NUMBER 1 WAS MARKED.)

Q.   Do you recognize this document?

A.   It's outdated, but yes.

Q.   I believe this is the CV that you used when you applied for your fellowship at UNC?

A.   Possibly.  Okay.

Q.   Okay.  I want to talk a little bit about it.

A.   Yeah.

Q.   Just going to the second page, which is UNC7976.  Tell me a little bit about your educational background, which is listed here.

A.   I'm a medical doctor.  I practiced in Egypt.  I moved to the States.  I completed the USMLE exams.  I completed three fellowships at Harvard and Duke before I start at UNC.

Q.   Okay.  So it says here that you received your Bachelor of Medicine and Bachelor of Surgery in Cairo from 2000 to 2007?

A.   Two thousand to -- two thousand -- no.

Q.   Two thousand?

A.   Yeah.  Okay.

Q.   So is that different in Egypt than it is here, 'cause here you would do undergraduate and then medical school?  How does it work in ---



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 12 of 348

A.   Yeah, it's actually much more time than Egyptian -- than American students do for medical school.  I spent seven years in medical school.

Q.   So you didn't go to undergraduate school or college at all, it's just medical school?  Or how does that work?

A.   After secondary school we go to medical school.

Q.   Okay.

A.   Which is seven years plus.

Q.   Okay.  Well, just tell me a little bit about you're a member of the World College of Surgeons in Ireland in 2014.

A.   Yeah, that's like a fellowship in Ireland.

Q.   Okay.

A.   And they do have some exams if you want to be a member of the fellowship.

Q.   Uh-huh (affirmative).

A.   Before I move to the U.S. I completed step one.

Q.   Okay.  So talk -- before you moved to the U.S. you were practicing in Egypt from July of 2007 through October of 2015?

A.   That's kinda residency plus private practice.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.    What were you doing?  What type of -- what was some of your job duties?

A.    Ophthalmology, comprehensive cataract, and LASIK and retina and ocular oncology and squint and glaucoma.

Q.    Okay.

A.    Yeah, that's how we practice in Egypt.

Q.    Okay.  Were you doing any surgeries?

A.    Yes.  A lot.

Q.    What kind ---

A.    Cataract and LASIK basically.

Q.    Please let me finish my question before you answer.

A.    I'm sorry?

Q.    You -- you're -- let's do our best not to interrupt each other.  So if you'll -- I'll -- I'll give you as much time as you want to answer a question, just let me finish my question before you start ---

A.    Okay.

Q.    --- talking that way we have a better transcript.  Can you tell me about the type of surgeries you were doing.

A.    Cataract.

Q.    Okay.



A.    Glaucoma.  Squint.  LASIK.  Retina.
Everything in ophthalmology.

Q.    Okay.  And then you came to the U.S. in
2016?

A.    '15.

Q.    Okay.  You did not -- you started working
in the U.S. in 2016?

A.    Okay.  I mean, what kind of work?  There
was -- it wasn't work.

Q.    Okay.

A.    It's not like a money I get, it's just
stuff like observerships.  Just like research.  And,
yeah, this kind of volunteer and observership, kind
of like externship work.

Q.    Okay.  I'm looking at your CV, that's why
I'm asking.

A.    Yeah, but when you say "work" it means
like I'm -- it's paid positions, right?  That's what
you mean?

Q.    Well, I'm asking -- okay.  Let's just
start at the bottom.  What were you doing as an eye
disease consultant in West Hartford?

A.    Externship.

Q.    Okay.  What were some of your duties?

A.    Everything from seeing patients, document


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

notes, taking images, and then discuss it with the - - with the Dr. Goodyear.

Q. Okay. Then you moved to the Park Avenue LASIK?

A. The same thing. Everything from welcoming patients, do the imaging, do the charting, do the exam, document everything, until I put the patient on the table for surgery.

Q. But you weren't doing the actual surgeries?

A. I had not licensed to do surgeries back then.

Q. Okay. Did you have similar duties at Hartfield Hospital ---

A. That was -- that was research stuff.

Q. Research? What were you researching?

A. Cardiology.

Q. Okay. What made you go to research after doing that LASIK, Park Avenue LASIK?

A. Well, my plan was to get as much publications as possible to improve my resume.

Q. Okay. You then had some pretty short stints at Harvard Vanguard Medical Associates, the Massachusetts Eye and Ear, and then in private practice, what were you doing there?



A. Back then I got my work -- like a work employment card, so then I started to work as a technician.

Q. What were some of your duties as technician?

A. Again, working with patients, taking history, document findings, and do imaging and bring patient to the doctors.

Q. So you were doing everything up until taking them to the -- to see the doctor?

A. I mean, not exactly at the same time. So if I'm gonna do imaging -- so one day I do imaging. If another day I have to do history, then I bring the patient to the room and do the exam and take the history. If another day I have to do like refraction, it's a different duties. It's a different day. But I used to do everything, not for every patient.

Q. Okay. And then that was for one month in September and then October you spent a month shadowing Dr. Lloyd Aiello -- am I saying that right -- and Dr. Paul Arrigg? Were you just shadowing them or were you doing -- actually working for them?

A. Where is that because that's ---

Q. Joslin Diabetes Center.



800.211.DEPO (3376)
EsquireSolutions.com

A.    That's a fellowship.

Q.    Okay, that's a fellowship, okay.

A.    That's a fellowship under license.

Q.    Okay.  Is there a reason you all -- so many of these were for only one or two months?

A.    For which place?

Q.    Massachusetts Eye and Ear was for one month.

A.    No.

Q.    Private Practice for one month.  Joslin Diabetes for one month.  Boston Children's Hospital for two months.

A.    No, no, no, no.  So ---

Q.    Okay.

A.    --- Massachusetts Eye and Ear, I was -- there is two things I have done there.  One is, shadowing Dr. Penida.  But if you go up, Massachusetts Eye and Ear, I had from July to January 2019.

Q.    Okay.  So were you working there that entire time and then just doing ---

A.    Exactly.

Q.    --- these fellowships additionally?

A.    Not fellowship.  So I work at Mass Eye and Ear as a tech.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 18 of 348

Q. Okay.

A. At the same time, I work with other doctors for research and with other doctors for externship. I was trying to use every minute to ---

Q. Uh-huh (affirmative).

A. --- gather more experience. After work, after hours, on the weekends, everything.

Q. Okay.

A. So Dr. Benida was like a, I think, two days a week or so or something. It's -- it -- or maybe actually couple weeks, not exactly sure. But it was during the same job at Mass Eye and Ear.

Q. Okay. And then you went to a facility in Plymouth, Massachusetts?

A. Yeah, that was for a tech job.

Q. That was for what?

A. A technician job.

Q. Still a technician job? Okay.

A. Yes. That was before I start the fellowship.

Q. So at this point in 2019 you were still only acting as a technician in terms of roles of doctor? You were not actually seeing or diagnosing patients?

A. Before I go to Plymouth, Dr. Kadrmas, I



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 19 of 348

matured into a fellowship at Mass Eye and Ear, Harvard or Joslin. Then I left my position as a tech at Mass Eye and Ear. They used to pay me like 40-something per hour and then actually 30-something. Then I moved to Kadrmas only for five months before I start the fellowship ---

Q. Uh-huh (affirmative).

A. --- because they offered me a higher salary.

Q. Okay.

A. It was a six-months fellowship. He was aware that I'm gonna get into Mass Eye and Ear fellowship.

Q. And the Mass Eye and Ear fellowship, is that the one at Joslin ---

A. Correct.

Q. --- Diabetes Center?

A. Yes.

Q. From July of '19 to June of '20 when you were a medical -- what were you duties as a medical retina fellow?

A. As a ophthalmologist doing everything except treating surgeries. Even though I was shadowing retina surgeries with Dr. Jennifer Sun.

Q. Okay.



A.   At that time I had more privileges to do surgeries, to do emergency consults, to work as a -- moonlighting to cover attendings, and I was completely functioning as an attending on the calls.

Q.   Uh-huh (affirmative).

A.   For two years seeing emergency patients.

Q.   Those were -- so those were your same duties the following year when you were just -- just a senior medical retina fellow?

A.   In addition to some administrative stuff for the following year.

Q.   All right.

A.   Like making lectures.  Like organize the on-call duties, like communicate with the residents.

Q.   Uh-huh (affirmative).

A.   Yeah.

Q.   Still no surgeries, though?

A.   There were surgeries.

Q.   There were?  What type of surgeries?

A.   Like general stuff.  If there is injections, if there is -- so it's not retina surgeries.

Q.   Okay.

A.   It's either emergency surgeries like someone with a wound.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.   Okay.

A.   Like laser surgeries.  Like injections.

Q.   Uh-huh (affirmative).

A.   And for the retina surgery itself, I used to shadow Dr. Jennifer Sun.  The fellowship was medical so surgical training was not part of it.

Q.   So when you say you shadow, you're just watching ---

A.   Sit next to them.

Q.   --- them?

A.   No.  Scrub, scrub, assist, handle stuff, doing the same thing.

Q.   But they're doing the actual surgery?

A.   They're doing most of the surgery.

Q.   Okay.

A.   More than 95 percent.

Q.   Okay.  And then in July of '21 you go to Duke Eye Center for the ocular oncology fellow, tell me about that.

A.   Ocular oncology surgical fellowship.  It's a two-week surgery.

Q.   Okay.  I'm looking at your CV, sir.

A.   That's what I'm trying to explain to you what means ---

Q.   Okay.



A.    --- ocular oncology.  It's a surgical.

Q.    Okay.  What were some of your roles and duties?

A.    Everything as an attending, in addition to surgeries on my own.

Q.    What type of surgeries were you doing on your own?

A.    Ocular oncology.

Q.    And you were doing that for the entire ---

A.    Year.

Q.    Year, okay.

A.    Two days a week on my own.  Most of it -- I mean, I have one day on my own, the other day with my attending.

Q.    Okay.

A.    Again, it was surgical.  And I have a volume of surgeries I can provide.

Q.    Okay.

A.    Before I start at UNC.

Q.    I want to go -- okay.

A.    Immediately before I start at UNC.

Q.    Okay.  I want to go back -- and we'll talk about UNC in a little bit, but let's talk about where are you currently employed?

A.    Prairie Eye Center.



Q.   Okay.

MR. PADGET:  I'm just gonna mark this as Exhibit 2, just to make sure this is what I believe it is.

(DEFENDANT'S EXHIBIT NUMBER 2 WAS MARKED.)

BY MR. PADGET:  (Resuming)

Q.   I believe this is your initial contract with Prairie Eye Center, and then at the very back I think there was an addendum, but just double-check me.

A.   I had multiple contracts with them.

Q.   Okay.  This might have been just -- this might just be the initial one?

A.   The differences are basically in the compensation and the salary, so.

Q.   Okay.  The only change I saw that -- in your discovery, at the very end of the last two or three pages there's an amendment to the employment agreements, which looks to be as though it was amended on May 3rd, 2023, but that's the only other change.

A.   No, there's a lot of changes, that's not everything.  So before I start at UNC I'd had an offer from Prairie Center for 450, I declined it to start at UNC.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.    Okay.

A.    After I started at UNC, during the process I was searching for jobs.  Every job I had an interview, every job I was offered a contract, once they knew about UNC they cancel it.

Q.    Sir, I'm asking you about your ---

A.    I'm going back to my current job.

Q.    --- current job contract.  Okay.

A.    Then I had to look into the contract I had before I start at UNC, and I told them I'm now available but I'm not gonna agree on the same terms, I need a raise.  They offered me 500 and then 550 after a few weeks after I started.  And then 600 after -- a few weeks after I started.  So this was the contract I had before UNC fellowship.

Q.    This is effective March 20th, 2023.

A.    Yes.

Q.    Okay.  And yet you're saying it's the contract that you had before you worked at UNC?

A.    Yes, I had that contract from the same place before I start at UNC.

Q.    But this is the contract that went into place March 2023 according to the first page, correct?

A.    According to the first page, that's the



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 25 of 348

effective contract ---

Q.   Okay.

A.   --- on 2023, yes.

Q.   And that's when you started with them?

A.   That's what?

Q.   That's when you started working for them?

A.   Correct.

Q.   Okay.  What are some of your roles and responsibilities with them?

A.   Everything in the clinic regarding to medical retina, including some in-office surgeries: laser, injections, ultrasound, fluorescein angiography, pneumatic retinopexy, cryopexy, everything related to retina detachment in the office.

Q.   Okay.  Is there a difference between in-office surgeries and surgeries you can do in a hospital?

A.   Yeah.

Q.   What kind?  What are they?

A.   I mean, if you fail in-office procedure you go to the hospital to do the surgery at the hospital, which is more complicate -- complex surgeries.

Q.   So you said "in-office procedures," is



that more what you're doing -- you also called them in-office surgeries?

A.   Yes.  So if a patient comes to me for retina detachment ---

Q.   Okay.

A.   --- there are two options.  Surgeons usually prefer to run to the OR room to fix the retina detachment.  I fix retina detachment in the office using a lot complicated, difficult technique that even most surgeons, at least at UNC, cannot do.

Q.   How do you know that?

A.   Because I saw them.

Q.   Okay.  All right, I might come back to that but...  So let's go back to the summer of 2022.

A.   Yup.

Q.   Why did you decide to leave Duke and come to UNC?

A.   I wanted to expand my surgical training in retina.  I wanted always to be a surgical retina doctor.

Q.   And why choose UNC?

A.   I was stupid.

Q.   You were what?

A.   Stupid.

Q.   At the time, why did you choose UNC?


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.   Because I lived close by.  Even though I had three other offers in other places to start a fellowship and whether to start the job but, again, I was stupid.  I didn't listen to other people.

Q.   What people?

A.   My friends.

Q.   What were their names?

A.   Like Dr. -- like that department of retina at Duke, the chairman, she told me it's better to go to another place.

Q.   Okay.  What's her name?

A.   She offered me another position at another place.  And I was like, "Oh, I live here in Duke, it's easier for me to stay in North Carolina."  Again, I was stupid.

Q.   What are you looking at right now, Dr. Rageh?

A.   Her name.

Q.   We can come back to it later, maybe you can just find it during a break.  We can move on.

A.   It's gonna be just one more minute.  Yes, this is she.  Lyla Blazovich.

Q.   Okay.  And she told you not to go to UNC?

A.   She actually didn't say that frankly.  She said, "I have a better place for you."

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 28 of 348

Q.    Okay.  Anyone else tell you not to go to UNC?

A.    Some other, like, fellows and students and doctors.  Not exactly like not go to UNC, but things like it's a small program.  Things like it doesn't match, nobody go there because they don't match with a fellow so it's -- even a resident back then said it's a bad program.

Q.    Do you remember the names of any of those people that said that?

A.    Dr. Khalid Aldaas.

Q.    What?

A.    Dr. Khalid Aldaas.

Q.    Did he end up working with you at UNC?

A.    Yeah, he was a resident back then.

Q.    Okay.  So he was telling you not to come when he was a resident?

A.    Correct, because I was there before so I was at UNC since 2021, not 2022.  During my ocular oncology fellowship I used to be affiliate with UNC.

Q.    Okay.  Tell me a little bit about your relationship with UNC when you were at ---

A.    I used to go there twice a month, like every other Friday.  Again, seeing patients, doing everything with Dr. Materin, the ocular oncology



director at Duke. He was also affiliated with UNC.

Q. Okay. Did you work with any of the -- any other doctors at UNC?

A. The residents.

Q. Just the residents, okay.

A. Yup. And there were sometime kinda communication between the retina faculty too, but it's not like a work. They send me a patient, what's your opinion, can you do a B-scan, yes.

Q. Okay.

A. So I was kinda -- a little bit in touch with them for any mutual patients.

Q. Okay. Prior to starting at UNC, were you in communications with Dr. Zhang?

A. Say that again.

Q. Prior to starting at UNC, were you in some communications with Dr. Zhang?

A. Yes, six months before I started.

Q. Okay.

(DEFENDANT'S EXHIBIT NUMBER 3 WAS MARKED.)

Q. I'm gonna show you Exhibit 3, which are some texts that you provided to us in discovery, which start on Rageh1053.

A. Yes.

Q. Exhibit 3.



A.   Yeah, once I matched at UNC, she wanted me to do some research.

Q.   And is this going back and forth between you all talking about the type of research you would do?

A.   Yes.  It was like over emails and texts and stuff.

Q.   So from these texts it seems like she was pretty excited for you to get started?

A.   Yeah.

Q.   What type of research were you gonna do?

A.   Ocular oncology.

Q.   Any particular topic?

A.   Iris tumors.

Q.   Why that particular topic?

A.   So there is a -- a website called The State Bills.

Q.   Uh-huh (affirmative).

A.   They have a lot of research kinda looking for people to work on it ---

Q.   Uh-huh (affirmative).

A.   --- and we picked up the topic.

Q.   Okay.  So these texts go through September 5th of 2022?

A.   No -- oh, I mean -- but it started in



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 31 of 348

maybe December or January of 2022.

Q. Okay.

A. Six months before I started the fellowship she wanted -- she wanted me to do some work.

Q. Okay. So this is in May so this would have been -- your communications would have started prior to this?

A. Again, in January 2022.

Q. Okay.

A. Six months before I start the fellowship.

Q. Okay. So I think you started -- I believe you started in August?

A. Yes.

Q. Tell me -- tell me a little about your initial impressions, kind of what your day-to-day jobs were when you started in August.

A. I need more specific question. Like I -- I go to the clinic.

Q. Okay.

A. I see the patient. I take the history. I document the findings and I then discuss it with the doctors and then go through treatment options.

Q. Okay. What doctors?

A. All of them.

Q. Every doctor at UNC?



800.211.DEPO (3376)
EsquireSolutions.com

A.   Every doctor at Retina UNC.

Q.   Okay.

A.   Zhang, Ulrich, Willett, Brewington, and Willett.

Q.   Okay.

A.   Sometimes the other departments request some evaluation of retina issues so I go and look at their patients too.

Q.   Okay.

A.   Glaucoma, neurology.  They wanted me to go see their patients and I go there and do my job.

Q.   But before you listed -- sorry.  The first four, just so I have them in there, were Dr. Brewington, Dr. Ulrich, Dr. Willet, and Dr. Zhang?

A.   That was the retina faculty, yes.

Q.   Okay.  So those were your four supervisors?

A.   Correct.

Q.   Okay.

A.   In addition to the other doctors I work with, but they are not my official supervisors, but definitely they are attending and I'm a fellow, so they are ranked higher.

Q.   Do you remember the names of the other attendings you were mentioning?



A. All of the faculty at UNC Ophthalmology.

Q. Okay. Okay. I apologize, I don't have -- do you have a ballpark how many that was?

A. Who?

Q. Do you have a idea of how many other doctors when you say all the ---

A. It's like consultations. Like the glaucoma department, they have a patient with a retina lesions, can you come see it, okay. It's like cornea. It's like everybody.

Q. Okay. Can you tell us a little bit more about the type of work you were doing?

A. I just did. Welcoming patients.

Q. Okay.

A. Taking history.

Q. Okay.

A. Document the findings. And then go with the doctors, discuss it, and make a plan. Maybe I do some procedures like injections in the office.

Q. Okay. And you ---

A. That's in the clinic.

Q. That's in the clinic?

A. Yeah. And the surgery, it depends. Like -- like Dr. Willett, Dr. Ulrich, they used to have me as a primary scribe. I'm the only one who sit



next to them in the surgery.

Q. Okay.

A. I do as much as they let me do, with Dr. Willett and Dr. Ulrich. Dr. Zhang used to give some preference to the residents and she had me sit in the back like writing documents or writing notes, and even though it's very known that first the attending writes the notes. But as Dr. Ulrich did, as Dr. Willett did, they used to write their notes, but Dr. Zhang had me sit in the back and write the note even though usually, if it's not the attending who writes the note, usually it's the one who scribed because he's the one who working with the surgeon.

Q. Uh-huh (affirmative).

A. So she wanted me to sit in the back, watch the screen, and then write or type down the notes.

Q. Okay.

A. That was completely different from the other doctors. She's the only one who used to do that.

Q. Okay. And I'm very sorry, I need to go off the record for one minute.

THE COURT REPORTER: Off record, 10:32.



800.211.DEPO (3376)
EsquireSolutions.com

(Whereupon, a recess ensued from 10:32 a.m. to 10:33 a.m.)

THE COURT REPORTER: Okay, we're on record, 10:33.

BY THE WITNESS: (Resuming)

A. Okay, so it just mention the first and last name if you don't mind because that's a document like you ask for.

Q. Okay, we were talking about some of your different doctors you were working with, different roles. Did you work with Dr. Zhang more than the other attendings?

A. What do you mean more? Because every attending have different clinics days. So Dr. Ulrich, I work with him the most.

Q. Okay.

A. Dr. Willett, maybe the least.

Q. Okay.

A. Dr. Zhang, in between. Actually, Brewington is the least.

Q. Okay. It's fair to say maybe Brewington and Willett a little less, then a little more Dr. Zhang, and the most with Dr. Ulrich?

A. Most with Dr. Ulrich and then Zhang, yup.

Q. Okay. Did Dr. Willett -- or, excuse me --

 
Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 36 of 348

did Dr. Ulrich or Dr. Zhang ever discuss your performance with you?  Your job performance ---

A.    No.

Q.    --- after one of the shifts?

A.    No.

Q.    Never?

A.    What do you mean by never?  Like -- so performance never.

Q.    No time at any time during the shift had ---

A.    At ---

Q.    --- any issue?

A.    If you want to say performance eval, never.

Q.    How about after a shift, hey, Dr. Rageh, you did this today, you could improve on this?  You did this today, maybe we can do it a little bit different?  Nothing?

A.    So we are doctors working together.  We discuss cases.  This is not a performance eval. Performance eval, again, never discussed.

Q.    Okay.  I know they did not conduct an official performance evaluation.  What I'm asking you is ---

A.    Even non-official.



800.211.DEPO (3376)
EsquireSolutions.com

Q.    Please let me finish my question.

A.    Go ahead.

Q.    After your shift, after you're done working, did they ever talk with you about things you could improve on what you had done that day?

A.    No.

Q.    Okay.  You're under oath, remind you.

A.    I know.

Q.    Okay.

A.    I mean, because that's different from, hey, we have this patient this morning, what's your opinion, my opinion is blah, blah, blah.  The other doctors have a different opinions.  That's not eval. That's not performance.  That's discussing cases. It's nothing like you have done something wrong and there is something you can do better.

Q.    There were no discussions about things you could improve?

A.    No.

Q.    What about with Dr. Willett?

A.    No.

Q.    Okay.

A.    Even the emails he sent later, he sent like, okay, there is a patient with a little tear over here so maybe just document it next time.



That's not like -- it's -- it's more like, okay, you can do things differently or like suggestions for a better ideas or things like that.

Q.   Or ways to do things better?

A.   It's a training position so there is always room for improvement.

Q.   So there were what -- they were -- they did discuss with you about things you could do better?

MR. MADISON:  Objection, asked and answered.

MR. PADGET:  He ---

BY THE WITNESS:  (Resuming)

A.   So definitely there are things I would do better.  It's a fellowship training position.

Q.   Okay.

A.   It's not like, hey, your performance is not good.  You did harm with this patient and next time don't do that or do that.  That's not true. But when we see a patient, even between them -- so there was patients where Dr. Willett misdiagnosed cases and I don't agree with them.  I go to Dr. Zhang and she agrees with me against Dr. Willett. Same with Dr. Brewington, she misdiagnosed cases.  I don't agree with her.  I go to Dr. Ulrich and he



800.211.DEPO (3376)
EsquireSolutions.com

approves my plan.

Q. Okay.

A. So that's the kind of discussion. That doesn't mean someone did something wrong, it just...

Q. But at a certain point you were made aware that your supervisors had an issue with your job performance?

A. No, not until I raised concerns of discrimination. Before that, it was only about like -- like missing a page. Someone paged me and instead of responding to the page at 2:00 o'clock or 1:00 o'clock and I respond at 6:00 o'clock. So then I have to -- you -- you should kinda make sure the page. Is that something like performance eval? No, it is not.

Q. Is it important to be an on -- when you're on call to be responsive?

A. I'm on call from the day I started until the day and finished 24 hours for six months.

Q. Again, please let me finish my question.

A. Go ahead.

Q. Isn't it important when you're on call to be responsive, yes or no?

A. Of course.

Q. Okay.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 40 of 348

A.   How many days I've been on call?  From the day I started until the day I finished.  How many pages I got?  Hundreds or thousands.

Q.   Do you remember a meeting that you had with Dr. Zhang and Dr. Ulrich on ---

A.   Of course.

Q.   --- November 10th?

A.   Yeah.

Q.   Please let me finish my question.  Okay.

(DEFENDANT'S EXHIBIT NUMBER 4 WAS MARKED.)

Q.   I'm gonna show you a document where Dr. Ulrich discusses that meeting, and then a number of other emails.

A.   Oh, yeah, go ahead.

Q.   Okay.  This is gonna be Exhibit 4.  In the middle it mentions -- it recaps a meeting you had with Dr. Ulrich and Dr. Zhang on November 10th.  Do you remember that meeting?

A.   Yes, I remember the meeting.

Q.   Do you remember it being discussed that you were significantly behind your peers?

A.   No.

MR. MADISON:  Excuse me, there's no document number.  Which document ---

MR. PADGET:  Oh, sorry.  The copy cut



800.211.DEPO (3376)
EsquireSolutions.com

it off.  I apologize.  This is UNC3783.  I don't know why it's cut off there.

MR. MADISON:  Thank you.

MR. PADGET:  Yeah.  I apologize. Yeah, and we -- I may make a better copy of this and replace Exhibit 4 because some of the other pages are cut off.

MR. MADISON:  Okay.

MR. PADGET:  I didn't realize that. But we can do that during a break.  I'll make you a better copy of that.

MR. MADISON:  Okay, thank you.

BY MR. PADGET:  (Resuming)

Q.    Sorry, going back to looking at this document, you're saying that during that meeting they did not discuss any of the issues that ---

A.    Do you know what we discussed?

Q.    Please let me finish my question.

A.    Go ahead.

Q.    Thank you.

A.    You're welcome.

Q.    You have no memory of them discussing any issues that your supervisors were having with your performance?

A.    Should I answer?

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.   Yes.

A.   Do you know what we discussed?  Discussed the way she mocked my accent on that meeting.  We discussed the way she discriminated or she was pulling at me because of her towel fall under her foot.  Dr. Ulrich said, "Fuck the towel," to her.  Dr. Ulrich said his wife cannot even pronounce his name in front of her.  These kind of things that we discussed.

Q.   Do you have any evidence of that?

A.   Do you have any evidence of what you said?

Q.   I'm about to, but yeah.

A.   I don't have -- I mean, yes, you can ask Dr. Ulrich.

Q.   Okay.

A.   And even though like -- like -- ask Dr. Ulrich if he said, "Fuck the towel."  Ask Dr. -- how could I know if his wife is foreign because he cannot pronounce his last -- his name?  That happen when Dr. Zhang mocked my accent in front of him.  That happens when Dr. Zhang kinda said, "He cannot even fold the towel under the foot pedal."

Q.   Okay.  Going to the next page ---

A.   He was like, "Fuck the towel."

Q.   Were you aware that only weeks after your



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 43 of 348

fellowship began your supervisors began to document performance issues of yours?

A. Only Dr. Zhang after three weeks working with her.

Q. There are others, but let's just talk about ---

A. Yeah, show me which ---

Q. --- her ---

A. --- other doctors kinda documented things.

Q. Well, the next page is -- that's from Dr. Zhang on September 9th where she discusses a handful of issues that you were having in your performance.

A. I'm not gonna say performance. Not performance. It's a different way of maybe doing things.

Q. Okay.

A. But it's nothing to -- and I was not involved with this kinda things. I only knew about it after they wanted to get me out of the fellowship.

Q. So you weren't aware that she had an issue with the fact that you were telling her that a patient -- it says 35F, I'm guessing that's -- it was a 35-year-old female when she was 58?

A. Thank you for mentioning that she lied.



800.211.DEPO (3376)
EsquireSolutions.com

She said that happened in the operative room, right?

Q.   No.

A.   When it was an inpatient -- sorry, when it was like a routine outpatient clinic.

Q.   So is it not important when you're in an outpatient clinic to properly document someone's age?

A.   No, no, it's not -- it's, of course, important but ---

Q.   But you're admitting that you did that, it's just not important to you?

A.   One second.

Q.   Okay.

A.   Is it the same if you introduce a patient to your doctor and saying this is a 35 instead of 50-something in the clinic, outpatient clinic ---

Q.   Uh-huh (affirmative).

A.   --- versus as she lied and said it was in the operative room and the patient was ready for surgery?  There is a difference.

Q.   Do you want to turn to the next page and I'll read it to you.  It says, "When signing up a patient for retinal detachment surgery" ---

A.   Yes, okay, I need you to hold that.  Next page, right?



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 45 of 348

Q. Yeah.

A. Okay. Which one? The third one?

Q. Yeah.

A. Okay. "When signing up a patient for retina detachment surgery he told me that the patient is 35 when she was 58." What can you tell from that? Is it a surgery patient already in the room for surgery or ---

Q. I think it's just ---

A. --- it's an outpatient clinic?

Q. Regardless, isn't -- wouldn't it be a good practice to double-check ---

A. Of course. I see hundreds of patients ---

Q. Please let me finish my question.

A. And you have to understand, you cannot just say one patient age is a problem. It's definitely like maybe because of the humiliation I was at, maybe the toxic environment, maybe everything, that I got a little bit of mental block about the age and, again, I admit it. And this was outpatient clinic. This is gonna be very important to prove her lies. We're gonna catch on this later on.

Q. But let me just -- you're saying you were under so much stress a couple weeks into your



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 46 of 348

fellowship that you had a mental block about someone's age?

A. Yes. With Dr. Zhang, yes, from first day.

Q. Perhaps maybe surgery was a little too stressful for you?

A. This is not surgery.

Q. Perhaps being in a surgical environment was a little too stressful for ---

A. This is not surgical environment.

MR. MADISON: Objection, argumentative.

BY THE WITNESS: (Resuming)

A. I also just mentioned I had been in surgery for a whole year before I started at UNC doing surgeries twice a week. Before I started at UNC.

Q. Uh-huh (affirmative).

A. So it's not about I'm incompetent with the surgery environment. It's about the person who used to treat me bad.

Q. Okay. Well, actually prior to this was Dr. Ulrich ---

A. Yes.

Q. --- September 7th. So that was even before this.



800.211.DEPO (3376)
EsquireSolutions.com

A.    Let me see that.  Where is it in here?

Q.    It's right at the bottom.  He notes that, again, you didn't -- you were on general call but didn't have your phone on, which you say is not a big deal.  Do you remember those instances and ---

A.    Yes, I told you I already missed the page.

Q.    Okay.

A.    On one day, right.  He said like on 8/9. This is the first week, right?

Q.    And then did you ---

A.    Right?

Q.    Yup.

A.    This is the first week since I started a 24-months fellowship.  Did it happen again?  How many times?  And how many times I'm on page?  How many times I'm on call?  Twenty-four hours since I started until I finished.  Twenty-four hours responded to the page at night, any time.  They used one -- this example from the first week I started and they documented that.

Q.    Okay.

A.    Because they knew they are in the process of terminating my fellowship.

Q.    They knew on September 7th?

A.    Even before.  I have a resident told me we



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 48 of 348

knew Dr. Zhang is working on terminating your fellowship a few days after you started on my phone.

Q. So well before you made any alleged allegations, they were all -- they already had issues to your performance and were gonna terminate you?

A. Nobody had said the performance. I did not say performance.

Q. But you ---

A. Where did you get the performance on the first couple weeks? I said three days after I started my fellowship. Three days after I started a 24-months fellowship, the resident said they are working on your termination. I said who? He said Dr. Zhang.

Q. Who told you that?

A. Two residents.

Q. What were their names?

A. Khalid Aldaas and the guy who died, Uzu.

Q. Okay. So your testimony is that they hired you into a highly competitive fellowship for two years ---

A. Yes.

Q. --- Dr. Zhang, as we talked about, communicated with you for months prior to it, and



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 49 of 348

two days after you started they decided to terminate you?

A.   That's what the resident told me.  They told me, maybe in December, and I have the text message.  I'm not lying.  We knew that Dr. Zhang was willing to terminate your fellowship few days after you started.  I got this message in December, like four months or so, after everyone was aware of the process, that they are in the process of my termination.

Q.   Okay, going back to -- what Dr. Ulrich noted about you ---

A.   Yeah, he noted I missed a page, right?

Q.   He also noted that you had issues about properly attending your attendings about cases, which seemed to go throughout your fellowship.  Do you remember those issues?

A.   I'm not sure what you're talking about.

Q.   Eight fifteen, top of the second page, it talks about -- begins with "saw patient," and then it talks about how you never told attending about the case.  It's the next page.

A.   Oh, the second half.  "Saw a patient in hospital with a resident..."

Q.   It also notes you did not forward any



Case 1:24-cv-00336-CCE-JEP   Document 68-3   Filed 03/13/26   Page 50 of 348

notes at all ---

A. No. I have documentation texting with Dr. Ulrich about it.

Q. Uh-huh (affirmative).

A. Maybe it was a little -- one or two days after ---

Q. Uh-huh (affirmative).

A. --- I saw the patient, but I have the documentation that I texted him about it. And there is no single case that I did not text him about it. Maybe sometimes it's -- it's not immediately, maybe the following day.

Q. Uh-huh (affirmative).

A. Yup. But he's ---

Q. This seems like one of those where you're admitting that you didn't tell the attending about the case, but in your mind it's just not really a big deal?

A. Every case is a big deal.

MR. MADISON: Objection, argumentative.

THE WITNESS: He tries to -- he doesn't know anything about retina.

BY MR. PADGET: (Resuming)

Q. Okay.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 51 of 348

A.    So every case is a big deal.  Every case is important to document and discuss.  When I go see a patient in the emergency, I communicate with the residents.  I communicate with the on-call attending that day.  It doesn't necessarily mean they are retina.

So if I'm gonna see a patient belongs to the cataracts team, if I'm gonna see a patient belongs to the cornea team, if I go see a patient belongs to anyone, I talk to the attendings who are ten years at least more experienced than me.  It doesn't necessarily mean I had talked with Ulrich because it's not -- the first essential thing is just to get the job done.  The cornea team wanted me to see a patient.  Okay, I went to see a patient.  I talked to the cornea team, the patient is improving.  The cornea team is also agreeing that the patient is improving.  I'm not the only one responsible for the whole thing.  There is a team of other doctors.

Q.    Okay.  He also notes at the bottom here that -- and this is on September 7th ---

A.    Yup.  Again, this is four weeks after I started.

Q.    --- that he had had several official discussions with him about this with clear



800.211.DEPO (3376)
EsquireSolutions.com

instructions to run every patient he sees with the residents on call by attending and send the notes.

A.    Exactly.  So that's what I said, I don't -- I don't have to get back to him.  I talk with attendings, the residents, and send the notes for them to sign.

Q.    And that was because you weren't doing that when he made this ---

A.    No, that's not true.

Q.    Okay.  We can keep going.  There's another document that ---

A.    So when you go see a patient you have to do something about it.  You have to send the notes. I cannot just leave.  I have to put documentation. I have to send the documentation to the doctors.  So even if I'm not in direct calling them about the patient, I document the communication.  I send in the note electronically.  It doesn't necessarily mean, hello, Dr. Ulrich, I saw this patient.  I already documented everything and sent them the note electronically.  He wanted me sometimes like to call them in the middle of the night, I mean.  But everything was documented electronically through the EPIC.

Q.    All right, there's another email from Dr.



800.211.DEPO (3376)
EsquireSolutions.com

Zhang from 10/14, but I want to go to the one that she sent ---

A.    Yeah.

Q.    --- 11/4 so continuing documenting issues that you were having in October and November of 2022.  Have you seen this document before?

A.    Which page?

Q.    It's two down.  Sorry, it's not ---

A.    And before we go there, do you see anything related to patient safety?

Q.    I've seen quite a bit, but you don't ---

A.    Yeah.

Q.    --- we're not -- you're not ask -- I'm not asking questions ---

A.    No, no, did you see anything about patient safety in the emails?

Q.    I'm not answering questions.

MR. MADISON:  It's -- it's his ---

BY THE WITNESS:  (Resuming)

A.    I understand you're not answering question, I just want to make a comment.  Which page?

Q.    It's a page that begins with an email from Dr. Zhang, and it is cut off.  I'll make a copy of this during the break.  It's dated -- it's an email



800.211.DEPO (3376)
EsquireSolutions.com

from November 4th, 2022.

A. Which page?

Q. It's, again ---

A. I -- I don't have a copy.

Q. You do have a copy.

A. Yeah, which page?

Q. It's the email that's from Dr. Zhang. It's from November 4th. The page number was cut off and I'm gonna fix it. We're gonna make a corrected copy during the break.

A. November 4th.

Q. Dr. Zhang to Dr. Ulrich laying out -- it's entitled, "Retina fellow issues," October, November of 2022.

A. Yes, November 4th. Yes, go ahead.

Q. Again -- and she talked about a number of incidents that you had during those two months in which she was concerned about.

A. Yeah, she can say anything. I was not included in that email.

Q. Okay. But, again, this was done in early November.

A. Yeah, between them.

Q. Still.

A. I was not aware of that.



800.211.DEPO (3376)
EsquireSolutions.com

Q.   Okay, it talks about a couple different --
I'm not gonna go through all of them here, but it
talks about instances -- give me one second --
instance in which you reviewed a case based on a
photo ---

A.   Incorrect.

Q.   --- rather than going to see the patient?

A.   Incorrect.

Q.   Okay.

A.   Lying.

Q.   So this is documented right near this,
your memory two -- three years later is that this
did not happen that she documented at the time?

