**In the Matter Of:**

Rageh vs UNC, et al.

**JAN ULRICH, M.D.**

*February 16, 2026*

EXHIBIT 4



INFO@NCDEPO.COM     1-919-557-4640

DEPOSITIONS, INC.

WWW.NCDEPO.COM

1000 N. MAIN ST., SUITE 215, FUQUAY VARINA, NC 27526

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF NORTH CAROLINA

DURHAM

Civil No. 1:24-CV-336

Abdulrahman Rageh,                          )

      Plaintiff,                           )

v.                                          )

University of North Carolina at      )

Chapel Hill, Jan Niklas Ulrich,      )

Alice Zhang, and Donald Budenz in    )

their official capacities,           )

      Defendants.                          )

---

DEPOSITION OF JAN NIKLAS ULRICH, M.D.

10:09 A.M.

---

Chapel Hill, North Carolina

Monday, February 16, 2026

Reported By:  Marta J. Charles

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 2 of 90

A P P E A R A N C E S:


Representing Plaintiff:

MADISON LAW, PLLC

BY:  KIRTON M. MADISON, ESQUIRE

8936 Northpointe Executive Park Drive, Suite 240-260

Huntersville, North Carolina 28078

(704) 981-2790

kmadison@madlawpllc.com

and

BYNDON LAW

BY:  POTSO BYNDON, ESQUIRE

2016 Fowler Avenue

Omaha, Nebraska 68110

(402) 570-1287

potso@byndonlaw.com


Representing Yang "Alice" Zhang, M.D.:

THE CONNOR LAW FIRM, PLLC

BY:  GREGORY S. CONNOR, ESQUIRE

5511 Capital Center Drive, Suite 180

Raleigh, North Carolina 27606

(919) 237-9220

gconnor@connorlaw.com

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 3 of 90

A P P E A R A N C E S:    (Cont.)


Representing all Defendants:

NORTH CAROLINA DEPARTMENT OF JUSTICE

BY:  LINDSAY VANCE SMITH, ESQUIRE

114 West Edenton Street

Raleigh, North Carolina 27603

(919) 716-6065

lsmith@ncdoj.gov


Also Present: Dr. Rageh, via Zoom connection

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 4 of 90

                              I N D E X


                        E X A M I N A T I O N S


Examination                                                   Page

Direct examination by Mr. Madison                               8

Continuing Direct examination by Mr. Byndon                    20

Continuing Direct examination by Mr. Madison                   26

Continuing Direct examination by Mr. Byndon                    32


                        E X H I B I T S

Exhibit Number          Description                           Page


Exhibit 2   Amended Complaint                                   33

Exhibit 3   Letters: Dr. Budenz, Dr. Burks,                    35
            Dr. Rageh

Exhibit 4   Program Requirements for Fellowship                41
            Education in Surgical Retina &
            Vitreous

Exhibit 5   Vitreoretinal Fellowship Curriculum                45
            University of North Carolina
            at Chapel Hill

Exhibit 6   Email: Dr. Zhang, Dr. Ulrich                       51

Exhibit 7   Email: Dr. Zhang, Dr. Ulrich                       66

Exhibit 8   Email: Dr. Rageh, Dr. Ulrich                       70

```
             E X H I B I T S   (Cont.)
Exhibit Number      Description                        Page


Exhibit 9  Email: Email: Dr. Zhang, Dr. Ulrich      81
Exhibit 10 Text: Dr. Rageh, Dr. Ulrich              89
Exhibit 11 Email: Dr. Budenz, Dr. Ulrich,           96
           and others
Exhibit 12 Email: Dr. Ulrich, Dr. Zhang             106
Exhibit 13 Email: Dr. Rageh, Dr. Ulrich             109
Exhibit 14 Email: Dr. Ulrich, Dr. Rageh,            112
           and others
Exhibit 15 Email: Dr. Zhang, Ms. White              118
Exhibit 16 Email: Dr. Ulrich, Dr. Zhang,            122
           and others
Exhibit 17 Email: Dr. Rageh, Dr. Ulrich,            125
           and others
Exhibit 18 Email: Dr. Ulrich, Dr. Budenz            130
Exhibit 19 Email: Dr. Ulrich, Dr. Zhang             140
Exhibit 20 Email: Dr. Willett, Dr. Ulrich,          143
           and others
Exhibit 21 EXHIBIT 4 SAFE Reporting System          148
           Program
Exhibit 22 Email: Dr. Ulrich, Ms. White,            169
           and others
Exhibit 23 Email: Dr. Ulrich, Dr. Rageh             170
```

Case 1:24-cv-00336-CCE-JEP   Document 68-4   Filed 03/13/26   Page 6 of 90

E X H I B I T S    (Cont.)

Exhibit Number          Description                        Page

Exhibit 24 Email: Dr. Ulrich, Dr. Rageh,                   174
           and others

Exhibit 25 Email: Dr. Meeks, Dr. Ulrich                    179

Exhibit 26 Email: Dr. Jewart, Dr. Ulrich                   183

Exhibit 27 Dr. Rageh's postgraduate reference              185
           letter

Exhibit 28 Dr. Rageh's postgraduate training               190
           verification

Exhibit 29 Arizona Medical Board, Dr. Rageh's              191
           postgraduate training verification
           Form

Exhibit 30 Supervisory Evaluation Form                     194
           attachments

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 7 of 90

This is the deposition of JAN NIKLAS ULRICH, MD, taken pursuant to Notice of the parties and in accordance with the North Carolina Rules of Civil Procedure, before Marta J. Charles, Court Reporter and Notary Public for the State of North Carolina, at the University of North Carolina at Chapel Hill, Office of University Counsel, 123 West Franklin Street, Suite 600A, Chapel Hill, North Carolina, on the 16th day of February, 2026, beginning at 10:09 a.m.

The reading and signing of this transcript is waived.

Case 1:24-cv-00336-CCE-JEP     Document 68-4     Filed 03/13/26     Page 8 of 90

P R O C E E D I N G S

* * * * * * * * * *

JAN NIKLAS ULRICH, M.D.,

having first been duly affirmed,

was examined and testified as follows:

DIRECT EXAMINATION BY MR. MADISON:

Q.      Good morning, Dr. Ulrich.

A.      Good morning.

Q.      How are you this morning?

A.      Good.  I don't know your name, but good morning.

Q.      All right.  My name is Kirton Madison.  I am counsel for the plaintiff, Dr. Rageh.  This is my co-counsel, Mr. Byndon.

A.      Okay.

MR. BYNDON:  Good morning.

THE WITNESS:  Good morning, guys.

Q.      (By Mr. Madison)  Can you please state your name for the record?

A.      It's Jan Niklas Ulrich.

Q.      Okay.

MR. MADISON:  Counsel, could you please note your appearance?

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 9 of 90

MS. SMITH:  Lindsay Vance Smith.  I am counsel for all defendants in this matter.

MR. CONNOR:  Greg Connor.  I'm the counsel for Defendant, Dr. Zhang.

MR. MADISON:  Okay.  Great.

Q.    (By Mr. Madison)  My name is Kirton Madison.  I am the attorney for Dr. Rageh.  I'm here to ask you some questions regarding a lawsuit that Dr. Rageh has filed against UNC and you, yourself.  All right?

For background, have you ever been deposed?

A.    I have.

Q.    Okay.  How many times have you been deposed?

A.    Six, eight times.

Q.    And why were you deposed?

A.    It's -- med-mal lawsuits I'm an expert witness for.

Q.    You're an expert witness?

A.    Mm-hm.  Yeah.

Q.    Have you been ever deposed as a defendant yourself?

A.    I have not.

Q.    Okay.  Okay.  So a deposition is an

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 10 of 90

about this case?

A.     I mean, they know there is a case going on, but I've not spoken about any details, any -- anything about this case.

Q.     At any point?

A.     At any point.

Q.     Have you ever gotten in trouble with law enforcement for being dishonest?

A.     I have not.

Q.     Have you ever received any employment-related disciplinary actions?

A.     I have not.

Q.     Have you ever received any employment-related reprimands?

A.     I have not.

Q.     Have you ever been involved in any other lawsuits?

A.     I have as an expert witness.

Q.     Okay.  Have you ever sued anyone?

A.     No.

Q.     Any civil cases?

A.     No.  I -- I take that back.  I've been involved in the criminal case against Dr. Rageh where he was convicted of cyberstalking against me and colleagues of mine.  He was charged, and pled guilty

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 11 of 90

to cyberstalking.

Q.    Was that charge overturned on appeal?

A.    Not that I'm aware of.  He pled guilty. And that's all I heard about it.

Q.    So you didn't follow up after that?

A.    Not in person.  I was told by the district's office attorney that he needed to appear, I think it was -- like, they put him on probation or something for six months.  He needed to appear, but I -- I didn't hear any -- I mean, I didn't hear anything else.

Q.    Okay.

A.    I didn't have to appear to that -- his appearance there.  I didn't go to that.

Q.    Okay.  Have you ever been convicted of a crime, or pled guilty to a crime?

A.    A crime, no.  I have some parking violations, but that's all.

Q.    Okay.  All right.  Let's get into it a little more.  What is your full name?

A.    It still is Jan Niklas Ulrich.

Q.    Okay.  Do you have any nicknames?

A.    I go by Nick.

Q.    Okay.  Have you used any other names?

A.    I have not.

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 12 of 90

that the fellow is trained adequately, and learns adequately, and, yeah, graduates successfully.

Q. Understood. Understood. So your current position you do, obviously, multiple things.

A. Mm-hm.

Q. Outside of managing and supervising and directing the fellows, what do you do?

A. Well, I have a clinical practice, and I see patients, operate on patients myself. I might do research. I do some administrative work, university. I do -- I teach. I mean, I do formal teaching to residents and medical students. That's about it.

Q. If I would watch your typical, let's say, week, what percentage of you would be doing -- what percentage of your day would be spent doing that versus managing and guiding fellows?

A. So -- so 70 -- probably 75 percent of the time, I'm clinically active. That means I -- with patients. A good amount of that time is together with fellows and residents. So most of the time that I see patients, I have some trainee in some capacity with me. So there's -- I rarely am just completely just by myself.

Q. Okay. So, Doctor, you're the program director of the VR fellowship?

www.NCDepo.com
info@NCDepo.com
Depositions, Inc.
Serving all of North Carolina
(919) 557-4640

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 13 of 90

A.      Vitreoretinal Surgery Fellowship.

Q.      Okay.

A.      Yes.

Q.      Is there anyone else that fulfills, or assists you, or shares that role with you at UNC?

A.      I'm the program director.

Q.      So that means solely you?

A.      Correct.  I mean, my other retina faculty, they help train and teach the fellow.  But that role is -- is me.

Q.      Is you, and you alone?

A.      Correct.

Q.      Okay.  Okay.  Okay.

BY MR. MADISON: (Continuing direct examination.)

Q.      One thing --

THE COURT REPORTER:  Can we go off the record for a second?

(Discussion off record.)

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

BY MR. MADISON: (Continuing direct examination.)

Q.      Dr. Ulrich, I just want to clarify something about your work history.  You've been in supervisory roles at UNC since '08, correct?

A.      In various capacities, yes.

Q.      Okay.  What are your work hours?  Like,

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 14 of 90

A.    I don't think so.

Q.    How did you become acquainted with Dr. Rageh?

A.    It was -- gosh, it's so long ago. Timeline's difficult.  It would've been in the fall of 2021.  We were looking for a new vitreoretinal fellow, and we didn't -- there's a certain process called the match, where fellowship programs are matched with applicants.

And due to the pandemic and virtual interviews, whatever, we didn't match a fellow, so we were looking for a new fellow outside the match.  And he applied to us.

Q.    Okay.  And when he applied, what happened next?

A.    So there were a bunch of people applying. And then he sent his CV and letter of interest over, and we -- me and my colleagues, we looked at this.

And then we interviewed with him virtually, I believe, through Zoom.  And then we eventually offered him a contract -- or a job with us.

Q.    And why did you do that?

A.    Why did I do that?

Q.    Why did you offer him the job?

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 15 of 90

A.      Because we felt he would be the best qualified applicant among the ones that applied for this position at that point.

Q.      And how many applicants did you have?

A.      We had a dozen.

Q.      And you felt he was the best qualified?

A.      Among the pool of what we had, he was the best.

Q.      Okay.  So essentially, once you decide that, what's the next step?

A.      In this case, the university drew up a contract.  And we sent it to him, and he signed it, and then -- yeah, then he started six months later or so with us.

Q.      Do you remember how long that contract was?

A.      I don't.  They're usually a year or two. The fellowship is -- is a 24-month fellowship.  I think in the past, they've done it a year at a time -- or done both years at the same -- at once.  I'm not familiar.

Q.      Okay.  I'd like to show you what's been marked as Plaintiff Exhibit Number 3.

(WHEREUPON, EXHIBIT 3 WAS MARKED FOR IDENTIFICATION.)

MR. MADISON:  Sorry.  There you go.

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 16 of 90

Q.    Okay.  And in that email -- I believe you sent it at, what, 9:30 at night, September 7th?

A.    That's what it says.

Q.    Yeah.  It's to Dr. Zhang.  Could you read to me what you have occurring on 8/9?

A.    (As read): He was on general call but did not have his phone on.  The resident had to wake me and Dr. Fleischman up to talk about patient with ruptured globe.

Q.    Okay.  Now, the question I have for you is: Did you actually personally observe that?

A.    Did I observe what?

Q.    This happen.

A.    I was -- I was called by the resident in the middle of the night, which never happens. Because the resident calls the fellow who is on call, as they should.

