# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### DURHAM
### CIVIL ACTION NO: 1:24-CV-336

| | |
|---|---|
| Abdulrahman Rageh,<br><br>Plaintiff,<br><br>v.<br><br>University of North Carolina at Chapel Hill, Jan Niklas Ulrich, Alice Zhang, and Donald Budenz in their official capacities,<br><br>Defendants. | **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Plaintiff, Dr. Abdulrahman Rageh, an ophthalmologist, was accepted into a two-year vitreoretinal fellowship at UNC-CH. Almost immediately, Plaintiff's supervisors became concerned about gaps in Plaintiff's knowledge of ophthalmology and Plaintiff's inappropriate conduct. Their concerns escalated following multiple instances where Plaintiff's poor job performance put patient safety at risk. These incidents included Plaintiff incorrectly prescribing medication, accidentally cutting a patient's eyelid during surgery, using incorrect sutures, and missing an infection during an eye exam, resulting in the eye becoming unsalvageable. After every incident, Plaintiff refused to take responsibility for his actions, and at times lied about what happened. Because

1

of Plaintiff's poor performance, Defendants removed him from unsupervised patient care and shortened his fellowship. Plaintiff ultimately resigned.

Plaintiff has nevertheless filed this lawsuit claiming that Defendants' actions towards him were discriminatory and retaliatory, based on his national origin and his age. Furthermore, despite clear evidence to the contrary, Plaintiff claims that Defendants Ulrich and Zhang have defamed him, interfered with his contractual relations, and interfered with his prospective economic advantage. As discussed below, the record makes clear that all of Plaintiff's claims are without merit and Defendants are entitled to summary judgment.

## STATEMENT OF THE NATURE OF THE CASE

Plaintiff initiated this lawsuit on April 4, 2024. After Defendants moved to dismiss, Plaintiff filed an Amended Complaint, D.E. 14. In his Amended Complaint, Plaintiff alleged discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA"), defamation per se, breach of contract, intentional infliction of emotional distress, interference with contractual relations, tortious interference with prospective economic advantage, and wrongful discharge in violation of public policy. *Id.* The Amended Complaint

named UNC-CH, Dr. Jan Niklas Ulrich, Dr. Alice Zhang, and Dr. Donald Budenz as defendants. *Id.*

Defendants moved to dismiss Plaintiff's Amended Complaint, D.E. 17, and the Court dismissed the majority of Plaintiff's claims. The claims the Court allowed to proceed were Plaintiff's: (1) discrimination claims against UNC-CH to the extent they were based on the alleged denial of training opportunities; (2) retaliation claims against UNC-CH to the extent they were based on shortening or terminating Plaintiff's fellowship in retaliation for protected activity; (3) defamation and tortious interference with prospective economic advantage against Ulrich in his individual capacity; and (4) interference with contractual relations against Ulrich and Zhang in their individual capacities. D.E. 23.

The discovery period closed February 18, 2026. Defendants now timely move for summary judgment on all of Plaintiff's remaining claims.

<u>STATEMENT OF THE FACTS</u>

**A. Plaintiff is hired as an ophthalmological fellow at UNC-CH.**

The ophthalmology department at UNC-CH offers a vitreoretinal fellowship, which provides board-eligible ophthalmologists with advanced training in the diagnosis and management of disorders of the retina and vitreous. D.E. 14 ¶¶26-27; D.E. 68-1 ¶¶4-5. Fellows in the program treat

3

patients with vitreoretinal diseases both clinically and surgically, under the supervision of attending physicians. D.E. 68-1 ¶5. The fellowship generally accepts only one fellow every two years. *Id.* Ulrich is the Director of the fellowship program. D.E. 14 ¶59; D.E. 68-1 ¶4; D.E. 68-4 25:24-26:12.

Plaintiff applied and was accepted to the fellowship in December 2021. D.E. 14 ¶¶28-29; D.E. 68-1 ¶6; D.E. 68-4 34:2-35:8. He began his fellowship in August 2022. D.E. 14 ¶30; D.E. 68-1 ¶6. Plaintiff was directly supervised by both Ulrich and Zhang. D.E. 68-1 ¶6; D.E. 68-2 ¶7.

### B. Plaintiff displays concerning behavior from the start of his fellowship at UNC-CH.

Early into Plaintiff's fellowship, Zhang and Ulrich became concerned about Plaintiff's knowledge and skillset, as well as his failure and/or refusal to complete basic requirements of his fellowship. D.E. 68-2 ¶7; D.E. 68-1 ¶¶7-9; D.E. 68-7 Ex. B ¶3[1]. During the first three months of the fellowship, they identified and spoke with Plaintiff about the following general concerns:

- Exhibiting significant general deficiencies in ophthalmological knowledge, leading to misdiagnosis of patients;
- Failing to take care with the details of surgery;

---

[1] Plaintiff did not timely respond to Defendants' First Request for Admissions. D.E. 68-7 ¶¶10-11. They are thus deemed admitted. *Ferrellgas, L.P. v. Best Choice Prods.*, No. 1:16CV259, 2017 WL 3142044, at *3 (M.D.N.C. July 24, 2017). Admissions based on unanswered requests for admissions may provide a basis for summary judgment. *Batson v. Porter*, 154 F.2d 566, 568 (4th Cir. 1946).