A.   No.  Not three years later.  I know like
when they started to bring me the documents during
the EEOC.

Q.   Uh-huh (affirmative).

A.   This was the only time I got these emails.
During the EEOC process I got these documents.  And
if you want to go each one, I can prove how much
lies there.

Q.   What about it goes down where it's talking
about from October 23rd, 2022?

A.   Okay.

Q.   Talking about that you had not made it to



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 56 of 348

the eye clinic yet.  I think this was when you were supposed to be reviewing a patient?

A.   Okay.  You want to go through this?

Q.   Were you there at that time when you were supposed to be?

A.   I was on my way.

Q.   So that's a no?

A.   No ---

Q.   Okay.

A.   --- that's not a no.

Q.   So you were 20 minutes late?

A.   Okay.

Q.   Okay.

A.   And who told me not to go?  Dr. -- the resident told me you don't have to come.  The resident told me this is a trap.  Dr. Zhang wants you to go home.  This is a trap.  The resident, Bickrum told me, "Abdu, Dr. Zhang said you don't have to come."  At the same time the resident said, "This is a trap."  I was like, "Whatever she said to you, she's the boss.  If she doesn't want me to go see the patient, I'm -- I'm going home."

Q.   So you were running late and you were running late because it was a trap being set by Dr. Zhang?



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 57 of 348

A.  No.  I was running late because I had to do some -- again -- like moving some document -- some like furniture using a U-haul.

Q.  Uh-huh (affirmative).

A.  And after I finished, I was like maybe 20 minutes late.  Again, okay, "Bickrum, I'm on my way, please wait for me."  He said, "Abdu, you don't have to come.  Dr. Zhang said you can" -- it was done because he did the exam, vision, pressure, and she's feeling comfortable with it and she told him to let me go home.

Q.  Okay.

A.  I said, "Are you sure, Bickrum?"  He said, "This is a trap."

Q.  Okay.

A.  And that was her favorite resident.

Q.  Were you always honest in your communications with Dr. Zhang?

A.  Of course.  I'm not in fear of anybody.  So with -- with that situation the resident did the whole surgery with Dr. Zhang and I was sitting in the back also.  And she wanted me even though I did not put any -- I did not scrub or do any steps, she wanted me to write the notes.  She wanted me to see the patient post operative the following day.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 58 of 348

In academia, in work, it's very routine that the one who does the surgery, the one assisted in the surgery, does the post-operative follow-up. That's most commonly happens. With Dr. Zhang she believes the residents are much need to be trained. She believes I don't deserve to sit next to her, either I sit in the back. I'm not allowed to make any talks.

When I said something one time she was like, "You're not allowed to make jokes. You're here only to learn. Don't make any talk." And that was not even a joke. That was -- she asked for an opinion. I gave her an opinion. She did actually felt I'm right. The resident agreed that I'm right. And she adjusted the surgery based on my opinion. But she then said after that -- I told her after she corrected the thing she was doing, I said, "Thank you, Abdu," my name. She turned around, she was holding this kinda like saline and she did this to me (indicating). She squirted me with the saline. And I was laughing. That's it.

Q. Okay.

A. The next day she sent this email like I was what? I was what? Not doing -- giving her instructions or correcting her on the surgery?

ESQUIRE
DEPOSITION SOLUTIONS

Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 59 of 348

Q. Actually she was talking about a whole host of other issues you were having ---

A. In between, yeah.

Q. Yeah.

A. That -- that's one of them.

Q. Okay. Did you have an instance in which you used a different type of suture? I think this was on November 2nd. Vicryl versus a nylon suture ---

A. Yeah, she -- she ---

Q. --- and you were -- okay, I'm not done -- and you were asked about it, whether you used nylon, and you said, "No, I did not." Do you remember that instance?

A. Are you done?

Q. Say again?

A. Are you done with the question?

Q. Yes, I am.

A. Okay. So the following day she ask me that question.

Q. Uh-huh (affirmative).

A. I said I don't remember I did that. And then she sent me a text message of another fellow was there and they agree that I did use the wrong type of suture. They also agreed that I did this



800.211.DEPO (3376)
EsquireSolutions.com

technique right.  They also agreed that I did a right stitch, only using a different type of stitch, different type of like nylon instead of Vicryl.  So it has nothing to do with the skills.

Q.    But simply that you used the wrong suture and then were not honest about it?

A.    I don't remember I did that.  I said I -- I agreed I did it.  I don't remember I do it.

Q.    Well, she seems to remember 'cause she wrote this email two days later ---

A.    Yes, I don't remember I did the wrong suture.  Why would I do a wrong suture?  If I have the skills, why would I do a wrong suture?  Again ---

Q.    I think that  question.

A.    Yeah, again, it's the hostile environment.  It's the toxic environment that made me do something has no relation with the skill or knowledge.

Q.    So it's the environment that you were in that caused you to use the wrong suture and then not be honest about it?

A.    Again ---

            MR. MADISON:  Objection, argumentative.

BY THE WITNESS:  (Resuming)


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.   Again, I never been non-honest.  I'm very truthful, more than any other person maybe in this room.  So when she told me about it, I said I don't remember it.  But she send me that message and the message she agreed, like the other fellow, agreed about it.  So, okay, I did it.  So what's wrong?  You just remove it.  Did the patient harm happen?  Did the patient harm happen?  No.

Q.   Okay.  So I'm gonna talk to you about -- talk with you about a number of documented issues -- -

A.   Before I go there, I need to document thing.  There was never an incident like any surgical problem with Ulrich or Willett.  But she used to use these kinda, I would say, stupid documentation things only for documentation.  And this is what Dr. Ulrich told me, "She is not comfortable with your age and she is documenting everything you do.  And she is aggressive."  He even said that, she -- he noticed she was aggressive to me.  Dr. Ulrich said that multiple times.

Q.   When did he say that?

A.   He also -- well, multiple time.  Even that -- in September.  In September I walk with him to the garage, "How are you doing, Abdu?"  "I think I'm



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 62 of 348

doing good." I didn't want to complain about anything. And then he started to say, "How is Dr. Zhang?" I was like, "Okay, she might be a little tough." He was like, "She's very uncomfortable with your age even before you started."

Q. Okay.

A. I was like -- I didn't understand what discrimination means back then. I don't know what discrimination mean. This is only in the U.S. So he told me she's not comfortable with your age, even before you started. I -- I -- I, again, I did not digest it. "Okay, Dr. Ulrich, what should we do?" I was like, "Can we just have maybe a lunch together? Maybe a dinner together? Maybe break the ice because she doesn't feel comfortable being with me or next to me?" He was like, "No, you don't have to do that. Just -- just be professional." And he said, "Sometimes bend over, suck it up."

Q. Do you have any document, evidence of any of that?

A. You can ask Dr. Ulrich. Again, this was during my way to the garage.

Q. Stop. So that's a no, you have no documented evidence of any of these conversations?

A. I'm glad I recorded him one day. So in



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 63 of 348

one -- in this documentation, I recorded him and I can prove that -- the record proves how much lie was there. So the -- this conversation no documentation, if that makes you happy.

Q. Thank you. You talked quite a bit about how Dr. Zhang had issues with you ---

A. Go ahead.

Q. I'm marking this as Exhibit -- Defendant's Exhibit 5.

(DEFENDANT'S EXHIBIT NUMBER 5 WAS MARKED.)

Q. It starts on ---

A. So far I don't see anything related to patient harm.

Q. Okay.

MR. MADISON: I'm sorry, you said ---

MR. PADGET: I'm sorry, this is Exhibit 5.

MR. MADISON: Okay.

MR. PADGET: It's a series of emails beginning on UNC4200.

BY MR. PADGET: (Resuming)

Q. And these are from other of your supervisors. The first page I'm showing you is from Dr. Willett.

A. Yup.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.   Email from November 15th.

A.   Yes.

Q.   Talking about how you were not detail-oriented with ordering medications.

A.   Okay.

Q.   And then you said -- and I'm reading from the very top -- "Sorry for that, I realize the difference now."

A.   Yes.

Q.   So you recognize that you did have -- made a mistake there?

A.   What kind of mistake?

Q.   Ordering the wrong medication.

A.   Incorrect.  Lying.

Q.   These are your words.

A.   That's -- where is the ordering not the same med -- it's the same medication, just not the same formula.  Not the same -- instead of tablets it was in disintegrated tablets.  It's the same effect.  It's the same everything but he wanted it to be in -- instead of disintegrating tablets, he just wanted regular ones.

Q.   And then he had to correct -- send the correct prescription?

A.   Incorrect.



Q. It says it.

A. I have a text message and I told him in the text message this is not correct. Look at my email. I have sent of ten -- hundred milligram disintegrating tablet, which is not the standard pill and everything else was the same, except the form. Again, this is November, I work with Dr. Willett since August. This is started only when they asked him to document thing. And he was like -- when I called him about it, he was like, "Don't worry about it, it's just for documentation." And that was Dr. Willett.

Q. Do you have any evidence of him saying that?

A. Stop that question, please.

Q. Is that a no?

A. Evidence? Documented like written evidence?

Q. Yes.

A. Well, Dr. Willett is a little bit truthful so you can talk to him about that.

Q. I have.

A. Ask him about that, when I called him about an email he sent to me, and he was like, "Don't worry about it." But I -- I call him.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

What's wrong?  These emails look very, you know ---

Q.   Okay.  Let's talk about another one, Dr. Willet.

A.   Yup.

Q.   Where it appears you would have -- you seemed to have missed a basic imaging interpretation?

A.   Yes.

Q.   And you said, "Dr. Willett, I just looked it up.  I don't know how I missed that.  Sorry on that."

A.   Yes.

Q.   So that would be in  general perhaps another issue you were having that he documented?

A.   Documented and also the interpretation. Do you know when I started to do also the interpretation?

Q.   Nope.

A.   Ten years before maybe I start at UNC. And this is -- if you show this to any ophthalmology -- not ophthalmology -- any resident -- not a resident -- in medical school, he will laugh.  So this is gonna be a subject for -- and hopefully we're gonna bring an independent ophthalmology expert to prove that this is just a pretext.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.    Do you have a -- have you identified an expert?

A.    Yeah.  Yeah, I'm gonna do it.  Not right now.  Not right now, but I'm searching.

Q.    Okay.

A.    'Cause it's gonna be a lot funny after this all ends.  The people will understand how much -- I don't want to say stupid -- but the people will understand how much they can overuse and abuse their power for only terminating a trainee.  Like you didn't answer a page, okay.

            MR. MADISON:  May I have a quick break for the bathroom?  Did you -- is this your copy?  I noticed some blue highlighting ---

            MR. PADGET:  Yeah, I highlighted the wrong one, yeah.

            MR. MADISON:  Okay.

            MR. PADGET:  Let's go off the record.

            THE COURT REPORTER:  Off record, 11:04.

            (Whereupon, a recess ensued from 11:04 a.m. to 11:12 a.m.)

            THE COURT REPORTER:  We're on record, 11:12.

BY MR. PADGET:   (Resuming)


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q. So back on the record here, Dr. Rageh. We had talked about emails from Dr. Willett and Dr. Zhang and Dr. Ulrich.

A. To who?

Q. To discussing your performance.

A. I was not involved with it.

Q. I know. The next one we have here is -- and it is UNC516, which should be in front of you, is an email from Dr. Brewington, which is one of the other attendings you worked with.

A. Right, that was actually nice. Which page?

Q. UNC516.

A. Is it still Exhibit 4?

Q. Yes. No, this is Exhibit 5. That's Exhibit 4. It's right here (indicating).

A. Oh, thank you.

MR. PADGET: I'm gonna take this back, this is an old copy of Exhibit 4.

MR. MADISON: Okay.

BY MR. PADGET: (Resuming)

Q. Yeah, that page.

A. Yeah. What date was that?

Q. December 12th.

A. 2022?



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 69 of 348

Q.    Yeah.

A.    Correct.

Q.    She notes that -- and I was curious if you remember any of these issues -- she notes that you sometimes forget to result the images.  Your notes often include unnecessary stuff and would leave out key info.  And she then notes that when she talked with you about it you got a little better but not much, and that she still had to complete your notes and charting, and then she pretty much gave up asking.  Do you remember any of those concerns being shared with you?

A.    That was a training position.  We communicate about things, how to document things better.  So with every doctors everyone has his own preference.  So she -- actually she was the one who was giving me the much more to do in the clinic. Every laser she wanted me to do.  Every subconj, numbing patient, she's the only one who wanted me to do, until my last day.

Q.    So is that a yes to my question, that you remember some of these notes being shared with you and some of her concerns?

A.    Not -- no, I didn't -- no, nothing like that was shared with me.



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 70 of 348

Q. She never shared with you, as she noted here in her email, about how your notes would often leave out key information?

A. No, she never shared that, but she sometimes wanted me to do more documentation, like it's comments, it's not like sharing with me concerns.

Q. Would those comments note that she had issues with how you were taking notes?

A. Nothing like issues, it just -- again, no issues. So if I work with someone he likes to do things as his preference and every doctor is separate. Teaching these things to me doesn't mean it's notes, doesn't mean it's concerns. It just she wanted me to do things this way.

Q. And then it seems that you consistently forgot to do things the way she asked you to do it?

A. No.

Q. Next she says, "I also told him that it was okay for him to give my injection patients their subconj injection. He must have forgotten that I told him that because he doesn't do it. I'm not going to remind him 'cause I shouldn't have to. He doesn't seem to be -- he doesn't seem to pick up on things even when told more than once."



A. Keep going. That was between them, I don't care about it.

Q. You don't care about that one of your attending doctors felt like you did not respond when she asked you to do things multiple times.

A. Because she never told me that. Because she never told me that.

Q. She never told you -- she never asked you multiple times ---

A. No.

Q. --- to change how you were taking notes ---

A. No.

Q. --- or how you were doing ---

A. No.

Q. --- injections?

A. No. No.

Q. Okay.

A. And I need you to go by the end of this because the last sentence, "Just hope this is helpful," that's very, very obviously she was pushed to do something negative and document it against me. Dr. Brewington says by the end of all this paragraph, "Hopefully" -- or "Hope this is helpful." Helpful for what?



800.211.DEPO (3376)
EsquireSolutions.com

Q. Well, perhaps they ask various issues she was having with your performance.

A. Why it's -- why it's in December by the end of my -- why it's December?

Q. Because they had been documenting -- actually I'm not gonna answer you.

A. Exactly. Why it's December and why it's helpful? Why this was the first communication from Dr. Brewington when they pushed her to write something?

Q. Well, you also noted earlier that you didn't often work with Dr. Brewington, correct?

A. I work with Dr. Brewington every week.

Q. But you worked with her less than the other attendings?

A. Correct.

Q. Okay. I just want to note ---

A. But every week.

Q. --- one other thing she says, "When he first started showing up," he being you, "for his retina CAP or my clinic, he literally would not speak to me or acknowledge me in any way. I'm not sure why, but he is definitely more comfortable with Kiernan than with me." It seems to be a common theme. Did you have an issue working with female



doctors or female attendings?

A.   That's funny.

Q.   It doesn't seem funny to me, it seems ---

A.   Well, she ---

Q.   --- rather serious.

A.   --- worked with me to the last day.  She was the nicest person.  And I worked with her until the last day.  The only reason I sometimes prefer Dr. Willett clinic is it's more complex.

Q.   You actually didn't answer my question. My question was, did you have an issue working with female doctors or attendings?

A.   Did you finish your question?

Q.   Yes.

A.   The answer is no.

Q.   Okay.  Would it surprise you that Dr. Zhang and Dr. Brewington would seemingly disagree with that statement?

A.   Where is that?

MR. MADISON:   Objection ---

BY THE WITNESS:   (Resuming)

A.   I told you ---

MR. MADISON:   --- misstates facts not in the record.

MR. PADGET:   Okay, that's fair.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 74 of 348

BY THE WITNESS: (Resuming)

A. Where is that? I mean, I have a lot to say about this Dr. Brewington. Do you know that within these communications they communicated to each other and they kicked out Dr. Brewington from the email communications.

Q. Do you have any evidence of that?

A. Yes, it's in the emails. I was like why you excluding Dr. Brewington? Why you're claiming things on her behalf when she's not cc'd?

Q. Let's go to the next page.

MR. MADISON: I'm sorry, which -- which page ---

MR. PADGET: This is UNC2992.

MR. MADISON: So it's cut off again.

MR. PADGET: It's literally the next page. It's ---

MR. MADISON: Okay.

BY THE WITNESS: (Resuming)

A. At the next page following Dr. ---

Q. Yeah.

A. --- Brewington?

Q. Yup. The next one's an email from Dr. Ulrich on December 12th, 2022.

A. Yeah, 12/12/2022. And the same email from



800.211.DEPO (3376)
EsquireSolutions.com

previous, 12/12/2022.  The same email -- same day, sorry.  Two emails on the same day.

Q.  Uh-huh (affirmative).  We're gonna get to that.

A.  Yes.

Q.  He notes again several issues that he's had with you in the last two weeks.  This is at the very top.  He notes that you ---

A.  He or she -- oh, Ulrich, yeah.

Q.  Yeah, Dr. Ulrich.

A.  Okay.

Q.  Seems that you had no -- highlighted part at the first bullet one, "Had no idea about the foot pedal functions again."  Do you have any issues with that or remember that, of them asking you multiple times about how to use the foot pedals?

A.  He is lying.  I use microscopes -- listen, even before this, who was doing the emergency surgeries?  Me alone, I was bringing residents to teach them on the microscope, on the foot pedal.  But he's talking about a different instrument and every doctor, again, has their own settings.  So he wanted me to adjust to his setting by putting me in the chair and just remember everything immediately, which is just putting me to fail.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.   So what he was -- what you're saying is he was asking you to do things the way he did in his clinic and you were unable to or unwilling to?

A.   That's not clinic, that's the surgery room.

Q.   So even more important, he was asking you how he did it in the surgery room ---

A.   Right.

Q.   --- and you were unable to do it like he asked?

A.   Exactly.  The same way I say like when you drive a car, you sit in the seat, you hold the stick, and you then put the whatever things of the car and then, yeah, you turn.  When I put you there, am I telling you down or not?

Q.   Well, again, I'm -- I'm not gonna answer your questions.

A.   And every doctor is different again.  And, again, I used to do surgeries on my own at UNC when I see emergency patients.  They asked me to do it. They asked me to train residents doing surgeries.

Q.   If you were so accomplished, as you've talk about, in your abilities to do surgeries and that you didn't need to learn, why did you do a ---

A.   No, I didn't ---



800.211.DEPO (3376)
EsquireSolutions.com

Q.   --- fellowship?

A.   --- say that.  Because this written.  The things I used to do are a little bit different, like cataract, like glaucoma.  And, again, even if I do have the skills, I don't have a certificate.

Q.   So when they were trying to teach you, so when Dr. Ulrich was trying to teach you how he did it, you were unwilling to learn?

MR. MADISON:  Objection, argumentative.

BY THE WITNESS:  (Resuming)

A.   What kind of question is that?  Why would a fellow being unwilling to learn?

Q.   Well, you just said he'd ask you how to do the foot pedals in his surgical room and you simply did not or ---

A.   Did not what?

Q.   I don't ---

A.   He asked me like this is right turn, this is left turn, this is speed, this is vibrator, this is cryo, this is laser, this is light, and then go ahead.

Q.   Okay.

A.   So when I go ahead, it's not the same setting I'm used to.  It's not the same.  And,



800.211.DEPO (3376)
EsquireSolutions.com

again, it's the first time with him on the foot -- on the -- on the main chair as a primary surgeon and they just tell you just, okay, this is the right -- this -- as I said, and then go ahead. And then I struggled to find my foot, it's too long. I'm a little shorter so I need to adjust my seat. I take my time and, boom, you failed it.

Q. And you're saying he only asked you to do that one time?

A. Exactly.

Q. Okay. I'm not gonna go through all of these, but the second point talks about a time where there's a Spanish-speaking patient. Dr. Ulrich noted that he -- you told him that you did not talk with the patient much as you did not feel like calling the interpreter. And he then noted, going on that, "This is the third time I instructed him to always call an interpreter when he's unable -- he's not able to communicate with a patient." Do you remember that?

A. No. I remember there was a -- only one Spanish patient. When I took the Spanish patient they know some basic English, hey, can you look at my ear.

Q. Uh-huh (affirmative).


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.    Can you look at my chin?  Can you look up, down, right, left?  So I get everything needed.  He commented that I did not bring a Spanish interpreter.  He did not comment on was the exam -- like the exam was enough, was the exam good or was not.  So why do I need to, I mean, again, I'm -- I'm in training and I believe I did the right thing.

I did examine the patient, I got all the information I need, and I give all the instructions I need in basic English.  Dr. Ulrich take this advantage because he speaks Spanish, so he wanted to show like he speak Spanish.  He went into the room.  He wanted to show me that it's -- it's like you have to bring a Spanish interpreter when it's not exactly very essential in all patient unless I feel that the patient cannot communicate with me.  It's not like every Spanish patient I need to bring an interpreter.  He can speak English, at least basic English, that we can communicate enough.  He understand.

Q.    Did Dr. -- did Dr. Ulrich direct you, though, to bring in an interpreter and you said ---

A.    No, no, that's -- that's the only case and that's the only time and that's the only one patient.



800.211.DEPO (3376)
EsquireSolutions.com

Q.    Okay.  So that is the only time you had a Spanish-speaking patient during the entirety of your time with ---

A.    I had a lot of Spanish-speaking patients.

Q.    Okay.

A.    But, again, they speak basic English.  The same for me, I -- you don't have to bring an Arabic interpreter when you examine me.

Q.    Okay.  I want to go to the next page ---

A.    Is it a patient harm?  Is it a patient safety concern?

Q.    I'm gonna go to the next page.

A.    I just want to show to everyone how funny and baseless these kind of things.

Q.    Okay.

A.    When you see like 50, 60 patients a day and then they can't find anything wrong, so you saw a Spanish patient, you did not bring an interpreter.

Q.    I'm gonna -- I'm gonna ask you just to answer my questions.

A.    I have to comment if I have to.

Q.    No, you don't.

A.    I will.

Q.    The next page is an email that you were involved in but I was unsure if you're of them.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

It's an email from Dr. Ulrich to a couple people from December 12th noting that ---

MR. PADGET: And, for the record, this is UNC ---

BY THE WITNESS: (Resuming)

A. The second page?

Q. Yeah. It's UNC509.

A. 509. Okay.

Q. And it's an email on December 12th ---

A. Okay.

Q. --- 2022 saying that they were having ---

A. The same day, right?

Q. Yes, it is.

A. So three --

Q. Please let me finish answering [sic] my question.

A. Okay.

Q. I've asked you this multiple times.

A. You can keep asking, no problem.

Q. Please.

A. I'm okay you asking me.

Q. And I just need you to wait till I'm done.

A. I'll do my best.

Q. Okay. As discussed, email from Dr. Ulrich to Dr. Budenz and Bonnie Leonard on December 12th,


Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 82 of 348

December twenty -- excuse me -- December 12th, 2022, "As discussed a bit ago, we still have significant trouble with our current retina fellow Dr. Rageh."

A.    Yes.

Q.    "He is way behind in regards to knowledge, clinical skills, and has nonexistent surgical skills."

A.    Okay.

Q.    "Because we have had issues with him following instructions, being truthful and respectful towards our female retina faculty to a point that Dr. Zhang currently is not participating in his teaching."

A.    Okay.

Q.    Okay.  I'm gonna skip down, he notes, "In my plan" -- going to the bottom -- "was to have him finish this year through July '22 and give him a certificate for medical retina fellowship.  Not sure what we need to do to terminate his contract."  Were you aware that there was discussions to shorten your fellowship and terminate your contract on December 12th of 2022?

A.    From the first week.  Dr. Ulrich used to say she's not comfortable with your age and we are one team, if one of the team is uncomfortable, we


Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 83 of 348

have to terminate your fellowship.  That was very early on.  She wanted me to wait until December for many reasons.  But that conversation happened multiple times early on since September.

Q.   So the documentation of your issues, performance issues, throughout this time all occurred before this date?

A.   All occurred?  What do you mean occurred?

Q.   That was a bad question.  I'll rephrase the question.  Strike that, that was a poor question.  As we discussed, there's been documented from Dr. Brewington ---

A.   What do you mean documented?

Q.   Please let me finish the question.

A.   So you can save time when I ask you -- what do you mean by documented?

Q.   Please let me finish the question.

A.   Go ahead.  I'm listening.

Q.   As we've discussed, there have been issues from all four attending doctors that worked with you -- Dr. Brewington, Dr. Willett, Dr. Zhang, and Dr. Ulrich -- all noting issues that they had with your performance prior to this date.

A.   Where is the question?

Q.   Correct, that's what we've been talking



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 84 of 348

about?

A.    No.    These are documented communication between them, it's not documenting errors.  It's not documenting mistakes.  They communicate with each other for one reason, Dr. Ulrich told me about it the first -- I mean, in September, Dr. Zhang is not comfortable working with you.  She has concerns about your age, even before you started.  Later on he said she's even going crazy, she doesn't feel comfortable sitting next to you because of your shape and size.  And from the day one he said if one of the team is uncomfortable we have to terminate your fellowship.

Q.    Okay.  Did you have a meeting with Dr. Ulrich on December 16th to discuss these ongoing issues?

A.    That was a phone call.

Q.    Okay.  Tell me about what you remember from the phone call.

A.    Well, as I remember, he told me the same thing, that I should better look for a job.  He told me that they don't have to have any reason to terminate my fellowship because in North Carolina, like employees -- employers can fire employees without notice.  He said, "Abdu, if you don't want



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 85 of 348

to come to work, that's fine, you can just leave us. At the same time, if we don't need you, we can fire you.  That's it.  That's how it work in North Carolina."

And the discussion was mainly about, "Dr. Ulrich, you can't just terminate my fellowship right now, I don't have anywhere else to go.  I cannot pay rent."  He said, "You can live in my shed."  I was like with my mom, back visiting me from Egypt.  He said, "You can live in my shed."  I said, "I need to find another program.  Can you help me transfer to another program?  Can you help me find another job?" And that was the main things about the call.

Q.    Did you also discuss some of the ongoing issues we've been talking about today?

A.    Like performance evaluation, clinical competency?  The answer is, no.

Q.    Okay.

(DEFENDANT'S EXHIBIT NUMBER 6 WAS MARKED.)

Q.    I'm gonna show you Exhibit 6.  It's two documents.  The first is the email that Dr. Ulrich sent to you.  And the second is what I believe, I'm gonna ask you about, are notes that you took that you provided to us in discovery.

A.    Yeah, he had this kinda behavior if we



800.211.DEPO (3376)
EsquireSolutions.com

talk about anything, next day he sent to his colleagues an email claiming things that never happened in the conversation. And that was the reason on my third meeting with him I had to record it. He had the same habit after I recorded the meeting, he claimed things that never happened in the meeting. And we have the recording and we have the emails and any third person can tell he's lying about the things that happen in the meeting.

Q. We're gonna talk about that later.

A. Of course.

Q. I have some questions about your alleged transcript. So you have no memory of him discussing many of the emails we've actually been talking about today, that you start -- how you started your fellowship far behind your peers and having multiple incidences where your decision-making, lack of seeing the patient, and lack of communication with your attending caused or could have caused considerable harm to the patient and potential for malpractice claims? You don't remember having that conversation?

A. That was -- you mean the next day, right?

Q. Yes, it was.

A. Yeah. I don't remember having this



conversation, I only saw it in the email.

Q. Okay. You don't remember him discussing with you how you have to remind to fulfill your basic retina fellow duties, like being thorough with examination patients, calling interpreter, which you noted a minute ago you did not do ---

A. One patient.

Q. --- recording all findings into EPIC and sending his notes of patients seen on call?

A. Yeah, there is always gonna be some instructions from day one to everybody, not only me, to the residents. To everybody. Same instructions.

Q. Okay. So you admit that some of that was going on?

A. Admitted some of that was going on? Not in the way he's mentioning. He want to phrase that as if there is a potential patient harm and want to phrase that as if I lack knowledge. He want to phrase that as if I lack the skills. This is not true.

Q. Okay. It also notes that, "Our female faculty have reported lack of respect towards them and lack of truthfulness when interacting with them in clinics and OR." And on the next page your note -- you write, "Lol," exclamation point, laugh out



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 88 of 348

loud ---

A.    Yeah.

Q.    --- so your lack of respect to female faculty was funny?

A.    No, his lying.  So I was like, what, I was already working with all of them, like Dr. Brewington, until the last day.  The problem was only with Dr. Zhang.

Q.    So even though, as we've discussed, we have emails from Dr. Zhang and Dr. Brewington regarding their interactions with you, you're saying ---

A.    Did they send it to me?

Q.    Please let me finish my question.

A.    Go ahead.

Q.    Even though we had emails, which we've discussed today ---

A.    What do you mean by emails?

Q.    Please let -- I don't know what else to do.

A.    You have to be -- you have to be more fair.  When you say emails you believe you -- you make it like they sent me these emails, which is not true.  These emails are just communication, documentation, between each other.  When you say an


Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 89 of 348

email, that means an email sent to me so I don't understand what you're trying to -- to show. Is it email sent to me? Is it email sent for evaluation? Or did they communicate with each other trying to put any whatever claims? We need some copy.

MR. MADISON: Dr. Rageh, let -- let him finish. Let him finish first and ---

BY THE WITNESS: (Resuming)

A. You can finish, but you need to be more clear what you means by emails. I did not receive these emails.

Q. Are you done?

A. Not yet. I did not receive these emails.

Q. You've reiterated that. Let's move on.

A. Yeah, go ahead.

Q. Please let me finish my question before talking.

A. Okay.

Q. In the emails that we've documented in the exhibits today ---

A. I don't agree.

MR. MADISON: Let him ask the question, Dr. Rageh.

BY MR. PADGET: (Resuming)

Q. --- between Dr. Zhang and Dr. Ulrich and



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Dr. Brewington ---

A.  Nice.

Q.  --- Dr. Ulrich, they mentioned, specifically documented these issues that they had with your interactions to them.  Do you remember those emails?

A.  I got these emails later on at the EEOC ---

Q.  Okay

A.  --- stage.

Q.  Okay.

A.  I mean, there is a lot of emails so some emails was brought to me the minute they wanted me to leave.  So which email exactly?  So good luck, find something.

Q.  It is noted in this email -- sorry, an email you mention -- it mentions here that they did decide to end your fellowship on June 30th, 2023.  Do you remember that?

A.  Yes.

Q.  Okay.  That was his offer to me, "Abdu, I mean, some of the faculty doesn't feel comfortable with you.  We have to terminate your fellowship.  But after Dr. Zhang decided not to work with me, we can let you continue with us."  With who?  All of



the three -- Brewington, Willett, and Zhang -- continue with -- sorry, with Ulrich.  So they wanted me to complete working with them, continue working with all three ---

Q.    Okay.

A.    --- except Zhang for the end of the year.  So by the end of the year they find another fellow to take my position and I declined it.  I declined the offer.  But I need to document here that despite all this, he wanted me to work with all three of them, except Zhang, doing the same duties, same patient's exams, same exact duties, except working with Zhang.  Have you seen that?  You don't have to answer the question.

Q.    So I'm gonna go back so -- and this is actually back to Exhibit 5, were you aware -- and I think we mentioned this earlier -- that on December 12th, and I'm looking at UNC2971, there were discussions both with Dr. Ulrich and also among HR to discontinue your fellowship on December 12th?  Were you aware of those conversations?

A.    What do you mean aware?  No, I was not aware of anything except what Dr. Ulrich told me in the very beginning, if one of the team is uncomfortable we have to terminate your fellowship.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

These communications, again, was between each of them.  They needed a reason to terminate the fellowship so they had to find a reason.

Q.   Okay.

A.   And they discussing between each other, how can we terminate his fellowship?  Should we let him work for a -- a full year and then have him agree to leave or should we just terminate immediately or what?  They don't know how to terminate my fellowship back then, they just trying to find a path to terminate the fellowship finding like whatever they felt.

Q.   You done?  Let's move on.

(DEFENDANT'S EXHIBIT NUMBER 7 WAS MARKED.)

Q.   I'm gonna show you Exhibit 7, which is your discovery responses to our interrogatories ---

A.   Okay.

Q.   --- marked as Exhibit 7.  I want you to look at page 12, which is you talk about retaliation.

A.   Yes.

Q.   Which is note -- we have the question and then I'm going back to page 11, sorry, is, "Describe in detail" -- and this was the interrogatory sent to you -- "each way you contend the university engaged



800.211.DEPO (3376)
EsquireSolutions.com

in retaliatory conduct, including the names of all individuals who you contend engaged in said conduct, specific dates of said conduct, a summary of each entity's or individual's alleged conduct, and the witness to the alleged conduct."  You note on here, the first page ---

A.    Page 12?

Q.    Yup.

A.    Okay.

Q.    "Retaliation immediately following complaint letter to Dr. Ulrich."

A.    Yes.

Q.    We're gonna talk about that letter in a minute.

A.    Right.

Q.    So you were saying that -- excuse me -- and I go down -- let's go down to conduct, on December 19th you hand-delivered a formal, written complaint to Dr. Ulrich, and we're gonna discuss that in a minute, detailing ongoing discrimination and mistreatment.  And that's when Dr. Ulrich, that same afternoon, sent an afternoon -- or, excuse me, sent an email saying that I have documented deficiencies and that my fellowship would not be renewed beyond June 30th.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

But that decision had already been made prior to the letter you sent on December 19th?

A.   It was made the first week of September.

Q.   So it was made well before?

A.   Correct.

Q.   Okay.

A.   And that's what Dr. Ulrich told me, "She doesn't feel comfortable with you.  We have to terminate the fellowship if one of the team is uncomfortable."  But he said, "Let's wait until mid December."  And two things happen in mid December.

Q.   Uh-huh (affirmative).

A.   As he said, he said that, Dr. Ulrich might be -- stressed might be anxious because of her interviews during the match season to meet with the residents and make a list.  So he said, "Let's wait until then, probably she's much relieved and she will accept you again."  That was the reason he said.  The reason I found out is, even before the emails on 12/12.  When I talk to him about the post he put on the SF match website ---

Q.   Uh-huh (affirmative).

A.   --- that was one day before all these emails on 12/12.

Q.   All those emails when they were collecting



800.211.DEPO (3376)
EsquireSolutions.com

various ---

A.   So I told ---

Q.   Please let me finish my question.

A.   No, I didn't finish my -- my -- my example yet.

Q.   Then go ahead.

A.   So I told him, Dr. Ulrich, "Why you are posting the position, my position, as vacant?"  He then took like 30 minutes or one hour and he came back and said, "Because we're probably gonna have a fellow every year instead of a fellow every other year."  I was like, "If this is true, why it says it's immediately vacant?"  He said he did not see it.  He did not even read it, and he will review it.  That was one or two days before of these 12/12 emails.  So then he called them, Dr. Brewington, can you write us something?  Dr. Ulrich, we're gonna need to -- Dr. Budenz, can we do something.  So they documented few emails only the following day when he found out that I knew about their plans early on.

Q.   Okay.

A.   Hopefully that makes your day.

Q.   Oh, it does 'cause that was all before December -- you said that was a couple days before the December 12th emails, so that's in early

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

December.

A. Yes.

Q. So it's well before the letter you sent on December 19th?

A. Yes.

Q. That decision had been made?

A. No, the decision been made very early on.

Q. Okay.

A. That's what he said. But in order to do the decision, you have to make a plan. So the documentation was like to collect some emails and then contact HR at some point, contact Dr. Budenz at some point.

Q. Okay.

A. I ---

Q. I don't have any other question ---

A. Actually this is interesting, yeah. So when I give him the letter on the 20th and the 19th you can -- you gonna find how many communication happen the same afternoon.

Q. That's fine, let's talk about that letter.

(DEFENDANT'S EXHIBIT NUMBER 8 WAS MARKED.)

Q. This is Exhibit 8, marked as UNC3275, a letter that you sent. I'm gonna hand it to you, you don't have it yet.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 97 of 348

A.     Oh, okay.

Q.     Exhibit 8, a letter you hand-delivered, I think, on December 19th, 2022.

A.     You can say December 19th in the morning or actually noontime because immediately after that, the same day, he sent a lot of emails, everyone, hey, he is worried about retaliation, discrimination, how can we cover up ourselves. Yeah, it's gonna be so funny later on.

Q.     Okay.  And this email was in response -- excuse me -- this letter was in response to the meeting you had on -- with him, or the call you had with him, on December 16th?

A.     Which email?  This letter?

Q.     Please get off your phone.

A.     No, I'm gonna show you something on the phone.

Q.     You're happy ---

A.     This is December 11 ---

          MR. MADISON:  Keep on reading ---

BY THE WITNESS:  (Resuming)

A.     --- when I sent him this message ---

BY MR. PADGET:

Q.     Have you provided this in discovery?

A.     Yes.  Yes.  But this is one day before all



Case 1:24-cv-00336-CCE-JEP     Document 68-3     Filed 03/13/26     Page 98 of 348

of the 12/12 emails.