And only if there is a problem the fellow can't handle, the fellow would call the attending.

In this case, the resident called me and said they tried for a long time, multiple times, to contact Dr. Rageh, but he didn't answer.

Q.    Okay.  So at that point, you were -- someone called you, right?

*www.NCDepo.com*
*info@NCDepo.com*          *Depositions, Inc.*
*Serving all of North Carolina*          *(919) 557-4640*

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 17 of 90

A.    They called me directly.

Q.    They called you directly?

A.    Yes.

Q.    But you would not know if Dr. Rageh did or did not answer the phone?

A.    Afterward, I confronted Dr. Rageh with that the next day, whatever, and he said, oh, my -- I didn't -- my phone didn't work.  I didn't have my phone on, whatever, yeah.

Q.    Do you have that in writing somewhere?

A.    I don't.

Q.    Could you read what you have occurring on 8/15?

A.    And again, we're writing this down --

Q.    Hold on.  We're just going to answer the questions, Doctor.

A.    Could I make a comment to my last question?

Q.    Go ahead.

A.    The reason why we're writing this here, in my now 16 years observing a fellow, this -- can I finish, please?

This has not happened, that a fellow doesn't answer his phone.  This is serious.  Just wanted to put this to protocol.  That's, like, the basic job description of a fellow, to be available in

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 18 of 90

the middle of the night when the residents have questions about urgent cases, when we talk about vision loss, if not treated immediately.

Q.    I understand, Doctor.

A.    That's my comment.

Q.    Does Dr. Rageh's name appear in this email, in terms of to and from?

A.    It says, Subject: Dr. Rageh.

Q.    What about the "to" field?  Is his name in there?

A.    It says from me to Dr. Zhang.

Q.    Why did Dr. Rageh not get this?

A.    Because I talked to him about this in per- -- personally.

Q.    But you have no documentation of that, correct?

A.    I don't.

Q.    Okay.  So let's go to 8/15.

A.    You know, things I discuss with my colleagues about performance of the fellow, I don't always share with the fellow -- with the trainee. Which is standard.

Q.    I understand.  So let's -- let's go to 8/15.  Could you read that for me?

A.    (As read): He saw a patient in the hospital

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 19 of 90

A.      -- he's clearly mentioned in the email.  I misunderstood you.

Q.      No problem.  I'm sorry.  Let me clarify. He's not in this email, and there's also no documentation to Dr. Rageh that you discussed this with him?

A.      Whenever I discuss something in person, I don't always document it in writing either.  So that should be enough to --

Q.      Right.

A.      -- discuss it in person.

Q.      But you were able to document this to Dr. Zhang, correct?

A.      Correct.

Q.      Okay.

A.      This was a summary of cases over the last month or so.  That's what we did about once a month every few weeks, we would document a summary, basically, to each other.

Q.      Okay.

A.      Every single occurrence, I -- I discussed with Dr. Rageh immediately, because these are -- these are grave concerns.

Again, training fellows for 16 years, I have never experienced patient concerns like this,

Case 1:24-cv-00336-CCE-JEP     Document 68-4     Filed 03/13/26     Page 20 of 90

even from a beginning fellow.

This is not even about not knowing what to do. This is not about not being -- from a knowledge standpoint, being way behind. This is about asking for help when you clearly need it, or not doing it. That's what this is about.

Q. Okay. Let's go up to the -- flip back to the 9/9 email. Do you see that there?

A. Yes, sir.

Q. Sent at 6:27 p.m. It's from who?

A. It's from Dr. Zhang addressed to me.

Q. Okay. And do you see Dr. Rageh's name in the "to" field to that?

A. I don't.

Q. Okay. So it's safe to say he did not get this email, correct?

A. I assume so.

Q. Okay. Could you read Number 1 for me.

A. (As read): While examining a patient, he measured count finger vision because he did not know how to turn on a projector and measure the visual acuity -- actual visual acuity.

Q. Okay. So it's safe to say you did not personally observe that?

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 21 of 90

where there was an issue with Dr. Rageh mispronouncing Dr. Zhang's name?

A.      She told me at times that he was not pronouncing her name correctly.

Q.      Okay.  And tell me about that conversation.

A.      I don't know when this came up, or how often.  I remember one meeting where we had a meeting in -- I think it was the first half of November with the three of us, Dr. Zhang, and -- and myself, and Dr. Rageh, where we discussed a list of deficiencies. At that point, it had been August, September, October, three months into his fellowship.

And there was a -- we compiled a list of problems with his performance, behavior, you name it, and we had a meeting with him to discuss those and to figure out a way forward.

Q.      Okay.  So --

A.      And during that meeting, he -- it was brought up, or I heard -- didn't hear before -- but in the meeting it was brought up that -- by Dr. Zhang that he didn't pronounce, or care to pronounce her name correctly.

Q.      Okay.  Dr. Zhang said that to you in the meeting, right?

A.      The three of us, yeah.

*www.NCDepo.com*
*info@NCDepo.com*                    *Depositions, Inc.*
                           *Serving all of North Carolina*          *(919) 557-4640*

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 22 of 90

To all of that.

So as a result of that meeting, Dr. Zhang said, I don't feel comfortable working with you on this basis. You don't listen to me, you don't respect me, you don't do what I ask you to do. I don't feel safe working with you.

And so as a result of this meeting, we decided that he would not work with Dr. Zhang going forward.

Q.     Okay. Understood. And you made a very serious allegation that he blinded somebody. So I want to explore that.

A.     Please.

Q.     Who did he blind?

A.     Uhm.

Q.     I mean --

A.     Let's --

Q.     Yeah. Who did he blind?

A.     Let's go back to Exhibit 6. It's the email at the bottom from me to Dr. Zhang where it says 8:15, in the second page, top of the second page, where he saw the -- hospital -- where he saw a patient at the hospital with a known infection of a red eye, and he repeatedly examined the patient, and did ultrasounds for the patient, and didn't recognize

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 23 of 90

there was a infection of the back of the eye that was going on.

And as a result, the condition worsened. By the time -- by the time my colleague saw this patient, the eye was full of pus and the eye was unsalvageable.

Q.    Okay.  And when was that?

A.    That was in August of 2022.

Q.    So I want to make sure we're clear.  He blinded someone in August of 2022?

A.    That's what I said.

Q.    Okay.  And you allowed him to continue working after blinding someone in August 2022?

A.    What kind of question is that?

Q.    And so he -- okay.  So he was working until when?

A.    So his lack of judgment led to a bad patient outcome.

Q.    So he blinded somebody.  I want to make sure we're clear, because that's very important, Doctor.  I don't want to put words in your mouth.

He blinded someone -- a patient in August of 2022?

A.    So his action led to a patient lose his vision, go blind.

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 24 of 90

Q.    Okay.  And in this email, there's nothing that states anything related to patient safety concerns; is that correct?

A.    That's correct.

Q.    Okay.

A.    It states (as read): ...knowledge, clinical skills, and non-existing surgical skills.

Q.    Nothing about patient safety, right?

A.    Following -- (as read): ...trouble following instructions, being truthful, lack of respect towards --

Q.    Okay.

A.    -- female -- yes.

Q.    So nothing about patient safety --

A.    Correct.

Q.    -- correct?

A.    Correct.

Q.    Okay.  Good.  All right.

In this email, does it say anything about limiting the terms and conditions of Dr. Rageh's fellowship, such as what he does on a day-to-day basis?

A.    It does not.  Well, it says the plan is to have him finish in July and give him a certificate for a medical retina fellowship.  That implies he

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 25 of 90

wouldn't do surgery, basically.

Q. Okay. So I'm going to the second email here. You see where it says Monday, December 12th? I believe you sent that at 4:26 p.m., so about two hours later. Do you see that? It's from you to Dr. Budenz?

A. Which page is this?

Q. Sure. Maybe --

A. Oh. 4:26.

Q. Yeah, yeah.

A. I see. Third page. Okay. So it's my email to Dr. Budenz.

Q. Could you read that to me, please?

A. Yes.

Q. Thank you.

A. (As read): Alice has stopped working with him. There were some issues being truthful, and respecting her. Really bad. Keirnan and I are okay for now. He is just absolutely terrible in surgery. We said we would reevaluate in January.

If we get this guy from Pittsburgh, I was going to have a conversation with him and say we don't think we can train him as VR fellow, but if he wants, he could stay

www.NCDepo.com
info@NCDepo.com
*Depositions, Inc.*
*Serving all of North Carolina*
*(919) 557-4640*

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 26 of 90

Q.      So there's no documents --

A.      Correct.

Q.      -- to support what you're saying?

A.      Correct.

Q.      I'm going to show you what is marked as Plaintiff Exhibit 13.

                    (WHEREUPON, EXHIBIT 13

            WAS MARKED FOR IDENTIFICATION.)

A.      This is Exhibit 13.  This is a -- this is a two-page document he gave to me, I believe, on December 20th in response to my conversation I had with him where we told him that we would end his fellowship early.

Q.      Okay.  So on the 16th, as you've documented in the previous exhibit, you stated that you were going to end it early and give him a retina certificate, correct?

A.      Medical retina certificate.

Q.      Okay.

A.      And we laid out exactly why we're ending his fellowship early.  I reiterated all the problems with patient safety with patients, with his performance in the OR, in clinic, what we discussed before, and which is all through the email chains. Which, the -- some of that led to our decision that

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 27 of 90

it would be -- that we would -- end his fellowship early.

Q.     Okay.

A.     And as a result of that, three days later, he handed me this document.

Q.     Understood.  Did you read the document?

A.     Back then, I did.

Q.     Okay.  What was your response to the document?

A.     So he lines out some -- a long list of grievances, and supposedly -- or -- or claims how he was treated or mistreated, or -- or whatever, in the -- I mean, I talk -- I looked at this.  We talked -- we talked through it.

Basically, I told him what I thought about most of the things that I thought, in my opinion, these things either didn't happen the way he reported them, or they weren't -- he would -- they weren't -- he didn't -- he misrepresented them, or they weren't true.

And I encouraged him, if he -- if he felt that this was true, to go through the -- to go through the existing channels at the university to express his grievances.

Q.     Okay.  So you reviewed this document when

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 28 of 90

A.    That's what it sounds like, yes.

Q.    Okay.  In this email, you state (as read): Dr. Rageh now makes repeated statements of being treated unfairly and discriminated against.

Correct?

A.    That's what the email --

Q.    What did --

A.    -- reads, yes.

Q.    -- you mean by that?

A.    Again, so that -- so he made -- the statements of being treated unfairly, I mean, all through, and since -- since November in our meeting where he said she was treating him unfairly.

And now he was -- then he gave me this on the 20th, or whenever -- 19, whatever it was, he gave me -- you know, he had given me this document where he was claiming discriminatory actions by Dr. Zhang against him.

Q.    Okay.  And in the same email, it was your intent to terminate his employment immediately, rather than in June, correct?

A.    Correct.

Q.    So safe to say, as of January 1st, 2023, we've now moved on from staying for -- until June

30th, 2023, to immediate termination?

A.      So this was an ongoing process.  You know, this was a process that started -- you know, we talked to him, said we're going to shorten it.

And then, you know, right after, it's, like, on the 19th or 20th, whenever that happened, you know, he knows we're going to shorten his fellowship.  And, like, he knows we are, like -- he is -- he is -- he basically knows he's -- he's got to watch out what he's doing.  We keep telling him.

The same night, next night he makes a big oops again when he -- again, where he sees this patient at night that was -- he was told to see by my other retina colleague.  He looks -- she told me he has a -- the patient has a retinal tear.  So a retinal tear, if you have a tear in the retina, untreated, can lead to retinal detachment, can lead to irreversible vision loss.

Q.      Was there a tear?

A.      There was no tear.

Q.      Okay.

A.      And so we looked at the patient.  The problem was not that there was no tear.  The problem was, he didn't -- the attending said there is a tear. A retina -- a retina-trained specialist says there's

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 30 of 90

a tear, please treat it with laser.  He looks at the patient, he doesn't see a tear.  She's gone by that time.

What does a -- what do I expect a retina fellow to do in this situation?  I expect him to call the retina physician on call to double-check to make sure there is no tear.  Because as I said, if there is, he can get retinal detachment overnight, it can happen anytime, with irreparable vision loss.

He didn't do that.  He sent the patient out.  I saw the patient the next day when he brought him back.  And, yes, there was no tear.  He was lucky there was no tear.
And the area he was looking at wasn't
even the area my colleague thought the tear was there.

Q.    Did you observe him looking at it?

A.    Yeah.  We looked at the patient together.

Q.    Do you know what he looked at before?

A.    Well, he showed me.  He showed me what he thought was the -- was no tear.  And I looked at that.  I could tell he was looking at the completely wrong area of the --

Q.    During the time he examined that patient, the day before, were you there?

A.    I was not there.

Q.    Okay.

A.    But the next day when he came back, he showed me the area he looked at.  That's what he said.  That's his words.  This is the area I looked at, Doc.  There's no tear.

I looked, and I said, I agree there's no tear.  And this is not the area of question.  So he had looked at the wrong area.

So the reason I'm bringing this up -- so this was -- the decision was to shorten his fellowship.  And then right after we had this hour-long conversation, like, dude, watch out.  You're not performing.  You're putting a patient in danger.  You're going to shorten your fellowship, you know?  This is not going well.

The next day, he does the same thing again.  And no learning, no insight.  At that point, we are, like, dude, this is -- this is -- I was -- every time I was on call, I was worried he would mess something up, and the patient would lose vision because of that.  Every time I was on call.  I'm on call every three weeks.