4

- Failing to take responsibility for or be honest about mistakes, and failing to demonstrate a desire for improvement;
- Failing to appropriately explain diagnosis and treatment to patients;
- Failing to timely consult with attending physicians about patient diagnosis and treatment plans;
- Failing to complete notes in a timely manner;
- Failing to keep his phone on and be available when he was on call; and
- Failing to show up timely for clinic appointments.

D.E. 68-2 Exs. A, B; D.E. 68-1 Exs. A, B.

For example, on one occasion, Plaintiff used the incorrect suture material during surgery. D.E. 68-2 ¶8 & Ex. B; D.E. 68-3 59:6-60:4. Not only did Plaintiff fail to correct his error during the surgery, he also lied to Zhang when she asked what material he had used. D.E. 68-2 ¶8.

On another occasion, when prepping a patient for surgery, Plaintiff accidentally cut the patient's eyelid. D.E. 68-2 ¶8 & Ex. B; D.E. 68-5 57:4-59:6; D.E. 68-3 103:15-104:25. When Zhang noticed and brought it to Plaintiff's attention, he failed to take ownership of the error. D.E. 68-2 ¶8. A member of the operating room team filed a report about the incident, and Zhang was required to discuss the incident with risk management. D.E. 68-2 ¶8 & Ex. B.

### C. Plaintiff's supervisors meet with him to address concerns.

Zhang and Ulrich met with Plaintiff in early November 2022 to discuss their concerns and emphasize the need for improvement. D.E. 68-2 ¶11; D.E.

68-1 ¶12; D.E. 68-4 69:5-16. Unfortunately, Plaintiff refused to take responsibility for his deficiencies. D.E. 68-1 ¶12.

Due to her ongoing concerns about Plaintiff's ability to treat her patients, Zhang did not participate in Plaintiff's training after the November meeting. D.E. 68-2 ¶12; D.E. 68-1 ¶12; D.E. 68-4 74:2-9. Ulrich and another attending physician, Dr. Keirnan Willett, supervised Plaintiff from this point forward. D.E. 68-1 ¶12.

### D. Plaintiff is informed that his fellowship will be shortened due to continued concerns.

Plaintiff's performance did not improve. D.E. 68-1 ¶13. Instead, he continued to show deficiencies in general knowledge, which resulted in misdiagnoses; incorrectly prescribing medication; failures to consult with his attending physicians as appropriate; and continued poor interactions with patients. D.E. 68-1 ¶13 & Ex. B.

As a result of these significant deficiencies, Ulrich was concerned that he and his colleagues would not be able to train Plaintiff as a competent retina surgeon. D.E. 68-1 ¶15. After consulting with his colleagues and department chair, Ulrich decided to convert Plaintiff's fellowship to a medical retina fellowship—instead of a surgical fellowship—and to end the fellowship after one year, in June 2023. D.E. 68-1 ¶15; D.E. 68-4 99:19-100:1 & Ex. 11.

6

On December 16, 2022, Ulrich met with Plaintiff to discuss the continued deficiencies in Plaintiff's performance and Ulrich's decision to end the fellowship early. D.E. 68-1 ¶16 & Ex. C; D.E. 68-4 109:14-110:2. He explained that he and Willett would continue to let Plaintiff observe in the operating room and would train him on general retina surgery principles. D.E. 68-1 Ex. C. However, Plaintiff's fellowship would no longer be considered a surgical fellowship, and he would instead receive a medical retina certificate. D.E. 68-1 ¶15; D.E. 68-4 99:14-18.

Three days following this meeting, Plaintiff hand-delivered a letter to Ulrich in which he alleged that he had been subjected to bullying and harassment by Zhang. D.E. 68-1 ¶17; D.E. 68-4 109:14-110:5 & Ex. 13. In addition, at some point in late December, Plaintiff made a report of discrimination to UNC-CH's Equal Opportunity and Compliance Office ("EOC"). D.E. 68-6 34:9-35:1.

### E. After additional concerns arise, Plaintiff is removed from seeing patients unsupervised, and eventually resigns.

Following Ulrich's meeting with Plaintiff, two incidents occurred in late December that caused Ulrich and his colleagues to become increasingly concerned about the potential for patient claims of negligence due to Plaintiff's poor performance. D.E. 68-1 ¶19 & Ex. D. First, he disregarded an attending physician's orders and sent a patient home without consulting with the

attending physician. D.E. 68-1 Ex. D; D.E. 68-4 132:24-135:23; D.E. 68-3 301:6-302:9. Second, Plaintiff made a diagnosis without examining a patient or consulting with the attending physician, and the treatment he prescribed could have caused blindness. D.E. 68-1 Ex. D; D.E. 68-4 220:5-221:25 & Ex. 30; D.E. 68-3 302:11-305:7. As a result of these additional concerns, Plaintiff was removed from unsupervised patient care. D.E. 68-1 ¶19; D.E. 68-4 137:7-138:9.