Q.   Okay.

A.   And in this one he's lying again.  Yeah, you can go back to this letter.  This letter, after I found out they are working to bring a fellow, I was like, okay, so they are definitely terminating my fellowship.  So I give him this, hopefully he feels responsible and do his duties as the program director to make everyone sit together and set the rules.  Hopefully he being responsible for his duties as a program director.  Dr. Zhang being responsible at her duties as a residency director.  So that was the goal of this email, that letter that I handed him privately before I document and call HR or any other people.  "Dr. Ulrich, please look into my complain," and then this is friendly.  This is only through this thing.  I did not document it through email.

Q.   Okay.  I'm not gonna talk about all the various things you allege in here, how you mention "friendly and information way."  But you mentioned earlier the towel not being folded into a -- folded in half twice under the Microsoft controller.  Isn't that kinda one of those small things that are important in a surgery?  Aren't the little details


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

important when you're doing surgery?

A.   So every doctor, again, has their preference.   Does Dr. Ulrich do that?   No.   Does Dr. Willett does that?   No.   He even said, Dr. Ulrich, "Fuck the towel."

Q.   Uh-huh (affirmative).

A.   What I want to show up is she is trying to use any word I say, any joke I make, any -- I can't even say it's a mistake.   It's just the folding the towel and put it under her foot.

Q.   Uh-huh (affirmative).

A.   And she claimed I did it wrong.

Q.   Did you?

A.   Okay, I'm sorry.

Q.   Okay.   So you did do it wrong, you just don't think it matters?

A.   Yeah, I did according to what he said, what she said, I did fold the towel wrong.

Q.   Okay.

A.   Hopefully, that really...

Q.   Are there any other small things you did incorrectly?

A.   Yeah, she said a lot of small things.

Q.   Okay.   All the things you did incorrectly -- okay, that's fine.   I want to go down to the



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

bottom of this page ---

A. You need to try harder.

Q. Okay, thanks. You mentioned at the bottom here, I'm looking at the last four kinda sentence there, bullets here on the first page, you note that on -- "At the clinic on another occasion you mentioned to me," and this is Dr. Ulrich, "she's a little aggressive, oversensitive." My question really is, for any of these in the notes about how Dr. Zhang said that the residents are baby, then again that she said that the fellowship is not accredited, there's no regulations. Another time Dr. Zhang walked in, and let's see, she texted me on EPIC that -- or, no, sorry -- just go to -- for the first -- do you have any documents showing any of these allegations?

A. Which one?

Q. The time that Dr. Ulrich is a little -- said to you that Dr. Zhang's a little aggressive and oversensitive?

A. That was -- her definitely was not gonna say that so anybody hears it.

Q. Is that a no?

A. What do you mean by evidence?

Q. Do you have any documents of that


ESQUIRE
DEPOSITION SOLUTIONS

conversation?

A.    Nothing in writing.

Q.    Okay.  What about the time that she said that the residents are her baby, her children?

A.    I think this one I might have evidence.

Q.    Okay.

A.    Yeah, she -- that was actually very interesting and I have to tell the story over here.

Q.    Nope.

A.    No.  No.  No, because you ---

Q.    I'm not ---

A.    --- you are claiming that I am lying about she said.  I need to tell the story so you understand the circumstances about that event.

Q.    I'm gonna ask you to answer my question.

            MR. MADISON:  It's his deposition. He gets to ask the questions.

            THE WITNESS:  Okay.

BY MR. PADGET:  (Resuming)

Q.    I'm curious about this one, this popped up a lot, you -- Dr. Zhang, you allege, one time told you in the OR that you have thick skin?

A.    Yes.

Q.    Thick skin normally means that you're able to, you know, move past things or take things well.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 102 of 348

Why -- yet you seem to take this as a pejorative, and I'm just curious why?

A.    I mean, what do you mean why?

Q.    Well, when someone tells you you're thick-skinned it means you're able to take, you know, hard times or hardships well and keep going forward.  So I -- it's a compliment normally.

A.    Okay.

Q.    So I'm curious why you took it as not?

A.    No, it's -- it was not a compliment.

Q.    Okay.

A.    It was like it's gonna be very difficult to -- that's my perception.  It's gonna be like we humiliated you.  We made fun of you.  We discriminated against you and you're still here, you have tough skin.

Q.    Okay.  So your testimony is that Dr. Zhang said we discriminated against you and you made it here 'cause you have ---

A.    (Laughs.)

Q.    --- thick skin?  Is that what you just testified to?

A.    You're asking me if Dr. Zhang said we discriminate against you?

Q.    I'm asking you what ---



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 103 of 348

A.    I'm saying what is my ---

Q.    --- you just said.

A.    --- perception, what is my understanding.

Q.    Okay.

A.    My understanding is you accept -- you thought that tough skin or thick skin is a compliment.

Q.    Uh-huh (affirmative).

A.    I said my interpretation of tough skin. Tough skin means despite everything she tried or she did, I'm still able to function.  I'm still able to work.  So that's how I have tough skin.

Q.    Okay.

A.    Or a thick skin.

Q.    I'm gonna -- the next one on here is one that I -- I know I had an email about somewhere that I might have missed, but we'll just talk about it here.  You state that you were shocked when Dr. Zhang reported an incident in the OR, which I assume is operating room, to risk management ---

A.    Yes.

Q.    --- when I caused a, quote, "small skin cut while prepping the patient for surgery without notifying me about it or advising me how to avoid that."  I think she ---



A. Yes.

Q. --- was hurt. So you, I believe in that case the small cut was to somebody's eyelid?

A. Yes.

Q. And you didn't seem to think that was a big deal or you were shocked that she reported it? Why was that?

A. Well, yes, it was not a big deal. Second, she said that herself to the investigator on the investigation with Dr. Zhang. The investigator asked how is the only SAFE report incident going and she said it was nothing. The patient is good. That's her own word to the investigators. I have documentation. So the same incident she claimed it's a serious one, she reported to the investigator that it was nothing. The patient came back second day, no pain, no complaints, none, none, none, none. Who did say that? Dr. Zhang.

Q. Still ---

A. But -- go ahead.

Q. Still it'd be an issue that you probably wouldn't want to replicate, cutting somebody's eye ---

A. Of course, I don't want to do anything -- like I want to do things perfectly.



800.211.DEPO (3376)
EsquireSolutions.com

Q.    Uh-huh (affirmative).

A.    But it's not about that.  It's about how you interpret, how you escalate minor things when you know these things happen.

Q.    Okay.

A.    And when you take advantage of your power as a program director or as an attending to document that as a serious harm.

Q.    Uh-huh (affirmative).

A.    When, again, the following -- during the investigation, I hope we can come to that email later on, she said, forget about it, kinda like forget about it, it was nothing.  There was no patient harm.  Everything was good.  But they reported that incidence to medical boards.  National like medical board of any state I apply for a license they reported that as a serious harm.

Q.    And you don't think cutting somebody's eyelids is a serious harm?

A.    What do you mean by cutting someone's eyelids?  Of course I don't mean to cut anybody's eyelid.

Q.    Okay.

A.    But if you have a stitch -- or not a stitch -- if you have like a -- something very



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 106 of 348

sticky on your skin and you pull it, it might cause some scratch, the skin of the eyelid for that patient, where he was old so it was a lot loose. Again, maybe it's better to be a little bit careful and push and remove it slowly. That's completely understandable. And I'm not denying it, I'm just explaining how that used as a reason for termination.

Q. Okay.

A. When she said the following day with the investigators that was nothing. Hopefully you can find these emails. Actually I have it.

Q. So that's December 19th, and then I think the plan was, at that point, was to try to let you just have a shortened fellowship. But then it seems that there was a number of additional issues, performance issues, that arose over the next few days, so let's talk about 'em.

(DEFENDANT'S EXHIBIT NUMBER 9 WAS MARKED.)

Q. I'm gonna show you Exhibit 9.

A. Yes.

Q. Our first page is UNC3217. The first email is an email from Dr. Willett again on December 22nd, talking about an OP. What does OP stand for? I don't know.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 107 of 348

A.    Operative room.

Q.    Note, "Needs more attention to detail."

A.    Yup.

Q.    This is an email to you?

A.    Yes.

Q.    In which he says, "Thank you for your help with this O-P note," or OP note, "but there was many details that were incorrect so I'm sending this feedback.  Attention to detail is very important."  Did I read that right?

A.    Yes.

Q.    Skip to the bottom, it says, "Future opportunities in the OR depend on your demonstration of learning and attention to detail and this was a very poor quality note."  Do you remember seeing this email?

A.    Yes.  Do you have my response to this email?

Q.    I don't.

A.    You should find it.

Q.    Okay, well, tell me about it.

A.    Okay.  So first I apologized.  Second, I said right now, this is December 2022, I know I only have a few days here.  I was under too much stress.  I apologized and I promised to do a little better



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

working on the notes, sitting and writing notes. English is not my first language.  I do my best using simple English.

But, again, this was as, you know, you can't write a note.  I mean, it's -- it's not exactly that way, it just -- I maybe use very, very simple -- I might forget some steps that happens but, again, it is nothing related to patient harm, patient safety.  And, again, I don't see that you have my response to this email.  I wish we can find it.

Q.   So I'm just curious about that.  So you're -- at this point, 2022, you'd be in the U.S. for seven years.  You told about the variety of jobs you'd had.  And yet you just said that at this point you had issues with writing your notes and that you even know that you would sometimes forget steps ---

A.   Yes.

Q.   --- from the surgery when writing ---

A.   Yes.

Q.   --- your notes?

A.   Yes.

Q.   Isn't that fairly important, for these notes to be accurate?

A.   There is always a learning curve how to



800.211.DEPO (3376)
EsquireSolutions.com

write notes.

Q. And this -- you'd been there four months at this time?

A. Four months at this time not writing a note every time. As I said, Dr. Ulrich and Dr. Willett, they write their own notes.

Q. Had you never had to write notes in any of your previous jobs?

A. It was not surgical retina.

Q. Had you not had to write notes in any your previous jobs?

A. Of course, Duke. I spent a year doing surgeries twice a week doing everything in the OR, writing all the notes.

Q. Uh-huh (affirmative).

A. So, yes, ocular oncology is cancers of the eye.

Q. Uh-huh (affirmative).

A. It's surgeries.

Q. And ---

A. Right.

Q. --- despite all that, you were still struggling to write accurate notes?

A. Because everyone has their own preference.

Q. Okay.



A.   I may put like a very simple note.  I might forget steps.  And, again, that was after everything escalated and I knew I only had a few days.

Q.   Okay.  So I want to just briefly touch on a couple emails from Dr. Ulrich.

A.   I'm here.

Q.   And it's the next page, it's 34, UNC3416.

A.   Oh, 3416, yes, I have it.

Q.   Emails from Dr. Ulrich to Dr. Zhang talking about an issue that arose in the operating room with you ---

A.   Yes.

Q.   --- on Monday, December 19th.

A.   That's so funny.

Q.   Well, I don't find patient harm funny, but perhaps you do.

MR. MADISON:  Objection, argumentative.

MR. PADGET:  Fair.  I'll withdraw.

BY MR. PADGET:  (Resuming)

Q.   This is regarding a patient that Dr. Brewington examined and she had found a tear and some subretinal fluid.  Skipping down, you brought back -- you brought back the patient the next day in

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

my clinic, there was, in fact, no tear but he had not even seen the area of concern outlined by Dr. Brewington the day before -- prior, excuse me. "We had a discussion that he absolutely needs to discuss this with a retina attending before sending the patient out." Do you remember this -- this incident?

A. I love it. Can I talk about it?

Q. Sure.

A. So Dr. Brewington misdiagnosed the patient.

Q. Okay.

A. She was an attending. She misdiagnosed a patient. She put a patient under too much risk asking me to laser it. I looked at the patient. I did a best exam, again, that was like 6:00 p.m. or 7:00 p.m. or something.

Q. Uh-huh (affirmative).

A. There was no tear. There was no need for laser.

Q. Did you discuss that with the retina attending?

A. The following day.

Q. But not the day of.

A. Not same -- no, not the date of. Because



there was nothing risky.  And it's like, okay, Dr. Brewington, you misdiagnosed the patient, can you come see your patient.  Should I do that?  Should I say, "Dr. Brewington, you misdiagnosed the patient," the same night?  Or I did my best exam, I flow -- I brought the patient 7:00 a.m. the following day.  It was the best -- the first patient Dr. Ulrich saw.

Q.    Well, I think he also notes that he had discussed -- and I'm reading here -- "I reiterated that we had discussed very similar issues several times before," so it seems like you had been told ---

A.    It seems like what?

Q.    --- multiple times to talk to the attending and you had refused to do it?

A.    I always talk to the attendings.

Q.    Well, not this time.

A.    Not this time, okay, not this time.

Q.    Okay.

A.    But it's not always.

Q.    Okay.

A.    Because I have documentation of a lot of patients communication between all the doctors. And, again, most of the communication, if it's not on the text message, it's electronically.  I don't


ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

have to call them.  I send the notes, they review it, they sign it.

Q.  Okay.  We're gonna skip to a couple pages down, it's UNC3123, email from Dr. Ulrich again.  This is from ---

A.  I'm sorry 31?

Q.  23.  It's the last page of this document.

A.  Okay.

Q.  From January 2nd, recapping issue that ---

A.  It's the same kinda email about Brewington.

Q.  Oh, I apologize, it is the same as December 21$^{st}$.  We can disregard that.

A.  Your apology's accepted.

Q.  But actually, I'm sorry, no, the first one -- strike that -- was about an issue you had on Monday, December 19th, and this was about another issue you had on December 21st.

A.  I mean, again, it's on the last page ---

Q.  Yup.

A.  --- 3123?

Q.  Yup.

A.  Okay.

Q.  And this was, again, appears that you had re -- are unwilling to contact the person on call --



800.211.DEPO (3376)
EsquireSolutions.com

-

A.   No, it's the same incident.

Q.   I'm not done.

A.   It's the same thing we discussed a minute ago.

MR. MADISON:   Let him -- let him ask -- ask the question.

BY THE WITNESS:   (Resuming)

A.   Please prepare.

Q.   Well, this seems to indicate that this happened on December 21st and also on December 19th, but it's your contention that these are the same incident ---

A.   I mean, we're talking about this email on the last page?

Q.   Yes, I am.

A.   3123.

Q.   Yup.

A.   Okay.  Where exactly you're referring to?

Q.   The first sentence ---

A.   Okay.

Q.   --- says, "Alice, this is to recap an issue with Dr. Rageh that happened on December 21st."

A.   Okay.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q. And it goes down, at the bottom it says, "We had a long discussion that when he was asked by a faculty member to treat a retinal break and he is unable to locate it, he absolutely needs to call the retina attending on call and ask for help and advise. He stated it was" -- he being you -- "it was after hours," and there's a -- it said DOB, I believe did -- "did not want to call the person on call and admit he was unable to find the break."

A. Okay, keep going.

Q. That's it.

A. Did he -- did he find the break? Did Dr. Ulrich, the program director, found the break?

Q. Well, I think the issue is more that you were unwilling to call the attending to ask.

A. It's not about that, again.

Q. Okay.

A. When you have -- so did Dr. Ulrich himself found the break?

Q. (No response.)

A. The answer is, no. And he wrote this to show up as if I can't do an exam.

Q. Okay.

A. When the attending, Dr. Brewington misdiagnosed the patient, so. And, again, he was



800.211.DEPO (3376)
EsquireSolutions.com

happy and he accepted that I brought the patient the very morning of the following day.  He did the thorough exam, he agreed with me there is no break.  So we have two things here.  Is it my mistake or is it Dr. Brewington mistake?

Q.   Okay.  You met with Dr. Brewington -- or, excuse me, strike that.  You met with Dr. Ulrich and Dr. Willett on January 4th, I believe?

A.   Yes.

Q.   Or January 3rd.  January 3rd.

A.   Yes, some there.

Q.   You -- you recorded that conversation?

A.   Correct.

Q.   You did not let them know you were recording that conversation?

A.   Correct.

Q.   Other than that conversation, did you record any other conversations with your ---

A.   That will show up later on.

Q.   Let me finish my question.

A.   Okay.

Q.   Other than that conversation, and I believe you also provided us with conversation or an email or a phone call from Nicole Davis from this office and I believe also the Kentucky board --



Case 1:24-cv-00336-CCE-JEP   Document 68-3   Filed 03/13/26   Page 117 of 348

medical board. Were there other recordings that you made of other doctors or ---

A. Do I have to answer that?

Q. Please let me finish my question.

A. Okay.

Q. Did you make any other recordings of other doctors while at UNC?

A. Did you finish?

Q. Yes.

THE WITNESS: Should I have -- answer this question?

MR. MADISON: You can answer.

BY MR. PADGET: (Resuming)

Q. Yes.

MR. MADISON: Yes.

BY THE WITNESS: (Resuming)

A. No.

Q. You are under oath.

A. I know.

Q. Okay. You did not record any other conversations or meetings or any other discussions with any other doctor or employee of UNC during your time here, yes or no?

A. No.

Q. Okay.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

(DEFENDANT'S EXHIBIT NUMBER 10 WAS MARKED.)

Q.   I'm gonna show you Exhibit 10.  I'm not sure what this is.  I know what it purports to be.  But let's talk about it.  I believe it purports to be -- and, again, this is Exhibit 10 -- it is from your discovery.  It's Rageh -- first page is Rageh415.  Oh, I'm gonna give you the wrong copy.  There ---

MR. MADISON:  Can you pronounce your last name for him.

BY THE WITNESS:  (Resuming)

A.   My last name Rageh.

Q.   Rageh?

A.   Yeah.

Q.   Okay.

A.   I prefer it Arabic, but I don't think you can pronounce it in Arabic like Rageh.

Q.   Okay.

A.   I'm not gonna make fun of it, as Dr. Zhang did.

Q.   Okay.

A.   I'm not gonna make fun of it, as Dr. Ulrich said.

Q.   Would you prefer Dr. Rageh?

A.   I prefer Abdul, my first name.



800.211.DEPO (3376)
EsquireSolutions.com

Q.   Abdul's fine.

A.   Yeah.

Q.   If that's your preference ---

A.   Yeah.

Q.   --- I'm happy to call you Abdul.

A.   I appreciate you.

Q.   Okay, Abdul.  What is Exhibit 10?  Are you familiar with this document?

A.   This is the transaction -- the transcription of the meeting we had with Ulrich and Willett.

Q.   Who made this -- did you or you -- SDC Transcript Services, does that appear -- did they have -- make the actual transcript?

A.   What -- what -- I mean, I used some services online or -- yeah, that was through Fiverr.

Q.   Okay.  I'm gonna have some questions about this later, but for now I just -- I was curious about something.  Just starting with -- just go to page 5.

A.   Page 5, here we go.

Q.   And on the fourth block it's, "Abdu" -- Abdul 13:17, and it says, the transcript is: "It is," and then in parenthesis and in bold it says, "The area of supposed tear as Brewington



Case 1:24-cv-00336-CCE-JEP   Document 68-3   Filed 03/13/26   Page 120 of 348

misdiagnosed." Now is that the transcript or is that your notes?

A. Within the brackets it's likely my notes when I put it in -- in the brackets.

Q. Okay. So this is a doctored transcript of your call?

A. It's not -- this is -- what do you mean doctored transcript?

Q. You made additional note -- this is not the actual transcript. This is a transcript with your notes ---

A. Yeah, I mean ---

Q. --- or comments in it?

A. --- maybe I edited some stuff as my language, my interpretation, to make it easier for people to understand what we were talking about.

Q. So you edited -- not only did you edit additional things and not only the things in bold or in brackets, but were there other things you edited?

A. Let's go step -- let's go line by line and see who did that and if it me or it's not, so.

Q. I'm ask ---

A. I have the recording here on my phone and I have this here, we can go through it.

Q. Well, I'm just asking you what you did



800.211.DEPO (3376)
EsquireSolutions.com

when you took this transcript and if you added additional things to it.

A.    Exactly.  So this -- this comments, some stuff I have my own comments on it.

Q.    Okay.

A.    And we have the source.

Q.    So this is not a true and accurate transcript of your actual conversation?

A.    It is true.  It is accurate.

Q.    With your additional edits?

A.    With my edits, yes.

Q.    Okay.  All right.  We're gonna talk about that a little bit more later but for now I think we're good.

A.    And, come on, we have the only -- the resource.  We have the -- the recording already.

Q.    Okay.  And, again, that's the only record -- are there recordings you sent us ---

A.    I already answer that question.

Q.    Not just this but ---

MR. MADISON:  Let him ask the question before you answer.

BY MR. PADGET:  (Resuming)

Q.    Do you have any -- other than the recordings you sent to us in discovery, which I



800.211.DEPO (3376)
EsquireSolutions.com

believe are the Kentucky medical board, and there are some others, do you have any others relative to this case?

A. I said, no.

Q. Okay.

THE WITNESS: I'm gonna get rid of this ---

MR. MADISON: Okay. Okay. Okay.

MR. PADGET: Yeah, you can just leave it on ---

BY THE WITNESS: (Resuming)

A. So when I go ---

MR. PADGET: You can leave it on the table. It's fine.

BY THE WITNESS: (Resuming)

A. When I go to board meetings for licensure, there is some ---

Q. I haven't asked you ---

A. --- recordings.

Q. Okay.

A. I don't know do you consider this recordings.

Q. Do you have access to them?

A. It's online.

Q. Okay.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 123 of 348

A.   Everyone has access.

Q.   All right.  The next document I'm gonna mark is Exhibit 11.

(DEFENDANT'S EXHIBIT NUMBER 11 WAS MARKED.)

A.   So this is the only thing you want to discuss about this ---

Q.   For now.

A.   --- transcription?

Q.   We're gonna come back to it.

A.   Yes.

Q.   But this document, this first page, it starts with UNC631 and 632.

MR. MADISON:   Thank you.

BY MR. PADGET:   (Resuming)

Q.   And we're gonna start at the end and work our way back.  The first document or first email appears to be -- correct me if I'm wrong -- but an email from Dr. Ulrich on January 8th recapping or some confirming what you had discussed during your call and noting that you were relieved from performing any clinical duties during retina or trauma call.  Do you remember that?

A.   I remember the email.  Again, that conversation we had never discussed this.  And the recording is here.  If -- that's why every time he



800.211.DEPO (3376)
EsquireSolutions.com

have a conversation with me, the following day he claims things that never happened and sent me email and says stupid stuff like -- like a documentation of what we discussed when we never discussed it.

Q. Well, you had been relieved from performing clinical duties during retina and trauma calls, correct?

A. That was not on the conversation. He claims that that was a topic we discussed. That was not a topic that we ever touched on the conversation we had.

Q. What do you remember talking about?

A. I mean, in -- in that conver -- yeah, I have the script here.

Q. No, no, I'm just asking you.

A. We have the script.

Q. I'm asking you.

A. Yeah, he wanted me to leave. He wanted me to find another job. And was uncomfortable working with me after I raised concerns of discrimination officially to the EEOC and the HR.

Q. Well, as we've talked about earlier, the decision to end your -- or shorten your fellowship had happened well before that.

A. Yeah, first week or first month when he



800.211.DEPO (3376)
EsquireSolutions.com

said we're -- we are one team, if one of the team is uncomfortable we have to terminate your fellowship. But this is the first time he said something about serious patient concerns. And when I asked him when that happened, he said we discussed it. No, he -- we didn't discuss that.

Q. So your conversations, your meeting in November, your meeting in December, your call in January, your position is you never discussed patient care or danger to patients?

A. So there is a difference between dangerous or serious harm and discussing clinic issues.

Q. Okay.

A. We discuss every day ---

Q. Uh-huh (affirmative).

A. --- things about patient exams, things about planned, everything.

Q. Okay.

A. But the only time probably I know about this term "patient safety concerns" was in mid to late December. That's the only time I knew about what is patient safety concerns, what is that.

Q. Well, he actually didn't say patient safety concerns here, he just said that you're relieved from performing clinical duties.



A.   No, look at the first text, "Serious patient safety concerns."

Q.   That's right, we haven't gotten there yet, but ---

A.   I think that's down page ---

Q.   That's fine.

A.   That's -- that's the second day about the conversation we had.  So after the conversation, again, I have to do that.

Q.   You don't ---

A.   After the conversation -- no, you're asking me about an incident.

Q.   I haven't asked you a question yet.

A.   Okay, go ahead.

Q.   Okay.  You respond to this email saying that, "I did not expect your disapproval of my right to complain about what I believe I'm exposed to.  I expect to continue all my duties and training, including clinical, surgical, and on-call responsibilities."  I'm confused by this email because, as we've talked about and as been documented, this decision had been made well before this so it was, seemingly, unrelated to your right to complain?

A.   What is the question?



800.211.DEPO (3376)
EsquireSolutions.com

Q.    Okay.  That's my question, I guess.

A.    Can you rephrase it, please.  Can you say it again.  What's the question?

Q.    Actually I'm gonna move on.

A.    (Laughs.)

Q.    Well, you've already answered it so ---

A.    I'm sorry.

Q.    That's fine.  I'm happy you're having a good time.

A.    I actually can't wait because I am coming to un-end to all this story.

Q.    Uh-huh (affirmative).

A.    It's been three years and it's not only like someone had a mistake, like Dr. Zhang, or someone was discriminative, like Dr. Zhang, no. It's the full team, they try to covering her up. Not only the doctors, the HR.  The investigators, everyone were trying to cover up things in the university, which is a shame.

Q.    I haven't asked you a question.

A.    That's the big question.  That's the big shame.  When people try to cover up when it's so obvious.

Q.    Please answer the questions I've asked you.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.    That's why I'm saying I'm happy.

Q.    Well, no, it's -- I guess, we're going back there and you saying that there's no mention of patient's safety during your call.  And yet I'm looking at page 4, it says -- the bottom of page 4, sorry, of Exhibit 10, "Dr. Ulrich" -- of your doctored transcript, but let's just assume for the sake of argument some of it's correct.  He notes on this call, first on page 3, "So at this point we have probably a dozen potentially serious patient safety concerns documented.  Over the months we've discussed every one of them with you.  From day one we put these things down."  And yet you ask here, and state a moment ago, you testified under oath that there was no discussion of patient safety concerns on your call?

A.    I need every document of communicate -- I need any documentation of patient harm.

Q.    But that's not what you said.  You said there was no -- and I -- we can go back -- but you said there was no discussion on January 3rd of patient safety, and yet I'm just reading about exactly patient safety.

A.    You're done with your question?

Q.    Yes.



800.211.DEPO (3376)
EsquireSolutions.com

A.    I said we discuss every day some kind of per -- not performance -- like some clinical stuff, things to do things better.

Q.    Uh-huh (affirmative).

A.    If I didn't respond to a page, okay, I should do best in kind and make sure I have a -- a full battery in my page.  This is not a patient safety concern issues.  This is routine, everyday kind of learning, training.

Q.    Okay.

A.    Did they make it clear the difference between serious patient safety concerns and the routine work in a clinical training position?

Q.    So what you're saying is you didn't consider the litany of issues we discussed to be serious patient concerns?

A.    I need the -- I need the documentation of any serious patient harm happened.  Show me any concern that patient harm happened.  It's not -- definitely it's not serious, definitely it's not harm, but there is always a way of doing things better.  There was no single report of a patient harm.  If you can show me a single report of a patient harm I was completely responsible for, I will dismiss the case.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 130 of 348

Q.   Well, you cut a person's eye.

A.   (Laughter.)  A person's eye?  You call an eyelid a person's eye?

Q.   Well, that would be patient harm.

A.   I -- look at Dr. Zhang's statement about it.

Q.   Okay.  Well ---

A.   Look at Dr. Zhang's statement about, that shows the bias.  This is just an evidence of your bias.  You're trying to cover up for her, when she herself said nothing wrong with the patient.

Q.   Okay.

A.   Look at the biased you are.  I cut the patient eye.  Yeah, I do that every day, I do surgeries so I need to cut patient's eyes and lids and stuff, that's my -- part of my job and I do that for good purpose all the time.

Q.   That one wasn't for good purpose, though, that was on accident, correct?

A.   That was not intentional and that was nothing.

          MR. PADGET:  Let's go off the record for a second.

          THE COURT REPORTER:  Off record, 12:12.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

(Whereupon, a recess ensued from 12:12 p.m. to 12:53 p.m.)

THE COURT REPORTER: On record, 12:53.

BY MR. PADGET: (Resuming)

Q. All right, back on here. When we left we were talking about some back and forth with Dr. Ulrich and you in January of 2023, and I want to -- I'm gonna show you what I'm gonna mark as Exhibit 12, which at the very back is an email from Dr. Ulrich to you on February 20th, and then the rest of it is your response.

(DEFENDANT'S EXHIBIT NUMBER 12 WAS MARKED.)

Q. The first page is UNC3389, and it's Exhibit 12. So I'm gonna start at the back and just see what you remember from this email. The back I'm looking at the last -- second to last page, it's 3397. And, again, it's an email from Dr. Ulrich to you. I think at this point you've been away from -- or you had not been back to the office since early January. Is that right?

A. I think ---

Q. Or back to the hospital since early January?

A. Yeah, like maybe 8 or 11, something.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.   Okay.  And this is February 20th.  And I'm just gonna read a little bit from you and just I want to get -- get your explanation or get you to explain exactly what was going on.  Dr. Ulrich was reaching out about work status.  He notes, I'm looking at the third paragraph, "You have not yet submitted paperwork to begin the leave request process.  You also have not returned to work.  Past efforts to facilitate your return to duties that will allow you to participate in various and expected educational activities have been unsuccessful."  And on February 9th you stated you were declining to return to work and that you were waiting for the discrimination investigation to let me know what to do.

Let's start with the last part.  I've seen the email, I don't have it here, do you remember the email from February 9th in which he had asked you to return to work and you said that you were not comfortable doing it until the discrimination and you were gonna let the investigators let me know what to do?

A.   I remember -- I'm not sure about the date but ---

Q.   Uh-huh (affirmative).



A.    --- at one time he said per HR, you're okay to come back to work.

Q.    Okay.

A.    With -- with -- you're -- you're allowed only to observe.

Q.    Okay.

A.    That's per HR.

Q.    Was that something you were interested in doing?

A.    Observe?

Q.    No.  Yes.  Sorry.

A.    Observe?

Q.    Yes.

A.    And per HR?

Q.    Yes.

A.    The HR has -- so the answer is, no, because I did not trust the work environment anymore.  They are lying.  They claim things that was not accurate.  And even when he said I can come back to work, it was just a trap.  I did not believe -- because in other emails he said we hope he doesn't come back.

Q.    Okay.

A.    So I was right that that was a trap or at least he wanted to show up that his -- I don't know


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

how you call it -- like he's doing the right thing. Again, in other emails we wish he doesn't come back.

Q. But he did ask you to return and you refused. Is that right?

A. He said per HR. Per HR you are -- you're -- you can come back, observe, and, yeah, per HR you're allowed to come back and observe in the clinic and the OR.

Q. Okay.

A. I was like, no, because I need first to find out about the legitimacy of their false patient harm ---

Q. Uh-huh (affirmative).

A. --- claims. And also I have a lot of evidences of his lies, like the recording, like other stuff that he told me and then declined it. So there is no way I can trust him after all that.

Q. You had also on this date, February 20th, you had not submitted any paperwork to start the leave request process. Is that right?

A. I submitted something like ADA.

Q. Looking at that, I think you had -- okay. I think that is in your response and we talked about it a little bit. But I'm curious about this, and just I'm reading the recipients of Dr. Ulrich's



800.211.DEPO (3376)
EsquireSolutions.com

email.  He sent to you.  He also sent it to Bonnie Leonard, Patricia White, Gina Austen.  And then if you go back to the first page, this is your response.  And that's, again, UNC3389 email.  You responded on the same day, February 20th, in which you added a litany of other people.

A.    Sorry?

Q.    You added many other people.

A.    Oh, on that email chain, yes.

Q.    Yes.  First, why did you add all of these people?

A.    Well, those are HR people.  Those are like EOC.  Those are doctors I work with.

Q.    There are others.

A.    Like who?

Q.    You included, just looking through it, complaints@ACGME ---

A.    Yes.

Q.    --- ethics@AAO, ethics, somebody named Jill@ASRS.

A.    Correct.

Q.    Another person at AAO and various other people.  So, again, people at the EOC.

A.    Yes.

Q.    So he had sent an email pretty much just



800.211.DEPO (3376)
EsquireSolutions.com

to you and a couple people asking about work status, and you respond to this huge group of people ---

A.   Yes.

Q.   --- why?

A.   I wanted to get as much people involved as possible.  I wanted to get some advice and maybe someone reasonable would reach out to UNC people ---

Q.   Uh-huh (affirmative).

A.   --- and ask them to stop the retaliation. So I want -- because also like the ACGME, like the Medical Academy of Ophthalmology.

Q.   Uh-huh (affirmative).

A.   Like the ASRS, the American Society of Retina Specialists.  They advised me to either contact the AUPO.  They advised me to also contact the ACGME.  And everyone is sending me over to the other person.

Q.   Uh-huh (affirmative).

A.   But from all the communication with everyone, they told me the only organization or the only two institutions who should solve this problems are ---

Q.   Uh-huh (affirmative).

A.   --- UNC and the AUPO.  The AUPO stands for the American University Professors of Ophthalmology,


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

which put the regulations for all the fellowships in the U.S. on the residency program in the U.S.

Q.   Uh-huh (affirmative).

A.   And I contacted the AUPO, as I was advised.  And the AUPO only had replied once when I sent them that I need some help, they ask me about which program is it.  I told them about it and they never responded.

Q.   Okay.

A.   I found out later on that the president of the AUPO was Dr. Budenz.

Q.   Had this happened ---

A.   And as ---

Q.   --- prior to ---

A.   --- the president of UNC Ophthalmology. So let me finish and then you can ask.

Q.   But this wasn't before February 20th, 2023.  That's all I'm asking about, is on this date. All of ---

A.   No.

Q.   --- that happens ---

A.   No.

Q.   --- after this.

A.   No, that was December when I communicated with the American Academy, when I communicated with



Case 1:24-cv-00336-CCE-JEP   Document 68-3   Filed 03/13/26   Page 138 of 348

the AUPO, when I communicated with EOC, when I communicated with the HR.  When I communicate with everyone that was late December.

Q.   I'm gonna give you a little more time then I need you to wrap up because I haven't asked -- you've answered my question and now you're going so far beyond ---

A.   I think just you don't like my comment -- answer.  Go ahead.

Q.   Okay, awesome.  This email, you note that you have attached the ADA request, so that was good you had finally done that.  And I believe that was eventually granted.  We've talked about -- and then even though he had sent you a rather short email, you then responded with -- let's see -- almost nine pages of an email which you go through a whole litany of things, which I don't want to go back through 'cause we've discussed many of them already. I want to touch on a few things.  You were writing this not only appears -- and I'm looking on 3390 -- UNC3390, at the bottom.

A.   Which page?

Q.   3390.  The second page.

A.   Okay.

Q.   You were sending this to not only Dr.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 139 of 348

Ulrich -- who was the one that responded to you -- but you were also sending it HR and investigators, the ASRS, the AAO, and the AUPO and the EEOC.  And, again, you've mentioned you just were trying to make sure they're all aware of these situations?

A.   No.  I wanted to get advice.  I'm here by myself.  I don't have anybody to back up me.

Q.   Okay.

A.   So I wanted to included everyone included in ophthalmology training and just seeking advice.  I got responses from people at Harvard.

Q.   Uh-huh (affirmative).

A.   I got responses from the ASRS.  And everyone has kinda directed me the best way to deal with it.  So that was my goal, to seek advice and also make sure that UNC, whatever actions would make, will be exposed.

Q.   Okay.  At the bottom of that page, and this is in the category -- you sent this to Dr. Ulrich, hashtag regarding clinical and surgical training.  I'm reading the last part, it says, "You mentioned that my clinical and surgical skills initially were far behind my peers and I'm not gonna argue that."  So you agree that you were significantly behind your peers when you started?



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 140 of 348

A.    I do not agree.  I just don't want to argue that.  There is a difference between I agree and don't agree and argue.  Do you understand?  It's -- it's -- it's easy to understand.  When I won't argue it doesn't mean you're right.

Q.    Okay.  But this is your email and you chose to include that in your email saying that ---

A.    Because it's a waste of time.

Q.    Okay.

A.    It's a waste time arguing what?  You -- you can say something, I can say something, I don't want to argue it.  At the same time, look here at the recording call we had in December, he said this has nothing to do with your surgical or clinical skills.  He said that and it is recorded.

Q.    I believe you said surgical skills 'cause you had never shown the ---

A.    Okay.

Q.    --- ability to do surgery.

A.    Okay, I ---

Q.    But let's -- I'm talking about this document ---

A.    No, I'm not gonna -- I'm gonna stop here for a minute, please.

Q.    We're gonna -- no ---



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 141 of 348

A.   Because I wanted to show ---

Q.   I'm not asking that question.

          MR. MADISON:  Dr. Rageh, let him ---

BY THE WITNESS:  (Resuming)

A.   There is no question.

Q.   I know, I haven't asked you a question.

A.   I have to say that in his recording he said this has nothing to do with your clinical or surgical skills on the recording meeting.

Q.   That's -- you're pointing to your doctored transcript?

A.   Yes.

Q.   Okay.

A.   Do we have it here?  I think we have it.

Q.   I'm not -- I'm asking you a question and ---

A.   Good.

Q.   --- I need you to answer my question.

A.   Good luck, yup.

Q.   Thank you.  You then note on the next page, this is now what I think you're talking about Dr. Zhang.  And I'm highlighting this is the, I guess, second full bullet, the middle.  It says, "She put me under so much anxiety and stress that affect my performance in the clinic and the OR."