Q.    All right.

A.    So my point is -- you laid it out very

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 32 of 90

nicely, that by this -- by New Year's Eve, the decision was this. And by the 1st, the decision was that. This is nothing that changed from one day of the other.

This was an active process of me talking with my colleague and saying, hey, this is still going on. We don't feel -- this is something we don't feel safe. Me talking with HR, they're telling us about negligent -- negligent retention. And if you know someone, is potentially putting people -- anything funny?

Q.     No. No, I'm not -- I'm just listening. Sorry, Doc. Go ahead.

A.     So they're telling us, if someone -- if you continue to employ someone where you -- knowing that they put a patient at a risk and that they're not qualified to do their job, you can't do that.

So it was a combination of this, and the vacation time, you know, HR not really being there all the time, that led to this -- what seems like from, oh, one day we keep him on. Next day, we're not keeping him on. It was a process of over about 10 to 14 days.

Q.     Okay.

A.     That's what I'm trying to explain.

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 33 of 90

Q.      So --

A.      Sorry this was a long answer.

Q.      No, that's fine.  That's fine.  I want to make sure I don't put any words in your mouth, and you adequately can explain what, you know, what you want to talk about.

So that occurred on -- according to the doc, that occurred on December 19th, correct?

A.      19th.  I think I saw the patient the following day.

Q.      Okay.

A.      So, like, the week -- the following week of our conversation.

Q.      Okay.  So that occurred on the 19th.  You saw the patient the following day, which would've been the 20th, correct?

A.      Correct.

Q.      Okay.  But from the 20th -- safe to say from the 20th to the 31st, the plan was what?  To keep him until July of 2023?

A.      Officially, even though we had -- I already had second thoughts right then, you know, when this happened again.  And other things happened, too, during that period.  If you look at the emails closely, there was things with -- other problems with

ordering wrong doses of, I think, of steroids, and other things.

So the bottom line is, from the time we told him, we're going to shorten your fellowship, things still kept happening. So we were like, this is just not safe anymore.

Q.    Okay. So the -- the documentation states that on the 19th, something happened, right, you're talking about the retina tear?

A.    Correct.

Q.    Right? Obviously, you examined the patient, and there was no tear, right?

A.    Again, which is not the problem --

Q.    If --

A.    -- in this case.

Q.    -- you could just -- well, there was no tear, correct?

A.    Correct.

Q.    Okay. So you knew that as of the 20th --

A.    Correct.

Q.    -- correct? And -- but it wasn't until the 1st, you decided to terminate his fellowship immediately?

A.    Correct.

Q.    Okay.

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 35 of 90

Did you ever have a conversation with Dr. Rageh regarding the decision to end his fellowship immediately?

A.    I did.

Q.    Okay.  When was that conversation?

A.    That's one of the conversations we had -- that's -- that's that meeting I had with him and Dr. Willett in the beginning of January.

Q.    January 4th, 2023, sound about right?

A.    4th or 5th, something like --

Q.    Okay.

A.    -- that, yes.

Q.    What did you tell him during that conversation?

A.    We reiterate -- we reiterated all the problems we've had with him and his patient care, and all the problems I've out- -- I've outlined at length here today, in which I outlined in the emails.

And we said, as a result of that, we don't -- we don't think it's -- or we can't continue this fellowship.  We're planning on terminating his fellowship.

And as of immediately, we're going to relieve him of patient care activities that include risk, meaning any kind of unsupervised, any

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 36 of 90

Rageh vs UNC, et al.
ULRICH, M.D., JAN on 02/16/2026

Page 153

unsupervised surgery, things like that.

We asked him to continue doing the things he could without risk, meaning, like, participating in lectures, seeing his own patients in clinic, which is a comprehensive clinic where you prescribe glasses, basically. Things where we felt he couldn't harm patients.

Q. Okay. So the purpose of that conversation, say, this -- you know, that occurred on January 4th, 2023, was to let Dr. Rageh know why his fellowship was being terminated immediately?

A. Correct.

Q. And prior to that conversation, was there any conversations to Dr. Rageh letting him know that his fellowship was going to be terminated immediately?

A. I don't think there was.

Q. Okay.

A. We just --

Q. Okay.

A. -- decided it a few days before then.

Q. Okay. So that was the day that you told him the -- the fellowship was going to end?

A. I believe so, yes.

Q. Okay. In that conversation, did you tell

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 37 of 90

Q.    Okay.

A.    So that's my answer.

Q.    Okay.

A.    I don't -- I don't recall exactly what I exactly said --

Q.    Understand.

A.    -- to this person.

Q.    Well, whatever you sent to the EEOC in terms of that investigation, that was truthful, right?

A.    That should've been, yes.

Q.    Okay.

A.    That was truthful.

Q.    Okay.  So at the end of the conversation -- I'm still at January 4th, 2023.

A.    Mm-hm.

Q.    Okay?

A.    Okay.

Q.    What did you tell them?

A.    I told them that, at this point, I -- I wasn't quite sure what was going to happen next, this was out of my hands, that HR would -- again, since he filed this complaint, we couldn't terminate him immediately.

I said, this is -- I mean, I don't

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 38 of 90

really know what's going to happen next.  HR will tell us.  And I think then I said, I think maybe take the day off, take the weekend off, whatever, and I'll get back to you with -- with what we exactly do.

And then I think I emailed him the next day or a couple days later and said, you know, this is the plan going forward.  Please continue to participate in your training as much as we deem it safe, meaning, to continue to attend lectures.  You can follow us in clinic.

But we will take you off any duties that -- where you -- where you supervise residents on your own without supervision -- being supervised yourself.  Again, things we consider potentially causing patient risk, like taking call by himself, or doing surgery, things like that.

Q.    Okay.  Did you tell him he needs to come to his Friday clinic?

A.    Yes.  That was his comprehensive clinic.

Q.    Okay.

A.    That's what I talked about.  That's the clinic where he basically prescribes glasses to patients.  We -- we considered this not to involve any patient risk.  He wouldn't do procedures there. He wouldn't do lasers, he wouldn't do injections.  So

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 39 of 90

we deemed that safe.  Yeah.

Q.    Okay.  So -- so what would he be doing in his clinic?

A.    Looking at patients and doing eye exams and prescribing glasses.

Q.    Okay.  So that's all he'd be doing in his clinic?

A.    It was a comprehensive clinic, yes.

Q.    Okay.  So in the comprehensive clinic on Fridays, when we -- if we would witness him working, the only thing he would be doing is seeing patients as it relates to them needing glasses.  Is that correct?

A.    Again, it's not a retina clinic.  People don't come with retina problems.  They come with -- for general eye exams.  Like, you see an optometrist, that's what this comprehensive clinic is meant to be.

Q.    Okay.  And that's all he'd be doing?

A.    That's all he would have been doing from that point on.  Because, again, he didn't -- that's what we felt would be safe.

Q.    And that would've been unsupervised?

A.    That would be unsupervised.

Q.    Okay.  So in sum, as of January 4th, 2023, the plan was him -- for him to just go home.  And to

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 40 of 90

only do his clinic on Fridays.  Does that sound about right?

A.    Not quite.  It's -- he -- no, that doesn't sound right.

Q.    Okay.

A.    The plan was for him to not do any unsupervised call or surgery.  He -- he could -- he was expected to continue his clinic on Friday.  He -- we said he could continue working with us in clinic, see patients with me in clinic, like in our faculty clinic.  And he could continue to participate in lectures, both as learner and as lecturer.

Q.    Okay.  And you told him that when?

A.    Following the conversation on the 4th, and a couple days later.

Q.    Okay.  All right.

A.    We didn't -- we tried to find a -- we had problems.  At the same time, I was his mentor, you know?  I want the best for him.  I still do, believe it or not.  And we tried to -- as good as we could, not to deprive him of any kind of training which he could safely do with us.  So that's how we came up with this program or with this -- with this plan that he could do all these things.

Again, just come to clinic, see

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 41 of 90

patients, do glasses, and participate in lectures so he can still benefit, even though he wouldn't do unsupervised things.

Q.    Okay.  I'm going to show you what's been marked as Plaintiff Exhibit 22.

(WHEREUPON, EXHIBIT 22 WAS MARKED FOR IDENTIFICATION.)

Q.    (By Mr. Byndon)  And just to direct your attention, Doctor, I'm at the email you sent at 8:01 p.m. on January 4th.

A.    Mm-hm.  That's an email from me to Patricia White, the HR person, cc'd to a lot of people in the department.  It says (as read): Hi all, we asked Dr.

Rageh to go on leave through the end of next week, 1/15/23, except for his personal clinics, while this process plays out.  And we can proceed with the separation.

This was -- this was -- it looks like this was the same day, right, immediately following the conversation we had.  And I had not -- and as I told him, I didn't know how -- what we would do next, and after that, I received better guidance from HR to be more specific on what we wanted him to do.

But I agree this is what I told him on Wednesday, the 4th, at 8:01 p.m.

www.NCDepo.com
info@NCDepo.com
Depositions, Inc.
Serving all of North Carolina
(919) 557-4640

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 42 of 90

Q.　　Okay.　And it's safe to say that you would've -- you would've told Mr. Meeks that, right?

　　　　MS. SMITH:　Object to the form.

A.　　I would've answered truthfully --

Q.　　Okay.

A.　　-- to their questions.

Q.　　And it's safe to say that you would've told -- scratch that.

　　　　Did you speak to anyone else besides the individuals that I spoke to -- or, sorry -- told you about: Mr. Meeks, and the individual at Wake Forest?

A.　　I just mentioned earlier that I had -- I think there were -- there were a couple potential employers.　I don't know if -- there was someone else, and there was some other medical -- medical board people.

Q.　　Okay.　I'm going to show you what's marked as Plaintiff Exhibit 26.

　　　　(WHEREUPON, EXHIBIT 26 WAS MARKED FOR IDENTIFICATION.)

　　　　THE WITNESS:　Thank you.

Q.　　(By Mr. Byndon)　Okay.　Doctor, just to orient you, this is from -- you see a Brian Jewart there?

Case 1:24-cv-00336-CCE-JEP　　Document 68-4　　Filed 03/13/26　　Page 43 of 90

A.      I see that.

Q.      Okay.  And he's emailing you here at 10:45 a.m. on March 10th, correct?

A.      That's what it says.

Q.      Did you ever have a conversation with him?

A.      I believe so.

Q.      Okay.  And what would you have told him?

A.      The same thing I would've told the other two people who asked me about Dr. Rageh.

Q.      Okay.  You would've told him that there's -- you have issues with Dr. Rageh and his ability to see patients in a safe manner?

        MS. SMITH:  Object to the form.

A.      I would've told him that there's -- I mean, again, all the things we lined out.  There's problems with professionalism, with behavior, with -- with patient safety, with -- again, what we lined out in the last four hours probably.

Q.      Okay.

A.      Again, that's what's expected from a -- from me.  That's what's expected from me when a reference calls me --

Q.      All right.

A.      -- when someone calls me for a reference.

Q.      Okay.

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 44 of 90

A.     Be truthful.

Q.     Outside of these individuals we just discussed, do you recollect any other individuals you spoke to regarding Dr. Rageh's fellowship at UNC?

A.     As I mentioned before, I think I communicated with -- with a couple of medical -- state medical boards.

Q.     Which ones?

A.     There were a few.  I don't recall.

Q.     Were you consistent with the information you provided to these medical boards?

A.     I hope I was.

Q.     That a yes?

A.     That's -- yes.

Q.     Okay.  Let's go through some forms.

A.     Sure.

Q.     I would like to show you what's been marked as Plaintiff Exhibit 27.

                    (WHEREUPON, EXHIBIT 27

               WAS MARKED FOR IDENTIFICATION.)

Q.     (By Mr. Byndon)  Okay.  Doctor, did you sign this form?

A.     It looks like my signature, yes.

Q.     Okay.  And I assume you completed it; is that correct?

Case 1:24-cv-00336-CCE-JEP     Document 68-4     Filed 03/13/26     Page 45 of 90

Rageh vs UNC, et al.
ULRICH, M.D., JAN on 02/16/2026

Page 186

A.    That's correct.

Q.    Okay.  What's the date on that?

A.    December 20th, '22.

Q.    Okay.  So in this form, did you outline any issues with patient safety concerns?

A.    I did not.

Q.    Could you read the first one for me, first bullet point -- or first number in the third box?

A.    Where it says Number 1?

Q.    Mm-hm.

A.    (As read): During this time this applicant was in your training program, has he/she ever been subject to any disciplinary or corrective action, such as imposition of consultation requirements, suspension, termination, probation, or remediation plan?

Q.    And your answer was what?

A.    No.

Q.    Next one?

A.    (As read): At the time the applicant left your institution, were any actions instituted, in process, or pending against him/her?

Q.    And your answer was?

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 46 of 90

A.     No.

Q.     Number 3?

A.     (As read): Do you have knowledge of any condition or impairment which in any way affects the applicant's ability to practice in a professional, competent, and safe manner, including but not limited to (1), mental, emotional, nervous, or sexual disorder; (2), an alcohol or substance abuse disorder; or (3), a physical disease or condition?

Q.     And your answer?

A.     No.

Q.     Next box, please?

A.     I marked a choice where it says (as read): I recommend this applicant for licensure to practice medicine and surgery without any reservation.