On January 4, 2023, Ulrich and Willett met with Plaintiff to discuss this decision. D.E. 68-1 ¶21; D.E. 68-4 167:24-169:3. They explained that Plaintiff would still lead imaging conferences with residents, attend lectures, and would continue his comprehensive fellow clinic, which was essentially a clinic where Plaintiff prescribed glasses. D.E. 68-1 ¶21 & Ex. E; D.E. 68-4 152:13-153:7, 165:14-167:23.

Plaintiff did not report to work after January 6, 2023. D.E. 68-1 ¶22. He resigned effective March 20, 2023. D.E. 68-1 ¶24.

### F. Plaintiff threatens his former supervisors.

Following Plaintiff's resignation, he sent a series of increasingly threatening and harassing emails to Ulrich, Zhang, and other members of the ophthalmology department. D.E. 68-1 ¶25; D.E. 68-2 ¶¶18-20 & Exs. C, D; D.E. 68-4 226:22-227:18. As a result, both Ulrich and Zhang sought and obtained no-contact orders against him. D.E. 68-1 ¶25; D.E. 68-2 ¶21. Plaintiff violated

Zhang's no contact order and was cited for criminal contempt. D.E. 68-2 ¶22; D.E. 68-3 215:2-216:8. Plaintiff was also charged, and pled guilty to, cyberstalking based on these communications. D.E. 68-1 ¶25; D.E. 68-4 14:22-15:11.

### G. Plaintiff requests that UNC-CH provide information to various licensing boards and hospitals.

In March 2023, an ophthalmology clinic in Pennsylvania, which had offered Plaintiff a job, contacted Ulrich for a reference check. D.E. 68-1 ¶23; D.E. 68-4 183:18-184:22 & Ex. 26. In that conversation, Ulrich was honest about the problems he experienced with Plaintiff's professionalism and behavior, and the concerns he had for the safety of the patients in Plaintiff's care. D.E. 68-1 ¶23; D.E. 68-4 184:7-18.

Plaintiff also began sending voluminous emails to UNC-CH requesting that it provide information regarding his fellowship to various licensing entities. D.E. 68-1 ¶26. These included demands that Ulrich verify Plaintiff's fellowship to the Tennessee and Massachusetts medical boards. D.E. 68-1 ¶26 & Ex. F; D.E. 68-4 194:9-206:19 & Ex. 30. To complete those verifications truthfully, Ulrich was required to submit a letter explaining adverse actions taken during Plaintiff's fellowship. D.E. 68-1 ¶26; D.E. 68-4 206:14-20. Ulrich completed the verifications and explanatory letters and submitted them as Plaintiff had requested. D.E. 68-1 ¶26.

**QUESTIONS PRESENTED**

I.    Is UNC-CH entitled to summary judgment on Plaintiff's Title VII and ADEA claims?

II.    Is Ulrich entitled to summary judgment on Plaintiff's defamation claim?

III.    Are Ulrich and Zhang entitled to summary judgment on Plaintiff's tortious interference with contract claim?

IV.    Is Ulrich entitled to summary judgment on Plaintiff's tortious interference with prospective economic advantage claim?

**STANDARD OF REVIEW**

Summary judgment is appropriate where there are no issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To survive summary judgment, a non-moving party may not rest on mere allegations or denials; they must produce "significant probative evidence tending to support the complaint." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (cleaned up).

**ARGUMENT**

**I.    UNC-CH Is Entitled to Summary Judgment on Plaintiff's Title VII and ADEA Claims.**

To prevail on his claims of discrimination and retaliation under both Title VII and the ADEA, Plaintiff must either "provide direct evidence of discrimination" or satisfy the "burden-shifting" proof scheme established by the U.S. Supreme Court. *Jane v. Bowman Gray Sch. of Med.-N.C. Baptist*

10

*Hosp.*, 211 F. Supp. 2d 678, 691 (M.D.N.C. July 2, 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Here, Plaintiff has not alleged, nor can he produce, any direct evidence of discrimination or retaliation. Therefore, he must proceed under the burden-shifting framework.

Under that framework, Plaintiff's discrimination and retaliation claims fail. First, Plaintiff cannot establish a *prima facie* case on any of these claims. Second, even if he could, UNC-CH had legitimate, nondiscriminatory and non-retaliatory reasons for its actions towards Plaintiff. For these reasons, UNC-CH is entitled to summary judgment on Plaintiff's discrimination and retaliation claims.