A.    Which page?  I'm sorry.

Q.    It's 3391.

A.    Okay.

Q.    Yeah, I'm just asking about your comment there.  So despite what you talked about to us in your years of experience ---

A.    Right.

Q.    --- as a doctor, you were under so much pressure during these performances you were unable to perform, so you're admitting that you were failing to perform as you would were expected to?

A.    When I misrepresent the patient age, do you think this is a missed -- miss -- like under performance?  These are the things I'm talking about.  When I -- every day I see like forty patients and everything is good and she use one example or one incident that instead of saying the patient is 85, 58, sorry, I said 35 in a clinic outpatient, this is the stress I'm talking about.

This is how sometimes, I don't know, a mental block, but this is the result of a toxic environment.  Making silly things like this is not -- it has nothing to do anything with my education, with my clinical experience, with my -- I'm working for three years now after I left UNC as an



800.211.DEPO (3376)
EsquireSolutions.com

attending. No single complaint. I did three fellowships at Harvard and Duke before I started at UNC, no single complaint. But in a few weeks after I started at UNC all this came up, this guy is not even qualified for training.

Q. And that was from all your attendings?

A. I'm not gonna argue that.

Q. Okay.

A. I'm not gonna argue that.

Q. I had a couple questions about the next page about discrimination, you make various comments but I think we've already talked about that so I'm gonna move on. I'm now looking at UNC3393. And we touched on this a little bit, but I just want to make sure I'm clear. You make an -- it's the third bullet on here.

So it's -- you claimed and -- and this is to Dr. Ulrich -- with Dr. -- during -- you claimed the meeting with Dr. Willett on January 3rd was mainly about patient safety concerns. "I am sorry I had to record without your consent, again, but certainly our meeting did not discuss any patient safety instance to learn from." None?

A. Continue, please.

Q. You just wanted to let me know about the



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 144 of 348

termination decision.

A. Yes. You have the recording.

Q. I do.

A. Show me anything that was discussed as -- yeah, go ahead, show me anything that was discussed as ---

Q. Sure.

A. --- patient harm.

Q. Page 3.

A. Okay.

Q. Again, from your doctored transcript.

A. Okay.

Q. Rageh417.

A. Sorry, I need to find it.

MR. MADISON: I'm -- it's referring to it as doctored. I mean, he has annotations on it. I wouldn't say ---

MR. PADGET: Okay.

MR. MADISON: --- doctored is appropriate.

MR. PADGET: Okay, your objection is noted.

BY THE WITNESS: (Resuming)

A. Where is ---

Q. I'm looking at page 3.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 145 of 348

A.    I'm -- I can't find the document.

Q.    It is Exhibit 10, the front of it looks like this (indicating).  I think it is over there (indicating).

A.    Oh, yes.  Yes, page 3.

Q.    Yup.

A.    Okay.  I'm listening.

Q.    The second sentence -- or actually third sentence, "So at this point we have probably a dozen potential serious potential safe -- patient safety concerns documented."

A.    Where?  I'm sorry, that is not page 3.

Q.    Page 3, the first full paragraph.

A.    Oh.

Q.    Ulrich.

A.    It seems -- so it seems to me you don't?

Q.    Yup.  It starts, as I said, the third sentence.

A.    Oh, okay.  Sorry.

Q.    "So at this point we have probably a dozen potential serious patient safety concerns documented.  Over the months we've discussed every one of them with you.  From day one we put these things down."  Your contention is -- you said a moment ago there was no conversation of patient



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 146 of 348

safety during this conversation.  Is that so ---

A.   Yup.  Like when you say patient safety conversation, that means like this patient had a lot of complaints, this patient was approached this way, this patient should have done something different, this patient should maybe trying something other -- it's a training.  So this is what I'm saying about there is no documented conversation about anything.  But when you bring me this without any ---

Q.   Well, you had -- sorry.

A.   --- there is a process.  Yeah, go ahead.

Q.   You were asked to look at your transcript because you said there was no discussion of patient safety ---

A.   Yeah, that is -- where is the discussion?

Q.   Well, we just talked about one, but we'll ---

A.   No, I want to understand where is the discussion you're talking about.  This is the recorded meeting and he said we discussed, right?

Q.   Yes.

A.   Where is the discussion?

Q.   Oh, man.

A.   Where is the discussion of patient safety harm?



800.211.DEPO (3376)
EsquireSolutions.com

Q.    On page 4, Dr. Ulrich -- I'm gonna move on.

A.    There is no discussion.  This is the document we have.  This is the recording we have.  Show me one single discussion of the patient harm.

Q.    Bottom of page 4.

A.    Exactly, run away.

Q.    "That the main thing is multiple times you just did things on your own and did not talk to anyone, and we found out a day later, a week later, this has been going on."  That is the problem.  You don't ---

A.    That's not -- no, the -- finish your question.

Q.    So it's not your definition of patient safety concerns?

A.    No, no, no, you -- ask me the question.

Q.    And you don't think that your inability to follow normal procedure and abide by the rules, that doesn't potentially harm safety -- the safety of patients?

A.    The rules are to see the patient, document the findings, send a note electronically to them.

Q.    Uh-huh (affirmative).

A.    These are the kind of professional way of



doing this.  Every time I go see a patient, I have a computer, I put everything, I send the note to them. Sometimes I don't see a need to discuss it over the phone.  They already have the note immediately.

Q.    Uh-huh (affirmative).

A.    So where is -- where -- where do you think that -- what -- where -- what's wrong with whatever I did?  I sent the notes immediately through the computer.  They look at it either immediately or the following day.  They sign it.  And there was hundreds of notes, I sent, and they signed it immediately.

Q.    So, again, they -- it seems like they're discussing various issues with the patient safety and you just don't agree with them?

A.    You can't play with -- with -- with this kind of question, I'll -- any more.  There is no patient safety harm.  There is -- I don't agree I maybe -- maybe because of the stress.  Maybe -- I don't know, I -- I did not harm any patient.  I contacted Dr. Zhang on some patients I see and the hospital and she sent me to talk to Dr. Ulrich.  I talk to Dr. Ulrich and he says I'm not the one on call, it's Dr. Zhang.  I go to Dr. Zhang.  Everyone ignores me.  So when I try to do it that way, over


Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 149 of 348

the phone, over the text, they ignores me.  But when I send notes electronically, he cannot decline it. He cannot deny it.

Q.    Okay.  Let's go back to Exhibit, was it, 12, which is the email, a rather lengthy email, you sent in response to Dr. Ulrich's short note to you. I'm on page 3393, UNC3393.

A.    92, 93.  Yes.

Q.    And this is your document.

A.    Yup.

Q.    I'm looking at the last bullet starting with the second sentence.  You say, "I examined him to confirm the findings but I forgot to mention that to you immediately.  I presented to you the next day.  I believe you operated on the patient the following weekend -- on the weekend.  I apologize again for the delay in reporting it to you immediately, but so you accuse me of putting the patient at major risk.  I learned the lesson and it never happened again."  So from that time on you always properly reported any issue that was going on to your attending?

A.    I always do.  Again, it doesn't have to be a phone call, it's electronically.  We are in, I believe, and that does -- a respected training



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 150 of 348

problem.  We don't call each other to discuss patients all the time.  We do use the computers, I believe, to document things.

Q.    Uh-huh (affirmative).

A.    So, in this case, even though I saw the patient on a Friday night ---

Q.    Yeah.

A.    --- even though I discussed with the patient the treatment option ---

Q.    Uh-huh (affirmative).

A.    --- the patient decided that he's leaving the state, he want to do the surgery some other place.

Q.    So you didn't follow the rules and tell your attending that?

A.    I did.

Q.    Okay.

A.    But I did that over here in the text messages.  The patient left the state, he doesn't want to do the surgery in -- in North Carolina, he was on a trip or something.  So it's gonna be a scandal by the end of all that.  The way I was treated is gonna be a scandal.

Q.    That's good to know.  I want to talk a little bit about some of the records you sent us,



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

some psychiatric records ---

A. Okay.

Q. --- that you were undergoing around this same time. I'm gonna mark these as Exhibit 13.

(DEFENDANT'S EXHIBIT NUMBER 13 WAS MARKED.)

Q. The first record I'm showing you is from February 1st, 2023. It is from a Dr. Gwendolyn Morris. Do you remember doing to see Dr. Morris?

A. Yes. Virtual.

Q. Okay. And this -- she was with UNC Healthcare Psych, Psychiatry?

A. Correct.

Q. Prior to this date, had you ever received any psychiatric care?

A. No.

Q. Had you been receive -- had you seen -- had been seen by any mental healthcare professional prior to this date?

A. No. I mean, in Egypt during the Revolution time ---

Q. Uh-huh (affirmative).

A. --- I was involved with because I was one of the protestors against the regime. The military Mubarak regime.

Q. Uh-huh (affirmative).



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 152 of 348

A.   After the coup I was under so much stress and anxiety, I just helped myself taking some medications on my own.  There was no like I went to a doctor or two, but I used to, during that stressful time I used to take some anxieletic and stress management medications in Egypt as a PRN.

Q.   Who -- who prescribed the ---

A.   I'm a doctor.

Q.   So you prescribed yourself anti-anxiety medication?

A.   There is no need for a prescription, you can just walk in a pharmacy and request whatever you want.

Q.   Have you requested medications for yourself at other times?

A.   Not -- only during that -- I have a heartburn so sometimes I get myself some antacids, not the Tums, but proton pump inhibitors or H2 blockers, these things, I sometimes use it.

Q.   So that was the only time you had taken anti-anxiety -- prescribed yourself anti-anxiety medicine?

A.   Correct.

Q.   Okay.

A.   After the Revolution or the military coup



800.211.DEPO (3376)
EsquireSolutions.com

happened.

Q.   And then you mentioned you've done it for heartburn issues, any other medical issues ---

A.   No.

Q.   --- that you prescribed yourself?

A.   No.

Q.   Okay.  After meeting with Dr. Morris she diagnosed you with adjustment disorder with mixed anxiety and depression, was that the first time you had been diagnosed with those symptoms?

A.   Correct.

Q.   Okay.  She prescribed you -- I'm gonna probably mispronounce this, but I'm gonna give it a shot -- lansoprazole.  Do you know what that is?

A.   Yes.

Q.   What is it?

A.   Lansoprazole is one of the gastric -- it's a -- it's a proton pump inhibitor for like gastric reflux.

Q.   Do you still take it?

A.   Every day.

Q.   Okay.  Any side effects?

A.   No.

Q.   It mentions in here that recommendation was perhaps to meet two weeks later, but it seems


Case 1:24-cv-00336-CCE-JEP   Document 68-3   Filed 03/13/26   Page 154 of 348

like you did not meet with her again. Do you remember why?

A. Yeah, because she said that my UNC employee and she cannot take care of me because there is a conflict with UNC.

Q. Yeah, I have that back and forth on 644, if you want to look at it. It begins on 644 and goes to Rageh647.

A. I'm sorry, which ---

Q. It's bottom -- it's page, Rageh, it starts at ---

A. 645?

Q. --- excuse me, Rageh. I've been mispronouncing ---

A. Yeah. 644?

Q. Yeah.

A. Okay.

Q. And just sent it and then -- and I guess my question here is -- because she talks about how -- and I'm looking now at 645 -- that -- she says, "I am not sure if I understood what was needed from our visit yesterday. I thought you were on leave until this investigation into the discrimination concern is over. If you need a mental health evaluation to determine whether you can go back to work, I'm not



ESQUIRE
DEPOSITION SOLUTIONS

able to provide that."

And you respond, "I wanted your help because I was mentally psychological -- psychologically traumatized, depressed, and anxious because of what I've been exposed at UNC Ophthalmology." And then you go into kind of a long diatribe about your concerns. So I guess I'm -- why did you initially go to see her, was it for treatment or was it for the investigation?

A. It was because I felt horrible. I couldn't sleep. I couldn't do anything. I used to wake up in the morning, my mom was here, and I lie to her, I said I'm gonna go to work and I was sitting in the hookah place the whole day. I was terrible. I was driving Uber to bring money the time I stayed at home. I was terrible. My mom noticed me every time crying and she even called the neighbors, like he has a problem, can someone do something, because I felt so bad.

Q. And she told you that she was unable to help you because of her role at UNC, and then you seemed to not agree with that decision looking at Rageh647. You said, "Regardless of the conflict of being a UNC employee" -- and this is all capitalized -- "I need your help to get my anxiety, depression,



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 156 of 348

trauma, and frustration a little bit under control, please."  Was your frustration out of control?

A.    Everything was out of control.

Q.    So you were out of control at this point?

A.    I was a -- a nightmare every hour.

Q.    Okay.  And this was -- I think this was on February 1st.  Okay.  So you then went on -- you didn't go to see her again, you went to go see Dr. Gillette.  Dr. Amy Gillette, excuse me.

A.    Okay.

Q.    I will note that you -- I -- I'm not including all the records, but just you sent me records for a visit on February 14th, March 6th, and then these are the records from March 13th, but I was just curious about these.  Do you remember those visits?

A.    Yeah.

Q.    Tell me about 'em.

A.    It's already documented.

Q.    Tell me what you remember about your visit with Dr. Gillette.

A.    I don't know how to answer that question. It was a Zoom.  I even not sure if it's a Zoom or Webex.  It was a very short meeting.  They discussed everything, my status.  She asked me questions, I



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 157 of 348

answered her questions.  She sent me a prescription of medication ---

Q.   Okay.

A.   --- and we continued.

Q.   Okay.

A.   She also -- I'm not sure if it was she -- yeah, she asked me not to go to work until my symptoms are under control or it's not like -- it's like it's better to avoid them, something that she used to say over the -- our meeting.

Q.   Okay.  I didn't see that, but that -- I'm not saying it wasn't in the record.

A.   It's ---

Q.   This particular visit was on March 14th, so at this point you would have resigned from UNC, correct?

A.   What -- what was the date?

Q.   This particular visit was March 14th.

A.   I resigned on March 20th.

Q.   Well, you resigned on March 2nd and then the effective date was March 20th.  Is that correct?

A.   So the resignation date is March 20th.

Q.   Okay.

A.   And this is my first date at work at Illinois, the same day, March 20th.



800.211.DEPO (3376)
EsquireSolutions.com

Q.   I know.  Okay.  I'm curious about the last page here and just I wanted to get your thoughts on it, and this is Rageh698.

A.   698.

Q.   And, again, she had diagnosed you or she agreed with the, I think, the diagnosing of adjustment disorder with mixed anxiety and depressed.  I guess depression.

A.   Even initially they said hypomania.

Q.   Really?

A.   Yeah, look at the first diagnosis.

Q.   So you were undergoing hypermania [sic] at this point?

A.   Yeah, because I couldn't sleep.  I used to drive my car just wasting time.  I used to even try to date people on Facebook to ---

Q.   Try to ---

A.   Yeah.

Q.   You tried to date people on Facebook?

A.   Yeah.  People I don't know.

Q.   Weren't you married at this time?

A.   My wife in Egypt.

Q.   Okay.

A.   And I said I tried to date, like texted messages, let's meet for a coffee, let's do



800.211.DEPO (3376)
EsquireSolutions.com

something.

Q.   Uh-huh (affirmative).

A.   And when I told that, she was like, I mean, it might be trying to get the stress out socializing and try to get the thoughts out, and do something a little different, play sport, exercise, gym.

Q.   Uh-huh (affirmative).

A.   That's where she advised me to do.

Q.   Okay.  I want to ask about the last two paragraphs and then we can move on from this.  I'm looking at the paragraph that starts, the second to last paragraph on, again, Rageh698, "Client," being you, "asked the therapist if she could do anything to, quote, expedite my wife's application to come to United States.  Client was told that my appropriate role as his therapist could be to speak to the condition of his current mental health state but not to give an opinion on either his discrimination case or his wife's immigration status.  At this point, the client became even more withdrawn.  Client was asked directly if he wanted my help specifically with mental health issues and he stated that I could be of no help in that area."  Do you remember saying that?



800.211.DEPO (3376)
EsquireSolutions.com

A.   And this is the last page here on like 698?

Q.   Yes.

A.   So which paragraph was that?

Q.   Second to last paragraph.

A.   Second to last.  So when she asked me about socialization, I told her I live alone.  My wife in Egypt.  Sometimes if you ask the immigration that you might need some support, they might expedite the petitions to bring family in the U.S. So that's one thing.  And then, "Client was told that my appropriate role as his therapist could be to speak to the condition of his current mental health."  I'm not sure what that means.

Q.   Well, neither was I and that's why I wanted to ask, 'cause it seems to indicate that you were going to her to help with your immigration -- or the immigration case and/or your discrimination case and less for any issues with mental health, and that's why I was curious.

A.   So that's why I take medication?

Q.   I'm asking you.

A.   Are they proficient doctors?  Did they diagnose me with immigration status?  Did they diagnose me with discrimination status or they



800.211.DEPO (3376)
EsquireSolutions.com

diagnosed me with medical condition?

Q. Well, she notes that after she said she couldn't help with your discrimination case or ---

A. Yes.

Q. --- the immigration, you weren't -- you became more withdrawn and weren't interested in seeking any more help from her.

A. No, I -- I'm always interested in medical help. That was from the beginning. When we talk about some side stories, I see like, okay, my wife in Egypt, can you help me bring my wife? Is that something you can help? I don't know, maybe yes, maybe not.

Q. Well, the next sentence, "Client was asked directly if he wanted my help specifically with mental health issues and he stated that I could be of no help in that area. At this point the client was told that if he did not feel that I could not help with mental health issues, that it was appropriate that we terminate the therapeutic relationship. Client was in agreement."

A. That was part of the anxiety, I was desperate. When you say like is there anything I can help you, no, you can't, I'm so bad, the condition. That doesn't mean I don't need their


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

help.  I need their help but I was so -- so sick to -- or so anxious or so depressed that I don't need any help, I -- I just -- I'm -- I'm -- it's not like I don't need your help in these issues.  It's a condition that resulted in me being desperate and hopeless.

Q.  Okay.

A.  Why did I meet with them again then?

Q.  Those are the last records you sent us. Do you have additional healthcare records?

A.  Oh, I have record with other people at Illinois.

Q.  Did you provide those to us in discovery?

A.  I did.  I did.

Q.  I have looked through every document you sent us.

A.  You don't see any records from state health -- state ---

Q.  I will double-check.  Let's just -- I will double-check and if they're not there, I would just ask that you provide them.

A.  Of course.

Q.  Okay.

A.  I'm still getting those evaluations, but right now it's maybe every six weeks or -- or one


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

month to six weeks.  It's a little bit stretched out.  Then it used to be every week when I started.

Q.    Okay.  Before I move on I wanted to talk about something else, but I -- I meant to touch on something that was mentioned in the email you sent to Dr. Ulrich on February 20th.

A.    Okay.

Q.    But we -- we had talked about briefly your EOC and EEOC complaints that you had filed.

A.    Say that again.

Q.    You had mentioned in there that you included people from the EOC, mainly Chris Jamison and others, and then also the EEOC.  Is that right?

A.    I included in the email?

Q.    Yes.

A.    Yes.  What was the date?

Q.    February 20th.

A.    Okay, yeah.

Q.    What was the result of those two investigations?

A.    The result of those two investigation, the UNC investigation?

Q.    The EOC investigation into your claims.

A.    Yeah, right to sue.

Q.    That's the EEOC, I think, actually.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 164 of 348

A.    Yeah, that's the EEOC.

Q.    Yeah, they -- they -- the EEOC that won -- they found there were no grounds for discrimination and they gave you a right to sue letter, right?

A.    Did you say no grounds for discrimination? I need you to show me that.  That's not correct.

Q.    Did they -- okay.

A.    That's not correct.  They did not determine -- they cannot determine if there is a ground or not.

Q.    Uh-huh (affirmative).

A.    And they asked me to sue in the federal court.  You said there is no ground of discrimination, they never said that.

Q.    I believe they said you were allowed to sue in federal court but nonetheless.

A.    Was there any like mentioning of no ground of discrimination?

Q.    I believe there was, but I don't have the document in front of me so we can move on.  What about the EOC investigation ---

A.    Thank you.

Q.    --- at UNC?

A.    Yeah, the -- what?  What about it?

Q.    What were their findings?


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A. Their findings?

Q. Yeah.

A. I did not pay attention to it.

Q. You didn't pay attention to it? I -- I have maybe a hundred emails you sent to Chris Jamison.

A. Right, no, I'm talking about the -- the findings.

Q. Oh, okay.

A. So the findings was there is no preponderance. Like there is no -- I don't know how to say the word, preponderance of discrimination.

Q. Uh-huh (affirmative).

A. So that was the findings.

Q. Okay.

A. Right?

Q. I'm gonna guess you disagreed with those findings?

A. I even did not respond. You guys are waste of my time, that's what I was like why would I respond to that email when I'm already gonna go through the EEOC and the -- and that's a good point -- and the federal court. Because every other professors I contacted, they said wait, they gonna end up with this results that is not enough



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 166 of 348

preponderance of the discrimination or retaliation or whatever, and don't waste your time. That was given to me by professors of university programs. That was given to me by a lot of Wells Eye Retina Specialists, just -- just don't respond to it. Ignore it and go to the federal court.

Q. What professors?

A. Retina professors.

Q. Which ones?

A. You mean the names?

Q. Uh-huh (affirmative).

A. So it was the one I work with at Brady Eye Center. Her name was Tree -- Tee, sorry, T-e-e. That was her nickname. And the other doctor from the program director of the retina program at -- his name is Ahmed Sallam.

Q. Uh-huh (affirmative).

A. They both kinda have some experience that how the process goes. The people at your program that's always -- that their fault. They will just try to cover it up to protect themselves. Don't trust them. Wait for the court. And that was every single person from -- that I communicated with.

Q. Okay.

A. They will just cover themself. They work


ESQUIRE
DEPOSITION SOLUTIONS

Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 167 of 348

for the university, they're not gonna give -- or they're not gonna be any fair.  So it seems like people know a lot about how -- how it works here.

Q.   Uh-huh (affirmative).  I have a number of questions I want to ask you, but before I do I just -- I wanted to ask you briefly about this document just 'cause I don't know what it is.  I am gonna mark it as ---

MR. PADGET:  What are we at?  Defendant's?

THE COURT REPORTER:  14.

MR. PADGET:  15?

THE COURT REPORTER:  14.

MR. PADGET:  14.  Sorry, I jumped ahead.  Sorry about that.

(DEFENDANT'S EXHIBIT NUMBER 14 WAS MARKED.)

MR. PADGET:  Thank you.

BY MR. PADGET:  (Resuming)

Q.   I'm able to read some but not all of it, but I'm showing you, I think it's Rageh911.  And ---

A.   Okay.

Q.   --- they appear to be handwritten notes from you or by you?

A.   To who?

Q.   I don't know what they are.  They were ---


ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

A.   It's to nobody.

Q.   They were presented without context as ---

A.   Correct.

Q.   What is it?

A.   If you look at my room at that time, you're gonna find a room with stickers everywhere, pages everywhere.  Everything you think I write notes, this is only for myself.

Q.   What room are you talking about?

A.   My home.

Q.   Okay.

A.   So I was sitting home trying to write stuff, document for my kinda own memory.  It was never sent to anybody.

Q.   Okay.  Do you remember when you wrote it?

A.   I mean, December or -- or -- I -- I don't exactly know.  So maybe this one for -- during the EEOC process, I believe.

Q.   Okay.  Do you remember if you wrote it all at the same time or if it was multiple days, multiple entries?

A.   I have dozens of these things.

Q.   Okay.  Did you provide all of them to us in discovery?

A.   I most of it maybe lost it because I moved



800.211.DEPO (3376)
EsquireSolutions.com

from North Carolina to Illinois.

Q. Okay.

A. So I -- it's not essentially that I scan everything, I put it on my record because these are written notes. It's not like computer, I can save it. So I did not scan and include everything. But, again, this was for my own.

Q. You provided to us in discovery as being responsive to our discovery request?

A. Yeah, so you understand how much frustration I was in. So you understand how much discrimination and retaliation, how much my thoughts were in. So that's for your hopefully understand what I went through.

Q. I would ask if you have additional documents that are like this that you wrote at the same time, that you also provide us those as well.

A. I have a lot of sticky notes. I think I missed a lot of it. Like I have a lot of sticky notes everywhere. Like I couldn't sleep. Sticky notes on my computer, on my walls, I write something here, I ---

Q. So these are notes you wrote to yourself back ---

A. Correct.



Q.    --- in December of 2022?

A.    I'm -- I'm not sure about -- no, it's not December.  Maybe that was during the EEOC process.

Q.    Okay.  A moment ago you said December, that's the only reason I said that date.  If there's another date, tell me.

A.    I wrote notes from the beginning, from maybe December.  I don't know which one is this. But I wrote a lot of -- dozens of things like this from December.

Q.    And what I'm asking you is, you sent these to us with no context.  I don't know what these are.

A.    Okay.

Q.    If you can provide me just a time period or when you wrote 'em, that's all I need.  I'm just -- I don't know.  It just ---

A.    Let me go through it.  Let me go through it and then I will let you know exactly when that ---

Q.    Okay, thank you very much.

A.    (Witness reviews document.)  So definitely that was after I left because even here I said, "I will attend all big ophthalmology and retina meetings to take -- to talk to everyone about the discrimination I was exposed to Dr. Zhang."  That


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

was after I left.  So after March of 2023.

Q.   Okay.  Did you write 'em at the -- so this wasn't when all the -- did you write these notes contemporaneously or were these more your memories of how certain things happened?

A.   I am not sure I understand.

Q.   Okay.  So was it something like this happened today, I'm gonna take notes?  Or this is my recollection of what happened in the past, let me write it down?  I'm just trying to figure out what it is you ---

A.   It used to be helpful to get some relief when I have so much stress, when I write those things maybe I felt a little better.

Q.   Okay.

A.   It was not -- it was after I left.

Q.   Okay.  I'm not trying to argue about this, I just don't know what these are and so I'm just trying to understand.

A.   Hopefully you know right now.

Q.   That -- that's it.  Okay.  All right.

A.   It's so painful that you remind me of these things, but I have to go through it.  I can't believe how many notes like this I wrote.  I can't believe how many sticky notes.  Like you can't even



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

see the wall in my room because of the sticky notes I keep putting everywhere.

Q. Okay. I ask you, prior to coming to UNC ---

A. Yup.

Q. Actually since UNC too, have you ever threatened a coworker?

A. I'm sorry?

Q. Prior to coming to UNC ---

A. Okay.

Q. --- and since leaving UNC, have you ever threatened a coworker?

A. Threatened a coworker?

Q. Yes.

A. Like -- like -- like what do you mean? Like?

Q. Any way.

A. No. Even during the time I was at UNC, I never threatened any doctor.

Q. You never threatened a doctor?

A. Never.

Q. What about leaving UNC -- after UNC -- leaving UNC?

A. There was never a threatening.

Q. You never consider any email you wrote as



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

threatening?

A.   I threatened all of them to expose them. I threatened all of them to let everybody know about the corruption.  That's my threatening.  If you want to say threatening as physical ---

Q.   Uh-huh (affirmative).

A.   --- of course not.

Q.   Okay.  A judge disagreed with you about that, though?

A.   I'm sorry.

Q.   A judge disagreed with you ---

MR. MADISON:  Objection ---

BY MR. PADGET:  (Resuming)

Q.   --- about that?

MR. MADISON:  --- argumentative.

BY THE WITNESS:  (Resuming)

A.   Which judge?

Q.   We'll talk about that later.  I'll ---

A.   Which judge?

Q.   Withdrawn.

A.   No, no, no.  Which judge?  Please do.

(DEFENDANT'S EXHIBIT NUMBER 15 WAS MARKED.)

Q.   I'm gonna show you Exhibit 15.

A.   Okay.  I want to see which judge ---

Q.   This isn't about a judge.  We're gonna



talk about that later.

A. Okay. 'Cause it was funny that the case was dismissed before hearing.

Q. This is when -- actually I should ask, you noted earlier you are not in possession of a firearm. Have you ever owned a firearm?

A. A firearm?

Q. A gun.

A. Of course not.

Q. Have you ever owned bullets?

A. Never. I'm not a U.S. -- I didn't grow up in U.S. I grow up in Egypt.

Q. And yet I'm looking at ---

A. We don't use weapons.

Q. --- this first document, Exhibit 15, UNC6701.

A. Six seven -- yeah, the first page?

Q. You sent an email saying you found a bullet on your mailbox?

A. Correct.

Q. So it's your under oath testimony that you woke up one morning, walked outside, and there was a bullet on your mailbox?

A. Correct. Not inside.

Q. Uh-huh (affirmative).


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.    On the top.

Q.    On the top.  Where were you ---

A.    Not one time.  Twice.

Q.    Where were you living at the time?

A.    I was living in Chapel Hill, 1228 Cranebridge.  The same complex where Dr. Ulrich live.

Q.    Okay.  You have no idea how it got there?

A.    I have no idea.

Q.    You didn't put it there?

A.    Put what?

Q.    You didn't put the bullet there?

A.    I brought the bullet and put it on my mailbox?

Q.    I don't know.  Did you send this maybe as a threat to your former colleagues?

A.    I'm not a U.S.

        MR. MADISON:  Objection, argumentative, lack of foundation ---

BY MR. PADGET:  (Resuming)

Q.    You can still answer.

A.    I'm not like people use guns.  I'm not like people use bullets.  That's not my nature.  I'm very peaceful.  At the same time I'm very rightful, like I am -- if -- if I see something wrong, I will



800.211.DEPO (3376)
EsquireSolutions.com

speak up, whatever who you are.  That's why I'm here as a -- as a refugee.  I stood up against military generals in the streets during the Revolution.  Armless, just with my hands up, asking to stop killing people.

Q.  Okay, very peaceful.  You sent another email a few weeks later, March 3rd.  Now you're saying that you found three bullets ---

A.  Correct.

Q.  --- on your mailbox?

A.  Yes.

Q.  And I'll note the last page is 6786, I believe it's a picture of it, but our copy machine didn't do a good job.

A.  Right.

Q.  Again, under oath, you don't know how those bullets got there?

A.  I have some suspicion.

Q.  What are your suspicions?

A.  Dr. Ulrich.

Q.  Okay.  You didn't send this email as a threat to your colleagues?

A.  Can you read the email?

Q.  Sure.  It notes that you feel threatened and you keep receiving bullets, and I'm gonna put

Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 177 of 348

that in quotes.  You've already reported that before and now I have ---

MR. MADISON:  I'm sorry ---

BY MR. PADGET:  (Resuming)

Q.  --- three bullets.

MR. MADISON:  --- the quotes?  When you said -- what are you putting in quotes again?

MR. PADGET:  Well, I'm putting in quotes because ---

THE WITNESS:  He is doing ---

MR. MADISON:  And what's the -- the purpose of putting the quotes?

BY THE WITNESS:  (Resuming)

A.  Yeah, show me where I threatened anybody.

MR. MADISON:  Let him -- just ---

MR. PADGET:  I'm asking a question, you can object to the form of the question and ---

MR. MADISON:  Right.

MR. PADGET:  --- then we can -- I'm gonna keep asking.  I -- there are no quotes in the actual -- on the email ---

MR. MADISON:  Okay.

MR. PADGET:  --- to clarify.

MR. MADISON:  Okay.

MR. PADGET:  So that's a fair point.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

There are no quotes around the bullet, the word bullets in the email.

MR. MADISON: Okay.

MR. PADGET: I added them.

BY MR. PADGET: (Resuming)

Q. So why did you send -- you sent an email to a number of people again saying you received three bullets, what was the purpose of that email?

A. To let them aware -- advise me what to do.

Q. It wasn't a threat?

A. It was a threat to myself.

Q. It wasn't a threat to them?

A. Someone threatening me. Threat to who?

Q. Well, you said -- you said you -- and I wanted to make sure. I'm just trying to clarify. It wasn't a threat to any of your colleagues that you might do violence on them?

A. It's -- of course it is not a threat. It's a seeking for advice.

Q. Okay. 'Cause you said you're a very peaceful person and you wouldn't threaten anyone?

A. Of course I'm not gonna threaten anyone.

Q. Okay.

A. But I will speak up as much as I can.

Q. Okay. I'm gonna show you another email



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 179 of 348

from March 21st, 2023, which I am marking Defendant's Exhibit 16.

(DEFENDANT'S EXHIBIT NUMBER 16 WAS MARKED.)

Q. It is an email that you sent to a number of people, including Dr. Budenz, Chris Jamison, Dr. Willett, Dr. Zhang.

A. Yeah, I'm very familiar with this one.

Q. And you mentioned earlier you never threatened physical violence, only to oust them ---

A. Correct.

Q. You say, "I'll never forgive for what -- forgive you for what you put me through. The trauma you have caused me is lifelong and I am unable to recover it all."

A. Correct.

Q. "I wish you see such damage in your beloved ones."

A. Yes. I wish you go through the same stress. I wish you go through the same discrimination. I wish you go through the same humiliation in your job. Is that a threat?

Q. I think any rational person would consider that a threat.

A. Because you're biased.

Q. Okay. "I hope your family suffers the



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 180 of 348

same way my family did.  I wish the worst things ever to happen to you and your criminal teammates."

A.    And I do that every day in my prayers, I wish they get like justice.  I wish they get exposed.  I do that every day in my prayers.

Q.    Just so I'm clear for the record, as a peaceful person you use your prayers every day to wish that the worst things ever to happen to other people?

A.    No.  As a peaceful person, I wish justice and I wish the right thing to overrule.  I wish they get exposed.  I wish everyone is supporting them get exposed.  I wish everyone that's covering up for them to get exposed.  That has nothing to be like I'm threaten.  I do that every day in my prayers.  I hope the same pain I went through, I hope it happens to them.

Q.    We have different prayers.  But that's okay.

A.    Yeah, exactly.  So it's not like -- because in your culture, the first thing you do is you hold a gun.

Q.    Okay.  Let's talk about -- this is -- would have been around mid March, you noted that you started your new job March 20th.  Is that roughly


Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 181 of 348

right?

A.    Correct.

Q.    Okay.  In Illinois?

A.    Yes.

Q.    Okay.  You noted in your discovery, and I can find it if we need to, that you currently have license in -- a number of medical licenses in a number of states?

A.    Correct.

Q.    Illinois, Minnesota, Pennsylvania, Virginia, Connecticut, Georgia, Iowa, Massachusetts, North Carolina, Ohio, Tennessee, Texas, Florida, Missouri, and Alabama.  Now I might have missed one in there, but does that sound ---

A.    No, there was no Alabama.

Q.    No Alabama, okay.

A.    Yeah.

Q.    I thought I had one in there.  Okay.

A.    And also there are a few licenses, some licenses already lapsed.

Q.    Okay.

A.    Expired.

Q.    But after you got the job in Illinois in March of 2023, it's true you continued to send documentations requesting medical license renewals



800.211.DEPO (3376)
EsquireSolutions.com

in a number of states, right?

A. Correct.

Q. And in that process -- I'm trying to -- I'm not familiar with the process so I'm not sure -- you would send it to them and then did you also reach out to UNC to ask for them to send documentation ---

A. Correct.

Q. --- or information to those medical boards in response to your application?

A. Yes.

Q. Okay. I think I may have recently seen that you sent another one for Mississippi?

A. No.

Q. No?

A. Recently?

Q. Recently.

A. Yes. Just a couple weeks, yes.

Q. Okay. And, I guess, my question is, why?

A. A lot of things. First, I was threatened I'm not gonna able to practice. I was threatened I'm not gonna able to get a license by Dr. Ulrich, again, in the same recording.

Q. Okay.

A. So I wanted to secure myself to get some



licenses so hopefully I can find a job.  That's the most important thing.  The other things is, when I'm gonna start my job in Illinois, what if Dr. Budenz or Dr. Ulrich used their power to terminate my job, I still need to find another job.  If not, I can work locums, which is a one-week kinda job so it requires licenses.  There is a lot of reasons.  But also one of the reasons is to expose UNC.

Q.    To expose -- okay.  Another way maybe to harass UNC?

MR. MADISON:  Objection ---

BY THE WITNESS:  (Resuming)

A.    What do you mean by harass UNC?

MR. MADISON:  --- argumentative. Calls for ---

MR. PADGET:  Well, you can object to form.

BY THE WITNESS:  (Resuming)

A.    Like is UNC a person?

MR. MADISON:  --- a legal conclusion.

MR. PADGET:  He can still answer, though.

BY THE WITNESS:  (Resuming)

A.    Yeah, is UNC like a person like I am gonna harass?



MR. MADISON:  I understand that.  I'm just stating for the record, though.  Understood, but I am allowed to state an objection for the record.

MR. PADGET:  Yeah, yeah, for sure.

BY THE WITNESS:  (Resuming)

A.    No, I always have a good intention.  My main intention was to fix the wrongdoing, whatever it takes.

Q.    Okay.  So your main intention, I just want to get that, was to fix the wrongdoing?

A.    Correct.  Which I mean by the first Dr. Zhang and then Ulrich and then the -- the other people.

Q.    So it wasn't necessarily to seek a job in those states, it was to fix the wrongdoing?

A.    I said multiple reasons.  The first reason was I don't have a job, I need to get a license so when I talk to an employer, I have the job so it's gonna be easy to start the job.  That's what -- the first reason.  The first reason also because Dr. Ulrich said I'm not gonna able to get a license ---

Q.    Keep going.

A.    Yeah.  So a lot of reasons.  I cannot get a license so here is -- I need to get a license.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

The other reason, I don't have a job.  I don't know where I'm gonna end up working.  I applied for jobs. I went for interviews.  How many interviews I went? A lot.  And all these interviews they ask me about the license.  Given the conflict with UNC it's gonna take more than a year to get a license so it's -- it's better to start early on.  That's another reason.  Another reason is to find hopefully locum jobs, like one week to fill a space when someone on vacation or something, so I need a license because these things comes and goes very quick.