Q.     Okay.  And you signed this, correct?

A.     I did.

Q.     Let's go to exhibit -- what I'm -- what I will have marked as Plaintiff Exhibit 28.

A.     Can -- I would like to make a comment to Exhibit 27.  I didn't know you were moving on already.

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 47 of 90

So we fill these out all the time. These are for -- this is to -- to apply for medical license in a different state. If -- if -- if there is any problems with the training, if you say yes to any of those, there can be a significant problem for the trainee to obtain license in a different medical -- in a different -- different state.

At this point, as you know, we had already told Dr. Rageh we would shorten his fellowship to only a year instead of two years. He gave this to me and asked me if I wanted to -- could fill this out. And I said, I do not feel comfortable filling this out.

He said, would you please fill this out? I want to apply somewhere else. I want to be able to leave here and train somewhere else.

And I said, you realize this is not -- this is not where we are right now. You realize we are in the process of shortening your fellowship, and this is not correct like this. He said, I understand. He basically begged me to fill this out. And I said, you know, I'm your mentor. I want to do -- I feel like I want to do what's best for you. I will fill this out, knowing that -- especially since nothing has been formalized at this

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 48 of 90

Rageh vs UNC, et al.
ULRICH, M.D., JAN on 02/16/2026

Page 189

point, you know, we didn't have any papers that said his fellowship would be shortened.

But I told him, I'm going to fill this out since nothing has been formalized, but be aware, there's a good chance, if things go forward as planned, I will have to update the medical records and set this straight, and correct this form.

Q.   Okay.

A.   That was the premise under which I filled out this form the way I did.

Q.   Okay.  And this form is true.  The -- what you checked in this form is true at that time, correct?

A.   I felt comfortable, if not great, in filling it out the way I did.

Q.   Okay.  If you would go back to that exhibit -- I'm at 27 still.  Right above your signature, what does it say?

A.   (As read):  I attest that the foregoing information which I supplied is true in every respect.

Q.   And you signed it?

A.   I did sign it.

Q.   Okay.

A.   Again, with the premise that there was a

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 49 of 90

the fellowship had been formalized.

Q.      Okay.  Okay.

A.      And he realized that.

Q.      Okay, Doc, thank you for that.

We're going to go to Plaintiff Exhibit 30.

(WHEREUPON, EXHIBIT 30

WAS MARKED FOR IDENTIFICATION.)

THE WITNESS:  Thank you.

Q.      (By Mr. Byndon)  It's kind of a lot, but we'll break it down bit by bit here.  Do you recognize what's in front of you, Doctor?

A.      It looks like a form from the Massachusetts Board of Medicine regarding Dr. Rageh.

Q.      Any other forms in there?

A.      And then there is a form from the Minnesota Medical Board as well, and looks like the Tennessee Medical Board as well, it looks like the Kentucky Board of Medical -- Kentucky Medical Board as well.

Q.      Okay.

A.      So four different medical boards.

Q.      Correct.  Okay.  Doctor, we're going to go with these one by one, so we're not going to try to do everything at once here.

Let's talk about the Minnesota.  That should be the first one you see.

Case 1:24-cv-00336-CCE-JEP     Document 68-4     Filed 03/13/26     Page 50 of 90

A.     The Massachusetts is first in mine.

Q.     Is it first?  Okay.

MR. MADISON:  1478.  It's at the bottom.  UNC 1478.

MR. BYNDON:  Is the Bates stamp 1478?

THE WITNESS:  That's Minnesota.

Q.     (By Mr. Byndon)  Okay.  1478, and I believe it goes to 1479, that bottom Bates stamp.

A.     I see that.

Q.     Okay.  All right.  So I'm just focused on that form, Doctor.  Do you remember when you completed this?

A.     It says March 25th of '23.

Q.     Okay.  And you signed this form, right?

A.     I did sign this form.

Q.     Okay.  So I'm going to almost the bottom, let's say, three-fourths of the way down on the page.  The question is (as read): Was this individual issued a certificate as proof of completion of training?  And you answered what?

A.     No.

Q.     Okay.  Next question would be what?

A.     (As read): Did the individual take a leave of absence or break during training?

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 51 of 90

Q.     And the answer to that question is what?

A.     Yes.

Q.     Okay.  And the next question would be what?

A.     (As read): Was this patient ever placed on probation or remediation?

Q.     And the answer to that is what?

A.     No.

Q.     And next question would be what?

A.     (As read): Was this individual ever disciplined or placed under investigation?

Q.     And the answer to that was?

A.     No.

Q.     And the last question was what?

A.     (As read): Were any limitations or special requirements placed upon this individual due to academic incompetence, disciplinary problems, or any other reason?

Q.     And the answer to that question is what?

A.     Yes.

Q.     Okay.  And now I'm on the next page.

A.     1479.

Q.     1479.  And this was your response to the last question; is that correct?

A.     So the second -- well, any yes answer asked me to attach a letter of explanation.  So this will

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 52 of 90

be the letter of explanation regarding the 2nd and 5th question on this page.

Q. Okay. Good. And this is what you responded with, that -- the next page, 1479, right?

A. That's what it looks like.

Q. And that's all you responded with, correct?

A. I don't recall. But if that's what all you have, I don't have reason to believe that --

Q. Okay.

A. -- this is not complete.

Q. Okay. You say, Dr. -- I'm reading from your narrative here. You say (as read): Dr. Rageh was relieved from any clinical activities involving a patient risk on 1/8, given patient safety concerns.

What -- what risk happened on 1/8/2023?

A. Nothing happened on 1/8/23. He was relieved on 1/8/23, given patient -- given -- given patient safety concerns leading up to then --

Q. Okay.

A. -- all through the year of '22.

Q. Okay. So, okay, I see what you're saying. So you're saying that on 1/8, he was relieved from that?

*www.NCDepo.com*
*info@NCDepo.com*
*Depositions, Inc.*
*Serving all of North Carolina*
*(919) 557-4640*

Case 1:24-cv-00336-CCE-JEP     Document 68-4     Filed 03/13/26     Page 53 of 90

Rageh vs UNC, et al.
ULRICH, M.D., JAN on 02/16/2026

Page 198

A.      Yes.  On --

Q.      Okay.

A.      -- 1/8, we told him, you can't see any patients on your own that involve -- that involve -- involving risk, like unsupervised surgery, supervising residents --

Q.      Okay.

A.      -- because of the concerns we had.

Q.      But, Doctor, this says Dr. Rageh was relieved of any clinical activities, right?

A.      It says (as read): Dr. Rageh was relieved from any clinical activities involving patient risk.

That means he could -- that's why he continued his comprehensive clinic where he was prescribing glasses.  We don't -- we consider the risk of giving a patient a wrong prescription of glasses, I guess, minimal, compared to, like, with cutting someone's eyeball.

Q.      Okay.

A.      So that's what I mean by that.

Q.      Okay.  So as of this date, right, you're essentially saying that he was able to do his own clinic, not just the clinics that you deem are -- involved patient safety risk?

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 54 of 90

A.     We basically said, as of this date, he wasn't -- we didn't allow him to see unsupervised patients in a capacity, except for his own clinic.

Q.     Okay.  Except for --

A.     His own clinic.  Which, again, was the comprehensive clinic.

Q.     So now let's switch to the Kentucky --

A.     It also says he also applied for and was granted ADA leave on 2/10, and he resigned from the program on 3/20.  Just to be complete.

Q.     Sure.  Thank you, Doctor.  So let's go to Kentucky.

MR. MADISON:  Page number 1549.

A.     I have it.

Q.     Okay.  It looks like, Doctor, you completed this form on July 6th, 2023.  Is that correct, Doctor?

A.     Yes.

Q.     And you did sign this, right?

A.     I did.

Q.     So what I see differently from this, Doctor, from this form versus the other form, there's now a more robust explanation.  Do you see that?

A.     I see that.

Q.     Why is that?

*www.NCDepo.com*
*info@NCDepo.com*          *Depositions, Inc.*
          *Serving all of North Carolina*          *(919) 557-4640*

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 55 of 90

A.      I think they were coming back to me -- I got -- I filled this form -- I think I filled this form out several times, and it came back to me, and they wanted more explanation why we did what we did.

Q.      Did you ever provide him -- them with what you provided Minnesota?

A.      I don't recall what I originally provided them.  But there was -- I remember there was, like, emails back and forth, and they wanted more detailed information.

Q.      Okay.  So the narrative that you provided Minnesota, that we just went over, right, did you provide that to Kentucky?

A.      I don't recall.

Q.      But you did provide them this narrative?

A.      Correct.

Q.      Which is more detailed and more robust than what you provided Minnesota, correct?

A.      Correct.

Q.      Okay.  And we'll get to that in a minute.  But let's switch gears here and let's talk about Tennessee.  And just to guide you, we're at Bates stamp 1617, 1618 and 1619.

A.      Got it.

Q.      Okay.  Doctor, you did complete this form,

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 56 of 90

Rageh vs UNC, et al.
ULRICH, M.D., JAN on 02/16/2026

Page 201

right?

A.     It has my signature at the bottom, yes.

Q.     Okay.  And when did you complete this?

A.     Looks like September 13th, '23.

Q.     Okay.  Let's go through the questions.  (As read): Is your training program currently ACGME-approved?

And you wrote?

A.     No.

Q.     And we discussed that earlier, right?

A.     Correct.

Q.     The next question.

A.     (As read): Was the program -- was the above program ACGME-approved at the time the applicant completed fellow -- completed training?

Q.     And the answer was?

A.     No.

Q.     Next question.

A.     (As read): Were there any adverse charges or actions taken during the residency?  If yes, please attach supporting information and/or documation --

Q.     Okay.

A.     -- documentation.

Case 1:24-cv-00336-CCE-JEP     Document 68-4     Filed 03/13/26     Page 57 of 90

Q.    Okay.  And in the back, you provided the same narrative that you provided Kentucky.  Does that sound about right?

A.    Yes.

Q.    Okay.  But not the same narrative you provided Minnesota?

A.    Correct.

Q.    Okay.

A.    No.  This was more detailed.

Q.    Okay.  What's the next question?

A.    (As read): Would you recommend the applicant for licensure?

Q.    And what did you say?

A.    I said yes.

Q.    Let's switch gears now to Massachusetts. I'm at 1743, and I believe I'm going up until 1749, just to give you -- just to orient you.

A.    Can I make a quick comment about the last thing you showed me?  Would you mind?

Q.    Sure.

A.    When it says, "Would you recommend the applicant for licensure?"  I say yes.  That doesn't mean I would recommend the applicant to be considered for -- to be a vitreoretinal surgeon, or even retina specialist.  This is a medical board to become a --

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 58 of 90

to be -- to be approved as a doctor of medicine.

Q.     So you were -- it was your -- you're comfortable answering yes?

A.     As to be approved as a doctor of medicine, yes.

Q.     All right.

A.     Thank you.

Q.     Thanks for the clarification, Doctor. Okay.  So we're at Massachusetts.  Are you with me?

A.     Yes, sir.

Q.     Okay.  You completed this form, right?

A.     It has my signature on there from 3/29/24.

Q.     Okay.  So this is about -- okay.  3/29/24. Fine.  You signed it, correct?

A.     Yes.

Q.     Okay.  I'm going to skip to some questions here.  Read Number 10 for me.

A.     Number 10.

Q.     Under "Recommendations."

A.     I see it.  So they asked me to check a box as (as read): Recommend for licensure in Massachusetts, recommend for licensure with following reservations, or don't recommend for the following.

Q.     And what did you say?

Case 1:24-cv-00336-CCE-JEP     Document 68-4     Filed 03/13/26     Page 59 of 90

A.    I said (as read): Recommend for licensure in Massachusetts with the following reservations.  Based on experience with applicant during his time at UNC, I would not recommend licensure.

However, the board may take into consideration the evaluation of other institutions, and the progress he made since moving -- since leaving UNC.

Q.    Okay.

A.    And that's consistent with what I said earlier.  Again, this is an application for a -- to be a medical doctor.  It has nothing to do with vitreoretinal surgery.

Q.    Okay.

A.    So this is not up to me.

Q.    Okay.  So on -- I just want to make sure I'm clear here, Doctor.  On 9/13/2023 when you filled out Tennessee, you said that you would recommend Dr. Rageh for licensure.  Right?

A.    Correct.

Q.    Okay.  So on March 29th, 2024, you state that you would not recommend him for licensure?

A.    That's not what I said.  I said, I do recommend for licensure in Massachusetts, with the

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 60 of 90

following reservations.

Q.      Okay.  I'm going to make sure I'm reading this correctly.  So I'm on Number 10.  It says (as read): Recommend for licensure with the following reservations.

Right?

A.      Yes.

Q.      So what are your reservations?

A.      (As read): Based on experience of applicant during his time at UNC, I would not recommend for licensure.

Q.      Okay.  So based on his time at UNC, you would not what?

A.      Recommend him for licensure.

Q.      Okay.  But you're also telling the board that they can consider what --

A.      They make their own decision.

Q.      -- he has done after UNC?  Does that sound about right?

A.      After and before.  The evaluation of other institutions, that means before, his fellowship before, and the progress he's made since leaving UNC.

Q.      Okay.

A.      So that's after.

Q.      Okay.  So it's safe to say that you wrote

Case 1:24-cv-00336-CCE-JEP     Document 68-4     Filed 03/13/26     Page 61 of 90

here that you would not recommend him for licensure?

A.   And I told them to make their own decision.

Q.   Okay.  Fair enough.  Why did you not write that in -- in -- when you -- when you addressed that to Tennessee?

A.   I'm not sure.

Q.   Okay.  Let's go through the areas of concern here, Doctor.  I am going to direct your attention to 1748.  And let me know when you're there.