### A. Plaintiff cannot make out a *prima facie* case of age or national-origin discrimination.

Plaintiff asserts claims of discrimination in violation of Title VII and the ADEA. D.E. 14 ¶¶103-114, 124-131. This Court allowed Plaintiff's claims to proceed to the extent they were based on "a denial of training opportunities." D.E. 23 at 7, 9. Specifically, Plaintiff contends that Zhang "refused to train or work with" him because of his national origin. D.E. 14 ¶108. Plaintiff also contends that he was "provided fewer opportunities for training by Zhang than the younger residents who reported to him." *Id*. ¶128. But Plaintiff cannot make out his *prima facie* case on either claim.

In order to make out a *prima facie* case under both Title VII and the ADEA, Plaintiff must show that (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) the "adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Wannamaker-Amos v. Purem Novi, Inc.,* 126 F.4th 244, 255 (4th Cir. 2025) (Title VII); *Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 63 (4th Cir. 2023) (ADEA). One way to raise a reasonable inference of discrimination is to show that Plaintiff was treated differently from "similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012).

To start, Plaintiff cannot show that he was treated differently from other, similarly situated individuals, by being denied training opportunities. Employees are similarly situated if they deal with the same supervisor, are "subject to the same standards," and engage in similar conduct without "differentiating or mitigating circumstances." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). It is Plaintiff's burden to show that he is similarly situated "in all relevant respects" to his comparator. *Id*.

12

Here, as a fellow, Plaintiff worked with the ophthalmological faculty in both the surgical and clinical environment, receiving training opportunities in both areas. D.E. 68-2 ¶7; D.E. 68-1 ¶¶5-6. Indeed, Zhang is clear that Plaintiff was provided with training opportunities appropriate to his skillset and position as a vitreoretinal fellow. D.E. 68-2 ¶¶5-7.

Plaintiff has nevertheless claimed that he was treated differently than residents—specifically younger residents who reported to him. D.E. 14 ¶128; D.E. 68-3 34:3-14. But residents, who are recent medical school graduates, occupy a very different function than fellows who supervise residents. D.E. 14 ¶¶38, 128; D.E. 68-5 24:15-23; D.E. 68-7 Ex. B ¶2. As courts in the Fourth Circuit have acknowledged, "[a] supervisor and his subordinates are, by definition, not alike in qualifications." *Popo v. Giant Foods LLC*, 675 F. Supp. 2d 583, 589 (D. Md. 2009); *see also Franklin v. Flowserve FSD Corp.*, No. 6:14-CV-00040, 2015 WL 6756921, at *9 (W.D. Va. Nov. 5, 2015) (plaintiff and subordinate were not "similarly situated").

In other words, Plaintiff cannot establish a *prima facie* case for discrimination simply by claiming that he was provided with different experiences in the operating room than the residents he supervised. For this reason alone, Plaintiff's discrimination claims fail.

13

But more importantly, Plaintiff cannot show that his job performance was satisfactory. To the contrary, from the first few weeks of his fellowship, his supervisors had serious concerns about Plaintiff's skillset and ability to perform his duties as a fellow. *Supra* at 4-5. Those concerns only increased as time progressed and Plaintiff continued to exhibit not only general gaps in knowledge but also a failure to consult appropriately with attending physicians and an unwillingness to own mistakes and seek to learn from them. *Supra* at 4-8.

These concerns progressed to the point that in November 2022, Ulrich and Zhang had a serious discussion with Plaintiff about the need to improve. *Supra* at 5-6. And Zhang specifically declined to work with Plaintiff any longer because of her concerns about patient care. *Supra* at 6.

In other words, even assuming that Plaintiff was deprived of certain training opportunities, the evidence is that any such deprivation was based entirely on Plaintiff's own poor performance and conduct toward his supervising physicians. For this reason, his discrimination claims fail.

**B.  Plaintiff cannot make out a *prima facie* case of retaliation.**

To establish a *prima facie* case of retaliation, a plaintiff must prove "(1) that she engaged in a protected activity," as well as "(2) that [his] employer took an adverse employment action against [him]," and "(3) that there was a

14

causal link between the two events." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (cleaned up). Protected activity under Title VII includes participation or opposition related to discrimination based on race, color, religion, and sex, while protected activity under the ADEA includes participation or opposition related to discrimination based on age. *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998); 29 U.S.C. § 623 (a), (d). As to the third element, "Title VII retaliation claims must be prove[n] according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Norman v. N. Carolina Dep't of Admin.*, 811 S.E.2d 177, 185 (N.C. App. 2018) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)).

Here, to start, Plaintiff cannot show that he engaged in protected activity under Title VII that resulted in the abbreviation of his fellowship. Specifically, Plaintiff made two complaints prior to his resignation: a written complaint directly to Ulrich, D.E. 68-1 ¶17, and a complaint to UNC-CH's Equal Opportunity and Compliance Office, D.E. 68-6 Ex. 1. In both complaints, however, he alleged only that he had been subjected to discrimination based

15

on his age. D.E. 68-6 Ex. 1 at 2; D.E. 68-4 Ex. 13. For this reason, Plaintiff cannot show any retaliation based on protected activity under Title VII.[2]

More importantly, even if he did engage in protected activity under the ADEA, Plaintiff cannot show any causal relationship between that activity and the adverse employment actions he alleges here.