Q.    But at this stage, March 20, 2023, you have a job.  You are working in Illinois.  We are now two-and-a-half years later.  There's been no indication of any issue with your ---

A.    There is.

Q.    --- license -- I'm not done.

A.    Okay.

Q.    You've interrupted me so many times.

A.    Okay.

Q.    I'm not done.

A.    Yeah, you said ---

Q.    And yet you continue to send these applications to state and continue to harass UNC with emails, and I guess ---



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 186 of 348

MR. MADISON:  Objection ---

BY MR. PADGET:  (Resuming)

Q.    --- my question is why?

MR. MADISON:  --- argumentative.

BY MR. PADGET:  (Resuming)

Q.    You can answer.

A.    So I can show you job offers from Mississippi.  I can show you job offers from Kentucky.  I can show you job offers from West Virginia.

Q.    Does your current employer know that you're looking at ---

A.    No.

Q.    --- all those job offers?

A.    Of course not.  But I don't initiate a state license unless I feel like there is a -- there is something potential.

Q.    Okay.  You had an issue with that in Kentucky, I believe, where they called you, they said you didn't have a job offer.  Isn't that right?

A.    No, I have the job offer.  I have two actually in Kentucky.

Q.    Were you asked about that by the board?

A.    No.  After they declined my license the attorney said if you gonna show -- or if you're


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

gonna bring a job then you can get a license.  And that was few months after I started at Illinois.  I started the license before I start my job in Illinois, so the job in Illinois was not yet started.  So I started the license in Kentucky.  I did interviews.

Q.   Uh-huh (affirmative).

A.   I got the job in Illinois and the license is still pending.  It's still processing.

Q.   Okay.  I'm gonna show you an email.  This isn't marked 'cause you just sent this to us so I just want to ask you about it.  Email which it's from you, okay, "I also want to help Dr. Budenz understand why I am applying for all these state medical licenses" ---

MR. MADISON:  I don't want to interrupt too much before you start ---

BY THE WITNESS:  (Resuming)

A.   This is a couple days ago.

MR. PADGET:  He just sent this to us.

THE WITNESS:  Yeah, a couple days ago.

MR. MADISON:  I got ya, okay.

MR. PADGET:  That's fine, I'll start over.  Not a problem.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 188 of 348

(DEFENDANT'S EXHIBIT NUMBER 17 WAS MARKED)

BY MR. PADGET:  (Resuming)

Q.  Reading this, is from you to various people.  It says, "I also want to help Dr. Budenz understand why I am applying for all these state medical licenses, to tell my story about the retaliation and discrimination I was exposed to under his supervision at the UNC Ophthalmology chair and the AUPO president.  I have completed 16 of 50 states so far," exclamation point.  "Hope that helps UNC authorities to understand."

A.  What is the question?

Q.  So it's you're applying for these not to practice medicine there but just to keep harassing UNC?

A.  At the beginning, no.

Q.  At the beginning, no.  What about now?

A.  Right now I have job offers.

Q.  You said ---

A.  I have a job offer from Mississippi.  I have a job offer -- like this is one, just West Virginia.  And when I was reading through discovery documents, I saw Dr. Budenz asking a question why he's applying for all these licenses.  So that was just a couple days ago.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.   Uh-huh (affirmative).

A.   So I wrote that email to help him understand what I ever put here.  So that was in response to me finding in the discovery documents why he's applying for these states, and he was making kinda fun of it.

Q.   And this is why you're applying for all these states?

A.   Not the only reason.

Q.   Okay.

A.   One of the reasons is, yes, UNC Retina Ophthalmology everywhere will find out all these communications, all these emails, at some point as an effort to fix a huge corruption bias in the program.

Q.   Okay.

A.   But the other reasons, as I mentioned before, basically to secure myself a job, to secure myself a -- a future.

Q.   Okay.  We mentioned ---

A.   And also to prove they are wrong because every time I went they ask me about UNC stuff and it is, oh, my God, one of the people there said if I get this letter, like the letter he received from Ulrich, I will never have you work at my hospital.



800.211.DEPO (3376)
EsquireSolutions.com

That was recorded in Tennessee board meeting. But he agreed by the end when I showed them how much lies, how much unsubstantiated claims, and they approve my license.

Q. Congratulations. We're moving on. I'm gonna show you Exhibit 18.

(DEFENDANT'S EXHIBIT NUMBER 18 WAS MARKED.)

Q. You mentioned earlier ---

MR. PADGET: This is about the Kentucky licensure.

MR. MADISON: Okay.

BY MR. PADGET: (Resuming)

Q. I'm curious reading these again as -- knowing now that you describe yourself as a peaceful person ---

A. Yes.

Q. --- so this is UNC2803 at the beginning and it goes back to 2809. And I actually want to start at the back because that's the first one. It relates to emails between you and a woman named Cheryl.

A. That's the last page?

Q. Yeah. Tabler.

A. Okay.

Q. With Kentucky.



Case 1:24-cv-00336-CCE-JEP   Document 68-3   Filed 03/13/26   Page 191 of 348

A. Yes.

Q. Again, where you mentioned earlier how you were re ccing Ophthalmology again to respond to your emails, you were reaching out to UNC to get them to provide info for you?

A. Yes.

Q. And then you began to write seemingly weekly, maybe a little more than that, emails to a whole wide variety of people. Do you remember these emails?

A. Show me which one.

Q. Well, the first one starts, let's see, on 2807, which you sent on June 16th, 2023.

A. 2807?

Q. Yeah. Again ---

A. Yup.

Q. --- I'm not gonna refute some of the things you say in here 'cause I think we've already talked about those. Get it again on June 21st, June 23rd. You seem to be getting a little more desperate as we go on here. But June 25th, now on 2805. And then we get to July 2nd, which starts on 2804 and then goes on to 2805. I want to talk about some of the paragraphs on the back. These are on 2805 beginning.



800.211.DEPO (3376)
EsquireSolutions.com

A.    2805.  Yes.

Q.    At the top it says, "A few days later, Dr. Ulrich mentioned that I refused to go see the patient on a weekend!"  You say, "She lied to him. She is is a liar!  The resident was right!"  You talked about how you received these -- I'm gonna put in -- alleged three bullets on the top of your mailbox.  You then go ---

MR. MADISON:  I'm sorry ---

MR. PADGET:  I -- it's my -- alleged is my word, it is not in the email.  That is my comment, my statement.

BY MR. PADGET:  (Resuming)

Q.    "My" -- and then this is verbatim.  "My frequent emails and warnings are very, very serious and I have nothing to lose after UNC destroyed my dream and caused me serious mental, social, and career problems!  I am unable to sleep or think! I'm still getting nightmares!  I cannot recover from the anxiety or the depression.  I am losing control over myself!  I will take my own revenge if nobody cares!  Nobody can blame me then!  I have nothing more to lose and I do not care much about my future anymore!"

A.    What is the question?



800.211.DEPO (3376)
EsquireSolutions.com

Q.    You don't consider this a threat?

A.    No, it's not.

Q.    What is it?

A.    There is a huge cultural difference here.

Q.    Uh-huh (affirmative).

A.    You can behave like you are nicest person on earth when, at the same time, you're gonna wish to kill me immediately.  But in my culture, if I'm sad, if I'm mad, I speak up.  I talk about what I'm going through.

Q.    Uh-huh (affirmative).

A.    This has nothing to do with violence.  In your culture maybe it's violence because you're probably gonna think like I'm American, I have a gun, I can make murder, crazy stuff, but that's not my culture.  My culture is a lot peaceful than yours.  My culture is be as truthful and fair as possible, talk and talk and talk and that's it.  Seek justice.  Seek fairness.  Not like other people who pretend they are nice but if they have a chance to kill, they will do.

Q.    So in your culture you write emails to former colleagues ---

A.    Yes.

Q.    --- saying I will take my own revenge if



800.211.DEPO (3376)
EsquireSolutions.com

nobody cares ---

A.    I will continue ---

Q.    --- nobody can blame me then, exclamation point?

A.    Yes.  I will continue to take revenge.  I will continue to expose UNC.  I will continue, once I have the chance, to hold the big banners everywhere, look what UNC did.  That is my revenge. I will continue that until the court rule on it.

Q.    You then finish by saying, "I swear on my life, I will get my revenge AS!
                                   AP
                                  "!"

A.    Correct.  I swear on my life, again, I will get my revenge by speaking up everywhere, by not to kinda -- you guys make a lot of deals.  Okay, so that's what they're trying to do.  Let's stop, don't make any noise, leave peacefully and we will go and not write any negative reports about you. That is deals.  I'm not that kind of person.  I said I have to hold the wrongdoing responsible.  So there is, again, another cultural difference.  I'm not someone who can make a deal just for myself benefits.

Q.    Uh-huh (affirmative).

A.    I am not someone who can make a deal -- I could just left easily, right?  When they offered me



800.211.DEPO (3376)
EsquireSolutions.com

to leave, I could just leave and get a job and move on.  That was the easiest thing that it was offered to me multiple times, but I was like, no, there is discrimination.  That's wrong.  There is retaliation.  That's wrong.  There is attending that she's overusing her power, abusing her fellows.  There was a program director or a fellowship director, Dr. Ulrich, who was manipulated by Dr. Zhang and he was trying to cover up something wrong.  They offered me to leave.  They even, at some point, offered me money at the EEOC, but it's not my -- it's not my personality.

Q.    Uh-huh (affirmative).

A.    You have made something wrong, you decline it, you are someone professional.  You are someone responsible.  I will do my best to hold you accountable.

Q.    And get your revenge?

A.    That's my revenge.

MR. MADISON:  Objection, argumentative.

BY THE WITNESS:  (Resuming)

A.    And this is my -- in my language, that is my revenge.  I don't know about your language because you are believing that revenge means



violence.

Q. Well, let's -- let's go the next page about that, 2803. This is from July 18th.

A. 03?

Q. The first page.

A. Okay.

Q. It says, "BTY, the FBI has contacted me and inquired if I have access to a gun! I replied not yet."

A. Yeah. What is the question?

Q. It seems to imply that you were still thinking about getting one or maybe getting one soon?

A. Do I have the right?

Q. Of course.

A. So what's your problem?

Q. Well, you just said that you come from a nonviolent culture where you don't deal with guns and the way you get your revenge is to write -- well, I guess to write emails about getting your revenge, but you would never even think about getting a gun?

A. Correct.

MR. MADISON: Objective, misstates the record ---



800.211.DEPO (3376)
EsquireSolutions.com

MR. PADGET: Object.

BY THE WITNESS: (Resuming)

A. Maybe in the future, I'm so wealthy I will get a gun to protect myself. What's wrong with that? What are you trying to say?

Q. You hadn't bought a gun at that point, though?

A. I'm not a U.S. I don't believe in guns, I believe in voice. I believe in truth.

Q. Well, you just ---

A. I don't believe in -- in violence.

Q. Okay. Let's talk about the next email you sent.

(DEFENDANT'S EXHIBIT NUMBER 19 WAS MARKED.)

Q. This is Exhibit 19, it's a handful of emails from August of 2023. Okay, this is 725 -- I opened the wrong one, my bad. 7259 and it's Exhibit 19.

A. Okay.

Q. The first page are people responding to it. At the bottom is an email that you wrote on August 28th, 2023, to a whole number of people.

A. Yes.

Q. There's no context, it just keeps going on.



A.    Well, what do ---

Q.    All it is, is if you go to the third page, and you had forwarded a story ---

A.    Yes.

Q.    --- about a faculty member fatally shot at UNC.

A.    Correct.  What's the question?

Q.    Why did you send this email?

A.    To let everybody know that UNC sucks.

Q.    Okay.  So UNC had just undergone a horrendous event in which a shooter had shot and killed a faculty member ---

A.    Okay.

Q.    --- and you were aware of this, correct?

A.    I saw this on the news.

Q.    And you had previously sent emails in which you had said you would get your revenge, you would bring harm on families, and that you had not bought a gun yet?

A.    Yes.

Q.    And then you sent an email with no context?

A.    Yes.

Q.    As a threat to UNC?

A.    You have to stop saying threat.  If I want



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 199 of 348

to do something stupid, killing people, I'm not gonna send emails. If I wanna threat people of killing, I would pretend I'm nice such like you, and then I'm gonna kill them. I am not that. If I'm gonna send an email like this, I'm not that stupid to think that this is a threatening. This has never been a threatening. This is look here at you, you failed. You, UNC is a failure because you let that happen. Hopefully you understand what's the point of this, you failed, you let that happen. The same thing, you failed to let me go through this. You are a big failure to let this happen, that's the reason of these emails.

Q. Interesting. I also note that I'm looking at 7264, which is another email you had sent on July 25th where you said, "I will never forget or forgive!" And that was following the emails where you talked about that you hadn't bought a gun yet, threatening violence on families, and then an un-attributed ---

MR. MADISON: Objection. This seems ---

BY THE WITNESS: (Resuming)

A. You're trying to ---

MR. MADISON: Nope, let me ---



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 200 of 348

BY THE WITNESS:  (Resuming)

A.  --- bring a piece from here, a piece from there to make a story to believe it.

MR. MADISON:  Wait a minute, Dr. Rageh.  Objection, misstating the record of evidence.  Dr. Rageh never threatened families.

MR. PADGET:  Fair.  Okay.

BY MR. PADGET:  (Resuming)

Q.  I'm actually not -- it's not piecemeal, Dr. Rageh.  These are all emails you sent in succession.  These are all emails you sent in a row to this group of people.

A.  Okay.

Q.  You sent -- and I'll read so that there's no clarification -- you said on various days, "I will take my own revenge no -- if nobody cares, nobody can blame me then.  I swear on my life, I will get my revenge."

A.  Let me repeat that ---

Q.  I'm not done.

A.  Okay.

Q.  "The FBI has contacted me and inquired if I have access to a gun!  I replied not yet."

A.  Okay.

Q.  "I then," you then said, "I will never


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

forget or forgive." "What have I done to deserve this," was said on August 1st. And then an email in which a faculty member was fatally shot.

A.   Okay.

Q.   And you did not consider this a threat?

A.   You done?

Q.   I guess, would you be surprised that every person that saw this viewed it as a threat?

A.   You're done with the question?

MR. MADISON:  Compound.

MR. PADGET:  Yup.

MR. MADISON:  Let's ask one question so he can answer that.

MR. PADGET:  If he under ---

BY MR. PADGET:  (Resuming)

Q.   Do you understand?

A.   I understand and I'm repeating the same thing. This is 30th of October, I will never give up. I will take all the possible peaceful, legal ways to hold those people accountable. That's my revenge. I will do this for the rest of my career, for the rest of my life, until I get the people by court hold accountable. Not only Dr. Zhang, Dr. Ulrich, but everyone was covering up for them. I'm repeating this is my revenge, I will not give it up



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 202 of 348

for the whole rest of my life to seek rights and hold these people accountable.  I repeat, I will get my revenge for the rest -- I will work on that for the rest of my life.  Do you know how much expensive this process?  Do you know if I can just listen to the U.S. people, just move on?

Q.    I haven't asked you a question in a while so I ---

A.    You don't have to ask, I'm trying to explain to you the risk I'm taking.  Too much money.  Too much stress.  Too much to worry about and it's only myself against -- should be too much experienced lawyers or whatever HR.  And they all cover up for themselves.

Q.    Okay.

A.    I still will take my revenge, exposing them everywhere.

Q.    Okay, I'm moving on.  I know that you did not, I guess, perceive this to be a threat.  Were you aware that some of your former colleagues perceived it to be a threat?

A.    I was never contacted by them, never -- nobody told me it's a threat, unless after the no-contact orders.

Q.    Was your former attorney sent a cease and



800.211.DEPO (3376)
EsquireSolutions.com

desist letter directing you to stop harassing those individuals?

A. Well, my former attorney said UNC doesn't want you to contact anybody except some person. I don't think that is forcible, like why do I have to listen to it?

MR. PADGET: Wait, I sent you -- oh, I give you the wrong one, my bad. I'm sorry.

(DEFENDANT'S EXHIBIT NUMBER 20 WAS MARKED.)

BY MR. PADGET: (Resuming)

Q. I'm showing you Exhibit 20.

A. Yes.

Q. Which is a cease and desist letter that was sent to your former counsel Michael Elliott on October 5th, 2023.

A. Yes.

Q. It notes that you had previously -- and I'm looking at the second full paragraph, and this is 75 -- UNC7575. You had previously been directed on July 19th, 2023, that your sole point of contact with UNC, excuse me, would be Patricia White.

A. Who determined that?

MR. MADISON: Let -- let him ask you a question ---

BY MR. PADGET: (Resuming)



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 204 of 348

Q. And that you responded within just a few hours to indicate that you would continue to email, quote, everyone and that he will add and cc everyone I can to those messages about his experience at UNC. Do you remember that?

A. I do remember that letter, yes.

Q. Okay.

A. I do also remember Dr. Budenz asked me to contact Dr. Ulrich after that letter.

Q. Okay. You were then directed by counsel from UNC, it says, "I am writing to insist that your client cease and desist any and all communications, whether by email, telephone, call, letter, or in person, with the below listed University personnel."

A. Again, after this letter I got communication from Dr. Budenz. After this letter I got communication from Dr. Budenz to contact Dr. Ulrich.

Q. Did you continue to send harassing emails to those individuals?

A. What do you mean continue?

MR. MADISON: Objection ---

BY MR. PADGET: (Resuming)

Q. Did you continue to send ---

MR. MADISON: --- argumentative.



800.211.DEPO (3376)
EsquireSolutions.com

BY MR. PADGET: (Resuming)

Q. Did you continue to send emails to those individuals despite that letter?

A. I mean, look at the dates.

Q. Okay. I'm asking you.

A. I don't remember, when was it?

Q. Okay.

A. Look at the dates.

Q. Do you remember sending any emails to Dr. Zhang, Dr. Ulrich, Jackie Feeney, Chris Jamison, Ellen Maxfield, Kathryn Winn, Elizabeth Hall, or Harvey Lineberry, among others after October 5th, 2023?

A. What is October 5th?

Q. That is the date when you received this cease and desist letter.

A. I said I -- I did send, continue to send emails.

Q. All right.

A. This is not forcible and my attorney said it's not enforceable.

Q. Okay. You noted earlier, and I'm not gonna repeat it, that you did not perceive your emails as threats, correct?

A. It was never threat, except, in my



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

opinion, it's a threat that you have to realize you did something awful and it's time to fix it. That doesn't mean it's a physical threat. When I say threat, it means things are getting to get escalated.

Q. Okay.

A. When I say threat it means I'm not gonna get -- I am not gonna have you get away with it.

Q. Okay.

A. That means a threat.

Q. Okay. I know that's what you perceive it to mean. Is it -- is it fair to say that a judge disagreed with you?

A. Which judge?

Q. Well, let's see, I'm gonna show you ---

A. Yeah, I want to see that ---

Q. --- Exhibit 21.

A. --- as soon as possible. I can't wait.

Q. Okay.

(DEFENDANT'S EXHIBIT NUMBER 21 WAS MARKED.)

Q. This is 7932.

A. Okay.

Q. The first is the no-contact order and it gives -- for stalking or non-consensual sexual conduct.



A.   Okay.

Q.   That was ordered against you on November 6th.

A.   Okay.

Q.   Previously there had been a temporary no-contact for stalking or non-consensual sexual conduct on September 20th of 2023.  Do you remember these orders?

A.   I remember most of it, yes.

Q.   'Cause based on this order, you were at the court when these orders were issued, correct?

A.   I think that was virtual.

Q.   You were at the hearing, either virtually or in person, when these were ordered.  Is that correct?

A.   The first one, yes.

Q.   Okay.  The findings of the court ---

A.   Yes.

Q.   --- "Defendant," which is you ---

A.   Yup.

Q.   --- "has been sending threatening emails to plaintiff and other UNC staff since he resigned from UNC as a medical fellow."

A.   Okay.  Which page is that?

Q.   7934.  This is on the temporary no-contact



800.211.DEPO (3376)
EsquireSolutions.com

order.

A.    Okay.

Q.    The judge ---

A.    Where is the thing that said ---

Q.    I'm not done.

A.    You're talking about something you're reading so I need to follow with you.

Q.    It's 7934.  It is the temporary no-contact ---

A.    7934.  Okay.

Q.    --- for stalking that was issued September 20th ---

A.    Okay.

Q.    --- by Judge Joal Broun, I believe.  Date of the hearing September 20th.  The judge then found, "Defendant has been sending threatening emails to the plaintiff and other UNC staff since he resigned from UNC as a medical fellow.  The emails have been increasingly more violent."  So it wasn't just -- first, do you remember this order?

A.    I remember there is a lot of these things, but yes.

Q.    So it wasn't just the staff or the UNC employees that perceived it as a threat, it was a sitting, elected judge that perceived your emails to



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 209 of 348

be threats?

A. As you see here, if this is their decision so I don't see -- where is the violence? Increasing more violent ---

Q. Uh-huh (affirmative).

A. --- emails?

Q. Uh-huh (affirmative).

A. Okay, my emails were violent. Is that a threat? I mean...

Q. So you admit the emails were violent?

A. I am reading what you're saying here.

Q. Okay ---

A. My emails are so obvious, everyone can understand English can understand what's behind it. You cannot just propose that I'm holding any physical threat to any person. I lived here more than ten years. There is no single violence.

Q. Well, to be fair, it wasn't me that found it, it was ---

A. And by the way ---

Q. --- two -- it was two separate court judges that found it.

A. Yeah, they all dismissed. Do you know that?

Q. Was the no-contact order in place for two



800.211.DEPO (3376)
EsquireSolutions.com

years?

A.    Yeah, anybody can get a no-contact order. It's not like they -- they give jewelry or they give sweet like chocolates, here is a no-contact order. Anybody can get a no-contact order.  That doesn't mean I'm a criminal.

Q.    Okay.  But if you violate this order it does.

A.    Yeah, if intentionally violate, I -- I should -- that's not good.  If I intentionally violate any court order, that's not good.

Q.    Uh-huh (affirmative).  And as a part of the order, and I'm -- I'm looking at 7932 again.

A.    7932.

Q.    This is ---

A.    Okay.

Q.    --- the order that was issued November 6th, 2023.  Again finding that you had placed the plaintiff in reasonable fear.  "Defendant sent emails to plaintiff and other faculty at UNC Ophthalmology that made statements that 'I wish you see such damage to your loved ones' and 'I wish you the worst things ever to you'" -- teammates additionally -- excuse me, I'm not sure I read that -- "additionally defendant sent the headlines from


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

the murder of a UNC faculty member to plaintiff and other faculty on the day the murder occurred.  He did not include context."  Judge then ordered you, among other things, to cease stalking the plaintiff.  To cease harassment of the plaintiff.  Not to abuse or injure the plaintiff.  And I'm -- this is important -- not to contact the plaintiff by telephone, written communication, or electric means.  Do you remember this order?

A.    Yes.

Q.    You admit that you violated this order ---

A.    No.

Q.    You didn't violate ---

A.    I did not violate it.  It was never intentional to violate any orders.  And that's why it was dismissed before hearing.

Q.    Well ---

A.    Nobody even thought it's worth it.  And they dismissed it before hearing.  You understand what that means?

Q.    Well, this was ---

A.    It's actually a shame that when I go to the superior court they just dismissed it and they believe there is no evidence of anything.

Q.    I think you're thinking of Dr. Ulrich's.

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.    I'm sorry?

Q.    I think you're thinking -- this is ---

A.    No, I'm talking about Zhang.

Q.    Well, you had the no-contact order in place for a year after this.

A.    Okay.

Q.    This was issued November 6th, 2023.

A.    Okay.

Q.    I'm gonna show you an email from March 4th, 2024.

A.    Yeah, I remember that email.  Yeah.

Q.    Again, remember you were told by a judge not to contact Dr. Zhang.

A.    Correct.

Q.    Not to harass Dr. Zhang.

A.    Correct.

Q.    And you said you did not do that?

A.    I never did.

Q.    Okay.

A.    And I never did.

Q.    I have an email, marking it Defendant's Exhibit 22.

A.    Okay.

(DEFENDANT'S EXHIBIT NUMBER 22 WAS MARKED.)

Q.    You sent on March 4th, 2024.



800.211.DEPO (3376)
EsquireSolutions.com

A.    Yup.

Q.    To a litany of people.

A.    Yup.

Q.    Including Dr. Zhang.

A.    Okay.

Q.    You emailed her?

A.    No.  I did not -- I know you're gonna point at this.  I went through this hundred times.  So that was an error.  That was not intentional.  Look at the email time.

Q.    Sure.

A.    What time?

Q.    2:23 a.m.

A.    Okay.  That's one thing, how much stress I was, how much -- and then how many emails I sent after the no-contact order.

Q.    But I'm not done talking.

A.    No, I'm not gonna ---

Q.    I'm ---

A.    No, you are asking me for an answer.

Q.    I haven't.

A.    Okay, no -- no questions then?

Q.    No questions.

A.    Okay.

Q.    After the no-contact order you sent an



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

email on March 4, 2024, in which in the body of the email, I'm looking at 7689, you say, among other things, "Dr. Zhang told the UNC investigators that I represented a patient age incorrectly. Dr. Zhang lied to the investigators. Dr. Zhang used to ignore me and contact the residents instead to minimize me. Dr. Zhang decided not to work with me in late October." And you sent this to Dr. Zhang. This is a clear violation of the no-contact order, correct?

MR. MADISON: Objection.

BY THE WITNESS: (Resuming)

A. I did not send this to Dr. Zhang. Dr. Zhang was wrongly involved in one single email for the last three years or two-and-a-half years. One single email when there is a contact order. There is only one single email sent at 2:00 a.m. to, again, continue exposing to the other authorities: American Academy of Ophthalmology, American University Professor of Ophthalmology, my previous doctors at Harvard and Duke. I sent a lot of kinda emails.

This is the only that involved with Dr. Zhang. This is the only violation, which is, again, not intended. Not -- not -- I didn't mean it. And that's, again, why it was dismissed before



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 215 of 348

hearing.

Q. Well, I think the no-contact order was in place but just ---

A. Yeah, anyone can get a no-contact order. That's actually no problem.

Q. Not -- not everyone can violate it like you did?

A. I did not violate. You try your best, the judge does not agree with you.

Q. Okay.

A. You said before that the judge believe and I violated and I have a judge, which is a superior judge, does not even listen to you.

Q. Okay. Did you tell medical boards about the various no-contact orders directed against you by former colleagues?

A. No. When there is questions about any legal issues, I talk to the medical boards. I answer the questions fairly and truthfully.

Q. 'Cause they would want to know that two judges found that you were harassing former colleagues, right?

            MR. MADISON: Objection, argumentative.

            MR. PADGET: That's fine.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 216 of 348

BY THE WITNESS: (Resuming)

A. You are just desperate to prove anything.

Q. Okay. A couple more contact orders here.

A. Actually there is a lot of contact orders on cyberstalking and stuff, good luck. Go. I am listening.

Q. Yeah, there is.

A. I feel bad for you.

Q. Thanks. The same. This is a -- the formal permanent no-contact order that Dr. Ulrich got against you ---

A. Yup.

Q. --- on February 8th, 2024.

A. Okay.

MR. PADGET: Or actually can I have a defendant's sticker, I forgot one. Sorry.

MR. MADISON: This is 23?

MR. PADGET: I believe it's 22. Yeah, it's -- nope, it's 23. You're right.

THE COURT REPORTER: 23.

MR. PADGET: Yeah.

(DEFENDANT'S EXHIBIT NUMBER 23 WAS MARKED.)

MR. PADGET: Thank you. Yeah, thank you. And I'll just provide you this. Can I have that back real quick, sorry about that.

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

BY MR. PADGET: (Resuming)

Q. Do you remember this order? Again, directing you not to contact ---

A. Dr. Ulrich.

Q. --- or abuse or harass or stalk Dr. Ulrich?

A. Or sexually conduct, yes, I can see that.

Q. Do you remember this order?

A. Of course. I mean, I -- I knew about it.

Q. When did you know about it?

A. A few months after I contacted my attorney, Jacqueline Cobb.

Q. Okay. Do you remember when that was?

A. So that was, again, a few months after -- not a few months -- maybe a couple months after I contacted Dr. -- sorry -- Ms. Jacqueline Cobb.

Q. Uh-huh (affirmative).

A. She told me about it.

Q. You didn't know about it before then?

A. No.

Q. 'Cause you had sent -- continued to send various emails to Dr. Ulrich throughout that time. Is that right? In the spring of -- fall of 2023, spring of 2024?

A. What is your question?



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 218 of 348

Q.   You had continued to email Dr. Ulrich throughout this entire time period harassing him about his past actions?

MR. MADISON:   Objection ---

BY THE WITNESS:   (Resuming)

A.   I don't agree about that approach.  This was not delivered to me.  I was not aware of any no-contact order with Ulrich.

Q.   Uh-huh (affirmative).

A.   Once I get aware, I never contacted him.

Q.   Okay.

A.   And, again, do you know how did it end, it was even dismissed because I was not aware of it.

Q.   Okay.

A.   So the judge did not agree with you or Ulrich ---

Q.   Okay.

A.   --- about the contempt.  Another judge.

Q.   Uh-huh (affirmative).  I'm curious about this finding, I just -- I'm not sure what it is. 'Cause this appears -- at some point, were you also charged with cyberstalking, a criminal offense?

A.   Yeah, they tried the contempt of no-contact, they failed, so they tried another thing, cyberstalking.



Case 1:24-cv-00336-CCE-JEP   Document 68-3   Filed 03/13/26   Page 219 of 348

Q.   Okay.

A.   And, again, it's based on the one single thing.  It's based on the same email.

Q.   So they took it a little more seriously than you did, fair to say?

A.   No, they tried to find anything to harm me.  It's not like about more seriously.  I lived in Illinois, which is how many hours?  I do have a full-time job.  I'm -- I'm -- they just trying to give me noise and I'm pretty sure they wanted to use these things as a leverage at some point, but they failed.  Do you know they also contacted the immigration?

Q.   I haven't asked you a question in a while.  So let's look at this.

A.   Yeah, go ahead.

Q.   It appears in here that you pled guilty to cyberstalking?

A.   Okay.

Q.   Is that true?

A.   It was not guilty.  It was dismissed after a probation period of five months.

Q.   Well, let's look at what it says.

A.   Yeah.

(DEFENDANT'S EXHIBIT NUMBER 24 WAS MARKED.)



800.211.DEPO (3376)
EsquireSolutions.com

Q.    I am looking at UNC7960.

A.    Okay.

Q.    Regarding a case summary from Durham District Court involving you and a charge of cyberstalking.  And this is Defendant's 24.

A.    Okay.

Q.    It then goes on, on page 7961, at the bottom it says, "Disposition," that line, a plea where you pled guilty to cyberstalking.  Is that correct?

A.    I don't know what means pled guilty.  I never admitted I was guilty about this.  That was maybe some arrangement between my attorney and whatever the state, is let's just give him five months and dismiss the case.

Q.    So you are unaware that you pled guilty to cyberstalking ---

A.    I saw that guilty thing later on.  But before that, I thought there is some kind of deal between the state and my attorney.  There was no court.  There was no court.  They just communicated each other and then they decided to have like a five months probation.  I never talked to a judge.

Q.    And this was related to your conduct involving Dr. Ulrich and the emails you sent to him?



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 221 of 348

A.   He said cyberstalking.  I don't even know what cyberstalking means.

Q.   So you -- I'm just trying to clarify -- you thought you just received five months probation but you didn't plead guilty?

A.   Yes.  I -- I only saw that guilty thing over here (indicating) ---

Q.   Uh-huh (affirmative).

A.   --- in these documents, but I never had a court order that I'm guilty or I never admitted that I'm guilty.  And whatever the deal so was between the attorney and the state, they wanted to say, okay, let's give him actually five months -- first they said six months, and then later on they decreases because they believe there is some sort of retaliation going on with the case.  That what I got from my lawyer.  And after five months without any supervision, without any health evaluation, without anything, they dismissed it.

Q.   Okay.  Have you told any of your employers or potential employers that you pled guilty to cyberstalking?

A.   I always submit every documentation to every application I submit if they ask me questions.  So what kind of question I should respond to this?



800.211.DEPO (3376)
EsquireSolutions.com

Because this is not, again, what do you -- you have to go through some certain stages of court processing and if you end up with a final decision, then you report it, right?  Is that a final one?

Q.   It's your case in which you pled guilty and so I'm not sure.

A.   Yeah.

Q.   Okay.

A.   So most of the stuff I document, I send, I have, I have no thing to hide at all.

Q.   Okay.

MR. PADGET:  I have two more emails, and then let's take a little break.

MR. MADISON:  Okay.

(DEFENDANT'S EXHIBIT NUMBER 25 WAS MARKED.)

BY MR. PADGET:  (Resuming)

Q.   The first one is going back in time a little bit.  It's January 15th of '24 -- 2024, Exhibit 15 -- excuse me -- Exhibit 25.  An email again, that you sent, I'm just curious about it, at 3:54 in the morning to Dr. Ulrich, the investigator from the EEOC, and Dr. Budenz.

A.   Yes.

Q.   Did you often send these types of emails to those individuals?



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 223 of 348

A.   Did I often send?

Q.   Yeah.

A.   You have all the emails I sent already.

Q.   So is that a yes?

A.   You have the emails already there.  What do you mean by often?

Q.   I'm just curious how often you send an email like this that ---

A.   Yeah ---

Q.   --- some people could perceive as ---

A.   --- I don't know what you mean by often ---

Q.   --- threatening?

A.   --- but I sent emails.

Q.   Why'd you include the person from the EEOC?

A.   Well, instead of -- she has to be involved.  I mean, that was during the EEOC investigation.

Q.   This is January of this year.

A.   Yes.

            MR. MADISON:  Objection.

BY THE WITNESS:  (Resuming)

A.   Yes.

            MR. MADISON:  This is last year.  You



800.211.DEPO (3376)
EsquireSolutions.com

said January of this year.

MR. PADGET: Oh, I'm sorry. I apologize.

BY MR. PADGET: (Resuming)

Q. Strike that. January 2024.

A. Yes.

Q. So you included her in an email you sent to Dr. Budenz and Dr. Ulrich at 4:00 o'clock in the morning because of the investigation ---

A. Right.

Q. --- with subject title, "How do you feel?"

A. Yes.

Q. What was the purpose of this email?

A. Well, as I said, when I feel something, I write it down.

Q. Okay.

A. So can you read the email?

Q. I'm all right.

A. Can I read it?

Q. No.

A. Because I wanna -- I wanna read it.

MR. MADISON: It's ---

BY MR. PADGET: (Resuming)

Q. It's in the record, we're good.

A. Okay.



800.211.DEPO (3376)
EsquireSolutions.com

(DEFENDANT'S EXHIBIT NUMBER 26 WAS MARKED.)

Q.   I got one more that I'm just -- I'm very curious about, that's Exhibit 25, email dated April 18th, 2024.  This would have been when you -- this would have been after the no-contact order, but this would be you -- perhaps when you say you were not aware of the no-contact order?  April of 2024?

MR. MADISON:  It's 26.

BY THE WITNESS:  (Resuming)

A.   26.

Q.   This is ---

MR. MADISON:  It should be 26.

MR. PADGET:  26?

MR. MADISON:  Yeah.

MR. PADGET:  26.  I keep miscounting, my fault.  Thank you both.

BY MR. PADGET:  (Resuming)

Q.   All right.  And I'm just -- I'm just curious what this is?  'Cause I'll tell you what it appears to be and you can correct me.  It appears to be an email ---

A.   That's the same thing, the gunshot.

Q.   It's not -- well, that's what I want to know 'cause at the very top, and again this is UNC7850, it appears to be an email Dr. Rageh to Dr.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Ulrich on April 18th, 2024, at 7:57 in which you forwarded your previous email about the fatality at UNC. Do you remember this email?

A. No. I mean, so I sent that email on 4/18/24 to only Dr. Ulrich sent from my iPhone.

Q. 'Cause this would have been after the no-contact order, which I ---

A. Which Dr. Ulrich was ---

Q. --- you said that you were not aware of.

A. --- already involved in the first email, right?

Q. Yeah. So it's curious why you would resend him an email about someone being shot at UNC in this here letter. Do you have any reason why?

A. Did I explain why in the following email? Because there's some email that I sent to Ulrich and then I apologized and I wanted to forward to my attorney.

Q. This is all I saw from this (indicating).

A. Okay. You have to find my response or follow up on this if you are fair. The following email was like, sorry, Dr. Ulrich, I mean to send this to my attorney. My attorney said something like, you know, when you talk to actually have some privacy and you should not ---



MR. MADISON: Ah -- okay, yeah.

BY THE WITNESS: (Resuming)

A. You know what I mean?

MR. MADISON: Right, just don't disclose anything you shared ---

BY MR. PADGET: (Resuming)

Q. Attorney/client, yeah.

A. Yeah.

MR. MADISON: --- with your attorney.

BY MR. PADGET: (Resuming)

Q. So this wasn't a threat to Dr. Ulrich?

A. That was not a threat. That was not even -- I apologize for it.

Q. Okay. I see.

MR. PADGET: Let's go off the record for a little bit.

THE COURT REPORTER: Off record, 2:27.

(Whereupon, a recess ensued from 2:27 p.m. to 2:39 p.m.)