A.   1748?

Q.   Yep, 1748.

A.   Got it.

Q.   Okay.  All right, Doctor, so this is the narrative you wrote to Massachusetts, correct?

A.   This is what I wrote to Massachusetts, yes.

Q.   And it's safe to say this is consistent with all of the other narratives, with the exception of Minnesota.  Correct?

A.   I believe so.

Q.   Okay.  All right.  So we're going to start with August 2022.  Could you read that?

A.   (As read): AR saw patient with corneal/eye infection with no view to the fundus in the hospital to rule out endophthalmitis --

*www.NCDepo.com*
*info@NCDepo.com*
*Depositions, Inc.*
*Serving all of North Carolina*
*(919) 557-4640*

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 62 of 90

Rageh vs UNC, et al.
ULRICH, M.D., JAN on 02/16/2026

Page 220

A.    Did not.

Q.    Why not?

A.    I didn't feel it was indicated.

Q.    Okay.  Next one, December '22.

A.    (As read): He was called by a first-year resident from the ER about a patient who had had a vitrectomy and lens exchange the day prior.  He was seen in clinic earlier with -- that day with 20/50 vision.  She had noticed a drastic decline of vision over several hours and presented to the emergency with hand motion vision.

The resident's note mentioned 4+ cell and fibrin.  He did not see the patient but advised the resident to start every two hour prednisolone -- a steroid -- eye drops for suspected iritis.

There was no mention of potential endophthalmitis.  The attending was not notified.  The patient came back the next day to clinic with improving inflammation.  We had a long discussion that in postop period with acute vision drop and signs of significant inflammation, endophthalmitis has to be the diagnosis

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 63 of 90

until proven otherwise. It is unacceptable to go by the description of a first-year resident and make the very difficult decision between -- between infection and inflammation without seeing the patient. If this patient would've had an endophthalmitis and was treated as in this case with steroids, she would have lost vision permanently, and this would have been undefendable in a lawsuit.

Q. Okay. Do you have any documentation bearing Dr. Rageh's name that this was discussed with him at the time?

A. I personally discussed it with him.

Q. Do you have any documentation that says you discussed it with him at the time?

A. I did not discuss it with him -- I did not -- I didn't send document -- I didn't send email to him. I documented the way we document things at that UNC Department of Ophthalmology, by email, to my colleagues.

Q. Was there any harm to this patient?

A. Luckily, there was not.

Q. So the answer is no?

A. The answer is no.

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 64 of 90

Q. Okay.

A. I've talked to the FBI on several occasions after he threatened my family, myself, my colleagues, sent unhinged emails to us, again, which led to a non-contact order for myself and Dr. Zhang, which then led to his conviction of cyberstalking. And I know the -- the FBI told me that they have visited or spoken with him. That's all I know.

Q. Okay.

A. I don't -- I would not know how to -- how to request a SWAT team.

Q. Okay. So it's safe to say you've never said, I want a SWAT team to pay Dr. Rageh a visit?

A. I don't recall that.

Q. Okay. Who is James Ellis?

A. I believe he's the -- he's with the EOC.

Q. Okay.

A. With UNC. I'm not -- I'm not 100 percent sure.

Q. Okay. Are you familiar with a James Ellis?

A. I guess I'm not.

Q. Okay. Are you familiar with a David Harton?

A. He used to be our local, quote, unquote, FBI agent. I had multiple conversations with him.

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 65 of 90

Q. And what did you say to him?

A. I talked with him after -- after Dr. Rageh, you know, threatened, wished -- basically wished death on me and my family, wished suffering on me and my family, sent emails.

You know, there was a -- I don't know if you recall back then, I think in 2023, a UNC professor was killed on campus by one of his grad students. And it was a tragic incident.

And he sent, basically, the newspaper -- the -- the -- the internet, the article -- the newspaper article of that to all of us without comment, you know? I felt -- I felt -- you know, I felt a real threat to my -- to my safety to my life.

And so, talking with the UNC police, they advised me to call the FBI, which I did. And I told them what was going on. And they said they'll look into things.

Q. Okay. Did you speak to anyone else after that regarding it?

A. I did. I spoke to a guy in Chicago -- not Chicago -- somewhere in Illinois, that -- where Rageh -- I believe where he lives now, Agent Harton had connected me with the local field person there.

Q. Okay. Do you know an Anthony Ray?

www.NCDepo.com
info@NCDepo.com
*Depositions, Inc.*
*Serving all of North Carolina*
(919) 557-4640

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 66 of 90

NORTH CAROLINA

VANCE COUNTY

C E R T I F I C A T E

I, Marta J. Charles, Court Reporter and Notary Public, the officer before whom the foregoing proceeding was conducted, do hereby certify that the witness whose testimony appears in the foregoing proceeding was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter transcribed under my supervision; and that the foregoing pages, inclusive, constitute a true and accurate transcription of the testimony of the witness.

I do further certify that I am neither counsel for, related to, nor employed by any of the parties to this action in which this proceeding was conducted, and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereof, nor financially or otherwise interested in the outcome of the action.

This the 26th day of February, 2026.

*Marta Charles*

Marta J. Charles

Court Reporter and Notary Public

#201026500057

Case 1:24-cv-00336-CCE-JEP    Document 68-4    Filed 03/13/26    Page 67 of 90

From: Budenz, Don[donald_budenz@med.unc.edu]
Sent: Mon 12/12/2022 2:27:23 PM (UTC-05:00)
To: Ulrich, Jan Niklas[jnulrich@med.unc.edu]
Cc: Leonard, Bonnie L[bonnie_leonard@med.unc.edu]
Subject: Re: Retina fellow (confidential)



I would tell Dr. Rageh that things aren't working out, the best you can do is continue him as a medical retina fellow and give him a certificate for that after a year? Or do you want to get rid of him sooner?

It's a lengthy but possible process to get rid of him through Medical Staff.

Thanks,
Don

Please forgive any unusual words my phone comes up with.

From: Ulrich, Jan Niklas <jnulrich@med.unc.edu>
Sent: Monday, December 12, 2022 2:21:54 PM
To: Budenz, Don <donald_budenz@med.unc.edu>
Cc: Leonard, Bonnie L <bonnie_leonard@med.unc.edu>
Subject: Retina fellow (confidential)

Dear Don, Bonnie,
As discussed a bit ago we still have significant trouble with our current retina fellow Dr. Rageh. He is way behind in regards to knowledge, clinical skills and has non existing surgical skills. Besides we have had issues with him following instructions, being truthful and respectful towards out female retina faculty. To a point that Dr. Zhang currently is not participating in his teaching.
I entered the scramble and it looks like we may have a solid candidate (current resident from UPMC/ Pittsburgh) to start July 2023 who I will talk to this afternoon. Others may apply too.
How should I proceed logistically? This would be outside the match as with Dr. Rageh last year.
Then, I haven't told Dr. Rageh yet and this is obviously uncomfortable. I also do not want to tell him until we have a confirmed candidate. My plan was to have him finish this year (through July 2023) and give him a certificate for a medical retina fellowship. Not sure what we would need to do to terminate his contract after the one year or if he currently only has a one year contract anyways...
Please advise and please let's keep this confidential art this point.

Thanks!!
Nick

Confidential Subject to Protective Order
UNC_0000509

**From:** Brewington, Beatrice Yvette[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=71332637C56148C79B3215F169F24E57-MS BEATRICE]

**Sent:** Mon 12/12/2022 6:16:53 PM (UTC-05:00)

**To:** Ulrich, Jan Niklas[jnulrich@med.unc.edu]

**Subject:** Fellow

Hi Nick,

I do not work with Abdu that often. I talked with him a couple of times about charting because would often write incomplete notes and not include the exam or the diagnosis. He sometimes forgets to result the images. His notes often included unnecessary stuff and he would leave out key info. When I talked with him about this the first time, he got a little better, but not much. I still have to complete his notes and charting so I pretty much gave up on asking. I also told him that it was ok for him to give my injection patients their subconj injection. He must have forgotten that I told him that because he doesn't do it. I'm not going to remind him because I shouldn't have to. He doesn't seem to pick up on things even when told more than once. When he first started showing up for Retina CAP or my clinic, he literally would not speak to me or acknowledge me in any way. I'm not sure why but he is definitely more comfortable with Kiernan than with me. I'm sure he has some other deficiencies, but we really don't talk or interact unless absolutely necessary. Hope this is helpful.

Beatrice Y. Brewington, MD

Confidential Subject to Protective Order

**Message**

| | |
|---|---|
| From: | Budenz, Don [donald_budenz@med.unc.edu] |
| Sent: | 12/12/2022 4:28:37 PM |
| To: | Ulrich, Jan Niklas [jnulrich@med.unc.edu] |
| Subject: | Re: Retina fellow (confidential) |

Good plan!

Thanks,
Don

Please forgive any unusual words my phone comes up with.

From: Ulrich, Jan Niklas <jnulrich@med.unc.edu>
Sent: Monday, December 12, 2022 4:26:00 PM
To: Budenz, Don <donald_budenz@med.unc.edu>
Subject: Re: Retina fellow (confidential)

Alice has stopped working with him. There were some issues with being truthful and respecting her. Really bad...
Keirnan and I are ok for now. He is just absolutely terrible in surgery. We said we would reevaluate in January. If we get this guy from Pittsburgh (I should know tomorrow) I was going to have a conversation with him and say we don't think we can train him as VR fellow but if he wants he could stay on through the summer as medical retina and get a certificate. So he at least is getting something out of this. And hope he would leave somewhat amicably and not make a huge stink and badmouth us on all social media etc.
Best
Nick

J. Niklas Ulrich, MD

Vice Chair of Faculty Development
Director, UNC Surgical Vitreo-Retinal Fellowship Program
Associate Professor of Ophthalmology, Vitreo-Retinal Surgery
Adjunct Assistant Professor of Pediatrics
University of North Carolina at Chapel Hill
Department of Ophthalmology
5151 Bioinformatics Bldg CB 7040
Chapel Hill, NC 27599
ph: 919-966-5296
f: 919-966-1908

On Dec 12, 2022, at 4:16 PM, Budenz, Don <donald_budenz@med.unc.edu> wrote:

Can you put up with him for the rest of the academic year?

Confidential Subject to Protective Order



Hello Dr. Ulrich,

Further to our conversation over the last week, my understanding is that the program is in the process of terminating my fellowship earlier on 07/31/2023 instead of 07/31/2024. You also mentioned not offering me full surgical training, which I was promised when I accepted this fellowship. The reason, as you explained to me is that Dr. Zhang finds it difficult to deal with me because of my age being older than her, and my shape being bigger than her. The way I talk which she may consider as a talk back. I only see her reasons are just unmodifiable reasons and have to do with my personality and background. That being said, I never received a formal evaluation of things I can work on.

I was threatened that if she doesn't want me in the fellowship, you would go without a fellow because you are one team "against me?" even though I expressed my feelings that I was oppressed.

I have mentioned to you in a very friendly and informal way that she used to put me down and low in front of everyone. Here are some examples:

- She used to shout at me in the OR for some reasons like "towel" not being folded in half twice under the microscope controller. When I mentioned that to you, you agreed, and you said, "F" the towel, who cares". She did not deny that when we talked about it.

- When she frequently comments on the way I pronounce her name. You agreed that it does not bother you that your wife cannot perfectly pronounce your name, but she could not accept my accent.

- When I signed an email or Epic inbox message with "AR," she said I could not do that because I am nobody to do that and nobody knows who I am, so I should always type my name and not use initials.

- When I sometimes comment on a surgical step or ask for clarifications to learn, I feel she is not welcoming that and makes a big deal of it. On one occasion, She asked her resident assistant during an IOL replacement surgery, when I was writing the notes if the cornea marker for Yamane was placed centrally. They agreed it was centrally placed, but I said I think it was slightly eccentric, and they realized it and agreed on it, and then I joked and said, "thank you Abdu." She laughed and threw me with BSS, and we joked. The next time we talked I was shocked when you mentioned that she complained about it to you, and she considered my behavior as if I am correcting her or embarrassing her without even letting me know what did I do wrong! I felt very insecure! When I mentioned that to you, you advised that I should not comment or ask questions again and should only say okay and yes.

- At the clinic on another occasion, you mentioned to me that, for some reason, she is a little aggressive with me, and she is oversensitive to anything I do wrong.

- I went to her at one time and said that I do admire the way she supported the resident who made a mistake and lasered the macula. She said the resident is her child or baby, but I am not her trainee! I could not imagine what she could have done to me if it had been my mistake!

- She also said on one occasion while I was present in the room that residency training is ACGME accredited and regulated, but this fellowship is not accredited and has no regulations on it, and she can do whatever she wants.

- Another time in the clinic with Dr. Zhang, she walked into the exam room when I was examining one of her patients, and after she left, she texted me on Epic that I did not complete the exam section or the

wrap-up section or whatever in Epic in a very aggressive way. I replied that she had walked into the room, and I did not finish yet. She texted back in a very aggressive way again! I wished I had a screenshot of her response! I swallowed it and didn't complain because I never wanted to create a problem.

- Back to the OR harassment, in the beginning, when Uzo was the resident, she asked me to do PRP. When I started, I wanted to increase the laser power a little bit like 200 instead of 150, Uzo said no, don't do that and asked me to stop. He then went back to Dr. Zhang, who said it was okay. This is just an example of how toxic it was in the OR

- She once said in the OR that I have very thick skin when I was assisting, and I swallowed that.

- I can feel her negative energy toward me and have tried a few times to initiate a friendly conversation to break the barriers, but obviously, that was not enough. I even asked you if we could all meet outside for dinner or something, but you said I should not do that and all I need to do is be professional! I didn't have a chance to work with her since then!