First, the record is clear that the decision to shorten Plaintiff's fellowship was made well before he engaged in any protected activity. Ulrich discussed the possibility with his colleagues in early December. Following those discussions, he met with Plaintiff on December 16 and informed him that his fellowship would end in June 2023. D.E. 68-1 ¶ 16 & Ex. C. More importantly, Plaintiff concedes this point, testifying in his deposition that the decision was made well before his December 19 letter to Ulrich, and as early as the "first week in September." D.E. 68-3 93:16-94:6, 95:6-96:7.

Because there is no dispute that the decision to shorten Plaintiff's fellowship occurred before any protected activity, any retaliation claim on that basis fails. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir.

---

[2]     Plaintiff's EEOC charge does allege discrimination based on his national origin. D.E. 14-2 at 3. But that charge was not filed until April 2023—approximately five months *after* Plaintiff was informed that his fellowship would be abbreviated to one year, and nearly a month after Plaintiff resigned. *Id.*

16

2002) (holding that, where the alleged retaliatory action precedes the alleged protected act, the element of causation is not met).

Second, Plaintiff's January 2023 removal from unsupervised patient care cannot support a retaliation claim. On the contrary, the evidence is that such actions were necessary based on continued serious concerns about Plaintiff's performance. D.E. 68-1 ¶19, Ex. D. As a result, Plaintiff cannot show that "but for" his protected activity, he would not have been removed from unsupervised patient care. Any retaliation claim on this basis must fail.

### C. Defendants had legitimate, non-discriminatory and non-retaliatory reasons for their actions.

Even if Plaintiff could establish a *prima facie* case on his discrimination and retaliation claims (he cannot), the evidence in the record amply demonstrates that there were legitimate, non-discriminatory and non-retaliatory bases for any adverse actions taken against Plaintiff. *Nelson v. Three Points Ctr., LLC,* No. 1:23CV527, 2025 WL 1027846, at *15 (M.D.N.C. Apr. 7, 2025) (explaining if plaintiff makes *prima facie* case, burden shifts to defendant to articulate legitimate non-discriminatory reason). Further, as Plaintiff cannot demonstrate that these legitimate, non-retaliatory bases were pretextual, his claim fails. *Id.*

From the start of Plaintiff's fellowship, his supervisors had concerns about his skillset, conduct, and performance. *Supra* 4-5. Notably, Plaintiff

17

showed significant deficiencies of general ophthalmological knowledge, which was atypical of fellows entering the program. D.E. 68-1 ¶7; D.E. 68-2 ¶7.

Plaintiff's lack of knowledge resulted in misdiagnoses and subpar patient care. *Supra* 4-8. He frequently failed to discuss his patients with attending physicians or send appropriate notes about his diagnosis or treatment plan. D.E. 68-1 ¶9; D.E. 68-2 ¶8. At times he would not have his phone on when he was required to be on call. D.E. 68-1 ¶8; D.E. 68-4 52:4-53:9, 53:19-54:3; D.E. 68-3 39:5-24. Furthermore, Plaintiff harmed patients by accidentally cutting a patient's eyelid before surgery without bringing it to the attending physician's attention; using inappropriate sutures on a patient; incorrectly prescribing medication; and blinding a patient by missing an infection in a patient's eye, resulting in the eye becoming "unsalvageable." D.E. 68-1 ¶13; D.E. 68-2 ¶8; D.E. 68-4 74:10-75:11 & Ex. 6.

In 16 years of training fellows, Ulrich had "never experienced patient concerns like this." D.E. 68-4 58:21-59:1. Plaintiff's issues were more than just "not knowing what to do" or "being way behind," they were also failures to "ask[] for help when you clearly need it." D.E. 68-4 59:2-6. These concerns were shared by others in the department. D.E. 68-4 99:19-100:1 & Ex. 11. Because of Plaintiff's repeated, significant failures, Ulrich determined that Plaintiff could not be trained as a surgical fellow and instead he would have a shortened

18

fellowship and receive a medical retina certificate. *Supra* 6. When, after this decision was made, Plaintiff continued to make mistakes that put patients in danger, Plaintiff was removed from unsupervised patient care. *Supra* 7-8.

In the face of this overwhelming evidence that the adverse actions were taken in response to Plaintiff's poor performance and patient safety concerns, Plaintiff cannot make a plausible argument that UNC-CH's reasons were pretextual.

* * *

For the reasons stated above, Plaintiff cannot succeed on either his discrimination and retaliation claims. UNC-CH is entitled to summary judgment on these claims.