THE COURT REPORTER: On record, 2:39.

BY MR. PADGET: (Resuming)

Q. All right, Dr. -- or Abdul, I only have a few additional questions. The first is, in your discovery you include a number of text messages with



800.211.DEPO (3376)
EsquireSolutions.com

a number of people and I was just curious who they were.  The first -- the first one is Vikram Ponnusamy?  Ponnusamy.  I'm not sure how to say the last name.

A.  Me neither, so.

Q.  Okay.  Who is that?

A.  A resident.  That was his -- Dr. Zhang favorite resident.

Q.  Resident at UNC?  Okay.

A.  Yeah.

Q.  Do you remember who Patrick 2222 is?

A.  Yeah, another resident.

Q.  Okay.  I'm gonna guess this one, do you remember -- sorry -- what -- do you remember Patrick's last name?

A.  Lee.

Q.  Okay.

A.  I'm not sure.

Q.  Okay.  The next one is Ali resident, I'm guessing she was also a resident?

A.  Yeah.

Q.  Do you remember her last name?

A.  I can find it on my phone.

Q.  Okay, would you mind looking.

A.  Yeah.



800.211.DEPO (3376)
EsquireSolutions.com

Q. Yeah. I also just -- while you're looking, I'm looking, the next ones are Luke UNC and Hannah UNC.

A. So, yeah, she -- she's Harmel, I guess.

Q. Ali, say that again.

A. It's probably Alison Harmel.

Q. Harm? Can you spell the last name.

A. H as Henry, a as apple, r as Robert, m as meter, e as Edward, l as Lambert.

Q. Okay. Do you have any idea about Luke or Hannah on your phone?

A. Yeah, I worked with them.

Q. Okay. Were they both residents as well?

A. Yes.

Q. Okay.

A. Yeah, Alison Harmel.

Q. Okay. Do you remember Luke's last name?

A. Luke?

Q. Yeah, Luke UNC, Hannah UNC?

A. Yeah, it's easy to put their email, their name, and then Luke UNC. (Witness looking through phone.)

MR. PADGET: Here, let's do this just so -- I can send you an email or send you another interrogatory ---



MR. MADISON: Okay.

MR. PADGET: --- and I'll just -- there's about -- there's only about nine or ten of them, and just the names. They're just taglines. And that way we don't waste everybody's time. It's not -- I'm just curious who they were 'cause the -- we have texts and I just -- I didn't have any additional information. Is that okay? Does that work?

MR. MADISON: That's fine.

MR. PADGET: Okay.

MR. MADISON: You -- you're just -- well, I guess, the interrogatory -- I mean, let us know what exactly you're looking for.

MR. PADGET: Sure. I will send an additional interrogatory with that. Yup, that's fair.

BY THE WITNESS: (Resuming)

A. So you're asking me for their last names and first names and ---

Q. Yeah, I'll just -- let's just not worry about it for now, I'll send it to you. These are all people with whom -- or whom you sent text messages to us and it was more just like Hannah UNC, and I'm just curious who that is. And I'll just



800.211.DEPO (3376)
EsquireSolutions.com

send you an interrogatory and that way we don't --
you can just look and just let us know and ---

A.    Okay.

Q.    --- that's easy.  In your discovery, I believe you sent us tax records, I think it was for 2020 and 2021.  I did not see any for the last couple years.  I am assuming you have paid taxes for the last couple years?

A.    Taxes?

Q.    Yes.

A.    Of course.

Q.    I would just -- I didn't see them in your discovery responses.

A.    Was there a request for taxes?

Q.    I believe so.

A.    I don't recall that.

Q.    You sent two years of tax returns.

A.    I mean, if you need the taxes, I can send it right now.

Q.    Okay.

A.    Like you're talking about the -- the taxes, the state taxes?

Q.    The state -- state and federal taxes.

A.    Federal?

Q.    Yes.


800.211.DEPO (3376)
EsquireSolutions.com

A.   Okay, yeah.

Q.   Okay.

A.   I have it.

Q.   Okay.  All right.

A.   Was there a question about taxes in the discovery or the thing, questions?

Q.   I believe there was, yes.

MR. MADISON:  I think so, yes.

BY THE WITNESS:  (Resuming)

A.   So then I -- I did not send everything?

Q.   You sent a couple years, just not the most recent years.

A.   Okay.

Q.   Yeah, I think it was -- it was either '21, '22 or '20 and '21, I can't remember.  But it wasn't for the last couple years.

A.   Okay.

Q.   Because the one of 2024, I just got the refund a couple weeks ago.

Q.   Yeah, I -- to the extent you have additional tax records, I would ask you to send them.

A.   I can send them, no problem.

Q.   Okay.  I wanted to -- I do want to talk with you a little bit about -- and this is going



Case 1:24-cv-00336-CCE-JEP     Document 68-3     Filed 03/13/26     Page 233 of 348

back if you want to look -- I'm looking at Defendant's Exhibit 7, which are your interrogatories, your responses to interrogatories.

A. Exhibit 7 you said?

Q. Yes.

A. Got it, yes.

Q. Page 25.

A. Okay.

Q. Talking about your purported damages here.

A. My what?

Q. Your alleged damages.

A. Okay.

Q. The first bracket you allege is that allege economic damages, 15 million to 18 million.

A. Okay.

Q. Do you see where I'm reading that?

A. You can just -- yeah, all the way down here, okay.

Q. Yeah. How did you come by that number?

A. Well, there is a lot of things. First, if I have completed this surgical fellowship, which was supposed to be two years, there is gonna be almost no limit to my income. Surgeons can make two -- up to one half million a year if they are employees. If they are employers and they own a practice and



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

they do surgeries, there is no limit.

Q.   Okay.

A.   That's one thing.  I mean, if you are talking about about this kind of number, so that's my answer.

Q.   But did you rely on any financial ---

A.   Yeah.

Q.   --- expert or does this just purely ---

A.   I'm in the field.

Q.   --- what you believe you would have earned if you had gotten the -- the fellowship?

A.   I'm in the field.  I know people making more than that.  I know them personally.

Q.   You also know people making less than that, I would bet?

A.   Of course, there is people who are not smart enough to explore better options.  There are people who are more in academia, which pays a lot less.

Q.   Uh-huh (affirmative).

A.   But they get the superpower in academia. So it depends where you want to practice.  It depends not only where, it also depends on if you own the practice or if you are employer or employee, whatever.  It depends on many things.  Lectures, you



800.211.DEPO (3376)
EsquireSolutions.com

can give lectures.  You can do research.  There is a lot of things can contribute to a lot more income if you are a surgeon in surgical retina.

Q.   You mentioned earlier that some surgeons, I think you noted some make half a million dollars a year?

A.   I make half a million dollars a year.

Q.   And that's less -- I was gonna say that's less than what you make, right?  'Cause you make six hundred plus bonuses, right?

A.   Yeah, I make six hundred plus right now.

Q.   Okay.

A.   There are surgeons who maybe have no jobs ---

Q.   Okay.

A.   --- not only making nothing.  Just there are everything.  So it's all about the potential. Yes, there is a potential for much more than that number.

Q.   Next, inability to obtain board certification.

A.   Correct.

Q.   You note you are ineligible to sit for the American Board of Ophthalmology exam.  Before I ask about that, I wanted to -- we've talked a little bit



Case 1:24-cv-00336-CCE-JEP   Document 68-3   Filed 03/13/26   Page 236 of 348

about a litany of medical boards you've applied to all across ---

A.   Medical state boards, yes.

Q.   Yeah.  Have you been denied any medical board, state board licenses?

A.   Officially, no.

Q.   Okay.

A.   Kentucky did not approve my license. Kentucky sent me the reason, as I asked them, and they sent me that the only thing they explain it was North Carolina letter to them.

Q.   Say that again.  Well, you said officially, no, but Kentucky did what?  I'm trying to ---

A.   When I went to Kentucky Medical Board ---

Q.   Uh-huh (affirmative).

A.   --- I provided everything.  There was no mention at all to UNC during the conversation with the board members.

Q.   Uh-huh (affirmative).

A.   But one of the board members talked to my attorney and the attorney said they were kinda questioning because I was sending email including Kentucky Medical Board representative.  And ---

MR. MADISON:  Don't -- be careful not



to disclose discussions with your ---

THE WITNESS:  There is not much disclosure.

BY THE WITNESS:  (Resuming)

A.   They said that he's told me that they gonna decline your license because some stuff going on at UNC.  And then I waited for the hearing, nobody ask me anything about UNC, and they did voting.  Three people said no and two people, I think, said yes, to give me a license.

Q.   Uh-huh (affirmative).

A.   After that, I talk to my attorney about the background about UNC stuff because he was only informed by the medical board that there is some stuff at UNC.  And he told me, he explained that to the director of the medical board in Kentucky, the director of the medical board told him that he might issue me a license if I have a -- a job in Kentucky.

Q.   Uh-huh (affirmative).

A.   And he told him too that the issues about UNC could, even though affected the voting, but he can resolve it later on.  He can work on it in another -- in another stance and he believe me.  The attorney told him and he believed me and he wanted me to get a job only a few weeks or so after I



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 238 of 348

started at UN -- at Illinois.  So I'm not gonna -- even though I had job offers, but I'm not gonna talk to an employer in Kentucky to get another offer.

Q.  Okay.

A.  Do you know how long it did take for the license in Kentucky to make a decision?  More than a year.

Q.  Okay.

A.  Or almost a year.

Q.  That's your interpretation of why they denied your license?

A.  It's that what they send me.  That's what they sent me.

Q.  Well, that's not what they sent you.  They -- they're -- what did they send you?  I'm confused.

A.  They sent me an email.

Q.  Uh-huh (affirmative).

A.  It says a minute, kinda minute is like a decision or something, that I was voted for a license and two people said yes, three people said no.

Q.  Yup.

A.  And he also that -- the same thing said he was relieved from duties due to patient harm.

Q.  Okay.



A.    That was in the email when I asked them for -- I just need a formal decision on my license. So they sent me that email, Dr. Rageh was relieved from UNC because of patient safety concerns.  After discussion, two people said no -- sorry, two people said yes to me getting a license, three people said no.  And that's it.

Q.    Okay.

A.    That's what they said.

Q.    Okay.

A.    In the email.

Q.    Okay.

A.    Documented.

Q.    On here for non-economic damages, emotional distress, and psychological injury you allege two plus million dollars.  Is that right?

A.    I mean, second page?

Q.    Yeah.  Oh, yeah, I'm sorry, go back. Thank you.  Did you ultimately get a license from Kentucky?

A.    No.

Q.    Okay.

A.    Even though I applied twice.

Q.    Did you ever have a job offer from Kentucky?



800.211.DEPO (3376)
EsquireSolutions.com

A.   I said before, yeah.   And the first time when I got the job offer I applied for a license.   I got two job offers in Kentucky.

Q.   From where?

A.   Two places.   One is in Tennessee, they do have multiple locations, one of them in Kentucky. The other one was in -- actually three, not two.   So the one in Tennessee they had a location in Kentucky and he wanted me to do multiple satellite offices. The other place was Retina Associates of Kentucky in Lexington.   And the third one was in Paducah. Something call Paducah Eye Center.   I'm not sure.

And all of these people, after the interview I had a very positive response.   Some of them had me offers.   Some of them signed or had me sign the offers.   And then after they contacted UNC, I didn't know how did that happen, but one of the offers I got in Pennsylvania, after I signed it, asking me for a reference at UNC.   I sent Dr. Ulrich email. The following business day they declined the offer I sign.

Q.   Okay.

A.   The places is in Paducah and Retina Associates.   These two places were very interested but, again, after I provided them some references at


Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 241 of 348

UNC, they never communicated back again. The other office in Tennessee, which has a practice in Kentucky, they sent me an offer and I was going to start the offer, except my license was delayed.

Q. Okay.

A. I hope that answers your question.

Q. For the emotional distress and alleged damages, how did you arrive at two million dollars? Two million plus actually.

A. How did I arrive to that?

Q. Yeah.

A. Is that something?

Q. That's something you wrote.

A. Yeah. So usually I Google. Usually I do ChatGPT. Usually I explain my things and then I end up with some projected numbers.

Q. Are you still receiving mental healthcare?

A. Yes. Not -- not as frequent as before.

Q. In the records you sent us, the only ones that I saw are the ones we talked about today that ended in March ---

A. No, you have other records from state places in North Carolina and Illinois.

Q. I will double-check, I do not believe I do.



800.211.DEPO (3376)
EsquireSolutions.com

A.    We can send it again.

Q.    Okay.

A.    And, by the way, you mentioned earlier, so the reason one of the whatever civil or criminal charge was dismissed is I provided a letter from my healthcare in Illinois.  So there was a letter in the documents.

Q.    Have you ever been diagnosed with anything other than adjustment disorder, anxiety, and depression?

A.    This gastric and ---

Q.    Okay.

A.    --- right now I believe I have a lot more.

Q.    A lot more what?

A.    I believe I have irritable bowel.  I believe I have a stressed bladder.  I believe I have diabetes.  I -- I believe I have a lot.

Q.    That's all I have.  Thank you.

A.    Oh, it was a pleasure.

                    EXAMINATION

BY MR. CONNOR:

Q.    Okay, Dr. Rageh, am I saying that right?

A.    Yes.

Q.    I represent Dr. Zhang.

A.    Can you come closer so...



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 243 of 348

Q.   I'm gonna speak from here.  Are you okay with my ---

A.   Can I move to the other side?  I'm gonna sit ---

MR. MADISON:  I'm not sure if she can hear you.

THE COURT REPORTER:  He just needs to get on ---

MR. MADISON:  Okay.

THE COURT REPORTER:  Well, no, no, please don't ---

MR. MADISON:  Don't ---

THE WITNESS:  Oh.  I want to just have him face to face.

MR. MADISON:  Yeah, we can't move her equipment, though.

THE WITNESS:  I'm sorry.

THE COURT REPORTER:  My recording device can only go so far so ---

THE WITNESS:  Okay.  Can he move to the ---

THE COURT REPORTER:  --- this is where it can go.

THE WITNESS:  --- this other seat?

THE COURT REPORTER:  Should we go off



record?

MR. CONNOR: We're -- we're okay.

THE COURT REPORTER: Okay.

BY MR. CONNOR: (Resuming)

Q. I'm looking right at you.

A. I can -- I mean, it's not perfect, but what's wrong kinda sitting in front of me?

Q. Someone's already sitting there.

A. Yeah, he can change places.

Q. Dr. Rageh, I have a few follow-up questions, and I want to tell you who I represent because it's important because I don't represent everyone. I represent only my client, who I've told you. I don't represent Dr. Ulrich. I don't represent UNC. So a lot of my questions are specifically about her. And I say that because I know that you've given a lot of testimony today and -- and at times -- and I know you have a lot to say, but I'm just focused on -- on Dr. Zhang. First of all, I don't think we covered this, but do you suffer from any medical condition that would affect your testimony today?

A. Other than what I just disclosed.

Q. Okay. Does that condition, would that prevent you from giving truthful and accurate


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

testimony today?

A.   No, I'm always giving truthful and honest answers.

Q.   Okay.  Are you -- have you ingested any prescription or nonprescription substances that would impair your testimony today?

A.   Nothing is impairing my testimony.

Q.   Okay.

A.   Nothing.

Q.   You feel like you can give accurate and truthful testimony.  Is that right?

A.   Of course.

Q.   Okay.  What is your date of birth?

A.   July 25, '82.

Q.   And -- and with regard to your stint at UNC while you were with my client, Dr. Zhang, what was the first instance that you believe that she did something that you feel is unlawful?

A.   Yeah, first week when there was a patient I examined, I examined the patient.  I looked at the images.  She asked me about it and then she went to the resident.  The resident agreed with me, but she said we don't care about what Dr. Rageh said, what -- what do you see?  She was talking to one of the residents, not Patrick, maybe Luke.  She was talking



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 246 of 348

to him and she said, in front of everyone, don't worry about -- or don't worry -- it's like ignore Dr. Rageh and like tell me what did you see.  She was talking to the resident, and the resident agreed with me, but she, again, ignored me.

Q.   And you believe that that was unlawful?

A.   Oh, I mean, in a retina -- in a residency program, there is always -- that was a second-year resident.  A second-year resident.  His knowledge was much -- he was beginning.  And the way she phrased it is she wanted to put me too much down in front of everyone.  That is what I believe happened.

Q.   And that -- and that was the second week that you had started ---

A.   Yeah, very, very early in -- in August.

Q.   How many times had she met you?

A.   Met me?  We worked every week, like we have a full ---

Q.   So before ---

A.   --- I mean ---

Q.   --- you started, had you -- had you interviewed with her?

A.   Yes, I interviewed with her virtually and in person.

Q.   Okay.  And -- and do you know whether she



Case 1:24-cv-00336-CCE-JEP   Document 68-3   Filed 03/13/26   Page 247 of 348

wanted you to come on board?

A. At that time?

Q. Uh-huh (affirmative).

A. Back then?

Q. Yeah.

A. Yes.

Q. Okay.

A. And that was not her decision, I believe.

Q. But do you -- do you know if -- if she could have vetoed your fellowship?

A. How can I know?

MR. MADISON: Objection, calls for speculation.

MR. CONNOR: I -- I just asked if he knows.

BY MR. CONNOR: (Resuming)

Q. Do you know?

A. At -- at that time?

Q. Yeah.

A. No, at that time I felt I -- I have a -- a position. Like they -- everything they said back then, I was the best at -- best applicant.

Q. Uh-huh (affirmative).

A. I do have huge experience. Everything then, once I matched, everything was good, at least



looking good.  Dr. Ulrich used to make -- speak in Arabic sometimes to welcome me.

Q.    Uh-huh (affirmative).

A.    Dr. Zhang and Dr. Willett and Dr. Brewington, they invited me for a dinner and we had some kinda jokes.  That was the first time ever I meet with all of them.

Q.    Okay.

A.    But, again, it was not I'm sitting with her alone, they are -- like Dr. Zhang was sitting next to Dr. Brewington.

Q.    Uh-huh (affirmative).

A.    I was sitting next to Ulrich.

Q.    Uh-huh (affirmative).

A.    And Dr. Willett was having his kid playing in the background.  So that was the kinda interview.

Q.    Okay.

A.    And it was very brief.

Q.    So what do you think changed about Dr. Zhang initially wanting you to come on board and then you feel like two weeks later that she had a problem?

A.    I think what Dr. Ulrich told me, that there is a lot concerns from Dr. Zhang about my age, even before I started.



800.211.DEPO (3376)
EsquireSolutions.com

Q.    Okay.

A.    And then that was the only reason I can digest because in my culture, again, I don't know what discrimination means.

Q.    Uh-huh (affirmative).

A.    I don't know -- or I can't pretend I like someone and hid it in my -- from his back.

Q.    Uh-huh (affirmative).

A.    So, obviously, later on I found out that even before I started she did not like me, as Dr. Ulrich said.

Q.    Okay.

A.    And that continued until we get much more in contact, working with each other.  So it was much, much more obvious.

Q.    Uh-huh (affirmative).

A.    And, again, Dr. Ulrich said he noticed how much was she aggressive to me, how much she was sensitive to anything I say or do.  He told me that verbally.  And he also said from day one she started to document things and sending him too much detailed emails.  I did not understand what's going on.

Q.    Uh-huh (affirmative).

A.    Why is she sending him emails and why he's saying this to me.  He's trying to be -- he was



800.211.DEPO (3376)
EsquireSolutions.com

initially nice, but something happened at some point that he had to cover her up.

Q. What about your age concerned her, if you know?

A. Right now I understand. I'm five years older than her.

Q. Okay.

A. Right now I know that.

Q. Okay. And -- and what do you -- why do you think that concerned her?

A. That's what Dr. Ulrich said.

Q. Okay.

A. It's not me who realized that I'm too much older, I don't know her age. But she asked me a couple times about my age. The resident also asked me about my age. And then I am -- I kinda try to understand there is something called discrimination based on age.

Q. Uh-huh (affirmative).

A. Which was never, to my knowledge, before. And that how did it go. She's five years younger than me. I only knew this information last week.

Q. Uh-huh (affirmative).

A. And she is my supervisor. She's my attending, so.



Q.  Well, after the second week, what was the next incident that you believe showed that she ---

A.  Many things.

Q.  Okay, tell me.  Tell me.

A.  Yeah, many things.  So this one about the image.  If we have a patient in the in -- inpatient and the patient need advanced intervention like intraoperative injection, she ask me to contact the pharmacy, get the medication ready, and do all the work.  And then when everything is ready, she takes the resident, let Abdu leave, and you do the procedure.

I was like why she's not telling me that?  Why she's telling you that?  And then I was like -- I ask the resident, have you done this before?  He said, no.  Have you done any intraoperative injection before?  He said, no.  I contacted her, Dr. Zhang, what's going on?  Why you not communicating directly with me?  She never communicates directly with me.  She ask the resident to give me the orders.

Q.  Uh-huh (affirmative).

A.  She ask the resident to get me in touch with the pharmacy.  She ask the resident to let me leave.  She ask the resident not to show up.  She



ask the resident -- so all these things, most of it is between the resident who is much, much younger giving me orders what to do. And, again, I did not understand what's going on until -- I mean, I -- I kinda started to collect things from Dr. Ulrich, from other people I talk to, from program director at other places, this is obviously discrimination.

Q. Based on age?

A. I mean, based on multiple things. Maybe age. Maybe my shape. Maybe size. Because Dr. Ulrich also said she doesn't feel comfortable sitting next to you. I was like what does that mean? She said like -- or he said she feels like I'm bigger, I'm controlling when I sit next to her in the microscope. That's what I kinda got from Dr. Ulrich. And he called her crazy. He told me she's crazy. That was, again, before I raise concerns about discrimination. I was not sure what's going on.

Q. Were -- were there any other incidents that ---

A. A lot.

Q. --- made you concerned about Dr. Zhang's attitude ---

A. A lot.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 253 of 348

Q. --- towards you?

A. A lot.

Q. What? What were they?

A. My pronunciation of her name.

Q. Okay. How did you pronounce it?

A. Zhang.

Q. Okay.

A. Right now I say Zhang. But at some point in front -- it happened twice, in front of the residents, says it's not Zhang, it's Zhang. I -- I can't even realize what's the difference. And then a lot of other things. One time I put an AR as a signature of my email, was sending to me another resident. And she saw that, she said, "You can't do AR. You're nobody. Nobody knows you. So you can't put initials, you have to put your full name."

Q. Uh-huh (affirmative).

A. "You're not someone known." My -- the resident next to me was asking like, I mean, he was wondering is that only Abdu or that should be for everyone? And then she always say like he's nothing, he's not known, so you can't write down your initials, you have to put your full name. The other times she pronounce or she was mocking my accent was in front of Dr. Ulrich. So one was in



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 254 of 348

front of the sit -- that resident.  One in front of Dr. Ulrich.  And Dr. Ulrich, when he saw her saying that, correcting my accent, Dr. Ulrich told her that even his wife cannot pronounce his name.  Because Dr. Ulrich name is German or Dutch.  And I was like, thank you, Dr. Ulrich.

Q.    Other than those incidents, can you recall anything else?

A.    The towel under her foot pedal.

Q.    Uh-huh (affirmative).

A.    Every time she put me in the OR she had me sit in the back writing notes.  A lot of things on weekly, daily basis.

Q.    So can you estimate how many different incidents in that period of time ---

A.    I have everything documented.  I mean, I sent a lot of some emails that has some of these incidents.

Q.    Uh-huh (affirmative).  What -- what do you think is the most serious of those that shows the most as alleged bias?

MR. MADISON:  Objection ---

BY THE WITNESS:  (Resuming)

A.    Maybe ---

MR. MADISON:  --- calls for -- when



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

you say -- are you asking him what causes -- what's the most serious ---

THE WITNESS:  No, no ---

MR. MADISON:  --- incident or bias ---

MR. CONNOR:  What -- what's his best evidence.

BY THE WITNESS:  (Resuming)

A.    Yes, my best evidence is the SAFE report.

Q.    Okay.  It says what?

A.    The SAFE report.

Q.    Okay.

A.    She had someone report a tear -- not a tear -- a scratch or -- or a -- she called it laceration.

Q.    What -- what was it actually?  Was -- was it not a laceration?

A.    No.  It was a superficial cut.

Q.    Okay.  What's the difference between a laceration and a cut?

A.    Superficial cut is very superficial. Laceration mean there is a damage of the tissue.

Q.    Okay.

A.    It's straight, clean cut.

Q.    Uh-huh (affirmative).



800.211.DEPO (3376)
EsquireSolutions.com

A.    She called it laceration.  She report it or she had someone report it to the S-A-F-E, SAFE report system.

Q.    Uh-huh (affirmative).

A.    And she used that as an evidence of I'm causing patient harm, even though later on when the investigator Jamison asked her about the results of that, she said something like, "Forget about it, it was nothing.  The patient came in, no harm, no bleed, no pain, no -- nothing."

Q.    Uh-huh (affirmative).

A.    The other thing, which was also very big, when she claimed I misrepresented the patient age in the OR, in the operative room, when it was in the clinic.  I went into the room, a new patient came to the clinic.  I examined the patient.  And then I went to her, presented the case in the outpatient clinic.  Everything was accurate, except she found later that the patient age is few years older in the outpatient clinic.

Q.    Uh-huh (affirmative).

A.    And when she asked about it, I apologized. She said that I -- I blamed the resident.

Q.    Uh-huh (affirmative).

A.    I mean, blame a resident for what?  The



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 257 of 348

resident was not with me in the exam room. I did the full exam. And everything was accurate, except the patient age. There was no resident involved. And then she claimed it's in the operative room.

Q. Uh-huh (affirmative).

A. That is, oh, my God, you can't be someone has any medical ethics. You cannot be a program director when you claim that to harm your trainee. I came there leaving too many job offers, leaving too many better opportunities, even for fellowships, to learn from them.

Q. Uh-huh (affirmative). Now I -- I notice you made a distinction between some of the issues that the attendings had with your performance and patient harm. Do you think that you made any mistakes at your time at UNC as far as patient care?

A. Yes, of course, I -- I mean, just for misrepresentation of patient age. That was a mistake. The disintegrated tablets with Dr. Willett, that was -- yes that was something I should ask what kind of form of tablet. I sent the right medicine. I sent the right dose. I only sent a different form.

Q. Uh-huh (affirmative).

A. That was thing, yes. So, thank you for



showing this up to me.  The same with Dr. Ulrich, when he said like that's even there is come controversy, when you see an infection in an eye, you immediately treat.  Thank you, Dr. Ulrich.  When I go to Dr. Zhang, no, you have to have good evidence that this is an infection.  You don't have to treat.  Many of these things.  And I learn.  I get much more opinions, much more experience.

Q.  With regard to the -- the bandage and the superficial cut, as you called it, that -- that might have been handled better, right, as far as the removal of that bandage?

A.  Do you know how many bandage I remove?

Q.  How many?

A.  Thousands.

Q.  Okay.  But I'm just saying, that ---

A.  Huh?

Q.  --- there is room for improvement there?

A.  Of course.  I mean, but still there is un -- I don't want to say unavoidable, but things could happen.

Q.  Uh-huh (affirmative).

A.  If you have a -- a sticky, it's not a bandage.  It's like a sticky drape covering your whole face and you try to peel it off, then you find



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 259 of 348

out there is a little scratch or a superficial cut on this area.

Q. Uh-huh (affirmative).

A. That was exactly happened.

Q. So what do you think Dr. Zhang should have done after this patient had the superficial cut, if anything?

A. Yeah, she would talk to me how to better remove the drape, how to secure the areas of the loose skin, and then find -- follow up with the patient. That -- that's normal.

Q. So when she reported it, you believe that that ---

A. She did not report it.

Q. Okay.

A. So she had someone to report it.

Q. Okay. So she had someone else report it?

A. I believe so. That's my -- my understanding.

Q. Okay.

A. Because it's nothing.

Q. And what evidence do you have that she had someone else report it?

A. Because in the operative room a lot of worse things happen.



Q. Uh-huh (affirmative).

A. A lot of worse things happen in the operative room.

Q. That's not evidence, though. Do you have any ---

A. No, no, let me continue.

Q. --- direct evidence?

A. Yeah. A lot -- direct evidence, when one of her residents did a laser to a patient and the eye was completely blind. She did not report it.

Q. I'm just asking, how do you know that she got somebody else to report it?

A. Because later on we -- she told the investigator, when I looked at the discovery documents, that she believed someone, a nurse or someone, was there reported it. That's in that -- that conversation between her and the investigator at UNC.

Q. Right.

A. So the nurse can never do that without asking Dr. Zhang, or at least Dr. Zhang asking her to do that. Because there was a lot serious stuff, much, much more serious, that was never reported by her residents, which she called her babies.

Q. I -- I understand. But other than that



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 261 of 348

circumstantial evidence, do you have any other direct evidence that she asked someone else to report that?

A.   I don't have a direct evidence that she asked someone to do that, but I see in the emails she mentioned someone by name.  How can you tell if it's anonymous?  Usually these things are anonymous, but she mentioned someone by name during the investigation with the UNC people.

Q.   Okay, other than what you've stated, do you have any other evidence?

A.   Do you have multiple evidence that she said someone reported it?  How can you tell?

Q.   Okay, Dr. Rageh, you -- you have filed a lawsuit ---

A.   Yes.

Q.   --- and it includes two claims against my client personally.

A.   A lot more than that.

Q.   What claims do you have against my client?

A.   Look at the -- the stuff, it's -- it's a lot of things.

Q.   You know that it's more than two, tell me -- tell me what they are.

A.   Well, I don't know the legal terms, but


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

there is interference with contract.  There is psychological or whatever, mental health.  There is discrimination, retaliation.  I mean, a lot of things.

Q.   All right, and you believe those are all personally against my client individually?

A.   What does that mean?

Q.   Okay, if you don't know, just say I don't know.

A.   I don't know what?

Q.   Okay.

MR. MADISON:  I think he was asking for clarification.

MR. CONNOR:  I'm not ---

MR. MADISON:  He asked you what that meant.

MR. CONNOR:  I -- I'm ---

MR. MADISON:  So if you don't ---

MR. CONNOR:  I have a question, if he doesn't answer ---

MR. MADISON:  Right, he asked for clarification ---

BY THE WITNESS:  (Resuming)

A.   It's not like I'm not answering.  I'm gonna answer every single question I understand.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.    Okay.

MR. MADISON:  I'm -- he -- he asked for clarification.  If you're not going to provide that, you can move along to the next question or rephrase it.

MR. CONNOR:  I'm not gonna rephrase. I had a perfectly good question.

MR. MADISON:  That's fine, but if ---

BY MR. CONNOR:  (Resuming)

Q.    My next question is, you allege that my client tortiously interfered with contracts.  Is that right?

A.    The answer is, she did every possible thing to harm me.

Q.    Uh-huh (affirmative).

A.    She told Dr. Ulrich, the investigators, lies about my performance ---

Q.    Okay, I'm not gonna ---

A.    --- that ended up with my termination of the fellowship.  So I don't know if that is considered interference.

Q.    Did you, in your lawsuit in federal court, accuse my client of tortiously interfering with your contracts?

A.    Can we review the -- the claim?



Q. Do you know? If you don't know, you can say I don't know.

A. No, I think she is involved in all of these things. I can't -- I have to look at it. Because there is some -- like, for example, I wanted my attorney to also file a claim against Dr. Budenz as the AUPO president and the UNC chairman.

Q. Is there anything else, other than Dr. Budenz, that you would file? Is there any other defendants that you're gonna add?

A. Oh, later on?

Q. Uh-huh (affirmative).

A. Yes, I told him that we need to add some ---

MR. MADISON: Just ---

BY THE WITNESS: (Resuming)

A. I don't think -- I don't know if I need to expose that.

Q. Don't tell me what you talked to with your attorney. Just tell me if there are other people that you plan to sue?

A. I plan to sue?

Q. Uh-huh (affirmative).

A. If it's only myself ---

Q. Yeah.



800.211.DEPO (3376)
EsquireSolutions.com

A.    --- I plan to sue everyone covering up for them.

Q.    Do you know any names?

A.    Of course.  HR, Jamison.  I don't the name.  Everybody covered up for them.  Everyone using their job to cover up for someone who is manipulative and carry a lot of evil or -- or -- or discrimination or are not fair.  Her position and Dr. Ulrich position were professors in a big university program.  I felt like if I had my baby or my son going to a school and someone reacted the same way against my baby, that's not a country I want to live in.

Q.    Uh-huh (affirmative).

A.    I don't want to live in a place where people pretend they are nice, they are gentle, and then from my back they have a lot of discrimination or like malice or something.

Q.    Okay.

A.    So it's so, so painful.  I'm your -- I'm your student.

Q.    Uh-huh (affirmative).

A.    I'm doing every -- best I can do.  I wake up in the morning 2:00 a.m., 3:00 a.m. every day to go see patients in the ER.  I do lectures every



800.211.DEPO (3376)
EsquireSolutions.com

Thursday to the residents. I do everything possible. I invested too much doing this. And then by the end of the day because of, I don't know, childish personalities, I don't know, discrim -- it's -- it's a lot to claim that this doctor who spent 20 or 30 years in education is not even qualified for a training program after a couple weeks.

Q. Uh-huh (affirmative). Other than the EEO department at UNC, is there anyone else who has been involved in what you allege is the cover-up from this issue?

A. I'm not sure.

Q. Is there anyone in particular ---

A. So Budenz, AUPO, American Academy Ophthalmology, ASRS. I will -- I hope I get all of them involved.

Q. Okay.

A. Everyone, ACGME, I hope all of them do something to fix this. This was so traumatizing and the -- sometime they tell me to do things but they always keep themselves away.

Q. Uh-huh (affirmative).

A. A lot of doctors. My program directors at Harvard, my program directors at Duke, when they



800.211.DEPO (3376)
EsquireSolutions.com

talk to me over the phone they show very much empathy. But when I ask them for a testimony, when I ask them for something, they block me. So this is -- is that what -- something I should learn from being in a program like UNC? Like should I learn that all I need to do is to be, I don't know, White. Is to be an -- in a corrupt environment. Is that what I should learn from that?

All the residents at UNC were so much supported. All of them. But when I asked someone to say something, they withdraw and they say they are worried about any retaliatory actions. Do you know who Dr. Budenz is at that time? Not only the chairman of the UNC Ophthalmology, but also the president of the American University Professors of Ophthalmology -- AUPO -- which as her duties put all the regulations for residency programs in ophthalmology, fellowships program in ophthalmology. If you go to the website and see what regulations there, you're gonna say that's a great institution. But when you contact them about something that really touch their position, they ignore you.

Q. Uh-huh (affirmative). With regard to your claim in your federal lawsuit that my client tortiously interfered with your contracts, what



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 268 of 348

contracts are you referring to?

A. The fellowship and other employment opportunities I had.

Q. Okay. What -- what other employment opportunities did you have that Dr. Zhang interfered with?

A. So it got to my knowledge that Dr. Zhang talked to my other directors at Harvard and Duke. One of the professors over there called me and said, "This is what happened, Dr. Zhang called Dr. Jennifer Sun and she said bad things about you." And Dr. Jennifer Sun is the one that signs any fellowship verification. That's a good point.

You can see the difference between the fellowship verification I used to get from Harvard and Duke before I started at UNC and after. So even though I finished Harvard fellowship, everything was great. I finished Duke fellowship, everything was great. I get some letters of recommendations, fellowship verifications. Everything looks so great. And then once they found about UNC, they started to change the language.

Q. So who told you that, allegedly, my client talked to Dr. Sun?

A. Dr. Elmasry.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.    How do you spell that?

A.    E-l-m-a-s-s-r-y [sic].

Q.    And where is he?

A.    He was one of the attending assistant professor in ophthalmology at Harvard.

Q.    Where is he now?

A.    I -- again, so after things get escalated, they tried to get not involved.  So he wanted me to always keep him posted.  He was very supportive. But I found out recently that he left Harvard and he went to Pennsylvania, but he did not share that with me.

Q.    Are you in contact with Dr. Elmasry now?

A.    Well, because he did not share that with me because we were so closed, I tried to be a little bit, okay, whatever you want.

Q.    Uh-huh (affirmative).

A.    So I'm not in daily touch with him.  But sometimes, you know, when there is like Ramadan, when there is Eid after Ramadan, congratulation, hope you have the best, and that's it.

Q.    Uh-huh (affirmative).  Has -- has he expressed to you personally, not your attorney, you, any willingness to be a witness for you in this case?



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 270 of 348

A.   That's a good question.  The answer is he wanted to help me as much as possible.  That was his initial response.

Q.   Okay.

A.   But, again, after he had like a few months not contacting me, and also I found out that he left his job, went to another job, so I was like I don't want to bother him too much.

Q.   So if we -- if we spoke to him, it's your belief his testimony that he -- that he spoke to Dr. -- my client.  Is that right?

A.   He did not spoke to your client.

Q.   Oh, no, he spoke to Dr. Sun?

A.   Dr. Sun told him ---

Q.   Right, yeah.

A.   --- about what happened with Dr. Zhang.

Q.   Okay.  And -- and what about have you spoken to Dr. Sun about this issue?

A.   I texted her.  I asked her to call me once I found out this from Dr. Elmasry.  She did not respond.

Q.   Okay.

A.   A few weeks or a few days before she was so welcoming.  She wrote me an amazing letter before she knows about UNC.



Q. Okay. And you haven't spoken to her since?

A. I what?

Q. Have you spoken or communicated ---

A. No.

Q. --- with her since?

A. No.

Q. Okay.

A. Not -- nothing since then. So once I feel like they don't want to get too much involved, I understand that it's -- it's just a blind end.