- As for training, Dr. Zhang would get the resident, Vikram scrubs with her at least every other case, if not more. She would let him do more steps than I would. The furthest I reached after four months of training was placing a few trocars and sutures. She let Vikram do a little PPV, IOL cutting with scissors, IOL explanation, corneal and conjunctival stitches, and more!

- I was shocked when Dr. Zhang reported an incident in the OR to risk management when I caused a small skin cut while prepping the patient for surgery, without her notifying me about it or advising me how to avoid that. My understanding is that North Carolina embraces an open culture and no blame policy when it comes to safety incidents. This is not the case here, no discussion or learning point I received from this case.

On another front, just recently, you mentioned that my surgical skills are below what is expected. I appreciate the constructive feedback and am happy to engage in any focused plan to improve my skills. This could involve wet lab training or any other activities you see. My understanding is that the first step in addressing a surgical deficiency of a trainee is to provide support and not by putting them down or depriving them of operating privileges. Over the past five months, I was given very little surgery, and there was no plan was laid down for my improvement, nor I received any tasks to work on in relation to this.

To summarize, I have been the subject of discrimination and bullying by Dr. Zhang. Unfortunately, the program, instead of supporting me, has taken the direction of trying to terminate my fellowship and deprive me of my surgical training. I hope we can reach a resolution. My request is to continue in my fellowship, and we can come together with a focused plan to support my training and set rules to guarantee my well-being and that I am treated fairly and respectfully in the work environment going on.

We can also contact the dean's office, HR, GME, AUPO, ASRS, SFMatch, or other legal authorities to ask for some advice.

I look forward to your response.

Respectfully yours,

| | |
|---|---|
| **Message** | |
| **From:** | Brian Jewart [BJewart@aiovision.com] |
| **Sent:** | 3/10/2023 10:45:31 AM |
| **To:** | Ulrich, Jan Niklas [jnulrich@med.unc.edu] |
| **Subject:** | Abdulrahman Rageh |

You don't often get email from bjewart@aiovision.com. Learn why this is important

Hi Dr. Ulrich,

I wanted to introduce myself. My name is Brian Jewart. I am a retina physician in Pittsburgh, PA. Abdul reached out to us about finishing his fellowship here, and possibly staying on as an employed physician after that. I was wondering if you had a few moments to speak about him? It is a unique situation and I just wanted to get your thoughts.

Thank you,

Brian Jewart

( My cell is 412-496-8000. Feel free to call/text if convenient.)

CAUTION: The information contained in this electronic e-mail transmission and any attachments are intended only for the use of the individual or entity to whom or to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient, or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any dissemination, distribution, copying or disclosure of this communication and any attachment is strictly prohibited. If you have received this transmission in error, please notify the sender immediately by telephone and electronic mail, and delete the original communication and any attachment from any computer, server or other electronic recording or storage device or medium. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client, physician-patient or other privilege.



EXHIBIT
26
Ulrich MO
2-10-26

STATE OF MISSOURI
DIVISION OF PROFESSIONAL REGISTRATION
STATE BOARD OF REGISTRATION FOR THE HEALING ARTS
**POSTGRADUATE REFERENCE LETTER**

STATE BOARD OF REGISTRATION FOR THE HEALING ARTS
P.O. BOX 4, JEFFERSON CITY, MO 65102
FOR OVERNIGHT DELIVERIES
3605 MISSOURI BLVD., JEFFERSON CITY, MO 65109
TELEPHONE (573) 751-0098
TOLL FREE (866) 289-5753
FAX (573) 751-3166

| APPLICANT LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX | SSN | DOB |
|---|---|---|---|---|---|
| Ragen | Abdulrahman | Khamiss | | 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 | 07/25/1982 |

The applicant named above has applied for licensure in the State of Missouri. The Missouri State Board of Registration for the Healing Arts requires a Postgraduate Reference Letter from the program director of each ACGME/AOA/Canadian Royal College of Physicians and Surgeons approved training program the applicant has been in or is currently enrolled. Please provide all of the information requested on this form and return it to the address above. This information will become part of the permanent records maintained in this office. Please note that the applicant cannot receive final consideration without your cooperation.

I hereby authorize the below-named hospital, its staff or representative, to provide to the Missouri State Board of Registration for the Healing Arts any and all information requested below, whether such information is favorable or unfavorable, and I hereby release any and all liability against the below-named institution and/or person for any and all acts performed in fulfilling this request, provided that such acts are performed in good faith and without malice. Further, I request that this completed form be sent directly to the Missouri State Board of Registration for the Healing Arts, P.O. Box 4, Jefferson City, MO 65102.

| APPLICANT SIGNATURE | DATE |
|---|---|
| | |

| PROGRAM DIRECTOR NAME | EMAIL ADDRESS | PHONE NUMBER |
|---|---|---|
| J. N. Ulrich | jnulrich@med.unc.edu | 984-974-2626 |

| NAME OF TRAINING HOSPITAL | ADDRESS | CITY, STATE, ZIP |
|---|---|---|
| UNC Chapel Hill | 2226 Nelson Hwy | Chapel Hill, NC 27517 |

ACCREDITED BY
☐ ACGME  ☐ AOA  ☐ Royal College  ☐ Other _____

| | START DATE | END DATE | NAME OF DEPARTMENT |
|---|---|---|---|
| ☐ CLINICAL CLERKSHIP (FIFTH PATHWAY) | | | |
| ☐ INTERNSHIP | | | |
| ☐ RESIDENCY | | | |
| ☒ FELLOWSHIP | 08/01/22 | 07/31/24 | UNC Ophthalmology |

Please check one of the following:

☐ The above named applicant satisfactorily completed _____ months of a _____ month program.

☒ The above named applicant is on track to successfully complete __2.4__ months of postgraduate training at this hospital on __07/31/2024__ (DATE). I further certify that I will notify the Missouri Board of Healing Arts if there are any changes to the answers on this postgraduate reference letter, prior to the completion of the postgraduate training program.

PLEASE READ THE FOLLOWING AND INDICATE YOUR ANSWER BY A CHECK MARK IN THE APPROPRIATE BOX. (IF ANY ANSWERS ARE "YES", PLEASE PROVIDE COMPLETE DETAILS ON A SEPARATE SHEET.)

1. During the time this applicant was in your training program has he/she ever been subject to any disciplinary or corrective action, such as imposition of consultation requirements, suspension, termination, probation or remediation plan?  ☐ Yes  ☒ No

2. At the time the applicant left your institution, were any actions instituted, in process or pending against him/her?  ☐ Yes  ☒ No

3. Do you have knowledge of any condition or impairment which in any way affects the applicant's ability to practice in a professional competent and safe manner, including but not limited to: (1) a mental, emotional, nervous or sexual disorder, (2) an alcohol or substance abuse disorder or (3) a physical disease or condition?  ☐ Yes  ☒ No

PLEASE READ THE FOLLOWING RECOMMENDATIONS CAREFULLY AND MARK THE APPROPRIATE ONE.

☒ I recommend this applicant for licensure to practice medicine and surgery without any reservation.
☐ I recommend this applicant for licensure to practice medicine and surgery with reservation.
☐ I do not recommend this applicant for licensure to practice medicine and surgery.

IF YOU DO NOT RECOMMEND THIS APPLICANT FOR LICENSURE OR RECOMMEND HIM/HER WITH RESERVATIONS, PLEASE EXPLAIN WHY. USE A SEPARATE SHEET IF NECESSARY.

PLEASE LIST THE NAMES AND ADDRESSES OF ANY OTHER PHYSICIANS ON A SEPARATE SHEET OF PAPER WHO, IN YOUR OPINION, SHOULD BE CONTACTED REGARDING THIS CANDIDATE AND THE REASON FOR CONTACTING THEM.

I ATTEST THAT THE FOREGOING INFORMATION WHICH I SUPPLIED IS TRUE IN EVERY RESPECT.

| NAME (PLEASE PRINT OR TYPE) | TITLE |
|---|---|
| J. N. Ulrich | MD |

| SIGNATURE | DATE |
|---|---|
| J. U. | 12/20/2022 |

MO 375-0457 (11-2020)

PAGE 8

**EXHIBIT 27** Ulrich MD 2-16-24

Confidential Subject to Protective Order

UNC_0001108



nyc EXHIBIT
30
Ulrich MD   2-10-26

## Commonwealth of Massachusetts Board of Registration in Medicine
### 178 Albion Street, Suite 330 – Wakefield, MA 01880
### Telephone: (781) 876-8210   Fax: (781) 876-8383
### www.mass.gov/massmedboard

# SUPERVISORY EVALUATION FORM

**APPLICANT INSTRUCTIONS:  Complete this section.**
- This form must be completed by a <u>supervising physician</u> who can evaluate your clinical performance.
- If currently in training it must be completed by a Program Director.
- Evaluations must cover at least <u>one year</u> of current clinical activities. If you have been practicing at a facility for less than one year, you must request additional Evaluation Forms from previous supervisors to cover a full year.
- Locum tenens physicians must have evaluations from the most recent two years of assignments.
- The Evaluator must have no financial interest in your licensure in Massachusetts.

I hereby authorize the representatives or staff of the facility listed below to provide the *Board of Registration in Medicine* with any and all information requested in this evaluation form, whether such information is favorable or unfavorable, and I hereby release from any and all liability the named facility and/or any person for any and all acts performed in fulfilling this request, provided that such acts are performed in good faith and without malice.

Signature of Applicant: _____  Date: 12 17 2023

Applicant PRINT name: ___ Abdulrahman Khamiss Abdulrahman Rageh ___

Name of Evaluating Hospital/Workplace: ___ University of North Carolina Kittner Eye Center ___ State: NC

**SUPERVISING PHYSICIAN INSTRUCTIONS:**
- Please complete both pages and submit the form by following the instructions on the cover page.
- The Board may provide a copy of this Form and any attachments to the applicant.

| | |
|---|---|
| **1.** | Date(s) of applicant's affiliation at facility (month/year)? From: __08 / 2022__  To: __03 / 2023__ |
| **2.** | In what capacity did you supervise the applicant?  ☐ Department Chair  ☐ Chief of Service  ☒ Training Director  ☐ Supervising Physician  ☐ Chief Medical Officer  ☐ Medical Director |
| **3.** | Applicant's Status: ☐ Intern  ☐ Resident  ☒ Fellow  ☐ Staff Member  ☐ Other: _____ |
| **4.** | Do you have any conflict of interest, personally, professionally or financially in recommending this applicant for licensure?  ☐ YES  ☒ NO |

**5.** Please rate the applicant.  If "Below Average" or "Poor", explain in detail on a separate sheet.

| | Superior | Above Average | Average | Below Average | Poor |
|---|---|---|---|---|---|
| Clinical knowledge | ☐ | ☐ | ☐ | ☒ | ☐ |
| Clinical competency | ☐ | ☐ | ☐ | ☒ | ☐ |
| Professional judgment | ☐ | ☐ | ☐ | ☒ | ☐ |
| Character and ethics | ☐ | ☐ | ☒ | ☐ | ☐ |
| Technical skills | ☐ | ☐ | ☒ | ☐ | ☐ |
| Relationships with staff | ☐ | ☐ | ☒ | ☐ | ☐ |
| Relationships with patients | ☐ | ☐ | ☒ | ☐ | ☐ |
| Cooperativeness/ability to work with others | ☐ | ☐ | ☒ | ☐ | ☐ |

(Continued on next page)

Supervisory Evaluation and Certificate of Moral Professional Character Form, Page 1 of 3, Rev. 06/2022

Confidential-Subject to Protective Order

PRINT NAME: __Abdulrahman Khamiss Abdulrahman Rageh__

(Supervisory Evaluation Form continued)

| 6. | Has the applicant's privileges to admit or treat patients <u>ever</u> been modified, suspended, reduced or revoked? If "yes" please explain below. | ☒ YES ☐ NO |
|---|---|---|
| | see attached form | |
| 7. | Has this applicant <u>ever</u> been the subject of disciplinary action or had staff privileges, employment or appointment at this hospital or facility voluntarily or involuntarily denied, suspended, revoked or has (s)he resigned from the medical staff in lieu of disciplinary action? If "yes" please explain below. | ☒ YES ☐ NO |
| | see attached form | |
| 8. | Please comment on the applicant's strengths or weaknesses and/or any other information that you may have to assist in this evaluation. | |
| | see attached form | |
| 9. | The above comments are based on the following:<br><br>☒ Personal observation ☐ General impression ☐ A composite of evaluations by other physicians<br><br>☐ Other: _____ | |
| 10. | Recommendation:<br><br>☐ Recommend for licensure in Massachusetts.<br><br>☒ Recommend for licensure in Massachusetts, with the following reservations: _____<br>Based on experience with applicant during his time at UNC I would not reccomend for licensure. _____<br>However the board may take into consideration the evaluation of other institutions and the progress he made since leaving UNC<br>☐ Do not recommend for the following reason(s): _____<br>_____ | |

### SUPERVISING PHYSICIAN SIGNATURE

Signature: _____  (check one) ☒ M.D. or ☐ D.O.