## II. Ulrich Is Entitled to Summary Judgment on Plaintiff's Defamation Claim.

Plaintiff likewise cannot establish his remaining defamation claim against Ulrich, which is based on two communications sent by Ulrich to state medical licensing boards regarding Plaintiff's performance as a fellow. D.E. 14 ¶¶144-45. First, any alleged defamatory statements by Ulrich to licensing boards were substantially true, or in the alternative, Ulrich's opinion. And second, Ulrich had a qualified privilege to make these statements.

To recover for defamation under North Carolina law, Plaintiff must show that Ulrich "made false, defamatory statements of or concerning the plaintiff,

19

which were published to a third person, causing injury to the plaintiff's reputation." *Pierce v. Atl. Grp., Inc.*, 724 S.E.2d 568, 578 (N.C. App. 2012) (quoting *Tyson v. L'eggs Products, Inc.*, 351 S.E.2d 834,840 (N.C. App. 1987)). The truth of a statement, however, is a complete defense to a defamation claim. *See Terry v. Swift Transportation*, No. 1:16CV256, 2019 WL 10894098, at *1 (M.D.N.C. Mar. 6, 2019), *aff'd*, 771 F. App'x 245 (4th Cir. 2019); *Holleman v. Aiken*, 668 S.E.2d 579, 587 (N.C. App. 2008) (noting that truth is a defense to a libel claim). Likewise, a defamation claim cannot be based on a matter of opinion. *Starr v. Satya Tiwari, Surya, Inc.*, No. 1:18CV219, 2019 WL 955003, at *9 (M.D.N.C. Feb. 27, 2019) (citing *Daniels v. Metro Mag. Holding Co.*, 634 S.E.2d 586, 590 (N.C. App. 2006)). Finally, "[a] communication to the plaintiff, or to a person acting at the plaintiff's request, cannot form the basis" for a defamation claim. *Friel v. Angell Care Inc.*, 440 S.E.2d 111, 113 (N.C. App. 1994).

Here, Plaintiff demanded that UNC-CH verify his residency to the Tennessee Health Licensure and Regulation Board and the Massachusetts Board of Medical Licensure. D.E. 68-1 ¶¶18, 26 & Ex. F. There is no dispute that in response to this demand, Ulrich completed the requested forms, identifying that "adverse actions" had been taken against Plaintiff during his fellowship. D.E. 10-1; D.E. 17-1. And as requested by both state licensure

20

boards, Ulrich attached nearly identical letters to each form explaining the "unusual" or "adverse" actions taken. *Id.* Plaintiff now claims that the statements in these letters were defamatory.

Each letter set out the dates which Plaintiff started his fellowship, went on personal leave, and resigned from his fellowship. *Id.* They also identified the date Plaintiff was relieved from seeing patients without supervision. *Id.* And they described a list of specific cases that had raised patient-safety concerns. *Id.*

The record is clear that the factual statements contained in the letter are true. There is no dispute that Plaintiff was relieved from seeing patients without supervision and subsequently resigned from his fellowship. D.E. 68-1 ¶¶20-21, 24 and Ex. E; D.E. 68-7 Ex. B ¶14. Moreover, each patient incident and the associated safety concerns were documented by Plaintiff's supervising physicians. D.E. 68-1, Ex. A; D.E. 68-3 Ex. 5, at 1, 12; D.E. 68-2 Ex. B; D.E. 68-1 Ex. D. Plaintiff's own admissions confirm that these incidents occurred. D.E. 68-7 Ex. B ¶¶5-10. Because Plaintiff *did* endanger patient safety and *was* relieved of his fellowship due to patient-safety concerns, Plaintiff's defamation claim fails.

Moreover, to the extent any statements involve Ulrich's opinions that Plaintiff's actions fell below an acceptable standard of care, they cannot

support a defamation claim. Courts have repeatedly held that when a speaker discloses the factual basis for his conclusion, and the factual basis is accurate, this "dooms" any defamation claim based on the statement. *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998) (collecting cases). This is because "the reader understands that such supported opinions represent the writer's interpretation of the facts presented" and the reader is free to draw their own conclusions. *Id.* (citing *Moldea v. New York Times Co.*, 15 F.3d 1137, 1144-45 (D.C. Cir.), *modified*, 22 F.3d 310 (D.C. Cir. 1994)).

Here, Ulrich stated that there were "repeated patient safety concerns" during Plaintiff's fellowship, then described the circumstances of those concerns. D.E. 68-4 Ex. 30. Given that Ulrich gave the reader the underlying facts regarding the patient safety concerns, which are supported by the record, *supra* at 4-8, the reader was left with the ability to make their own assessment as to whether Ulrich's "patient safety concerns" were valid. As a result, these are not actionable statements upon which to make a defamation claim.

In addition to being substantially true, or in the alternative, opinion, Ulrich's statements were also covered by a qualified privilege. The privilege attaches where an "otherwise defamatory communication is made in pursuance of a political, judicial, social, or personal duty." *Dobson v. Harris*, 530 S.E.2d 829, 834 (N.C. 2000) (cleaned up). In other words, a defendant may

22

be entitled to the privilege where there was "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion and publication in a proper manner and to proper parties only." *Harris v. Procter & Gamble Mfg. Co.*, 401 S.E.2d 849, 850 (N.C. App. 1991).