Q. Uh-huh (affirmative).

A. So why do I need to push asking for something. This is something should be more ethical.

Q. Uh-huh (affirmative).

A. If I know that there was, at some point, someone is exposed to unjust, I would help as much as possible, even communicate and make things work right. But here they kinda fear the consequences when it comes to some legal or, you know, things.

Q. And so other than speaking to Dr. Sun, I believe you said that also that my client directly contacted somebody about job opportunities. Is that what ---



A.   No, I don't know who did -- the only person I know she talked to personally is Dr. Jennifer Sun in Harvard.

Q.   Uh-huh (affirmative).

A.   I knew that from the Egyptian assistant professor over there because she talked to him about it.

Q.   So that's -- that's the contract that you believe that she interfered with.  Is that right?

A.   No, there was no contract.

Q.   Okay.

A.   There was no contract.  She was -- actually she was trying to like a defamation.

Q.   Uh-huh (affirmative).

A.   So she talked to this person in Harvard.

Q.   Uh-huh (affirmative).

A.   She talked to Dr. -- another doctor, Egyptian, his name is Ahmed Sallam, and he told me about it.  So my impression is she did talk to everyone, the only two doctors who told me about it were the Egyptian doctors.

Q.   Okay.

A.   But I saw the emails that ---

Q.   Okay.  Who ---

A.   --- she contacted.



Q.   Dr. Sun.  And who else did she talk to ---

A.   Ahmed Sallam.

Q.   How ---

A.   A-h-m-e-d, space, S-a-l-l-a-m.

Q.   Uh-huh (affirmative).  And who is he?

A.   He's a professor at, I think, Arkansas or Kansas.  He's a retina fellowship director and a program director.

Q.   And how -- how did that affect you that, that you allege that she spoke to Dr. Sallam?

A.   How did that affect me?

Q.   Uh-huh (affirmative).

A.   Of course, I'm -- I'm not -- I mean, I wasn't aware the first time Dr. Sallam reached out to me.

Q.   Uh-huh (affirmative).

A.   I wasn't aware what was going on.  But later on he was one of the people who said this is discriminatory.

Q.   Okay.

A.   But the first thing it was ---

Q.   How -- how did he reach out to you?

A.   Yes, that first -- he reached out to me.

Q.   By email?  By telephone?  By text ---

A.   No, no, no.  I think I have email


Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 274 of 348

communication with Sallam. That was early on before I even leave Harvard because I was doing a fellowship and he was one of the big people in the retina in the U.S. He has a lot of box in the field. So I was like I'm -- I'm so happy I'm starting that, what do you think I should do next, and this kinda communication.

Q. Uh-huh (affirmative).

A. He gives me sincere advice and that's it. I move to next time to Duke. And then I am gonna do ocular oncology. This is great, good for you.

Q. Uh-huh (affirmative). So you allege that she spoke to Dr. Sun and Dr. Sallam and that you believe it was -- it was defamatory. Is that right?

A. One hundred percent.

Q. And -- and the -- that she didn't -- she didn't cause you to lose any contracts as -- as a result of those communications?

A. No, not -- not directly. But when I asked, again, there was a change the way Harvard used to put a verification form for my fellowship.

Q. Yeah.

A. Initially everything was great.

Q. Yup.

A. Later on it was a little different, that



the fellowship was only medical.  We cannot comment on blah, blah, blah, blah, blah, blah.  That was never before.

Q.    And how did that affect you?

A.    The other -- of course it raised questions.

Q.    With who?

A.    With any medical board.  With any licensing agency.  With any insurance company.

Q.    But I understand there was only one state licensing board where you didn't get a license ---

A.    No, that's correct.  Actually -- yeah, that's correct.  But at the same time, many hospitals declined my privileges based on UNC influence.

Q.    Which hospitals declined it?

A.    St. John's.  Saint -- the other one is Mary... Memorial.

Q.    And where is Memorial and St. John's?

A.    Springfield in Illinois.

Q.    And how do you know it's related to the verification page from Harvard?

A.    From it's either Harvard or UNC, but I believe it's more from UNC.

Q.    Of terms.



800.211.DEPO (3376)
EsquireSolutions.com

A.   Because my employer, she had some like she -- she is someone who's known and she reached out to the staffing -- privilege -- the privilege staffing at these hospitals.  And they told her that on paper everything looks great, but they received a call.  They received a call from someone at UNC.

Q.   And -- and your current employer's name is what?

A.   Dr. Sandra Yeh.

Q.   How do you spell that?

A.   S as Sam, a as apple, n as Nancy, d as David, r as Robert, a as apple.

Q.   Okay.

A.   Last name Yeh, Y as yellow, e as Edward, h as Henry.

Q.   Got it.  And -- and did you say that she knows about your criminal conviction?

A.   Dr. Sandra Yeh?

Q.   Yeah.

A.   Well, sometimes an officer came to my office, so yeah, she knows everything.

Q.   Okay.

A.   And officer came to my office to deliver me a letter.

Q.   Okay.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 277 of 348

A. So, yes, she knows everything. And, again, the conviction was dismissed.

Q. So it's your contention that you have no criminal conviction?

A. I mean, everything was dismissed. And not only dismissed, there is -- after you dismiss it, it was kinda removed from the record. What do you call that process?

Q. Expungement?

A. Expungement. So it was dismissed, expungement almost the same day or week. But she knows that I have some issues with UNC and that's why I can take some time off to come here for the -- do you know how many times I came here to attend all these regulatory, civil, and criminal actions? How many times? A lot.

Q. How many times?

A. A lot. I can't count it. Every time I have to take a day off, maybe two days off, three days off, because I don't live in a city where there is a big airport. I have to make a connection flight. And I have to make a hotel reservation. And sometimes I cannot do that the same day of the -- of the hearing, so I have to prepare one day before. The same thing when I go home, I have also



to spend another day.

Q. Is it your contention that my clients and Dr. Ulrich's bringing of these 50C no-contact actions and criminal actions as unlawful?

A. I did not say unlawful.

Q. Okay.

A. I did say they take advantage of the law. They claim things to take advantage of it. They know how to play the game legally. That was just their playing a game legally.

Q. Okay.

A. Put me under too much pressure, put me under too much hassle so I have to go and back forth and go and hire lawyers and these things when there is no merit.

Q. I want -- I want to -- I don't want to keep us here too long, so I'm -- I'm trying to move expeditiously. I asked you about the tortious interference claim. Is there anything that I asked you about that you haven't given me as far as evidence? I understand that you believe that my client contacted Dr. Sun and Dr. Sallam. Is there anything else that you ---

A. A lot.

Q. That you haven't told me about the



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 279 of 348

tortious interference claim that ---

A.    Yes.  American Academy of Ophthalmology.

Q.    Okay.  I ---

A.    She contacted them so I don't attend the meetings.

Q.    Okay.

A.    She contacted the biggest institution that control the meetings in ophthalmology that has annual meetings for all ophthalmologists -- ophthalmologists all over the world and she had me banned from attending.

Q.    Okay.  How do you know that?

A.    They sent me the email, the American Academy.

Q.    Okay.  What did it say?

A.    They said because of the charges or because of the no-contact orders by Dr. Zhang, then you're not allowed to attend the meeting.

Q.    That's a court order, isn't it?

A.    A court order?

Q.    Yeah.

A.    The no-contact order?

Q.    Yeah.

A.    And like I cannot go anywhere to attend the meeting?



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 280 of 348

Q.    I'm just saying isn't it true that there was a no-contact order?

A.    There was a no-contact order, but they abused it.  That's what I'm saying.  No-contact order, that means you cannot attend any conference. We're gonna keep you so isolated.

Q.    Okay.  But how is Dr. Zhang ---

A.    This -- yeah.

Q.    --- responsible for that?

A.    She sent the email.

Q.    But that's the order ---

A.    To the American Academy.

Q.    --- I mean, you all could not have been in the same location together ---

A.    Exactly.

Q.    --- right, because there's an order?

A.    Yes.  Well, do you know -- what do you mean by the same location?  If I have a very big area, more than a stadium size, because she's there I cannot attend anything there?  And even though ---

Q.    Have you read the order?

A.    Yes, don't come close to her.

Q.    Okay.

A.    Don't send communication.

Q.    So if you're in the same stadium ---



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 281 of 348

A.    I leave if -- if I ---

Q.    --- as her ---

A.    If I see her, I leave the place.

Q.    Well, that's what I said, you guys could not be in the same place at the same time while that order was in effect?

A.    How did she know I'm gonna attend whatever she's attending?

Q.    Well -- well, I don't know, but she knew.

A.    I'm gonna attend the oncology department sessions.  I'm gonna attend the cornea sessions.

Q.    Okay.  I ---

A.    I'm gonna attend the refractive sessions.

Q.    Other than with regard to the no-contact order ---

A.    But can you still -- if I do have -- if you have a no-contact order against me, can you prevent me from going to Florida because you may go to Florida?

Q.    Listen, I'm not gonna give you legal advice.  But I'm -- I'm gonna say, other than ---

A.    And, by the way ---

Q.    --- the 50C ---

A.    Let me finish.  Right now there is no -- there is still contact order, right?



800.211.DEPO (3376)
EsquireSolutions.com

Q.   Uh-huh (affirmative).

A.   It's still pending.  It's still going.

Q.   Uh-huh (affirmative).

A.   The American Academy sent me an email a couple days -- not couple days -- couple weeks ago, I'm allowed to attend after they realized that my -- my understanding -- that she just being oversensitive or abusing to the order.  So initially you're not allowed to attend, we need to study this. We need to see how things going.  You can't attend. And then the following year, only couple weeks ago, there is still a no-contact order by court.

Q.   Uh-huh (affirmative).

A.   They said I can attend.

Q.   Do you believe that ---

A.   So why you think there is a difference?

Q.   Do you believe that Dr. Zhang is oversensitive?

A.   Yes.

Q.   Okay.

A.   And Dr. Budenz said that in the email, oversensitive or overreacting, something similar. Dr. -- also Dr. Ulrich told me he noticed she was so aggressive and oversensitive to anything I do or say.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 283 of 348

Q. Uh-huh (affirmative). Let me talk about the emails that you sent, including the one with the -- the bullets ---

A. Okay.

Q. --- on the mailbox. Who do you believe put those bullets there?

A. I cannot exactly tell. I don't have a camera. I did not see anybody putting it. But this is something I raised to the university.

Q. Right.

A. I was in the process of leaving the state.

Q. Right.

A. So, listen, I got this bullet. At the same time things are heating up with UNC.

Q. Uh-huh (affirmative).

A. And then I got another two bullet. And, again, when I sent the first bullet, nobody responded. Nobody cared. When I sent the -- when I got the other two ---

Q. Yeah.

A. --- and then I sent an email, everyone was like, okay, you -- you contact the local police.

Q. Okay.

A. I was like I'm leaving already in a few days, I'm not gonna stay here. I hate the state, to



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 284 of 348

stay in this UN -- North Carolina thing.

Q.   Yeah.

A.   So I had to leave.

Q.   Why -- why did you assume it was somebody at UNC?

A.   Because of all things going together.

Q.   Couldn't it have been anybody?

A.   Well, I don't know.  I'm not God, I don't see from -- I don't know.  It could be anybody.  It -- why it only happen during that time, during exactly these couple weeks, I don't know.  Maybe yes.  Maybe no.  It could be anybody.

Q.   Okay.  Do you believe that you -- that Dr. Zhang contacted any of your prospective employers directly?

A.   Usually they contact the program director of my fellowship.

Q.   Do you have any evidence that Dr. Zhang contacted any of your prospective employers and prevented you from getting a job?

A.   As I said, she contacted my program director at Harvard.

Q.   Uh-huh (affirmative).

A.   Maybe I apply for a job at Harvard.

Q.   I -- I heard you.  I understand that.  I'm



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 285 of 348

asking you a very simple question.

A. Yes.

Q. Do you have any evidence ---

A. No, I don't have ---

Q. --- that she contacted any prospective employer?

A. Other -- no, nothing like documented evidence like this, no.

Q. Okay. Let me ask you about your claim for intentional infliction of emotional distress. Let me ask you about your treatment. Coming from the present day, who is your current mental health provider?

A. It's an institution, every time they have a different one. It's a state health at -- in Illinois. Let me get the accurate name. Okay, actually it's better to go here. LifeStance Health.

Q. Okay, LifeStance Health.

A. Yes.

Q. And who is your provider there?

A. There was a few. We have Dr. -- I don't know if they are doctor or not, but there's someone called Stacy Salmonson. Alexander Willett. Samuel Assam. Kayla Harlan. But the main person I used to talk to was Sampson, that's one.



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:24-cv-00336-CCE-JEP   Document 68-3   Filed 03/13/26   Page 286 of 348

Q. Are they ---

A. Another person I used to have a lot of sessions, Kayla Harlan. And actually recent there is another person. He was a man and that was a few weeks ago.

Q. Okay. Are they psychiatrists, psychologists, social workers, therapists?

A. They have a lot of these abbreviations by the end, I don't know exactly what it stands for.

Q. Uh-huh (affirmative).

A. But they used to send me prescriptions so I think they have some authority to send prescriptions.

Q. How often are you seeing these people?

A. Initially it -- when I was in North Carolina before I leave, maybe more than once a week.

Q. Okay.

A. But later on after I left, I was contacting the same person I used to see in North Carolina and I told her right now I'm starting a new page, I was starting a new life, and going through these terms can be sometimes painful. I don't want to remember all these memories so let's decrease it a little bit, and then we started to decrease. She



800.211.DEPO (3376)
EsquireSolutions.com

noticed improvement.  And then I told her that right now in Illinois, she wanted to transfer care to someone in Illinois.

Q.    Uh-huh (affirmative).

A.    And that's how I get to more than LifeStance, I have another also agency that I used to contact before, I think, LifeStance.

Q.    How often are you going now?

A.    Initial -- right now?

Q.    Uh-huh (affirmative).

A.    The last time it was -- so I have a meeting with them, I think, the next week.

Q.    Uh-huh (affirmative).

A.    So the last time probably was end of October.

Q.    Okay.  Like once a month or?

A.    It's even once every six to eight weeks now.

Q.    Okay.

A.    But sometimes I text them, I run out of medication, so they give me a kinda couple messages or questions, I answer, and then they sent me the prescription.

Q.    What's the medication?

A.    I take two medications -- three



800.211.DEPO (3376)
EsquireSolutions.com

medication.  Two of them are related to this.

Q.    Yeah, related to your mental health.

A.    Yeah.  Hydroxyzine HCL 25 milligram.  The other one, I think it's Lexapro.

Q.    Okay.

A.    Ten milligram.  And they have different dose -- dosages.  So what he told me is I need to use them once a day every day.

Q.    Uh-huh (affirmative).

A.    I told him I'm -- I'm completely fine, the only trigger that makes my life miserable is when I have to deal with UNC attorneys, UNC applications, licenses.  Anything that touch UNC makes me a lot more -- I don't wanna -- like aggressive.

Q.    Uh-huh (affirmative).

A.    And he said what -- when that happen, I can take two, like double the dose.

Q.    Uh-huh (affirmative).

A.    I told him one time I went to UNC for -- North Carolina for hearing and I couldn't sleep all the night.  I felt like my heart is racing and then I almost went to the emergency department because I had a hearing at the court the following day.  And he told me you can even double the dose before your hearings.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.    Uh-huh (affirmative).

A.    So, yeah.

Q.    Now you've sued both Dr. Ulrich and my client with regard to this intentional infliction of emotional distress.  Is that right?

A.    If it's me, I want to sue everybody that covered up for them.

Q.    Uh-huh (affirmative).

A.    But I know there is some legal kinda requirements so that's up to my attorney.  I tell my story and he kinda do his job.

Q.    Uh-huh (affirmative).

A.    But I believe it's not only Dr. Zhang that was responsible.  I believe it also the investigators who covered up.  I believe it's Dr. Budenz.  I believe it's Dr. Ulrich.  I believe it's everyone who covered up and that's -- they have some responsibility for me to end up like this.

Q.    Uh-huh (affirmative).

A.    So if I wish, if it's me, I need to sue all of them.

Q.    Uh-huh (affirmative).

A.    But I know there is some legal requirements and I'm -- I'm letting him do his job.

Q.    Who do you think was responsible,



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 290 of 348

primarily responsible, or if there are more than one person, please let me know, for terminating your fellowship?

A.    Number one, Dr. Zhang.

Q.    Okay.

A.    Number two, Dr. Zhang.  Number three, Dr. Zhang.  Number four, Dr. Zhang.  By the end of the list I wanna put every other one.

Q.    Okay.  So she's primarily responsible in your mind?

A.    Not in my mind.  It's Dr. Ulrich mind.  It's every resident mind.  I have communication from them.  They knew that Dr. Zhang is wanting to terminate my fellowship few days after I started.  And Dr. Ulrich told me the first -- fifth week or something, that she's not comfortable working with you.  If she -- if she continues to be not comfortable working with you, we're gonna terminate your fellowship.

Q.    Is there anything that you did during your fellowship that you think would justify terminating your fellowship?

A.    Terminating the fellowship?

Q.    Uh-huh (affirmative).

A.    In respected programs usually there is


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

protocol.  Usually there is a process.  Even if I did something wrong, there should be an official protocol.  There should be a -- a report system. There should be something professional, respectful. But all at UNC was personal.  They just decided to terminate my fellowship and they wanted to like justify it.  But they didn't follow any protocols, even Dr. Budenz protocols for the fellowship.  They did not follow anything.  Even UNC protocols for -- for programs, they did not follow anything.

Q.  Uh-huh (affirmative).  And I -- I have reviewed your discovery responses with regard to your damages alleged.  Can you tell me -- can you break apart where you came up with the dollar amount for your emotional distress?

A.  I using -- I used to kinda Google and discuss it with people and -- like Dr. Ahmed Sallam, he told me that one -- they had a few years ago one of the resident have similar issues and before he go to court they paid him one million dollar.

Q.  Uh-huh (affirmative).

A.  So, again, I was kinda Googling and ChatGPT and listening and that's -- that's actually not my exact wording.  That's a ChatGPT wording based on everything I give to ChatGPT.  At the same



800.211.DEPO (3376)
EsquireSolutions.com

time, I hear some news and I hear some kinda mediation things that end up before going to the court.  And most of the time things doesn't go to the court because they come to a deal somehow.

Q.    Uh-huh (affirmative).

A.    When I was offered that, I declined it because it's not ---

Q.    Well, I'm not ---

A.    --- any compensation is not my goal.

Q.    I'm not asking about your settlement discussions.  I -- I just -- I just want to get these damages.  So it says here that you estimate it at two million plus.  Is that right?

A.    Right.

Q.    Which part of that is out-of-pocket expenses?

A.    Out of pocket, what that means?

Q.    What have you had to pay for your emotional distress, if anything?

A.    What do I have to pay?

Q.    What have you had to pay out of pocket?

A.    Oh.  What did I have to pay, like money?

Q.    Uh-huh (affirmative).

A.    Well, I think insurance covers most of it. I pay maybe one hundred per visit.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 293 of 348

Q.   Uh-huh (affirmative).

A.   The medication's also insurance covered.

Q.   Uh-huh (affirmative).

A.   But the money was never an issue.

Q.   Other than your therapy costs and your prescription costs, are there any other tangible compensatory damages, out-of-pocket expenses?

A.   Yes.  I need someone from UNC to apologize to my wife.

Q.   Okay, tell me about that.

A.   I need someone to apologize to my mother. I need someone to apologize to my family in Egypt. I live here by myself, they all worried about me. They call me, I'm crying or I cannot answer calls because of this issues going with UNC.  So they felt so much worried about me.

Q.   Uh-huh (affirmative).

A.   And I cannot go back to Egypt.  They cannot even come to the -- to the U.S.

Q.   I guess I was talking about out-of-pocket expenses, though.

A.   That's the minimum.  I mean, I don't care about out of pocket.  Let's say I don't care about what I paid out of pocket.  If you want to say like it's a thousand, okay, maybe.



800.211.DEPO (3376)
EsquireSolutions.com

MR. CONNOR:  Let's go off the record.

THE COURT REPORTER:  Off record, 3:50.

(Whereupon, a recess ensued from 3:50 p.m. to 3:51 p.m.)

THE COURT REPORTER:  On record, 3:51.

MR. CONNOR:  No further questions.

MR. PADGET:  Do you have any?

MR. MADISON:  Yes.  Can I have about 15 minutes to ---

MR. PADGET:  Sure.

THE COURT REPORTER:  Off record, 3:51.

(Whereupon, a recess ensued from 3:51 p.m. to 4:07 p.m.)

THE COURT REPORTER:  On record, 4:07.

EXAMINATION

BY MR. MADISON:

Q.    All right, we're back on the record.  Dr. Rageh, did UNC convey to you why they selected you for the fellowship?

A.    Because I'm the best applicant.

Q.    How did Dr. Ulrich notify you that you would no longer work in the clinic with Dr. Zhang?

A.    After the meeting we had in November



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

something, everything went fine, even smiled, and left.  The following week when I was due to show up in the operative room with Dr. Zhang, the day before that Dr. Ulrich -- by the end of the clinic day, I was working with him, he asked me not to go to the operative room with Zhang.  So he was just sitting next to me, "Hey, Abdu, we finished the clinic, everything is good.  By the way, you don't have to go to Dr. Zhang clinic -- surgery tomorrow."  This was it, that simple.

Q.    Did he provide a reason why?

A.    He said she was so stressed with the residents and stuff and, again, from the beginning she was not comfortable with me, age and shape and size.  And that day he said she also was overwhelmed with the residency director duties, interviewing applicants for residency program.  That's what he said.  She was stressed by the residency program directors.  Let's wait until this is over in mid December.  He was welcoming me to work with him. The other doctors welcome me to work with them and their -- she was the only one and I found like this. Like by the end of the day, Dr. Ulrich sitting next to me, "You don't have to go to the surgery with Dr. Zhang tomorrow."



800.211.DEPO (3376)
EsquireSolutions.com

Q. Let's move along a little. Did you witness other residents making mistakes during your fellowship?

A. Oh, my God, a lot. But the most serious one was when Dr. Khalid Aldaas did laser and to a patient, I think she was single-eyed, like one eye is already done, gone, and she has only one healthy eye. And Dr. Khalid Aldaas lasered the patient macula, the central vision. I stopped him from continuing the procedures. And then he went to Dr. Zhang. So I stopped him, don't do anything, you are lasering the wrong area.

He went to Dr. Zhang and he told her the story. Two things are very important here because she said, "Don't worry, this happens when the residents feel more comfortable doing procedures." That was in front of me. "This happens when the residents feel so comfortable so maybe they pay less attention when they feel so comfortable." Because that was not the first, second, or third time that Dr. Aldaas does -- do -- did laser. So she was supporting him. At the same time, she called Dr. Ulrich, we have this incident. We have a patient, Dr. Khalid Aldaas laser the macula. Do you know what Dr. Ulrich said? "I have done the same thing



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 297 of 348

when I was in training." Dr. Ulrich said that, he had done the same thing. He blinded a patient macula by doing laser by mistake.

So I reached out to Dr. Zhang and I was like, "I admire the way you approach the resident, mistakes could happen." And she was like, "The residents are my sons. My babies." I was like, "But you treating me differently." She said, "You're not my baby and you are in a fellowship program which is not protected." I was like...

Q. What did you take that to mean when she said you're in a fellowship program that's not protected?

A. Because she's not the director of the fellowship program, Dr. Ulrich is. And the other thing is, she believed that because of the fellowship is not ACGME accredited, that she can do whatever she want. She believed that in these non-accredited fellowship she believes there is no regulations.

Q. Did you believe the mistake of lasering the wrong eye, was that more egregious than ---

A. It's not ---

Q. --- the mistakes you ---

A. --- lasering the wrong eye. It's lasering



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 298 of 348

the right eye the wrong place.  She -- or Dr. Aldaas blinded the patient.  And, by the way, the following day -- so the patient witnessed that I stopped Dr. Khalid Aldaas from doing the procedure.  I asked him to leave the room.  The following day I got an email from the HR.  I'm not sure HR or someone else.  But I got an email from non-doctor person.  And they told me in the email that the patient want to talk to me because they don't trust anybody else.

I showed that email to Dr. Zhang, what I need to do.  Again, it's on my phone.  She said forget about it, she will handle it.  There was, to my knowledge, any exemplary actions, any corrective measures.  The only thing I know when I looked at the discovery, that these things escalated as a SAFE report.  It's like a very serious patient harm.  So that I was -- I looked at it only I found it in the things here.  In those emails discussing this, Dr. Budenz, when he was notified that the patient want to talk to me, Dr. Budenz said something he's not online with us, about me, so don't have him talk to the patient.  That's one thing.  I have a lot of other instances where mistakes happened.  Even Dr. Ulrich.  Even Dr. Willett.

Q.    We're gonna get to that.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.    Even Dr. Zhang.  Even the residents.

Q.    We'll get to those.  While you were -- did you ever blind a patient while you were there?

A.    Never.

Q.    Was this doctor, this resident, were they removed from the program, to your knowledge ---

A.    No.

Q.    --- over this issue?

A.    No, no, of course not.

Q.    To your knowledge, did Dr. Ulrich or Dr. Zhang speak negatively -- negatively of this individual to others following this incident?

A.    No.  I was completely separated from that because when I -- the patient wanted to talk to me, Dr. Budenz said, no, he's not online or inline, something like that, about me.

Q.    To your knowledge, did Dr. Zhang or Dr. Ulrich inform potential employers or state medical boards that this individual had issues with patient harm or patient safety following this incident?

A.    He graduated successfully.

Q.    Graduated successfully.

A.    He never had any -- any -- to my knowledge he was a baby to them, so they had to -- as I was told.



Q. Okay. You mentioned earlier -- did you witness attending physicians or faculty make mistakes during your fellowship?

A. Yes.

Q. Okay.

A. Dr. Budenz -- sorry, Dr. Brewington.

Q. Uh-huh (affirmative).

A. She misdiagnosed a patient with a tear and she sent me the patient to laser.

(Audio playing: Lasering the right eye in the wrong place) -- oh, sorry -- (blinded the patient HR email) -- I don't know how to stop this. (Patient want to talk to Dr. Rageh. No corrective measures, serious patient harm. Other physician harming patient....)

MR. PADGET: I don't know how to stop this, only save it.

THE WITNESS: Is it like an ---

MR. MADISON: Are these your notes or is this something ---

MR. CONNOR: This my notes.

MR. MADISON: Okay.

THE WITNESS: It looks like an AI thing.

MR. MADISON: Yes.

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

MR. CONNOR:  I don't know.  I must have pushed the wrong button.

THE WITNESS:  I still -- you can do everything ---

BY MR. MADISON:  (Resuming)

Q.   Okay, continue, please.

A.   I was talking about mistakes by other doctor, Dr. Brewington.

Q.   Uh-huh (affirmative).

A.   So sent me a patient to laser and she said there is a tear with the subretinal fluid or retina detachment, I need to laser.  First, they trusted me to laser it.  Second, Dr. Brewington always let me do her lasers.  Dr. Willett always let me do his lasers.  Dr. Ulrich always let me do her lasers.  Dr. Zhang always let me do her lasers.  Everyone.  So I saw the patient that Dr. Brewington asked me to see, there was nothing.  I examined, there was nothing.  And I was like I'm hundred percent sure there was nothing, so let me bring the patient the following day to Dr. Ulrich 7:30 in the morning.  The patient came in.  Dr. Ulrich saw the patient.  He agreed there is nothing wrong.  But instead of following up with Dr. Brewington, there is no tear, there is no need for treatment, there is no need for



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 302 of 348

laser, he blamed me that I did not communicate with them the same night. Even though someone else made a misdiagnosis, someone else exposed the patient laser.

Let's say this patient was sent to see a resident, the resident will just laser the area she's pointing to and everyone is happy. At the same time, there was no necessity for treatment. There is a lot of examples like these.

Q. Okay.

A. One more example, there was a patient in the emergency room. That patient had a surgery the day before. That's an Ulrich patient. And everything went fine with the surgery so we bring the patient the following day for post-operative day one eval. I looked at the patient. I discussed all the treatment options she has to do after the surgery, taking the patch off and start treatment. Everything was great. Dr. Ulrich saw the patient, agreed. The patient left the office, couple hours she went to the emergency department complaining of some diminution of vision. The resident called me and the resident said the patient has some diminution of vision and there might be some inflammation at the front part of the eye. I asked



Case 1:24-cv-00336-CCE-JEP   Document 68-3   Filed 03/13/26   Page 303 of 348

the patient is there any tenderness?  No.  Is there any high popient, like a pus in the eye?  No.  Is there any pain?  No.  Did the patient started her medication?  No.

So then I asked the resident to have the patient start the medication at a little higher frequency and bring the patient to us the very thing in the morning.  Dr. Ulrich, again, I let him see the patient the first thing and he let -- didn't let me go in, so he was in the -- in by himself in the room.  Five minutes later the patient is excellent, he told me.  There was no infection and, not only that, he asked the patient to continue my instructions using the eye drops at a little bit higher frequency, and that was it.

At the same time Dr. Ulrich reported that as if Dr. Rageh did not go to see a patient in the ER when I saw the patient the same day only few hours before the patient go to the ER and there was almost zero percent that patients gets infection within one day of surgery, unless you shit in the patient eyes.  But infections doesn't happen on the first day, usually it takes at least five days or a week.  The patient did not start her medication so it was very obvious to me this patient just need to



Case 1:24-cv-00336-CCE-JEP     Document 68-3     Filed 03/13/26     Page 304 of 348

start treatment and let's see her tomorrow.  And, again, Dr. Ulrich approved my treatment.  This was on my last days.

When he went out of the room I was hoping that the patient goes well because I -- I'm confident when I evaluate patients.  So he said everything is good and I ask the patient to continue the same thing.  And then asked me why you did not let us know.  I was like everything is documented on the computer.  At the same time you had the note to sign it.  At the same time I brought the patient the first thing the following day.  You saw the patient.

So are you just trying to like criticize for, I would say, unsubstantiated reasons?  If you want me, I can -- with every patient I see, I can call you, but let's have the full day.  I see a lot of patients in the emergency.  I see a lot of patients in the clinic.  And most of the time document, send the notes, Dr. Ulrich get a notice. Dr. Zhang get a notice about my evaluation, my thing, the review, and that's it.  But they again -- and they send each other emails of like this the documentation, Dr. Rageh didn't see a patient in the ER.  They send it to each other.  And they called it a documentation and evaluation and safety harm.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 305 of 348

Like, okay, let's discuss it. Talk to me about it. Let me know the best way you want to do it. But you don't agree to my plan. You don't approve it. And then put it as statement Dr. Rageh went to the ER, didn't see a patient in the ER. That's completely mess kinda representation of the incident, or I call it a lie.

Q. Do you -- are there any other incidents of physicians ---

A. Yes. I had an ocular oncology fellowship so I am expert a little bit in the tumors and cancers of the eyes. We had a patient that when I saw the patient at the clinic, I told Dr. Ulrich there is a bulge on the iris. There is a cyst or a mass behind the iris. And we probably need to do further oncology tumor evaluation, like doing different set of imaging. Maybe if it were seen on geography, maybe consult Dr. Materin. And I put that in the notes. Then Dr. Ulrich said that's probably a little bit either a cataracts remnant from cataract surgery or a little bleed behind the iris or the colored part of the eye. We went to the emer -- to the ER. My advice was not to operate until we find out what this lesion is. And we found out it's a cancer. Operating in a patient with a



800.211.DEPO (3376)
EsquireSolutions.com

cancer, that put the patient life on risk 'cause it's gonna disseminate everywhere, so. And Dr. Ulrich removed it from the findings when I put that in the notes, that the patient has a -- an iris lesion at some area.

And when I discussed with him, I wanted him to do some imaging and discuss -- and -- and refer to Dr. Materin. He just went for the surgery. And I believe after this, the patient must have a must -- a much worse prognosis if you have a patient with a cancer in the eye like melanoma. It was melanoma. And you operate on melanoma, you're gonna disperse all the cells everywhere. The patient will have metastasis everywhere. That was another thing.

Q. Was this matter escalated with ---

A. Of course ---

Q. --- within the ---

A. --- not. Another example, a patient came in with a vitreous hemorrhage bleeding in the chamber of the eye, in the back chamber. And sometimes if the bleeding is dense you have to do an ultrasound to tell if this is just bleeding or this is a retina detachment. It was Dr. Willett. And he interpreted the image as if there is a retina detachment. I did not feel comfortable with that.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

I talk to Dr. Zhang and she agreed with me this is not a retina detachment, we don't have to operate on this patient. A lot of exams like this. A lot of things.

Someone might have an opinion, someone might disagree, but claiming that the stuff I did was enough to terminate my fellowship compared to what I noticed, what I experienced, what I witnessed, that's completely biased.

Q. You mentioned a few moments ago that your comment regarding a patient having cancer, a tumor, was ---

A. Yeah.

Q. --- removed from the ---

A. Correct.

Q. --- note. Can you explain what you meant by that.

A. Yes. So when you looking into the EPIC you use your credentials and you put like in the exam portion like I see a bulge of this area in the iris of this patient. And then Dr. Ulrich re-evaluate the patient, he can edit, he can move, he can adjust, he do whatever he want, and he can sign it. I have images of my documentation before he changes it. And I have images -- I have text



800.211.DEPO (3376)
EsquireSolutions.com

documents after we -- after we -- the surgery is done, he's asking me to send the patient to Dr. Materin who then replied this is a cancer.

Q.    So Dr. Materin ---

A.    Is the ---

Q.    --- does he work for UNC or ---

A.    Both.  Dr. Materin was my program director at Duke.  And back then I used to have still some -- like twice a month -- clinic at UNC.  So he work in both sides.  Dr. Materin was also very supportive in the beginning but later on -- that's also a very good thing to mention.  The letters I used to get from UNC from -- from Duke was so great until they found out about these kind of things going with UNC.

So Dr. Materin changes something in the letters and he said I recommended this doctor for license with, I think, recommendation or restrictions and he added something like based on the conflict with UNC or because of the conflict of UNC, I would recommend him with license with restrictions.  A week before that, everything was great.  Who did talk to him?  Who did ask him to do something?  I don't know.  But instead of recommend without reservation, he picked up recommend with reservation because of the conflict at UNC.



800.211.DEPO (3376)
EsquireSolutions.com

Q. Did you have any personal experience with Dr. Materin that would have made him change his recommendation of you?

A. Yes, he work at UNC.

Q. But any personal experience? Anything he witnessed with you? Did you have any experience that would make him change, lower his recommendation of you to one with restrictions?

A. Yeah, Dr. Materin was one of the people who told me to move on, you have a good job, and just put it my behind. But I was like, that's not me, Dr. Materin. I will do my best to fix something I see wrong.

Q. These incidents that you mentioned with the attending physicians, would you say those incidents are more serious than the -- what you've been accused of doing?

A. A lot more.

Q. And -- and how so?

A. Like this patient with a cancer, the patient definitely will have short life after this. This patient with the laser in the macula, the patient went blind in both eyes immediately. One eye was already blind, the other eye he lasered it. The patient with the virteous hemorrhage, why you



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 310 of 348

would operate on someone you claim they have a retina detachment when the ultrasound is not supportive of a -- of retina detachment.

Q. To your knowledge, did the ---

A. So the interpretation of his ultrasound was inaccurate. I spent a whole year doing ultrasounds daily at Duke so I -- I think I was able to stop Dr. Willett from doing surgery on that patient by asking Dr. Zhang.

Q. To your knowledge, did the university take any action against these physicians?

A. They don't know about it.

Q. What do you mean they don't know about it?

A. Like the thing with Dr. Ulrich, how did he found out? I did not raise it to HR or any SAFE thing. The things with the -- Dr. Willett.

Q. With the patient being blinded they ---

A. Oh, for that patient who was blinded, my understanding, according to the discovery, this is only recently, before I leave UNC I had no idea what's going on. They separated me. But when I saw this, I found out that I'm not inline so I'm not allowed to talk to the patient. At the same time, they -- on the emails everything was supportive to Dr. Khalid Adaas. There was no single criticism of



Dr. Khalid Adaas in this emails. None.

Q. How long have you been a practicing physician?

A. Well, I graduated from the medical school in 2007, and in Egypt it's a little bit different. In Egypt we get in a lot of patient care very early on, like even during my internship. I used to work at private clinics, even after -- during my residency. I used to run ophthalmology clinics. I used to do surgeries.

And it was a lot supported because let's say I have a patient that I can't do his surgery, I call my attending, I call my supervisor, I have this patient, let's do the surgery together, and he teaches me how to do it. He take the primary seat and I'm sitting next to him. And that was kinda the environment in Egypt. So I had exposure to almost every aspect, if not as a primary surgeon, as a secondary surgeon. So I've been practicing ophthalmology independently even before I graduate. The -- the residency program.

Q. Do you believe it was the allegations of patient harm made by Dr. Ulrich and Dr. Zhang that led to your termination from UNC?

A. Of course not.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 312 of 348

Q.    What do you believe it was?

A.    They wanted to get rid of me because one of the team is not comfortable with me.

Q.    Were you ever provided with any performance improvement measures regarding this alleged patient harm?

A.    Zero.

Q.    Okay.  What about with regarding the patient notes?

A.    Yeah, this kind of emails, okay, I missed this part, I'm gonna improve, I'm gonna work on it, no problem.

Q.    Was any patient harmed in -- in your writing of the notes, by your writing of notes?

A.    No.

Q.    Were you given any performance improvement measures regarding any alleged performance issues?

A.    No.

Q.    Okay.

A.    I want to touch base on something, the email I got from Dr. Ulrich on March 20th, 2023. Because this is which I responded to that email wishing harm and stuff like that.