                                               Text

Print Name: __J. Niklas Ulrich__  Date: __03 29 2024__

Title/Position: __Professor of Ophthalmology__

E-mail: __jnulrich@med.unc.edu__  Phone number: __(984)974 2020__

### SUBMIT THE COMPLETED CERTIFICATION ELECTRONICALLY USING THE INSTRUCTIONS ON THE COVER PAGE.

Supervisory Evaluation and Certificate of Moral Professional Character Form, Page 2 of 3, Rev. 06/2022

Confidential Subject to Protective Order

**Commonwealth of Massachusetts Board of Registration in Medicine**
**178 Albion Street, Suite 330 – Wakefield, MA 01880**
**Telephone: (781) 876-8210    Fax: (781) 876-8383**
**www.mass.gov/massmedboard**

## CERTIFICATE OF MORAL AND PROFESSIONAL CHARACTER

**INSTRUCTIONS TO THE APPLICANT:** This form must be signed by a physician legally authorized to practice medicine in the United States or Canada. Someone who has known you for at least one year and is not a relative should execute this statement. The Board of Registration in Medicine prefers statements from physicians licensed to practice in Massachusetts. You may use the same physician to complete both the Supervisory Evaluation Form and the Certificate of Moral and Professional Character, if they have known you for at least one year and are not a relative.

**CERTIFYING PHYSICIAN INSTRUCTIONS:**
- **Please complete the below certification.**
- **Please submit the form by following the instructions on the cover page.**

### CERTIFICATION OF MORAL AND PROFESSIONAL CHARACTER

This certifies that I have been personally acquainted with the physician named below:

## Abdulrahman Khamiss Abdulrahman Rageh

(print name of applicant)

for _____ years. I believe that the above-named physician is of good moral character and worthy of confidence and recommend him/her to the Massachusetts Board of Registration in Medicine.

SIGNATURE: _____    DATE: _____

Print Name: _____

License Number: _____    State: _____

Address: _____

City: _____  State: _____  Zip: _____

Email: _____

**SUBMIT THE COMPLETED CERTIFICATION ELECTRONICALLY USING THE INSTRUCTIONS ON THE COVER PAGE.**

Supervisory Evaluation and Certificate of Moral Professional Character Form, Page 3 of 3, Rev. 06/2022

Confidential Subject to Protective Order

**Commonwealth of Massachusetts Board of Registration in Medicine**
**200 Harvard Mill Square, Suite 330 – Wakefield, MA·01880**
**Telephone: (781) 876-8210    Fax: (781) 876-8383**
**www.mass.gov/massmedboard**

## POSTGRADUATE TRAINING VERIFICATION

**APPLICANT INSTRUCTIONS**: Primary source verification of **ALL** postgraduate training is required. Complete the Authorization and forward the form to your program director. If submitting verification of your training through FCVS, this form does **not** need to be completed.

**Authorization**: I authorize the release of information from my postgraduate training program listed below, as requested by the Massachusetts Board of Registration in Medicine.

Applicant's Signature: _(signature)_                                    Date: 11/15/2023

Print Name: Abdulrahman Rageh

Institution: UNC Chapel Hill                         City/State: N C

### PROGRAM DIRECTOR SECTION

Name of Institution: University of North Carolina at Chapel Hill

Institution name if different when applicant attended: _____

Verification for (Print applicant's name): Abdulrahman Rageh

| Program Director Instructions: | | |
|---|---|---|
| Report **incomplete years separate** from completed years. | PGY(s): # 5    Specialty/Subspecialty: Vitreoretinal Surgery | |
| | ☐ Internship    From: 8\|22    To: 3\|23 | |
| | ☐ Residency    Successfully Completed? ☐ Yes ☒ No ☐ In Progress | |
| | ☒ Fellowship    Accredited by: ☐ ACGME ☐ AOA ☐ RCPSC ☐ CFPC ☒ None | |
| If the training year is currently **in progress** report the expected completion date in the "**To**" field. | PGY(s): # _____    Specialty/Subspecialty: _____ | |
| | ☐ Internship    From: _____    To: _____ | |
| | ☐ Residency    Successfully Completed? ☐ Yes ☐ No ☐ In Progress | |
| | ☐ Fellowship    Accredited by: ☐ ACGME ☐ AOA ☐ RCPSC ☐ CFPC ☐ None | |
| | PGY(s): # _____    Specialty/Subspecialty: _____ | |
| | ☐ Internship    From: _____    To: _____ | |
| Report Internships, Residencies and Fellowships **separately**. | ☐ Residency    Successfully Completed? ☐ Yes ☐ No ☐ In Progress | |
| | ☐ Fellowship    Accredited by: ☐ ACGME ☐ AOA ☐ RCPSC ☐ CFPC ☐ None | |
| If more space needed, please use additional forms. | PGY(s): # _____    Specialty/Subspecialty: _____ | |
| | ☐ Internship    From: _____    To: _____ | |
| | ☐ Residency    Successfully Completed? ☐ Yes ☐ No ☐ In Progress | |
| | ☐ Fellowship    Accredited by: ☐ ACGME ☐ AOA ☐ RCPSC ☐ CFPC ☐ None | |

(Continued on next page)

Full License Application – Postgraduate Training Verification, Page 29 of 31, Rev. 8/19

Confidential Subject to Protective Order

UNC_0001746

(Postgraduate Training Verification Form continued)

APPLICANT'S NAME: **Abdulrahman Rageh**

**Unusual Circumstances:**

The following questions apply to unusual circumstances that occurred during any part of the applicant's medical education. If you answer "yes" to any of these questions, please provide an explanation in the space below or enclose a separate page.

**QUESTIONS**

| | YES | NO |
|---|---|---|
| 1. Did the applicant take any leaves of absence or breaks from his/her postgraduate training? | ☒ | ☐ |
| 2. Was the applicant ever placed on probation? | ☐ | ☒ |
| 3. Was the applicant ever disciplined or under investigation? | ☐ | ☒ |
| 4. Were any negative reports ever filed by instructors regarding the applicant? | ☐ | ☒ |
| 5. Were any limitations or special requirements imposed on the applicant because of questions of academic incompetence or disciplinary problems? | ☒ | ☐ |

Explanation for any "YES" answers:

See attached

---

**CERTIFICATION AND SEAL**

**SEAL / NOTARY**
If the institution does not have a seal, this form must be notarized.

*[Notary seal: NATHANIEL SALE, NOTARY PUBLIC, My Commission Expires 06-23-2024, DURHAM COUNTY, NC]*

Completion of the following is certification that the information above is an accurate account of this individual's records and is true and correct.

Program Director Signature: _____

Print Name: **J. N. ULRICH**

Academic Title: **Professor of Ophthalmology**

Date: **11/15/23**    Telephone: **984 - 974 - 2026**

E-mail address: **jnulrich@med.unc.edu**

**RETURN THE COMPLETED FORM TO THE APPLICANT IN A SEALED ENVELOPE WITH YOUR SIGNATURE AFFIXED ACROSS THE ENVELOPE SEAL.**

State of **NC** County of **Durham**
Subscribed and sworn before me on **11/15/23** (Date)

_____
(Notary Signature)

Full License Application – Postgraduate Training Verification, Page 30 of 31, Rev. 8/19



THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL
SCHOOL OF MEDICINE
DEPARTMENT OF OPHTHALMOLOGY

O 919-966-5296 | F 919-966-1908 | A 984-974-2020

5151 Bioinformatics Bldg. | Campus Box 7040
130 Mason Farm Rd. | Chapel Hill, NC 27599
www.unceye.org

November 15, 2023


Massachusetts Board of Medical Licensure


Re: Abdulrahman Rageh, MD


Dear colleagues,

Dr. Rageh started his vitreoretinal fellowship at the University of North Carolina on 8/1/2022.
He went on personal leave starting 1/9/23 and resigned 3/20/23.
There were repeated patient safety concerns during his fellowship were so it was decided that he would
be relieved from seeing patients without supervision as of 1/9/23.
The following represents a collection of cases that were of concern:

-August 22: AR saw patient with corneal/eye infection with no view to the fundus in hospital to rule out
endophthalmitis. Ultrasound was done twice within a week, and he did not diagnose any infection in
vitreous cavity. When my colleague operated a few days later due to worsening symptoms the eye was
full of pus and unsalvageable.
-August 22: AR saw patient with recent macula off detachment (same day) in clinic. These need to be
repaired within 24 hours as per standard of care. He sent patient home and did not tell the supervising
physician about it until next day.
-October 22: Patient was seen with retinal tear, Dr. Rageh performed laser treatment. When the
attending examined the patient after the procedure it was discovered that Dr. Rageh had not treated
the tear but instead a different area that did not need treatment.
-November 22: He ordered an incorrect formulation and number of doses of oral steroids for a patient
-November 22: He closed the eye with an incorrect suture (nylon- non- absorbable instead of vicryl-
absorbable) and caused an eyelid laceration while cutting a patient's drape
-December 22: He was called by an attending to see a patient with retinal tear and laser it. He did not
see a tear on his exam and sent the patient home without speaking to that attending or the attending
on call. The patient was brought back to my clinic the next day. There was a peripheral scar but noc
retinal tear or detachment. I had Dr. Rageh reexamine the patient and he was unable to see the area in
question even after multiple attempts. Had this patient actually had a retinal detachment and
progressed by the time I saw him this could have become a legal issue.
-December 22: he was called by a first-year resident from the ER about a patient who had had a
vitrectomy and lens exchange the day prior. She was seen in clinic earlier that day with 20/50 vision. She
had noticed a drastic decline of vision over several hours and presented to the ER with HM vision. The
resident's note mentioned 4+ cell and fibrin. He did not see the patient but advised the resident to start
q2 hour prednisolone acetate drops for suspected iritis. There was no mention of potential
endophthalmitis. The attending was not notified. The patient came back to clinic the next day- with
improving inflammation. We had a long discussion that in postop patient with acute vision drop and
signs of significant inflammation endophthalmitis has to the diagnosis until proven otherwise. It is
unacceptable to go by the description of a first-year resident and make the very difficult decision

between infection and inflammation without seeing the patient. If this patient would have had an endophthalmitis and was treated as in this case with steroids she would have lost vision permanently and this would have been undefendable in a lawsuit.

Please do not hesitate to email me at jnulrich@med.unc.edu or call my cell at 216-262-2922 with any further questions.

Best regards,

J. Niklas Ulrich, MD

Vice Chair of Faculty Development
Director, UNC Surgical Vitreo-Retinal Fellowship Program
Professor of Ophthalmology, Vitreo-Retinal Surgery
Adjunct Assistant Professor of Pediatrics
University of North Carolina at Chapel Hill
Department of Ophthalmology
5151 Bioinformatics Bldg CB 7040
Chapel Hill, NC 27599
ph: 919-966-5296
f:   919-966-1908

Confidential Subject to Protective Order

 **MINNESOTA**
BOARD OF MEDICAL PRACTICE

335 Randolph Avenue, Suite 140
St. Paul, MN 55102
612.617.2130 (phone) | 612.617.2166 (fax)
medical.board@state.mn.us | mn.gov/boards/medical-practice

## VERIFICATION OF POSTGRADUATE MEDICAL TRAINING
(Copy this form for multiple programs)

This form is for verification of all US/Canadian post graduate medical training (i.e. internship, residency and fellowship) and must be completed and mailed by the facility **DIRECTLY to the Minnesota Board of Medical Practice.** The applicant's signature authorizes release of information, favorable or otherwise, **DIRECTLY to the Board.**

Print Name **AbdulRahman Rageh** Birthdate **7/25/1982** Last 4 digits of SSN [Redacted - Privileged]

Signature _____ Date **3/23/2023**

Training Dates (Month, Day, Year) **08/01/2022 until resigned on 3/20/2023**

This section is to be completed by the Program Director or Graduate Medical Education Representative

It is hereby certified that:(Name of Applicant) **A. Rageh**

Received credit for post graduate training:(# Months) **5** from date: **08/ 01 /22** to date: **01/ 08 /23**

The program was accredited to provide graduate, clinical, medical training during the dates above by: (Check One)
ACGME___ AOA___ RCPSC___ CFPC___ None of the above **X** (explain) **fellowship**

at:(Name of Hospital or Institution) **University of North Carolina at Chapel Hill**

located at **2226 Nelson Hwy, Chapel Hill, NC 27517**
(Street Address, City, State, Zip, Country)

Affiliated Medical School Name **UNC** Specialty **VR surgery** PGY **5**

Training Program (Check One): Internship___ Resident___ Chief Resident___ Fellowship **X** Research___

Did the applicant complete all required years of the post graduate training program?
___Program was completed ___ Anticipated date of completion___/___/___
**X** Program was not completed because **resignation**

Was this individual issued a certificate as proof completion of training? .................. Yes _____ No **X**

Did the individual take a leave of absence or break during training? .................. Yes* **X** No _____

Was this individual ever placed on probation or remediation?.................. Yes* _____ No **X**

Was this individual ever disciplined or placed under investigation? .................. Yes* _____ No **X**

Were any limitations or special requirements placed upon this individual due to academic incompetence, disciplinary problems or any other reason? .................. Yes* **X** No _____

| Institutional Seal | Completed by Program Director or Graduate Medical Education Representative: |
|---|---|
| | Print Name **J. Niklas Ulrich, MD** |
| | Signature _____ |
| If the institution does not have an official seal, the form must be notarized. | Date **3/25/23** Phone **9199665296** |
| | Fax **9199661908** Email **jnulrich@med.unc.edu** |

*Attach letter of explanation

8/21

Confidential Subject to Protective Order

 | **SCHOOL OF MEDICINE**

THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL
SCHOOL OF MEDICINE
DEPARTMENT OF OPHTHALMOLOGY

O 919-966-5296 | F 919-966-1908 | A 984-974-2020

5151 Bioinformatics Bldg. | Campus Box 7040
130 Mason Farm Rd. | Chapel Hill, NC 27599
www.unceye.org

Minnessota Medical Board

Re: Dr. Abdulrahman Rageh

Dr. Rageh was relieved from any clinical activities involving patient risk on 1/8/2023 given patient safety concerns.