Under these principles, courts in the Fourth Circuit have concluded that former employers have a qualified privilege to give a reference. *Harris v. Prince George's Cnty. Pub. Sch.*, 141 F.3d 1158, 1998 WL 183837, at \*3-\*4 (4th Cir. 1998) (unpublished); *Bagwell v. Peninsula Regional Med. Ctr.*, 665 A.2d 297, 317-18 (Md. App. 1995). North Carolina courts have likewise held, in the context of an employer reference, that "[a] communication to the plaintiff, or to a person acting at the plaintiff's request, cannot form the basis for a libel or slander claim." *Friel*, 440 S.E.2d at 113 (citing *Pressley v. Continental Can Co., Inc.*, 250 S.E.2d 676, 678 (N.C. App. 1979)).

Here, the record is clear that Ulrich made his statements to the medical licensing board as a direct result of requests (and demands) by Plaintiff to provide information to those boards. D.E. 68-1 ¶¶18, 26 & Ex. F. Because these statements were "invited or procured by" Plaintiff, they are "insufficient to support an action for defamation." *Friel*, 440 S.E.2d at 113. Moreover, because the evidence demonstrates that Ulrich's statements were made in good faith in his role as fellowship director, were limited in scope to the licensure

23

requests, and were made only to those parties, D.E. 68-4 187:23-189:7, Ulrich is entitled to a qualified privilege as to those statements.

For these reasons, summary judgment is proper as to Plaintiff's defamation claim against Ulrich.

### III. Ulrich and Zhang are Entitled to Summary Judgment on Plaintiff's Tortious Interference with Contract Claim.

For similar reasons, summary judgement is proper on Plaintiff's claim for tortious interference with contract. This claim is predicated on his contention that Ulrich and Zhang made "slanderous" and "defamatory" comments about Plaintiff with the intention of causing him to lose his fellowship contract. D.E. 14 ¶¶172-74. To prevail on this claim, Plaintiff must show that he had a valid employment contract with UNC-CH; that Defendants knew about the contract; that Defendants "intentionally induce[d]" UNC-CH to breach the contract; that Defendants did so "without justification"; and that the induced breach "result[ed] in actual damage" to Plaintiff. *Embree Const. Grp., Inc. v. Rafcor, Inc.*, 411 S.E.2d 916, 924 (N.C. 1992). Because the record here is clear that both supervising physicians were justified in making their statements about Plaintiff's performance and conduct, summary judgment is appropriate.

The North Carolina Supreme Court has concluded that interference with a contract by an employment supervisor is justified "if it is motivated by a

legitimate business purpose." *Rafcor*, 411 S.E.2d at 924; *Smith v. Ford Motor Co.*, 221 S.E.2d 282, 292 (N.C. 1976). In the context of employment relationships, a "non-outsider" to a contract (i.e., one who is not a party to a contract but has a legitimate business interest of his own in the subject of the contract) nevertheless may have a "qualified immunity from liability for inducing their corporation or other entity to breach its contract with an employee." *Combs v. City Elec. Supply Co.*, 690 S.E.2d 719, 725–26 (N.C. App. 2010). North Carolina courts have noted that corporate fiduciaries and other employees may constitute "non-outsiders." *See Button v. Level Four Orthotics & Prosthetics, Inc.*, 869 S.E.2d 257, 265 (N.C. 2022). This includes employment supervisors. *See Hubbard v. N.C. State Univ.*, 789 S.E.2d 915, 922 (N.C. App. 2016).

As discussed above, neither Zhang nor Ulrich acted with discriminatory or retaliatory motives. *Supra* at 5-8; *see also* D.E. 68-2 ¶16, D.E. 68-1 ¶¶27, 29. Nor did they speak untruthfully when they expressed concerns about Plaintiff's skills and patient safety. *Supra* at 4-8; *see also* D.E. 68-7 Ex. B ¶¶5-10. Both physicians' concerns were shared by other members of the ophthalmology department. D.E. 68-3 Exs. 5, 9. As Plaintiff's supervisors and physicians responsible for patient care, Zhang and Ulrich had a legitimate interest in ensuring that concerns about Plaintiff's performance and conduct

were documented. Further, Ulrich had a legitimate interest in ensuring that, if Plaintiff's performance did not improve (as it manifestly did not), Plaintiff would not be permitted to continue seeing patients in an unsupervised capacity and his fellowship would end early. *E.g.*, D.E. 68-1, Ex. E.

For these reasons, Ulrich and Zhang are entitled to summary judgment on Plaintiff's tortious interference with contract claim.

## IV. Ulrich is Entitled to Summary Judgment on Plaintiff's Claim for Tortious Interference with Prospective Economic Advantage.