            MR. MADISON:  We're gonna get to that in a second.  I gotta get this -- I wanna -- sorry.



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 313 of 348

BY THE WITNESS: (Resuming)

A. In that email, which you guys did not share, that I responded to maybe a little bit impolitely, I -- he sent me an email thanking -- or not thanking me -- like it was an unfortunate. It was -- yeah, I -- I -- I need to read the email. It was an un -- unfortunate things and we wish you the best of luck wherever you go. And he also mentioned that we're gonna meet at some point, retina community is very close or very narrow or very little.

And that's when I responded to him, because I felt threatened, he's threatening my career. Retina community is very close and he can damage my career. He's a big guy. He can talk to the retina community, which is very close, and just put negative words about me. And then, again, I responded that way. So he was like, I wish you the best of luck. This is so crazy when someone does too much evil and then come back and say I wish you best of luck. Come on, be responsible.

Q. Dr. -- Dr. Rageh, defense counsel mentioned several emails, mass emails, that you sent to -- I don't know, a ---

A. Yeah, a lot of people.



Q. --- couple dozens ---

A. Yeah.

Q. --- a lot of people ---

A. A lot of ---

Q. --- including Dr. Ulrich and Dr. Zhang.

A. Okay.

Q. And this was after your termination from your ---

A. Yes.

Q. --- fellowship. In mid 2023 you had already started at the ---

A. Correct.

Q. --- in Illinois.

A. Yes.

Q. Where were you when you wrote those emails?

A. So the emails after '23, 2022, I was at home in Springfield, Illinois.

Q. Okay. Did you have any immediate plans to return to North Carolina?

A. I sent an email to Dr. Budenz, interestingly he didn't show it up, when he asked me not to attend the meeting. I told him and he was like you don't have to -- or please -- something like -- like don't attend the meeting. I was like I



don't want to see anybody from UNC even in my dreams.

Q. Do you know when that was?

A. So usually UNC have an annual ophthalmology meeting and I was registered to attend that meeting. So he saw my name on the list of people attending that ophthalmology meeting at UNC. Dr. Budenz. And then he asked me if I'm going. I said, no, I don't even want to see them even in my dreams. Immediately after the -- the politz (ph), I decided I have no place here. I'm gonna leave.

Q. Can you tell -- explain how the mistreatment from UNC, how it affected you.

A. I had a lot of better job opportunities in Tennessee, in Kentucky, and Tennessee I got from Wilson Eye. Kentucky, that was Paducah and Retina Associates in Lexington. And so these opportunities, I -- and also the one in Pennsylvania. When I talk to them about that job, they offered me a job, and I ask them that the job has to include on-the-job surgical retina training. And the job in Pennsylvania, he's agreed. He sent me the -- the term or whatever, the contract, and I signed it, and they included surgical training on the job. So I'm gonna be -- I'm gonna be paid as an



Case 1:24-cv-00336-CCE-JEP   Document 68-3   Filed 03/13/26   Page 316 of 348

attending, and in addition to that I will get training for free.  It's not like a fellowship, I do a fellowship for 60K a year.  No, it's a job and a job that is also training.  So it was like the dream, best fit for me.  I signed it.

He asked me for a contact at UNC.  This is Dr. Ulrich email.  The following business day he only said something like we're not gonna be able to proceed.  Something like that.  I did not even care to ask why.  North Carolina or UNC did a lot of things to harm my career.  Not only sending false information to the medical boards, and I have a dozen of those medical boards, every state medical board they ask me about these things and I need to show up for multiple times to defend myself.  I end up obtaining the license.

But you can't imagine how much hassle it is to obtain in front of a board one, two, three, four times, like in Tennessee.  Some states did that, like Massachusetts and Wisconsin, just Zoom. Hey, listen, a few days he signed me all these recommendation letters.  I raised complaints to the HR.  And I became the dangerous person on earth. Only few days.  On -- on December he signed me three letters of recommendations for my license



applications in three states.  A few days later I became the most dangerous person on earth and I need to be terminated immediately.

Q.    Can you specify the false statements that they -- that were made ---

A.    Yes.  It's -- it's everywhere.  It's the thing that he mentioned.  I did not go to the ER to see a patient when my plan was right.  I did not laser a patient that has a retina tear, according to Dr. Brewington, when there is no laser.  No need for laser.  I -- I did not respond to their page once or twice.  These kinda things, even though it was not addressed on time, they pin -- accumulated like they couldn't -- they tried to collect it for the time to be used for this -- for termination.

But there was no single discussion about patient safety or patient evaluation.  Any -- any respected program, if there's something wrong there has to be like a teaching point.  There has to be something like an evaluation and how to avoid that in the future.  And then if it's serious enough, it has to be reported to the SAFE kinda thing.  None was done.

Q.    Can you explain the SAFE.

A.    Yeah.  When -- when anybody witnessed any



800.211.DEPO (3376)
EsquireSolutions.com

harm to a patient, they have to report it to the SAFE thing.  Like the incident where a nurse, or whoever in the OR with Dr. Zhang, reported this little cut on the eyelid.  So they kinda ask higher people to investigate.

Q.    Was it your understanding that the ophthalmology department was selective about making SAFE reports?

A.    Completely.  Selected and biased and driven by malice and driven -- manipulated by Dr. Zhang.

Q.    Did you believe that -- well, I'm sorry. Did you inquire about due process procedures at ---

A.    Yes.

Q.    --- any time?

A.    In my letter I give him to his hand. Before I send any official complaint, I asked him for a process.

Q.    You asked who?

A.    Dr. Ulrich.  I asked him for a process.  I asked him we can get advice from HR, GME, ACGME, AUPO, America Academy.  Everyone.  That was in the letter I sent him friendly by hand.  Of course he did not even respond to it.  And the same day he sent emails for immediate termination.  So the



800.211.DEPO (3376)
EsquireSolutions.com

letter was in the morning of 19, I think 19 December, and you're gonna see a lot of emails the follow -- the same afternoon.

Q. You mentioned multiple times earlier when talking to defense counsel that you were being told it's a setup, you know, coming -- coming there was a setup, what did you mean by that?

A. Coming there?

Q. To the program, coming into the office with Dr. Zhang.

A. The meetings you mean?

Q. The meetings.

A. Yes. So every time when the meetings, first we had two meetings and one phone call. The first in-person meeting with was Zhang and Ulrich. And we discussed the things like the pronunciation of my name, her name. We discussed the towel. We discussed the thing that happened when she claimed I did not go to see a patient, when I was on my way. So these are things I -- we discussed. And we left the room, there was no problem. There was no any corrective measures. There was no any kinda decisions how to proceed. It was just a, I would say, a friendly discussion. And then the following week he told me you don't have to go to Dr. Zhang



surgery.  You're not gonna work with her anymore. That was by the end of the day.  So -- and not only that, he sent an email later on, or I'm not sure when, he claimed that we discussed serious or patient harm or profession -- academic deficiency, performance deficiency.

I was like you can't just claim things that never happened.  So the following in-person meeting -- meeting, I recorded it.  The same thing for the phone call.  It was a -- like a long phone call.  And he tried to -- the feeling I had that he's not going to support my training because Dr. Zhang doesn't want me in the clinic or in the OR or in the -- at work.  And he is just trying to justify the termination.

Things like it's -- it's what -- it's like a well job.  They can terminate me any time they want.  At the same time, I can leave any time I want.  Which is not true.  I have a contract for two years.  And things like I need to find another job and you cannot just terminate me right now.  He said something again like we don't have to find a reason. If you can't -- if you're gonna -- I told him I'm gonna end up homeless.  He said you can live in my shed at his bark with my mother.  So that was the



800.211.DEPO (3376)
EsquireSolutions.com

kind of conversation. It was kinda heating up.

So I asked him multiple times, if you don't want me in the program, at least let me move to another program. And he got some requests for references and, again, he put so much bad words, which again is not correct. There is a university program here in North Carolina called West Fork or West something Fork or I'm not sure of the name. I sent an email to this guy, he's a program director. Worst Forest, I'm -- I'm not sure.

And I asked him to have a vacant position in his program. That was an email. He called me, "Are you Dr. Ulrich fellow?" "Yes." "Why you are leaving the program?" "I don't think it's the best fit for me." "So you think you can find a job? You think you can find a position?" I was like, "Yes, I hope so." And then he said, "Sorry, we filled all our positions." That was on the phone. So why you're calling me? Why you don't respond to email? So next day Dr. Ulrich was like walking with me or we were outside of the Kidner Eye Center, and he said -- I told him I'm -- I'm looking for -- for jobs and other places to go. He said, "I know everything. My friends told me." Okay.

Q. Did he say who his friends were?



800.211.DEPO (3376)
EsquireSolutions.com

A.   No.

Q.   Who do you suspect they were?

A.   That was the following day I talked with the program director here in North Carolina, Wake Forest or whatever.  I can look that name of the university.  Yeah, Wake Forest.  I was right.

Q.   Thanks for your help.  The towel was mentioned several times.

A.   Yeah.

Q.   What is the significance of the towel that was mentioned earlier?

A.   It -- again, every doctor might feel comfortable doing things their own way.  The towel is simply if you're driving a car and you're putting your foot on the gas pedal, you have a little bit of a towel between your foot and the gas so it doesn't slip.  And that Dr. Zhang was the only one.  So I used to go underneath and put the towel underneath between her foot and the -- and the laser -- or the -- an instrument.  Pedal.  That's it.  So if the purpose is to just make like a cushion or something, okay.  But then she said, "It's not folded this way. It has to be folded this way."  Again, it was under her foot to push the pedal.

Q.   So -- so the complaints from Dr. Zhang



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 323 of 348

about the towel were how it was folded so her foot could push the pedal?

A. Correct.

Q. Okay.

A. Dr. Ulrich, when he knew about this, in front of Dr. Zhang, he said, "I'm sorry, fuck the towel," to Dr. Zhang.

Q. Was that normally something she had you do, set up the towel underneath her foot? Was that a normal ---

A. Yeah, I mean ---

Q. --- assignment for you?

A. --- I used to do that before and after. I used to do the best I can. If she ask me something to do, I do it.

Q. Okay. And currently, how many patients, on average, do you see at ---

A. Currently?

Q. Uh-huh (affirmative).

A. Seventy patients a day.

Q. Have you had any issues with patient harm or patient safety?

A. No.

Q. Or have ---

A. Seventy patients a day. Sometimes I open



800.211.DEPO (3376)
EsquireSolutions.com

a Saturday clinic so not only five days a week, sometimes I do more.

Q. Have you had any like special recognition or anything in your field?

A. I was selected as one of the best ophthalmologists and we're gonna go for a ceremony by the state for the best ophthalmologist in North Carolina -- sorry -- in -- in Springfield, Illinois. I don't know my rank yet, but they said I was chosen as one of the top three. But they don't -- they did not say which one, first or second. But it -- that was something structured or -- or done by the state. I know I was informed about it very later on, about the ceremony, that I need to show up on certain -- on November 3rd. And they asked me if I need to purchase like plaques or things.

Q. Do you know what the criteria for that award is? What's the criteria for that?

A. I have exactly no idea, but usually it's the state either according to the population, they do like a -- a voting. And then they do voting for all doctors maybe. And then they end up with a few doctors that go into the second stage. And then the final winners.

Q. Okay. Have you had -- did you have any



800.211.DEPO (3376)
EsquireSolutions.com

issues with patient harm or patient safety at your previous fellowships or internships?

A. No. I had two years at Harvard. I had one year at Duke. I was very good. And had three years after I left UNC. I was very good. It was only a few weeks at UNC when they find out that I'm the worst doctor and I have to be terminated immediately without any -- any process.

Q. Did you contact, I think it's AUPO, regarding your ---

A. A lot.

Q. --- fellowship?

A. Yes.

Q. And what was their response?

A. They -- I -- I sent them an email. I think that was late December or something. And they sent me a response like which program you in? I told them the program at UNC, Dr. Ulrich. They never responded until now. I kept asking them, if you notice, I keep bothering maybe, following emails, to get an answer. So they did not answer. And then I found out it's Budenz who controlled the AUPO. And you reminded me of something. I know a glaucoma specialist. He was going for a job interview -- actually he had the job interview with



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 326 of 348

Budenz for a glaucoma position at UNC. Dr. Budenz was in Emirates for some meetings and at that time my friend, or the glaucoma specialist, found out that was -- that was the time when AUPO contacted him about my emails. My glaucoma, the friend who is a glaucoma specialist, he said, "Yeah, I kinda noticed that when I was at the meeting with him in emirates."

Q. Did he tell you that anything that Dr. Budenz shared with him about that incident or?

A. He was in the process of getting a job at UNC, so he did not share much thing. But he only said that the AUPO contacted him during that meeting and he believe it was about me. And then he ended up, after I told him this place is not any -- they don't have any ethics or any morals, he did not start the job.

Q. You mentioned earlier -- and I'm gonna come to a close here -- you mentioned earlier that Dr. Ulrich and Dr. Willett had you as their primary scribe, but Dr. Zhang would usually have you in the back, sitting in the back and writing notes.

A. Yes.

Q. Which was completely different from the other doctors?



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 327 of 348

A.    Correct.

Q.    How else did Dr. Zhang treat you differently than the other doctors treated you?

A.    So it was not only Dr. Ulrich or Dr. Willett or Dr. Materin or Dr. Jennifer Sun or Dr. -- anyone I work with in the OR, they, according to who is in the OR and who is entitled for this kind of training and like scrubbing and learning from the attending.  When I was at Duke -- sorry, when I was at Harvard, I was the fellow so residents watch us.                When I was at Duke, I was a fellow so I -- residents continued to watch us, except when Dr. Materin leaves the room or is not in the room, so he had me as the primary surgeon and I trained the resident.  That was almost on a weekly basis at Duke.  Dr. Materin even doesn't show up when there is no need for him in the surgery room, so I take responsibility.  And I also have a training with me train -- like a resident, and I start doing some stitches and let them continue the stitches or do the rest of it.  The same thing Dr. Ulrich, I was the primary assistant.  The same thing with Dr. Willett, I was the primary assistant.  The only person who had me sit in the back was Dr. Zhang.  And the only person who asked me very, very



800.211.DEPO (3376)
EsquireSolutions.com

early on to sit in the back and write notes, only Dr. Zhang.  Dr. Willett take care of his own notes. Dr. Ulrich takes care of his own notes.  I stand or sit next to them and see how he phrase things and write things from Dr. Ulrich and Dr. Willett.

But Dr. Zhang, she wanted me to sit in the back, completely not in the microscope seeing things, but she expected me to write a very detailed, excellent English kinda professional language about the steps that she did when I'm sitting in the back watching at a screen.  The resident next to her was not responsible for anything.

I was the one also, even after the surgery finished, to touch base with the patients and handle prescription for medications.  Touch base with him and make sure he got everything he needs to go for the pharmacy, pick it up, and make sure he show up for the first day post-surgery, the first week, and the first month, post-surgery.  Because I was considered, I would say, senior to the residents. So I cannot ask the residents to do, I would say, junk work when I am the one responsible for it.

Q.   Okay.  Explain to us why -- how sitting in the back affected you.  Describe the room for us



800.211.DEPO (3376)
EsquireSolutions.com

and, you know, where you were in the back in relation to everyone else and, you know, the screen you had to ---

A. Okay. Simply, you guys are sitting here discussing together each thing and I'm sitting here behind and trying to work on a computer.

Q. So where's the screen?

A. There is many screens.

Q. Uh-huh (affirmative).

A. So if -- if she's the surgeon, might be the screen is over there (indicating), might be closer.

Q. Uh-huh (affirmative).

A. And, again, I'm sitting back here (indicating). She's the surgeon. This is Bickrum (indicating). Most of the time that was the resident working with her. And this is the nurse (indicating).

Q. Okay.

A. And, again, I was asked to sit back here working on a computer and looking and documenting, looking. That was my job most of the time with Dr. Zhang.

Q. Sitting in the corner?

A. Yes, I -- the computer is in the corner


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

and I have a stool here (indicating).

Q. Okay. Were you facing what everyone was doing or was your back to -- to the surgery ---

A. So sometimes I don't pay attention to the writing and I look at the screen.

Q. Uh-huh (affirmative).

A. Sometimes I try to listen to what they say to each other. There might be some advice how to do this procedure, so I tried to listen. I tried to learn.

Q. Uh-huh (affirmative).

A. But, again, I have another job she wanted me to do.

Q. Could you face the screen and still see ---

A. No.

Q. --- what was going on?

A. No.

Q. So you had to turn ---

A. Computer is like on the wall.

Q. Okay. So you're ---

A. So I sitting -- I'm sitting here, exactly here (indicating), and then I try to listen. I try to see. Maybe I look there, there's another screen. But the computer is here (indicating). And I need



to write, I have to write it here (indicating).

Q. Okay. So -- okay. So you're in the corner, you can't see what's going on without turning and ---

A. No, I cannot write and watch at the same time.

Q. Okay.

A. Either I had to memorize things, and by the end of the surgery I go and put in or I have to just be -- I don't know, like a -- like a typing machine kinda doing this blindly. And, by the way, she made fun of it, the way I write, sometimes.

Q. What did she say?

A. She said, "How many words you can write in a minute?" And then I was like, "I'm slow, I have to look at the number, the letters." And she was like, "You know, I can write much faster and without even looking at the screen." And then I was like, "Okay, can you write this, Doctor? Let me see how you write it fast." So I asked her to write this, "Today we had an amazing fellow, his name is Abdulrahman Rageh." And once she found out that I'm trying to have her write something positive about me, she stopped and laughed. But this is kinda like the experience when she asked me -- when she was



800.211.DEPO (3376)
EsquireSolutions.com

trying to find out how much fast of the speed writing.

Q.   Did -- did you ever see Dr. Zhang make anyone else stand in the corner ---

A.   No.

Q.   --- and write notes?

A.   No.

Q.   Why do you believe she had you in the corner writing?

A.   Well, she doesn't want to see me.  And it's kind of humiliating.

Q.   How so?

A.   Like being not involved and getting the training opportunity to residents.  At the same time asking me to fold the towel or sit in the back and do these kinda -- I -- right now I call it like childish behavior.  But that's -- that was so clear to me that she was just trying to -- something like let me kneel down like -- at that time I did not know what discrimination means so I just feel like that's what it was she treating me until I found out there is something called discrimination in the U.S. and it's very common.

Q.   I just need a moment to look at my notes.

MR. CONNOR:  Sure.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

THE COURT REPORTER: Off record, 5:01.

(Whereupon, a recess ensued from 5:01 p.m. to 5:03 p.m.)

THE COURT REPORTER: On record, 5:03.

BY MR. MADISON: (Resuming)

Q. Dr. Rageh, you mentioned earlier that this whole situation has impacted your immigration status and, you know, with your wife as well, can you explain like what -- what's happened with that?

A. Of course. A few days after one of these convictions I got a letter from the USCIS. The USCIS usually is very, very, very slow responding to any queries or applications or anything. But, anyway, a few days after the conviction the USCIS sent me a letter that my petition to bring my wife is going -- I mean, intended to decline. They intended to decline my petition to bring my wife in the U.S. because of whatever there was like sexual non-conduct or they have like Adam's Rule or whatever, I wasn't sure. But it has to do with UNC. So they sent me that letter and you can imagine that after almost seven or eight years in the U.S., I wanted to bring my wife. I started my application two years before that happen to bring my wife, and


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

suddenly they gonna cancel it because of the legal issues with the civil and criminal stuff immediately. Maybe the following few days after one of these convictions.

So, again, it was so sad. And I had to hire an immigration attorney. And they provided evidence that something like Dr. Zhang is not 18 years or younger, something like this has nothing to do with like abuse or trafficking or whatever. But it took us six months until I got a letter from the USCIS that my petition is moving forward.

Q. Okay.

A. Thanks, God, yes. And when I was talking about immigration attorneys about this, they say few things. First, the USCIS can do whatever they want, even if it has no -- there is no -- you can't argue their decision. Whatever they decide, it's final. The USCIS. At the same time, these issues also is, according to immigration lawyers, is preventing me from getting my citizenship. I should go for citizenship in January. And I consulted a lot of attorneys. And even though everything was dismissed and expunged, this has nothing to do with U -- with USCIS decision. They can easily find it as a reason to prevent me from getting my citizenship. A lot of



800.211.DEPO (3376)
EsquireSolutions.com

immigration lawyers said that.

Q. What do you believe were the -- was the intent behind Dr. Ulrich and Dr. Zhang moving forward with the order of protection to get you?

A. The intent behind it?

Q. Uh-huh (affirmative).

MR. PADGET: I'm gonna object as to form, it calls for speculation.

MR. MADISON: Okay.

BY MR. MADISON: (Resuming)

Q. You can -- you can answer.

A. So why did they file these things? My thinking about this is they wanted just to give me hard time. They wanted me to show up in North Carolina multiple times when they don't show up to the court. So I go to the court, nobody's there, and it was continued. That happened a few times. They wanted me to hire attorneys. They wanted me to kinda deplete my resources or something. They wanted me that this might affect my job. That is my understanding.

Q. So the -- they didn't show up for the initial hearings regarding the order of ---

A. Yeah, some hearings ---

Q. --- protection?


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.   --- they did not show up.  Not -- not -- not the hearings, it's during the processing of the contempt of no-contact order, during the processing of the cyberstalking.

Q.   Oh, contempt.  Got ya.

A.   They did not show up a few times.

Q.   For the -- for the violation of the no-contact?

A.   For the alleged violation of the no-contact.

Q.   Got ya.

A.   By the way, one of the times at the cyberstalking hearing with Dr. Ulrich, after -- I'm not sure the cyberstalking or the no-contact order -- after we finished, I was leaving, and I was sitting in the hall with my attorney Jacqueline Cobb.  He came by before she approaches me and he said, "I'll see you in March."  He told me on his way leaving the hallway for some no-contact order kinda hearing or -- or the cyberstalking, "I'll see you in March."

Q.   Do you know what he meant by that?

A.   Well, I'm -- I can see you every day, I don't know.  But he just wanted to exhaust me the best he could.  Yeah, I told my attorney about it.



800.211.DEPO (3376)
EsquireSolutions.com

And that's actually interesting. I told my attorney about it. Now I got some more things to remember. And I told her that he was coming toward me and he said, "I'll see you in March," she went to the either a state representative or attorney or something, and they decreased the probation time from six months or longer to five months and none -- whatever supervisor or something.

But she mentioned that to the state attorney and that -- after that they promised me that it's not gonna be six months, we can make it five months. One more thing that attorney said or the state -- the state representative -- told the -- my attorney then, that she's familiar with adjustment disorder and she feels like -- like sympathy. And that's also why, even if you see the judge does not understand why the order was for five months instead of six months or longer, why the order was not supervised. Why the order does not necessitate any like -- like psychological or -- or any visits or something, documentation. Because Dr. -- after -- after Dr. Ulrich said that, "I'll see you in March," she went to talk to the representative again. And the representative, as my attorney said, she said that she's familiar with



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

adjustment disorder and she can understand the stress I went through that led to these emails to be sent.

Q.   Is this the assistant district attorney that she spoke to or?

A.   It's the one that who is against me in the court in front of the judge.  Yeah, it's -- it's the state or district.

Q.   Got ya, okay.  I want to -- do want to circle back.  The bullets on the -- the mailbox, when you reported that to the university, what was their response?

A.   The first time nobody even responded when I reported the first bullet.  After I reported the other two bullets, they gave me some information about the police that I should contact and the phone number of the police.

Q.   Was that it?

A.   Yeah.  I'm not sure if they gave me the phone number or they wanted me to look for a certain like county police or something.

Q.   Uh-huh (affirmative).

A.   But I was like I'm already leaving, I'm not living here.

Q.   And who at the university did you contact



800.211.DEPO (3376)
EsquireSolutions.com

regarding those -- those bullets?

A.   I usually cc everybody, whoever responsible should take responsibility.  I don't know who to contact, HR, investigators, even my doctors.  I just try to, this is what's happening.

Q.   Okay.  Were they aware at that time that you were taking time off for your mental health?

A.   Yes.

Q.   Did they ever follow up regarding ---

A.   I left.  I left the whole state.  They did not follow up, they just asked me to contact the police.

Q.   No more questions.

MR. PADGET:  Give us like five minutes.

THE COURT REPORTER:  Off record, 5:13.

(Whereupon, a recess ensued from 5:13 p.m. to 5:20 p.m.)

THE COURT REPORTER:  On record, 5:20.

MR. PADGET:  Nothing else for the defense -- defendants.

THE COURT REPORTER:  Okay.  Off record, 5:20.

(Whereupon, the deposition concluded



800.211.DEPO (3376)
EsquireSolutions.com

at 5:20 p.m.)



Case 1:24-cv-00336-CCE-JEP    Document 68-3    Filed 03/13/26    Page 341 of 348

C E R T I F I C A T I O N

I, Christy Whisner, a stenomask reporter and notary public in and for the County of Forsyth, State of North Carolina at Large, do hereby certify:

That ABDULRAHMAN RAGEH, the witness whose examination is hereinbefore set forth, was first duly sworn by me and that this transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

Reading and signing of the testimony were requested.

IN WITNESS WHEREOF, I have hereunto set my hand this the 11th day of November, 2025.



CHRISTY WHISNER, Notary No. 202511500071

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

DEPOSITION ERRATA SHEET

Our Assignment No. J13658758

Case Caption: Rageh v. UNC Chapel Hill, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.  Signed on the _____ day of _____, 20___.

_____

ABDULRAHMAN RAGEH



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____

                ABDULRAHMAN RAGEH





EXHIBIT
RAGEH

# Abdulrahman Rageh

78 Tremont st,
Brighton, MA 02135
832-455-6298
dr.rageh@gmail.com

## Professional Experience

**Duke Eye Center**
*Ocular Oncology Fellow*

Durham, NC
*Expected: July 2021 – June 2022*

**Beetham Eye Institute – Joslin Diabetes Center**
*Senior Medical-Retina Fellow*

Boston, MA
*July 2020 – June 2021*

**Beetham Eye Institute – Joslin Diabetes Center**
*Medical-Retina Fellow*

Boston, MA
*July 2019 – June 2020*

**Kadrmas Eye Care New England**
*Certified Ophthalmic Medical Technologist and Surgical Assistant*

Plymouth, MA
*January 2019 – June 2019*

**Massachusetts Eye and Ear Infirmary**
*Certified Ophthalmic Medical Technologist and Surgical Assistant*

Boston, MA
*July 2017 – January 2019*

**Boston Children's Hospital**
*Pediatric Ophthalmology Observership*

Boston, MA
*December 2018 – January 2019*

**Joslin Diabetes Center**
*Shadowed Dr. Lloyd Aiello, Diabetic Retinopathy Specialist, and
Dr. Paul Arrigg, Chief of Vitreo-Retinal Surgery*

Boston, MA
*October 2018*

**Private Practice, Dr. Mark Latina**
*Shadowed Glaucoma Specialist (clinical and surgical)*

Reading, MA
*September 2018*

**Massachusetts Eye and Ear Infirmary**
*Shadowed Dr. Roberto Pineda, Chief of Cornea and Refractive Surgery*

Boston, MA
*August 2018*

**Harvard Vanguard Medical Associates**
*Ophthalmic Technician*

Boston, MA
*February 2017 – June 2017*

**Hartford Hospital**
*Cardiology Research Assistant*

Hartford, CT
*June 2016 – January 2017*

**Park Avenue LASEK**
*Cornea and Refractive Fellow*

New York, New York
*June 2016 – January 2017*

**Eye Disease Consultants**
*Externship*

West Hartford, CT
*March 2016 – May 2016*

Confidential Subject to Protective Order

| | | |
|---|---|---|
| **National Eye Center** | | Cairo, Egypt |
| *Ophthalmology Resident* | *November 2009* | *October 2015* |
| | | |
| **Hospital of Endemic Diseases** | | Portsaid, Egypt |
| *General Practitioner* | *March 2008* | *October 2009* |
| | | |
| **Al-Jawhara Medical Center** | | Portsaid, Egypt |
| *General Practitioner* | *July 2007* | *February 2008* |

## Education and Certifications

| | |
|---|---|
| **Certified Joslin Vision Network (JVN) level grader** | 2019 |

*Passed the certification exam for the Sequoia project. Also, involved in grading images for multiple on-going studies and clinical trials.*

| | |
|---|---|
| **Joint Commission on Allied Health Personnel in Ophthalmology** | 2018 |
| *Certified Ophthalmic Medical Technologist (COMT-JCAHPO)* | |
| | |
| **Education Commission for Foreign Medical Graduates** | 2016 |
| *ECFMG Certification* | |
| | |
| **Ain Shams University, Faculty of Medicine** | Cairo, Egypt |
| *Bachelor of Medicine and Bachelor of Surgery (MBBCh)* | 2000-2007 |

## Board Examinations

| | |
|---|---|
| **United States Medical Licensing Examination** | |
| *Step 3* | *2017* |
| *Step 2 CK and CS* | *2016* |
| *Step 1* | *2010* |
| | |
| **Member of the Royal College of Surgeons in Ireland (MRCSI)** | 2014 |
| *Ophthalmology, Part 1* | |
| | |
| **Ain Shams University** | 2013 |
| *Masters of Science in Ophthalmology, Part 1* | |

## Professional Memberships

- - 2019 - present     American Academy of Ophthalmology (AAO)
- - 2019 - present     Association of Research in Vision and Ophthalmology (ARVO)
- - 2015 - present     ARVO-Egypt Chapter
- - 2014 - present     Egyptian Vitreoretinal Society (EGVRS)
- - 2014 - present     Egyptian Ophthalmology Society (EOS)

UNC_0007976

## Research Experience

**Book Chapters:**

- Dunn JP, Langer PD, eds. Basic Techniques of Ophthalmic Surgery. Colombia: American Academy of Ophthalmology: 2018-2019. Chapter 11: **Rageh A**, Gupta P, Pineda R. Limbal Relaxing Incisions or Peripheral Corneal Relaxing Incisions.

**Conference Presentations:**

**Poster Presenation:**

- Lin MM, **Rageh A**, Turalba AV, Lee H, Falkenstein IA, Hoguet AS, Ojha P, Rao VS, Ratanawongphaibul K, Rhee DJ, Shen LQ, Song BJ, Chen TC. Endocyclophotocoagulation outcomes for different glaucoma types and stages. Scientific poster at the American Glaucoma Society Annual Meeting, New York, 2018.
- **Rageh A**, Ashraf M. Vortex vein location as an individualized marker of anatomic retinal far periphery using non-steered ultrawide field fluorescein angiography. ARVO 2020 (Baltimore – Accepted)
- **ARVO-2021 (Abstracts submitted):**
   - **Abdulrahman Rageh MD**, Recivall P. Salongcay MD MPM, Lizzie A. Aquino, Claude M. Salva, Aileen V. Saunar MD, Glenn P. Alog MD, Jennifer K. Sun MD MPH, Tunde Peto MD PhD, Lloyd P. Aiello MD PhD, Paolo S. Silva MD. Comparison of 1-Field and 2-Field Mydriatic Handheld Retinal Imaging with Early Treatment Diabetic Retinopathy Study (ETDRS) 7-Standard Field Photography for Diabetic Retinopathy (DR) and diabetic macular edema (DME)
   - Salongcay, Recivall P; Aquino, Lizzie Anne; Salva, Claude Michael G.; Saunar, Aileen V.; Alog, Glenn P.; **Rageh, Abdulrahman**; Sun, Jennifer K.; Peto, Tunde; Aiello, Lioyd P.; Silva, Paola S. Comparison of Mydriatic Handheld Retinal Imaging with Early Treatment Diabetic retinopathy Study (ETDRS) 7-Standard Field Photography for Diabetic Retinopathy (DR) and Diabetic Macular Edema (DME)
   - Aquino, Lizzie Anne; Salva, Claude; Salongcay, Recivall P.; Saunar, Aileen V.; Alog, Glenn P.; **Rageh, Abdulrahman;** Sun, Jennifer K.; Peto, Tunde; Aiello, Lioyd P.; Silva, Paola S. Comparison of Nonmydriatic Handheld Retinal Imaging with Early Treatment Diabetic retinopathy Study (ETDRS) 7-Standard Field Photography for Diabetic Retinopathy (DR) and Diabetic Macular Edema (DME)
   - Jacoba, Cris Martin; **Rageh, Abdulrahman**; Salongcay, Recivall P.; Aquino, Lizzie Anne; Salva, Claude Michael G.; Sun, Jennifer K.; Peto, Tunde; Aiello, Lioyd P.; Silva, Paola S. Comparison of Handheld Retinal Imaging Devices with Spectral Domain Optical Coherence Tomography (SDOCT) in the Identification of Macular Pathology
   - Elmasry, Mohamed A.; **Rageh, Abdulrahman**; Salongcay, Recivall P.; Sun, Jennifer K.; Peto, Tunde; Aiello, Lioyd P.; Silva, Paola S. Agreement rates for predominantly peripheral (PPL) grading assessed using qualitative and quantitative methods on Ultrawide Field Color Images (UWF-CI) and Fluorescein Angiography (UWF-FA) in Diabetic Retinopathy (DR)

**Paper Presentation:**

- Gilbert M; Ashraf M; Rhee, Jae; **Rageh A**; Silva, Paolo S.; Sun, Jennifer K.; Aiello, Lloyd P.; Roh, Miin. Progression of Diabetic Retinopathy in Presence of Age-related Macular Degeneration. Association for Research in Vision and Ophthalmology (ARVO) Annual Meeting; May 2020; Baltimore, USA

**Invited Talks:**

- **Longwood Medical Area Ophthalmology (LMAO) Conference#364** on Friday June.19,2020, Sponsored by Beetham Eye Institute of Joslin Diabetes Center. Title: Vortex vein location as an individualized marker of anatomic retinal far periphery using non-steered ultrawide field fluorescein angiography.
- **Teaching and leadership activities at the National Eye Center, Cairo, Egypt (2009-2014):**
   - A Case presentation of NPDR.
   - A Baby with Horner's Syndrome.
   - Third Cranial Nerve Palsy in elderly.
   - Femtosecond Laser Applications in Corneal Surgeries.
   - Supervise residents in the OR and clinic.

Confidential Subject to Protective Order

- Instructor at cataract surgery wet lab for the residents.
- **Teaching and leadership activities at the Beetham Eye Institute of Joslin Diabetes Center (2020-2021):**
  - Diabetes Control and Complications Trial (DCCT)
  - Epidemiology of Diabetes mellitus Interventions and Complications study (EDIC)
  - Diabetic Retinopathy Study (DRS)
  - Early Treatment Diabetic Retinopathy Study (ETDRS)
  - The Diabetic retinopathy Clinical Research network protocols (DRCR.NET)

## Publications:

- Ashraf M, Sampani K, Rageh A, Silva PS, Aiello LP, Sun JK. Interaction Between the Distribution of Diabetic Retinopathy Lesions and the Association of Optical Coherence Tomography Angiography Scans With Diabetic Retinopathy Severity. JAMA Ophthalmol. 2020 Oct 29
- Lin MM, **Rageh A**, Turalba AV, Lee H, Falkenstein IA, Hoguet AS, Ojha P, Rao VS, Ratanawongphaibul K, Rhee DJ, Shen LQ, Song BJ, Chen TC. Differential Efficacy of Combined Phacoemulsification and Endocyclophotocoagulation in Open-angle Glaucoma versus Angle-closure Glaucoma. J Glaucoma. 2019 05; 28(5):473-480.
- Lin MM, **Rageh A**, Turalba AV, Lee H, Falkenstein IA, Hoguet AS, Ojha P, Rao VS, Ratanawongphaibul K, Rhee DJ, Shen LQ, Song BJ, Chen TC. In Reply: Protocol for Titrated Endocycloplasty When Combined With Phacoemulsification in an Exclusive Cohort of Angle Closure Glaucoma. J Glaucoma. 2019 12; 28(12):e178-e179
- Ashraf M, Souka A, **Rageh A**, Gilbert M and Sun JK. Summary of DRCR.net Studies in the management of diabetic macular edema. Egyptian Retina Journal
- In review: **Rageh A\***, Ashraf M\*, (\*first co-authors), Fleming A, Silva PS. Automated microaneurysm (MA) counts on ultrawide field (UWF) color and fluorescein angiography (FA) images. Seminars in Ophthalmology

## Clinical Trials:

- Involved in the screening and recruitment for multiple national and international clinical trials (DRCR.net AC, AG, AH and AE).
- Unmasked injector in the Yosemite phase III clinical trial.

## Scientific Software:

- Proficient in the use of imagej, Optos AVR grading, Optos Opto-annotator, Heyex 1 and 2, Optovue Angio Analytic and Optos Advance
- Involved in the development and testing of an automated tool to evaluate MA counts in Ultrawide field images in collaboration with Optos Plc.

## Leadership:

- Senior clinical/research Fellow at BEI (July 2020-Present). Roles include lead on several imaging (OCTA/UWF) studies, close involvement with ongoing clinical trials supervision of research projects for new incoming fellows. Mentors; Dr. Llyod Paul Aiello, Dr. Jennifer Sun, Dr. Paolo Silva. Beetham Eye Institute, Joslin Diabetes Center, ophthalmology department, Harvard Medical School

Confidential Subject to Protective Order