He applied for and was granted ADA leave on 2/10/23.

He resigned from the program on 3/20/23.

Jan Niklas Ulrich, MD
Vice Chair of Faculty Development
Director, UNC Surgical Vitreo-Retinal Fellowship
Professor of Ophthalmology, Vitreo-Retinal Surgery
Adjunct Assistant Professor of Pediatrics
University of North Carolina at Chapel Hill
Department of Ophthalmology

**ATTACHMENT 2**

## TENNESSEE BOARD OF MEDICAL EXAMINERS
### (800) 778-4123, ext. 532-4384 or (615) 532-3202, ext. 532-4384

### VERIFICATION OF POSTGRADUATE MEDICAL TRAINING

**APPLICANT:** Provide the information requested in the top box and then mail this form to each institution in which you received any postgraduate medical training. If additional forms are required, copy this one.

Institution Administration: I am applying for a Tennessee medical license and hereby authorize you to release any and all information in your files concerning my medical training. I was in training at your institution as follows:

Applicant's name: _Rageh_ _Abdulrahman_ _Khamiss_
(Last)                    (First)              (Middle/Maiden)

Name of Institution: _UNC-chapel Hill_ Program Title: _Surgical Retina_

_Rageh_                                        _9/12/2023_
Applicant's Signature                          Dates

---

**THIS PORTION IS TO BE COMPLETED BY THE TRAINING PROGRAM'S ADMINISTRATIVE OFFICE**

Please complete (including questions) and return to:

**State of Tennessee**
**Board of Medical Examiners**
**665 Mainstream Drive**
**Nashville, TN 37243**

CIRCLE ONE

Is your training program currently ACGME approved?                                    Yes  **(No)**

Was the above program LCME/ACGME approved at the time the applicant completed training?  Yes  **(No)**

Were there any adverse charges or actions taken during the residency?                 **(Yes)**  No
  If yes, please attach supporting information and/or documentation.

Would you recommend the applicant for licensure?                                     **(Yes)**  No

Did the applicant successfully complete the program?                                  Yes  **(No)**

The applicant attended the program from _08|22_ to _03|23_. I certify that the information on this form is true and correct.

(Mo/Yr)          (Mo/Yr)

_____                          _9|13|23_
Program Director's/Dean's Signature               Date

Subscribed and sworn before me this the _13_ day of _September_, _2023_.

_____
Notary Public

My Commission Expires: _10|29|2024_

PH-4183(Rev.02/17)

Confidential Subject to Protective Order



| | SCHOOL OF |
|---|---|
| | MEDICINE |

THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL
SCHOOL OF MEDICINE
DEPARTMENT OF OPHTHALMOLOGY

O 919-966-5296 | F 919-966-1908 | A 984-974-2020

5151 Bioinformatics Bldg. | Campus Box
7040130 Mason Farm Rd. | Chapel Hill,
NC 27599 www.unceye.org

September 13, 2023

**Jeffrin Zachariah** | Administrative Services Assistant III
Health Licensure and Regulation
Metro Center, 2nd Floor
Board of Medical Examiners
665 Mainstream Drive, Nashville, TN 37243

Re: Abdulrahman Rageh, MD

Dear Jeffrin,

Dr. Rageh started his vitreoretinal fellowship at the University of North Carolina on 8/1/2022.
He went on personal leave starting 1/9/23 and resigned 3/20/23.
There were repeated patient safety concerns during his fellowship were so it was decided that he would be relieved from seeing patients without supervision as of 1/9/23.
The following represents a collection of cases that were of concern:

-August 22: AR saw patient with corneal/eye infection with no view to the fundus in hospital to rule out endophthalmitis. Ultrasound was done twice within a week, and he did not diagnose any infection in vitreous cavity. When my colleague operated a few days later due to worsening symptoms the eye was full of pus and unsalvageable.
-August 22: AR saw patient with recent macula off detachment (same day) in clinic. These need to be repaired within 24 hours as per standard of care. He sent patient home and did not tell the supervising physician about it until next day.
-October 22: Patient was seen with retinal tear, Dr. Rageh performed laser treatment. When the attending examined the patient after the procedure it was discovered that Dr. Rageh had not treated the tear but instead a different area that did not need treatment.
-November 22: He ordered an incorrect formulation and number of doses of oral steroids for a patient
-November 22: He closed the eye with an incorrect suture (nylon- non- absorbable instead of vicryl-absorbable) and caused an eyelid laceration while cutting a patient's drape
-December 22: He was called by an attending to see a patient with retinal tear and laser it. He did not see a tear on his exam and sent the patient home without speaking to that attending or the attending on call. The patient was brought back to my clinic the next day. There was a peripheral scar but noc retinal tear or detachment. I had Dr. Rageh reexamine the patient and he was unable to see the area in question even after multiple attempts. Had this patient actually had a retinal detachment and progressed by the time I saw him this could have become a legal issue.
-December 22: he was called by a first-year resident from the ER about a patient who had had a vitrectomy and lens exchange the day prior. She was seen in clinic earlier that day with 20/50 vision. She had noticed a drastic decline of vision over several hours and presented to the ER with HM vision. The

resident's note mentioned 4+ cell and fibrin. He did not see the patient but advised the resident to start q2 hour prednisolone acetate drops for suspected iritis. There was no mention of potential endophthalmitis. The attending was not notified. The patient came back to clinic the next day- with improving inflammation. We had a long discussion that in postop patient with acute vision drop and signs of significant inflammation endophthalmitis has to the diagnosis until proven otherwise. It is unacceptable to go by the description of a first-year resident and make the very difficult decision between infection and inflammation without seeing the patient. If this patient would have had an endophthalmitis and was treated as in this case with steroids she would have lost vision permanently and this would have been undefendable in a lawsuit.

Please do not hesitate to email me at jnulrich@med.unc.edu with any further questions.

Best regards,

J. Niklas Ulrich, MD

Vice Chair of Faculty Development
Director, UNC Surgical Vitreo-Retinal Fellowship Program
Professor of Ophthalmology, Vitreo-Retinal Surgery
Adjunct Assistant Professor of Pediatrics
University of North Carolina at Chapel Hill
Department of Ophthalmology
5151 Bioinformatics Bldg CB 7040
Chapel Hill, NC 27599
ph: 919-966-5296
f:  919-966-1908

Confidential Subject to Protective Order

UNC_0001619



## Kentucky Board of Medical Licensure
## Postgraduate Training Verification

Complete Section 1 of this form then send to your training program; request your Program Director or designated official to complete Section 3 of this form and return this form and the Program Director's recommendation letter directly to the Board.

### SECTION 1: APPLICANT INFORMATION

Applicant Full Name: _____
<br>Last               First          Middle     Suffix

Name if different when diploma awarded:_____

Social Security Number: _____ Date of Birth: _____
<br>*The applicant's social security number is to be used for purposes of identification and may not be used for any other reason.*

**Waiver for release of information:** I authorize the Postgraduate Training Program below to provide any and all information pertaining to my medical education at your institution to the below listed Medical Board.

Applicant's Signature_____ Date_____

### SECTION 2: PROGRAM DIRECTOR OR DESIGNATED OFFICIAL OF POSTGRADUATE TRAINING PROGRAM

Please complete Section 3 of this form and attach a recommendation letter from the Program Director and forward this information directly to this Board to the following address:

> **Kentucky Board of Medical Licensure**
> **310 Whittington Pkwy, Ste 1B**
> **Louisville, KY 40222**

### SECTION 3: POSTGRADUATE TRAINING VERIFICATION

Institution Name: _____University of North Carolina at Chapel Hill, Kittner Eye Center_____

Institution Address: _____2226 Nelson Hwy_____Chapel Hill_____NC____27517_____
<br>Street              City        State   ZIP Code

Affiliated Medical School Name:__University of North Carolina_____

Program Type/Specialty: __Vitreo-Retinal Surgery_____ Postgraduate Year:____8_____

Please circle one: Internship Residency **(Fellowship)** Research Chief Resident Other

From Date: __08/__01__/2022_____ To Date: __03_/__20__/_2023____

Successfully Completed? ☐Yes ☒ No ☐ In Progress

(The definition of <u>Successfully Completed</u> is: In each year of training, did the applicant demonstrate sufficient academic and clinical ability to qualify for advancement without conditional or probationary status to the next year and next progressive level of responsibility in a designated specialty program?)

Accredited by: ☐ACGME ☐ AOA ☐ LCGME ☐RSC ☐ CFPC ☐RCPSC ☐ APPAP ☒ None of these

Page **1** of **2**

**Kentucky Board of Medical Licensure**
**Postgraduate Training Verification**

Did this individual ever take a leave of absence or break from his/her training? ☒ Yes ☐ No

Was this individual ever placed on probation? ☐ Yes ☒ No

Was this individual ever disciplined or placed under investigation? ☐ Yes ☒ No

Were any negative reports ever filed by instructors? ☐ Yes ☒ No

Were any limitations or special requirements placed upon this individual because of questions of academic incompetence, disciplinary problems or any other reason? ☒ Yes ☐ No  Text

Please explain any "Yes" response from above (attach additional pages if necessary): _____

___see attached_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

*I certify that to the best of my knowledge and belief the foregoing is a true, accurate and complete statement of the record of the individual named on this form.*

Signature: _J. U._____

Print name: _J. Niklas Ulrich_____

Title: __MD_____

AFFIX INSTITUTIONAL SEAL HERE

(If no seal is available, this form must be notarized)

Date: ___7/6/23_____

Phone number: __984-974-2020_____

Fax: _____919-843-1908_____

E-mail: __jnulrich@med.unc.edu_____

Confidential Subject to Protective Order

UNC_0001550



**THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL**
**SCHOOL OF MEDICINE**
DEPARTMENT OF OPHTHALMOLOGY

O 919-966-5296 | F 919-966-1908 | A 984-974-2020

5151 Bioinformatics Bldg. | Campus Box
7040130 Mason Farm Rd. | Chapel Hill,
NC 27599 www.unceye.org

July 7, 2023

Cheryl Tabler
Licensure Coordinator L-Z
Kentucky Board of Medical Licensure
310 Whittington Pkwy, Ste 1B
Louisville, KY 40222

Re: Abdulrahman Rageh, MD

Dear Cheryl,

Dr. Rageh started his vitreoretinal fellowship at the University of North Carolina on 8/1/2022.
He went on personal leave starting 1/9/23 and resigned 3/20/23.
There were repeated patient safety concerns during his fellowship were so it was decided that he would be relieved from seeing patients without supervision as of 1/9/23.
The following represents a collection of cases that were of concern:

-August 22: AR saw patient with corneal/eye infection with no view to the fundus in hospital to rule out endophthalmitis. Ultrasound was done twice within a week, and he did not diagnose any infection in vitreous cavity. When my colleague operated a few days later due to worsening symptoms the eye was full of pus and unsalvageable.
-August 22: AR saw patient with recent macula off detachment (same day) in clinic. These need to be repaired within 24 hours as per standard of care. He sent patient home and did not tell the supervising physician about it until next day.
-October 22: Patient was seen with retinal tear, Dr. Rageh performed laser treatment. When the attending examined the patient after the procedure it was discovered that Dr. Rageh had not treated the tear but instead a different area that did not need treatment.
-November 22: He ordered an incorrect formulation and number of doses of oral steroids for a patient
-November 22: He closed the eye with an incorrect suture (nylon- non- absorbable instead of vicryl-absorbable) and caused an eyelid laceration while cutting a patient's drape
-December 22: He was called by an attending to see a patient with retinal tear and laser it. He did not see a tear on his exam and sent the patient home without speaking to that attending or the attending on call. The patient was brought back to my clinic the next day. There was a peripheral scar but noc retinal tear or detachment. I had Dr. Rageh reexamine the patient and he was unable to see the area in question even after multiple attempts. Had this patient actually had a retinal detachment and progressed by the time I saw him this could have become a legal issue.
-December 22: he was called by a first-year resident from the ER about a patient who had had a vitrectomy and lens exchange the day prior. She was seen in clinic earlier that day with 20/50 vision. She had noticed a drastic decline of vision over several hours and presented to the ER with HM vision. The

resident's note mentioned 4+ cell and fibrin. He did not see the patient but advised the resident to start q2 hour prednisolone acetate drops for suspected iritis. There was no mention of potential endophthalmitis. The attending was not notified. The patient came back to clinic the next day- with improving inflammation. We had a long discussion that in postop patient with acute vision drop and signs of significant inflammation endophthalmitis has to the diagnosis until proven otherwise. It is unacceptable to go by the description of a first-year resident and make the very difficult decision between infection and inflammation without seeing the patient. If this patient would have had an endophthalmitis and was treated as in this case with steroids she would have lost vision permanently and this would have been undefendable in a lawsuit.

Please do not hesitate to email me at jnulrich@med.unc.edu or call my cell at 216-262-2922 with any further questions.

Best regards,

J. Niklas Ulrich, MD

Vice Chair of Faculty Development
Director, UNC Surgical Vitreo-Retinal Fellowship Program
Professor of Ophthalmology, Vitreo-Retinal Surgery
Adjunct Assistant Professor of Pediatrics
University of North Carolina at Chapel Hill
Department of Ophthalmology
5151 Bioinformatics Bldg CB 7040
Chapel Hill, NC 27599
ph: 919-966-5296
f:  919-966-1908