Finally, summary judgment is appropriate on Plaintiff's claim against Ulrich for tortious interference with prospective economic advantage. This tort occurs when a party "maliciously induc[es] a person not to enter into a contract with a third person, which he would have entered into but for the interference." *Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enterprises, Inc.*, 546 F. Supp. 3d 440, 454 (M.D.N.C. 2021) (quoting *Spartan Equip. Co. v. Air Placement Equip. Co.*, 140 S.E.2d 3, 11 (N.C. 1965)). Importantly, "a plaintiff's mere expectation of a continuing business relationship is insufficient to establish such a claim." *Beverage Sys. of the Carolinas, LLC v. Assoc. Beverage Repair, LLC*, 784 S.E.2d 457, 463 (N.C. 2016). And even if there was interference, such interference is permissible if it is justified or privileged. *Cobra Cap., LLC v. RF Nitro Commc'ns, Inc.*, 266 F. Supp. 2d 432, 439

26

(M.D.N.C. 2003) (citing *Peoples Security Life Ins. Co. v. Hooks*, 367 S.E.2d 647 (N.C. 1988)).

Plaintiff's claim is based on a "prospective employment contract" with a vision clinic in Western Pennsylvania. D.E. 14 ¶180; D.E. 14-7. Plaintiff alleges that he had a "reasonable expectation" of an employment contract with this clinic, and that "Defendants, by and through the acts of Ulrich, intentionally induced [the clinic] not to contract with [Plaintiff]." D.E. 14 ¶¶181-82; D.E. 14-7.

First, the record makes clear that Plaintiff never had anything more than an "expectation" of an employment contract with the vision clinic. On its face, the term sheet the vision clinic shared with Plaintiff makes clear that Plaintiff's acceptance of the terms "does not create a binding employment contract." D.E. 14-7. Further, Plaintiff's contention that the contract was thwarted because of any statements Ulrich made is merely speculative as Plaintiff "did not even care to ask why" the clinic was not proceeding with a contract. D.E. 68-3 315:12-316:10.

Second, any statements made by Ulrich were justified because they related to a "legitimate business interest." *Cobra Cap., LLC v. RF Nitro Commc'ns, Inc.*, 266 F. Supp. 2d 432, 439 (M.D.N.C. 2003) (quoting *Smith v. Ford Motor Co.*, 221 S.E.2d 282 (N.C. 1976)). When deciding whether an action

27

is justified, courts consider "the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor and the contractual interests of the other party." *Peoples Sec. Life Ins. Co. v. Hooks*, 367 S.E.2d 647, 650 (N.C. 1988).

Taking these factors in turn, they weigh heavily in Ulrich's favor. The circumstances surrounding this alleged interference were repeated patient safety concerns so severe that Plaintiff was removed from unsupervised patient care. D.E. 68-1 ¶¶19-21; D.E. 68-4 137:7-138:9. Ulrich's motive in making the statements was to respond to requests for information about Plaintiff's performance as a fellow, and to "be truthful" when "someone calls me for a reference." D.E. 68-4 183:9-185:1. Further, Ulrich had no interests he sought to be advanced, as he was an uninterested third party to Plaintiff's contract with the clinic. Conversely, there is significant social interest in permitting medical doctors to speak freely about patient safety concerns they have, particularly when they believe a fellow medical professional could endanger patients. Finally, while Plaintiff had a contractual interest in gaining employment, this does not outweigh the other factors that cut in Ulrich's favor.

28

In sum, even if Ulrich's statements did cause the clinic to forego entering into a contract with Plaintiff, Ulrich's statements were justified.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court grant summary judgment in their favor.

This 13th day of March, 2026.

**JEFF JACKSON**
**Attorney General**

/s/Lindsay Smith
Lindsay Smith
Special Deputy Attorney General
NC State Bar No. 48085
lsmith@ncdoj.gov
NC Department of Justice
PO Box 629
Raleigh, NC  27602
T: (919) 716-6065
F: (919) 716-6764
*Attorney for Defendants*

/s/ Zach Padget
Zach Padget
NC State Bar No. 46610
padget@unc.edu

Office of University Counsel
The University of North Carolina at Chapel Hill
123 W. Franklin St., Suite 600A
Chapel Hill, NC 27599-9105
(919) 962-1219

29

*Attorney for Defendant the University of North Carolina at Chapel Hill*

30

## <u>CERTIFICATE OF WORD COUNT</u>

I certify that, in compliance with Local Rule 7.3(d), this brief is no more than 6,250 words according to the word processing software used to prepare this document.

This the 13th day of March, 2026.

<u>/s/ Lindsay Smith</u>
Lindsay Smith
Special Deputy Attorney General

31

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was served on all parties via the court's CM/ECF System, which will send a Notice of Electronic Filing to all Parties' counsel of record in this action.

Respectfully submitted this 13th day of March, 2026.


/s/Lindsay Smith
Lindsay Smith
Special Deputy Attorney General