IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE
DISTRICT OF NORTH CAROLINA
DURHAM
Civil No. 1:24-CV-336

Abdulrahman Rageh,

 Plaintiff,

 v.

University of North Carolina at Chapel
Hill, Jan Niklas Ulrich, Alice Zhang, and
Donald Budenz in their official capacities,

 Defendants.

PLAINTIFF'S LR 56.1(d)
RESPONSIVE BRIEF

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff respectfully submits

this response in opposition to Defendants' motion for summary judgment.

## I. STATEMENT OF FACTS

### A. Rageh was hired as an ophthalmological fellow.

Dr. Abdulrahman Rageh ("Rageh"), a doctor trained in Egypt, was hired by the

University of North Carolina at Chapel Hill (UNC-CH) for a two-year vitreoretinal

fellowship. (P.E. 76-1 ¶¶ 3-4; Ex. 1). UNC-CH's vitreoretinal fellowship is compliant

and approved by the Association of University Professors of Ophthalmology

Fellowship Compliance ("AUPO"). (P.E. 76-2 41:2-4). During the fellowship, Rageh

would gain knowledge of vitreous conditions. (P.E. 76-2 37:17-38:6). Upon completing

the fellowship, Rageh would be awarded a graduate certificate in retinal surgery.

1

(P.E. 76-2 37:15-38:12: Ex. 2). Rageh was supervised and evaluated by Dr. Jan Niklas Ulrich ("Ulrich"), the Program Director, and worked with Dr. Alice Zhang ("Zhang"). (P.E. 76-3 35:9-15; Ex. 3, p. 5:16-18). Zhang did not administratively supervise Rageh. (P.E. 76-4 25:14-25). Ulrich hired Rageh because the most qualified among 12 applicants. (P.E. 76-2 34:25-35:8). Rageh's typical day at the clinic included seeing patients, developing treatment plans, administering injections, and assisting with surgeries. (P.E. 76-3 33:11-34:1). He also supervised residents in the clinic. (Ex. 2, p. 3). Rageh never received a negative performance evaluation from Ulrich. (P.E. 76-3 35:25-36:14; 85:14-17). Ulrich approved Rageh's patient treatment plans without issue. (P.E. 76-3 38:16-39:1).

**B. Rageh makes complaints of discriminatory treatment.**

During work, Zhang asked Rageh his age, to which he replied, "40." (P.E. 76-3 250:12-18; Ex. 4 p. 55:21-56:5). From September 2022, Rageh expressed his concerns to Ulrich about Zhang's discriminatory treatment of him. (P.E. 76-1 ¶¶ 7-8). In September, during a conversation with Rageh, Ulrich described Zhang as "uncomfortable with [Rageh's] age." (P.E. 76-3 61:22-62:18; 248:19-25). When Rageh complained to Ulrich about feeling discriminated against by Zhang because of age, Ulrich responded: "[Zhang] is not comfortable with your age...." (P.E. 76-3 61:22-62:18). When Rageh asked Ulrich what he should do about feeling discriminated against by Zhang, Ulrich told him to "bend over and suck it up." (P.E. 76-3 62:6-18). Ulrich told Rageh that he and Zhang are on the same team. If she's uncomfortable with you, we will have to end your fellowship. (P.E. 76-3 82:23-83:4). On November 10, 2022, Zhang mocked Rageh's accent for the second time, which Rageh found

discriminatory. (P.E. 76-3 42:1-22; 253: 17-254:6; P.E. 76-1 ¶ 7). On December 19, 2022, Rageh delivered a letter to Ulrich opposing discriminatory conduct. (Ex. 5).

### C. The terms and conditions of Rageh's fellowship were adversely altered.

After Rageh complained of discrimination, he was barred from a significant portion of his employment. (P.E. 76-1 ¶¶9-10, 13). Rageh was assigned to sit in the back of the room and take notes, and was prohibited from speaking. (P.E. 76-3 34:2-21; 57:17-58:21). Zhang would ignore Rageh and direct the residents to give him orders. (P.E. 76-3 213-25:215-1). Zhang removed training opportunities from Rageh's fellowship and allocated them to junior doctors. (P.E. 76-1 ¶10). Starting in November 2022, Rageh no longer received surgical training from Zhang and never received any replacement training. (P.E. 76-4 31:1-4; 76-1 ¶13).

### D. Rageh's fellowship is shortened.

On December 11, 2022, Rageh informed Ulrich that his position was listed on sfmatch.org. (P.E. 76-3 95:6-20). UNC-CH considered expanding the fellowship, not because Rageh's would be shortened. (Ex. 6). Two days later, Ulrich offered a fellowship position to an American to begin in July 2023. (P.E. 76-3 94:4-24; Ex. 7). After securing an American replacement, Ulrich informed Rageh of his plan to shorten his fellowship contract to one year, allowing him to retain the certificate and continue his duties. (P.E. 76-2 99:19-100:1; 107:12-19; Exs. 7-8). A one-year reduction would prevent Rageh from working as a retinal surgeon. (P.E. 76-2 116:1-15). Rageh applied for medical licenses in different states. (Ex. 9). In completing a state board evaluation, Ulrich answered <u>NO</u> to the question of whether Rageh was subject to

3

disciplinary or corrective actions. (Ex. 9, p. 1). Ulrich recommended Rageh for leisure to practice medicine and surgery without reservation, and he had <u>NO</u> patient safety concerns or issues with Rageh's fitness as a medical doctor as late as December 22, 2022. (Ex. 9, pp. 1-4). On December 31, 2022, Rageh objected to Ulrich's plan to shorten his contract from two years to one year. (P.E. 76-2 126:1-11; Ex. 10). He asked Ulrich to treat him respectfully and to appeal the decision, or, put differently, he was opposing discriminatory conduct. (P.E. 76-2 126:1-11; Ex. 10; 76-1 ¶18). Ulrich failed to provide Rageh with the necessary process for appealing his decision. (Ex. 10; 76-1 ¶18). Instead, he described Rageh's email as an allegation of discriminatory treatment. (Ex. 11).

**E. Rageh's fellowship was terminated, he was placed on leave, and then constructively discharged.**

Prior to December 31, 2022, Ulrich had no plans to immediately terminate Rageh's employment. (P.E. 76-2 130:24-131:3). On January 1, 2023, Ulrich decided to end Rageh's fellowship immediately. (P.E. 76-2 131:21:132:1). In an internal investigation, Ulrich truthfully informed the investigator that he was not comfortable working with Rageh after Rageh filed a discrimination complaint with UNC-CH's Equal Opportunity and Compliance office; and that there is "no place for [Rageh] at UNC with [sic] these things happen. We just can't – we just can't keep working with [him]." (P.E. 76-2 87:15-22; 165:8-11; Ex. 3 62:20-64:16). On January 4, 2023, Ulrich instructed Rageh to stay home and only attend his comprehensive clinic unsupervised. (P.E. 76-2 166:19-167:19; 167:22-23; Ex. 12). By February 6, 2023, UNC-CH knew that Rageh wanted to return to work rather than remain on leave.

4

(Ex. 13). On February 9, 2023, Ulrich reversed course and invited Rageh to observe clinics or the operating room after HR informed him that excluding him was retaliation. (P.E. 76-2 174:10-24; Exs. 14-15). However, Rageh distrusted the work environment due to Ulrich and Zhang's deceit. (P.E. 76-3 134:13-17). He suspected their offer to let him return to work while their patient safety allegations were pending was a trap, and he wanted to verify the legitimacy of Ulrich's false patient harm allegations. (P.E. 76-3 133:15-134:12; 76-1 ¶¶ 21-22). UNC-CH and Ulrich's intention was to let UNC-CH's Equal Opportunity and Compliance's investigation progress play out, then terminate Rageh. (Exs. 12, 14-15). Rageh, a respected doctor, did not want to return to work until the allegations of harming patient safety were cleared. (P.E. 76-1 ¶ 21-22). Rageh's health declined, and he and his doctor believed continuing at UNC-CH would harm him, so he was left with no choice but to resign. (P.E. 76-1 ¶ 20, 23; P.E. 76-3 157:5-22).

## F. Rageh left UNC-CH, Defendants continued engaging in retaliatory, defamatory, and tortious conduct against him.

After leaving UNC, during his job search, each time Rageh was offered a position, those offers were rescinded after they contacted UNC-CH. (P.E. 76-3 24:1-5). For example, Rageh applied for a position at The Ophthalmology Group. (Ex. 16). Ulrich told the representative that Rageh was relieved of employment due to patient safety concerns. (P.E. 76-2 181:13-19). Rageh was not offered the job. (P.E. 76-1 ¶ 24). Ulrich made similar statements to an AIO Vision hiring representative, leading to the cancellation of a signed offer. (P.E. 76-2 184:10-18; Ex. 17; P.E. 76-1 ¶¶ 24-25; Ex. 18). Rageh applied for medical licenses in other states. (P.E. 76-2 182:24-183:8;

5

189:16-19).  On March 24, 2023, in response to Rageh's Minnesota application for a medical license, Ulrich provided a one-sentence note stating that Rageh had been relieved of all clinic activities due to patient safety concerns. (Ex. 19,  p. 2). On September 9, 2023, in response to Rageh's Tennessee application for a medical license, Ulrich provided a two-page narrative stating that Rageh was relieved of the responsibility of seeing patients without supervision due to repeated safety concerns. (Ex. 19, pp. 4-5). However, Ulrich stated he would recommend Rageh for licensure. (Ex. 19, p. 3). Months later, in response to Rageh's March 29, 2024, Massachusetts application for a medical license, Ulrich *did not* recommend licensure. (Ex. 19, p. 7; P.E. 76-2: 205:12-14). Rageh spent over $300,000 on attorney fees and over 1,000 hours successfully defending against Ulrich's fabricated statements about patient harm to various medical boards nationwide. (Ex. 20, p. 5; P.E. 76-1 ¶ 28).

## II. ARGUMENT

To prevail on summary judgment, the defendant must show there are no disputes of material facts. Fed. R. Civ. P 56(a). "Summary judgment should only be rendered if 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 174 (4th Cir. 2009). A fact is material if it would affect the disposition of the case. *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). An issue is genuine if the evidence would allow a jury to return a verdict for the non-movant. *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023) (internal citation and quotation omitted).  Summary judgment may only be granted

6

if the record, taken as a whole, could not lead a rational trier of fact to find for the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must presume Plaintiff's evidence is credible and view all evidence in the light most favorable to Plaintiff. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

**Methods of Proof**

A plaintiff may "avert summary judgment . . . by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor. . .motivated the employer's adverse employment decision." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (internal citations omitted).[1]

To establish a prima facie case of retaliation, a plaintiff must prove "(1) that she engaged in a protected activity," as well as "(2) that her employer took an adverse employment action against her," and "(3) that there was a causal link between the two events." *EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405-06 (4th Cir. 2005).[2] To establish a prima facie case of discrimination under the *McDonnell Douglas* framework, a plaintiff must establishing that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing at a level that

---

[1] Title VII methods of proof apply to claims under the ADEA. *See Gaines v. McDonald*, 152 F. Supp. 3d 464 (2015).

[2] Claims under Title VII and the ADEA are analyzed under the same framework. *Walton v. Harker*, 33 F.4th 165, 171 (4th Cir. 2022). Title VII prohibits an employer from (1) discriminating against an employee on the basis of national and (2) retaliating against an employee for complaining about past discrimination or retaliation. 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a). Similarly, the ADEA forbids retaliation against an employee who complains of age discrimination. *See* 29 U.S.C. § 633a(a).

7

met the employer's reasonable expectations at the time the adverse action took place; and (4) the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination. *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649-650 (4th Cir. 2021).

### A. Retaliation – Age and National Origin[3]

<u>Direct Evidence</u>

Direct evidence is evidence that the employer "announced, admitted, or otherwise unmistakably indicated that [the forbidden consideration] was a determining factor." *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982) (citing *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1113 (4th Cir. 1981). Stated differently, direct evidence is "evidence of conduct or statements that reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995) (*abrogated on other grounds*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, (2003)). If believed, direct evidence "would prove the existence of a fact...without any inference or presumptions." *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995) (cleaned up*), rev'd on other grounds,* 517 U.S. 308 (1996).

On December 31, 2022, Rageh objected to Ulrich's plan to shorten his fellowship contract. Rageh demanded that Ulrich treat him fairly and appeal the decision, opposing discriminatory conduct. Ulrich described Rageh's email as alleging

---

[3] Plaintiff's retaliation claims, involving multiple theories, will be addressed first. An adverse action under discrimination only requires "some harm", so if the court finds Plaintiff has alleged an adverse action under retaliation, he will meet the lower "some harm" burden under discrimination. *See Arnold v. United Airlines, Inc.*, 142 F.4th 460 (2025).

discriminatory treatment. Prior to December 31, 2022, Ulrich's had no plans to immediately terminate Rageh. Less than 24 hours later, Ulrich moved to end Rageh's fellowship immediately. *Supra* at 4. To justify moving for termination, Ulrich stated: "[Rageh] *now* has made repeated statements of being treated unfairly and that Dr. Zhang was acting discriminatory [sic] against him." (Ex. 21). Ulrich was not comfortable working with Rageh after he filed a discrimination complaint and stated that there is "no place for [Rageh] at UNC." *Supra* at 4-5. Ulrich's remarks reveal his decision-maker bias, directly proving discriminatory intent without inference.[4]

Indirect Evidence

*Protected Activity*

Starting in September 2022, Rageh reported Zhang's age-based discrimination to Ulrich. In September, during a conversation between Rageh and Ulrich, he described Zhang as uncomfortable with Rageh's age. When Rageh told Ulrich he felt discriminated against by Zhang because of his age, Ulrich responded, "[Zhang] is not comfortable with your age." When Rageh asked Ulrich how to handle feeling discriminated against by Zhang, Ulrich told him to "bend over and suck it up." *Supra* at 2-3. On December 19, 2022, Rageh delivered a letter to Ulrich, stating he had been the subject of discrimination. On December 31, 2022, Rageh objected to Ulrich's plan to reduce his employment contract by one year and asked Ulrich to treat him fairly and oppose discriminatory conduct. Ulrich described Rageh's language as an

---

[4]Plaintiff will analyze the contested employment decisions of termination and constructive discharge under *McDonnell Douglas* analysis. That adverse action section below completes a prime facia case of retaliation, under direct evidence theory.

9

accusation of discriminatory treatment made by Rageh. *Supra* at 3-4.

Rageh engaged in protected activity from September 2022, December 19, 2022, and December 31, 2022. *See Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018) (protected activities "include[] complain[ts] to superiors about suspected violations of Title VII." (internal quotation marks omitted)).

*Adverse Action*

For purposes of a retaliation claim, a materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). It must have "some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it." *Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018). [T]he antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm" because "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." *Burlington,* 548 U.S. at 63, 67. Plaintiff will present five distinct adverse actions to support a claim of retaliation.

After Rageh complained of discrimination, he was barred from assisting in surgery. Rageh no longer received surgical training from Zhang and never received any replacement training—only observing and assisting with basic procedure tasks. Rageh was assigned to sit in the back, take notes, and was directed to remain silent. Barring Rageh from assisting with surgery severely limited Rageh's employment,

which provides surgical experience. *Supra* at 3.

Second, after Ulrich filled Rageh's position with an American on December 13, 2022, he informed Rageh of his plan to end the fellowship early, but he would allow Rageh to obtain the fellowship certificate. A one-year reduction would prevent Rageh from working as a retinal surgeon, which poses "significant limitations" on his training. *Supra* at 3-4.

Third, Constructive discharge may be an adverse employment action in violation of § 20003e–3(a) "when the record discloses that it was in retaliation for the employee's exercise of rights protected by the Act." *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir. 1984). In the adverse action context, to establish a constructive discharge, "a plaintiff must show 'that [s]he was discriminated against by h[er] employer to the point where a reasonable person in h[er] position would have felt compelled to resign' and that she actually resigned." *Evans v. Int'l Paper* Co., 936 F.3d 183, 193 (4th Cir. 2019) (quoting *Green v. Brennan*, 578 U.S. 547, 555 (2016)). Here, on January 1, 2023, Ulrich decided to end Rageh's fellowship immediately. On January 4, 2023, Ulrich informed Rageh that his employment was terminated; he should stay home and attend only his independent, one-day-a-week comprehensive clinic unsupervised. By February 6, 2023, UNC-CH knew Rageh wanted to return to work. On February 9, 2023, Ulrich reversed his decision and invited Rageh to observe clinics or the operating room after HR informed him that excluding him was retaliation. *Supra* at 3-4. However, Rageh reasonably distrusted the work environment and suspected that Urich's offer to let him return to work to observe

while UNC-CH's fabricated patient safety allegations were pending was a trap. *Supra* at 5. Rageh, a highly esteemed medical doctor, did not want to return to work until the allegations of compromising patient safety were thoroughly investigated and cleared. *Supra* at 5. It was UNC-CH's intention to let Rageh's internal discrimination investigation "play out" and then terminate him.[5] Rageh's health rapidly declined, and he and his doctor believed that continuing to work at UNC-CH would harm him, so he resigned. *Supra* at 5. Rageh has never had any issues with patient harm or safety during his career. (P.E. 76-3 324:25-325:8). A reasonable doctor in Rageh's position would have resigned rather than return to work, risking false accusations of safety violations that could harm his career—until the investigation concluded, after which we know his employment would have terminated. Rageh's employment was terminated or, in the alternative, he was constructively discharged.

Fourth, Defendants' false allegations of patient harm to employers and professional licensing boards invited disciplinary action, negatively impacted Rageh's ability to practice, and harmed his employment prospects. The evaluations submitted to the medical board turned increasingly negative after Rageh left UNC-CH. *See*

---

[5] This admission by UNC-CH is crucial because Rageh was effectively terminated on January 4, 2023, when Ulrich informed him that his employment contract had been terminated. The Fourth Circuit has firmly established that the operative moment of termination is when the employee receives unequivocal notice of the termination decision. *Yellow Flag Felty v. Graves-Humphreys Co.*, 785 F.2d 516 (1986). The evidence further adduces that, UNC-CH's intention was to let their sham investigation play out, while Rageh was forced to take non-administrative leave (an adverse action) then terminate his employment once the performative investigation was over. (Exs. 12, 14-15). Rather than simply be victim of Ulrich's plan, Rageh was left with no reasonable choice but to resign, as returning to work while false allegations of patient harm are pending are simply unreasonable and harmful to a doctor's reputation. (P.E. 76-1 ¶ 22).

*Supra* at 4, 6 (*Ulrich's makes positive evaluations as late as 12/22/2022; evaluations increased in negativity from 3/24/2023 to 9/9/2023 to 3/29/2024*). This strongly implies that there is no non-discriminatory, non-retaliatory reason for the decline in evaluations, as Rageh <u>was no longer employed</u> at UNC-CH. When Rageh applied for a position at The Ophthalmology Group, Ulrich told their hiring representative that employing Rageh would bring patient safety concerns. Rageh was not offered the job. Ulrich made similar statements to an AIO Vision hiring representative, leading to the cancellation of a signed offer. *Supra* at 5-6

Fifth, Rageh spent over $300,000 on attorney fees and over 1,000 hours defending against UNC-CH and Ulrich's fabricated statements about patient harm to various medical boards nationwide. All attempts were successful. *Supra* at 5-6.

*Causal Link*

While there is not a bright-line rule instructing when temporal proximity is sufficient to establish causation, without other evidence of causation, the gap between the protected activity and the adverse employment action can generally be no longer than two months. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021).

Here, the time between Rageh's protected activity and his adverse actions can be less than three months, two weeks, or 24 hours. After complaining of discrimination to Ulrich in September 2022, by November 2022, Rageh was relegated to the back of the room, where he was only allowed to take notes. He was also prohibited from speaking. Zhang disregarded Rageh's concerns and directed the more

13

junior doctors to give him orders, effectively minimizing his involvement. Furthermore, Zhang removed training opportunities from Rageh's fellowship and allocated them to junior doctors. Consequently, Rageh no longer received surgical training from Zhang and never received any replacement training. *Supra* at 3. Rageh hand-delivered the letter alleging discriminatory conduct to Ulrich, and within two weeks, he was informed of his termination and required to stay home. *Supra* at 3-4 On December 31, 2022, Rageh engaged in a protective activity, which Ulrich viewed as a complaint of discrimination. A decision to terminate Rageh's employment was made in less than 24 hours. *Supra* at 4.

Alternatively, causation can be established through a pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity. *Barbour v. Garland,* 105 F.4th 579, 593-94 (4th Cir. 2024); *Lettieri v. Equant Inc.,* 478 F.3d 640, 650-51 (4th Cir. 2007*)* (causation established where plaintiff was stripped of multiple job responsibilities before ultimately being fired for an illegitimate reason).

Starting in September 2022, Rageh reported his concerns to Ulrich Zhang's age-based discriminatory treatment. *Supra* at 2-3. To justify moving for termination, Ulrich stated: "[Rageh] has *now* made statements of being treated unfairly and that Dr. Zhang was acting discriminatory [sic] against him." (Ex. 21). Ulrich was not comfortable working with Rageh after he filed a discrimination complaint and stated that there is "no place for [Rageh] at UNC." *Supra* at 4-5. Rageh has detailed

14

Defendants' coordinated scheme of ongoing retaliation as part of a plan to terminate his employment.

### B. Discrimination –Age and National Origin

*Rageh, a member of a protected class, suffered an adverse action.*

Rageh is of Egyptian descent and was over 40 years old when he started working at UNC-CH. *Supra* at 1-2. Zhang was aware of Rageh's age and nationality. *Supra* at 2; (P.E. 76-4 79:4-19). Zhang mocked Rageh's accent twice and was uncomfortable with Rageh's age. *Supra* at 2-3. Ulrich stated that if Zhang did not want to work with Rageh, he would be fired. Ulrich kept his word. *See Bell v. Home Life Ins. Co.*, 596 F. Supp. 1549 (1984) (discrimination based on a foreign accent could establish a prima facie case of national origin discrimination)

"An adverse employment action is a disadvantageous change to the compensation, terms, conditions, or privileges of employment." *Muldrow v. St. Louis*, 601 U.S. 346 (2024). "The harm need not be "significant," "serious," "substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow,* 601 U.S. at 355. "Title VII's text nowhere establishes that high bar." *Id. at 350*. Any of the adverse actions evaluated, *supra,* under Title VII's retaliation would meet the lower threshold for adverse action outlined in *Muldrow*.

*Rageh was performing at a level that met the employer's reasonable expectations.*

Ulrich described Rageh as the most qualified candidate among 12 applicants for the fellowship contract. Rageh never received a negative performance evaluation while employed at UNC-CH. During the fellowship, Ulrich approved Rageh's patient

15

treatment plans. *Supra* at 2. In completing an evaluation for a state medical board, Ulrich recommended Rageh for licensure to practice medicine and surgery without reservation and had <u>NO</u> patient safety concerns or issues with Rageh's fitness as a medical doctor as late as December 22, 2022. *Supra* at 4.

*The adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination*

"The burden at this stage 'is not onerous,' and meeting it 'in effect creates a presumption that the employer unlawfully discriminated against the employee." *Westmoreland v. TWC Admin., Inc.*, 924 F.3d 718, 725 (4th Cir. 2019) (quoting *Burdine,* 450 U.S. at 253-54). Rageh was terminated and replaced by an American. *See Lettieri v. Equant, 478 F.3d 640, 647 (4th Cir. 2007) (explaining that evidence that a plaintiff's job was filled by an individual outside of her protected class supports a reasonable inference of discrimination*). While Plaintiff is "not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim," *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (citing *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003)), he must still "present evidence that reasonably creates an inference of an unlawfully discriminatory motive to shift the burden to" Defendant. *Noonan v. Consol. Shoe Co.*, Inc., 84 F.4th 566, 573 (4th Cir. 2023)

Here, and further analyzed under the pretextual analysis:

- Starting in September 2022, Rageh expressed his concerns to Ulrich about Zhang's age-based discrimination. Ulrich explained that Zhang

16

felt uncomfortable with Rageh's age and stated that if she continued to feel uncomfortable, his fellowship would be terminated. *Supra* at 2-3.

- Zhang mocked Rageh's accent twice during the course of employment, which Rageh found discriminatory. *Supra* at 3.

- When Rageh found out his job was posted on sfmatch.org, Ulrich said that UNC-CH was considering expanding the fellowship —not because Rageh's fellowship would be shortened—within a week, Ulrich hired an American and shortened Rageh's fellowship. *Supra* at 3-4.

- When Rageh asked Ulrich to appeal his decision to shorten his fellowship, Ulrich deviated from standard employment practices by failing to provide due process under AUPO guidelines and moved for immediate termination. (Exs. 10; 22, p. 5).

Plaintiff has established a prima facie case under *McDonnell Douglas*, which creates an inference of discrimination because, if the acts above are assumed to be true, they are more likely than not based on impermissible factors.

*Prextext Argument for Discrimination and Retaliation Claims*[6]

Rageh can establish pretext in two ways. First, offer evidence that the employer's justification is "unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation,

---

[6] This applies <u>only</u> if Defendants have valid, non-retaliatory, and non-discriminatory reasons, which they haven't.

especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 134 (2000). The second is adducing other forms of circumstantial evidence sufficiently probative of discrimination. *Id.* at 147. If the plaintiff makes either showing of pretext, the case must be decided by a trier of fact and cannot be resolved on summary judgment. *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 652 (2021).

Ulrich allegedly ended Rageh's fellowship due to patient safety concerns, informing him on January 4, 2023. (P.E. 76-2 106:5-12; 153:8-12). This cannot be true. Despite UNC-CH's robust system for reporting safety issues, Ulrich never reported any alleged patient safety concerns regarding Rageh. (P.E. 76-2 148:25-149:15; Ex. 23). Ulrich never provided performance improvement measures addressing his alleged issues with Rageh's performance. (P.E. 76-2 84:20-85:4; 108:9-20). Ulrich admitted that there was no significant written communication about (alleged) Rageh's work performance deficiencies. (Ex. 24). In fact, despite his false claims about patient safety, Ulrich told Rageh to attend his comprehensive clinic without supervision. (Ex. 12). Rageh would treat patients with retinal diseases and usually would not prescribe glasses, which Zhang confirmed. (P.E. 76-4 19:18-19; 22:16-23:3; 76-1 ¶ 19). Of critical importance to a state medical board, Ulrich attested to <u>NO</u> patient safety concerns or issues with Rageh's fitness as a doctor as late as December 20, 2022, less than two weeks before moving to terminate Rageh. (Ex. 9, pp.1-4). A reasonable jury would disbelieve Ulrich's alleged justification of patient safety concerns.

18

Ulrich claims Rageh lacked general ophthalmological knowledge compared to other program entrants, leading to misdiagnoses and subpar patient care. However, Ulrich described Rageh as the most qualified candidate. *Supra* at 2. Ulrich admitted there was no significant written communication about Rageh's work performance deficiencies. (Ex. 24).[7] Notably, Rageh was unaware of any documentation about performance issues because he was not included in any emails Ulrich or Zhang *later* considered performance-related. (P.E. 76-2 162:1-7).[8] Since Rageh was not included in the alleged performance emails, there is no way to know whether they were discussed. (P.E. 76-3 54:16-25; 76-4 45:21-25). For Defendants to now state that Rageh's lack of progression, poor knowledge, and subpar patient care were determining factors in termination shows pretext.

---

[7]Zhang did not administratively supervise Rageh's fellowship. (P.E. 76-4 25:14-25; 28:18-29-1). Fellows learn at different rates, so there are no "standard milestones." (Ex. 26 15:13-16:5; 40:7-27). Ulrich's determination is to decide if a fellow is adequately progressing, not Zhang. (Ex. 26 15:13-16:5).

[8]During Rageh's deposition, UNC-CH's attorney asked, when questioning Rageh if there's been conversations regarding performance:

> *Q*: How about after a shift, hey, Dr. Rageh, you did this today, you could improve on this? You did this today, maybe we can do it a little bit different? · Nothing?

> *A*: So, we are doctors working together. We discuss cases. · This is not a performance eval. Performance eval, again, never discussed. (P.E. 76-3 36:15-36:21).

To further clarify and prevent Defendants from turning ordinary clinic conversations between doctors into performance deficiency talks, it's important to recognize that doctors routinely discuss patients and care in the practice of medicine. These conversations are normal and routine in the medical profession. (P.E. 76-3 37:3-16; 76-1 ¶17). Our Circuit describes the strategy that Defendants are employing as a "fatal flaw." *See Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 256. (2025). That is relying exclusively on statements made by the team of discriminators: Ulrich and Zhang. "Where an employer's allegations of poor performance are inextricably intertwined with the employee's claims of discrimination, we cannot give greater weight to the alleged discriminating official's criticisms of the employee's performance than to the employee's evidence disputing such criticisms." *Id.* (emphasis added).

In the Fourth Circuit, suspicious timing can constitute evidence of pretext. *E.g., Dotson v. Pfizer, Inc.,* 558 F.3d 284, 297 (4th Cir. 2009). Additionally, when "facts, if believed, would allow a trier of fact to think [the employer] was simply looking for a reason to get rid of [the employee]," the employer's proffered explanation may not be worthy of credence. *Merritt v. Old Dominion Freight Line, Inc.,* 601 F.3d 289, 296 (4th Cir. 2010).

Defendants claim Rageh's employment was shortened and terminated in December 2022 and January 2023, respectively, due to his failure to answer his phone on August 9, 2022.[9]  Rageh was always on call 24/7, and Ulrich and Zhang refused to answer when they were on call. (P.E. 76-3 47:7-20; Ex. 25). It is unworthy of credence to consider this a justification for shortening Rageh's employment or for terminating it more than four months after it occurred.

Defendants now allege that Rageh used incorrect suture material during surgery, which occurred six weeks before Ulrich decided to shorten his fellowship, as credible evidence to terminate Rageh's employment.[10] However, that did not happen. Rageh stated that he does not remember the incident and that Defendants claimed he used a nylon suture instead of a Vyril suture; he simply agreed with Zhang. (P.E. 76-3 59:6-60:14). Notably, both Vyril and nylon sutures are used in surgery, Rageh's

---

[9] Ulrich's Affidavit ¶ 8, he states that Rageh would sometimes not have his phone one when he was required to be on call. This implies that it occurred more than once. This is a new allegation therefore evidence of pretext. Additionally, Defendants' counsel cites to D.E. 68-1 ¶ 8; D.E. 68-4 52:4-53:9, 53:19-54:3; D.E. 68-3 39:5-24 to support that "sometimes" Rageh would not answer his phone when on call. This testimony describes this event occurring <u>one</u> time on August 9, 2022.

[10] Defendants brief cites to D.E. 68-3 59:6-60:4. This is inaccurate and it mischaracterizes the evidence.

20

assistant provided the suture in Zhang's presence, and Zhang did not intervene. (76-1 ¶ 11). For Defendants to now use this to adversely affect his employment aligns with the facts in *Merritt*. If Defendants *genuinely* believed the debate between a Vyril suture and a nylon suture was worthy of adversely impacting Rageh's employment, they would have instituted some work-related discipline at the time.

Defendants now claim Rageh's accidental eyelid cut to a patient in October 2022 justified adverse employment impacts six weeks later. Zhang, a doctor prioritizing patient safety, witnessed an accidental cut during surgery but chose not to report it as a safety issue, despite knowing how to do so. (P.E. 76-4 59-7:14; 60:14-15).[11] When describing the cut, Zhang called it "superficial" and "small", which led to "no harm" to the patient. (Ex. 28). For Zhang to now describe this accidental, superficial cut as a serious patient safety issue renders her credibility worthless. If Defendants *genuinely* believed the accidental superficial cut was worthy of adversely impacting Rageh's employment, they would have instituted work-related discipline at the time it occurred.[12]

Next, Defendant makes new allegations that Rageh blinded a patient in

---

[11]Defendants' brief cite Ex. B, but the surgery occurred after the email's date (October 14, 2022), so the email's contents are irrelevant. Zhang *now* states, she brought the accidental superficial and small cut to Rageh's attention, but he failed to take ownership of the error. *See* D.E. 68-2 ¶ 8. This cannot be true. The surgery took place on November 2, 2022, *after* Zhang and Rageh stopped speaking on October 21, 2022. (Ex. 27 p. 2; P.E. 76-4  47:17-48:10).

[12]Any argument from Defendants' that Zhang wasn't a decisionmaker is weakened by Ulrich's actions. He has no firsthand knowledge of Zhang's fabricated patient safety concerns yet used them to justify shortening Rageh's contract and then immediately terminating it. (P.E. 76-2 82-22:24).Thus, Zhang's discriminatory animus is imputed to Ulrich. Title VII does not "limit the discrimination inquiry to the actions or statements of formal decisionmakers for the employer." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290 (4th Cir. 2004).

21

August 2022. This allegation was first raised during Ulrich's deposition on February 16, 2026. (P.E. 76-2  73:3-4; 74:10:75:11). If the Defendants *truly* believed this happened, they would have imposed some form of work-related discipline in August 2022. They did not. Ulrich, who knows how to report safety concerns, did not report these allegations and has never done so at any point during his time working with Rageh. (P.E. 76-2 146:8-13; 149-6-15; Ex. 23). This fact would lead a reasonable jury to conclude that Ulrich is again lying.

Next, Defendants *now* allege that Rageh incorrectly prescribed medication. To support this allegation, they cite D.E. 68-1 ¶ 13 & Ex. B. The email lacks the word 'medication' and does not mention Rageh prescribing them. The email is contrived. Ulrich created this email on 12/12/2022 at 4:21 pm. Earlier that morning, Ulrich secured Rageh's replacement starting July 2023. At 3:30 pm, <u>less than 45 minutes</u> before Ulrich created the deficiency email, an HR representative requested documentation. (Ex. 29). Ulrich drafted "performance deficiency emails", excluding Rageh, to prevent him from addressing them for accuracy.

Defendants also cite an email authored by Ulrich on 12/12/2022 at 4:12 pm to support a non-discriminatory justification for negatively impacting Rageh's employment. This email was not naturally created in the course of Ulrich's rendering of employment-related discipline. The sequence of the email rings bells of pretext. First, HR asked for Ulrich for documentation. Thirty minutes later, Ulrich invents performance issues and sends an email to Zhang, purposely excluding Rageh so it

cannot be challenged, then he immediately sends the "performance email" to HR to satisfy their discriminatory thirst for documented performance defects for Rageh.

After December 12, 2022, Ulrich planned to create a paper trail by fabricating issues, emailing Zhang, and excluding Rageh. For example, on 12/16/2022 at 8:24 pm, Ulrich documented an alleged incident that occurred <u>7 days prior</u>. (Ex. 30).[13] Ulrich alleged that Rageh sent a patient home without consulting the attending physician. (Ex. 30). Again, the credible evidence shows that this is simply not true. Dr. Brewington had left for the day, and Zhang stopped working with Rageh in November. (P.E. 76-4 31-1:4; 76-1 ¶17). In the medical community, it is common to treat patients and send them home for follow-up without the attending physician present. (P.E. 76-1 ¶17). Additionally, Defendants' brief mischaracterizes the facts. They state that Rageh did not examine the patient; however, they cite evidence indicating he did.[14] For Ulrich to now make this a new concern is evidence of pretext. *What a tangled web Ulrich has weaved.* While contriving documentation, Ulrich now alleges that Rageh's treatment on December 19, 2022, could have caused blindness. However, in the same email, he admits that Rageh's exam was correct and that the patient had no (retinal) tear. (Ex. 30). Ulrich's last-ditch effort is to ask, "What if there was?" This is simply an illogical circular argument and fails to account for the

---

[13] Ulrich sent another contrived email on 1/2/2023 at 4:52 pm (Ex. 31 p. 1) less than 24 hours after Dr. Budenz asked Ulrich for paper documentation. (Ex. 31 p. 2). In his 1/2/23 email Ulrich repeats his false allegations but changes the date 12/19 to 12/21.

[14] *See* D.E. 68-3 301:6-302:9 & 68-3 302:11-305:7. This does not state that Rageh prescribed treatment that could have caused blindness, it states that as it relates to the patient care, Everything was great, Ulrich agreed, and Ulrich states that everything was good.

23

fact that Rageh examined the patient and his findings were correct—there was no tear—and that Ulrich confirmed it.

Another way a plaintiff may show pretext is by offering circumstantial evidence of discrimination. *Reeves*, 530 U.S. at 147. Such evidence often comes in the form of conduct or circumstances probative of discriminatory animus. *Merritt*, 601 F.3d at 300. The analysis under direct evidence of retaliation, outlined *supra,* can double as evidence of pretext under the *McDonnell Douglas* framework.

Evidence that a company failed to follow its own disciplinary policies in firing an employee can also be probative of pretext. *See Cowgill* v. *First Data, Techs, Inc,* 41 F.4th 370, 383 (2022); *Westmoreland v. TWC Admin. LLC,* 924 F.3d 718, 728 (2019). That is because an employer's "extreme overreaction" to a minor infraction may suggest that the relevant decisionmaker was "looking for a reason to get rid of [the plaintiff]" on discriminatory grounds. *Westmoreland,* 924 F.3d at 728 (first quote); *Cowgill,* 41 F.4th at 383 (second quote).

Ulrich, as program director, was responsible for ensuring that UNC-CH's fair policies and procedures for addressing grievances and ensuring due process were provided to aggrieved fellows. (Ex. 22, p. 5). Ulrich failed to follow UNC-CH's due process when it came to Rageh. (P.E. 76-1 ¶15). Instead, he stated that Rageh's complaints of discrimination need to be stopped immediately. (Ex. 21). Issue of material fact exists.[15]

---

[15] Defendants' brief details their alleged facts and circumstances regarding a protective order for ad hominem reasons. Plaintiff disputes these allegations, yet they're irrelevant to proving or disproving workplace discrimination or retaliation. Plaintiff will not address them at this time.

### C. Defamation and Defamation Per Se

To recover for defamation, Rageh must show that Ulrich published false, defamatory statements about or concerning Rageh to a third person. "Generally, a communication is deemed defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or deter third persons from associating or dealing with him." *Cannon v. Peck*, 36 F.4th 547, 559 (4th Cir. 2022). "[I]n order to be actionable as defamation, a statement must be one of fact, not merely opinion." *Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 38, S.E.2d 647 (2020).

Here, Ulrich made defamatory statements of fact in his letters to various medical boards, claiming that during Rageh's employment, he was relieved of clinical activities due to patient safety concerns. (Ex. 19). In contradiction, on December 12, 2022, in his decision to shorten Rageh's fellowship, Ulrich does not mention any patient safety concerns. (Ex. 7). On December 15, 2022, HR told Ulrich that there needs to be additional documentation. (Ex. 32). On December 19, 2022, Ulrich emailed HR, noting no patient safety concerns regarding Rageh. (Ex. 32)[16] Ulrich testified that a December 19, 2022, incident, in which Rageh's patient exam was correct, and the patient had <u>no harm</u>, led him to move for Rageh's immediate termination. (Ex. 30, p. 1; 76-2 132:24-134:20).[17] This is undercut by the fact that prior to December 31, 2022, Ulrich had no plans to immediately terminate Rageh's

---

[16] Ripe for the jury's Consideration: Ex. 32: Ulrich's 12/19/22 email to HR makes <u>no</u> mention of safety concerns with Rageh. However, after HR further coached Ulrich up to provide additional documentation, on 12/20/22 he sends his first "safety concern" email (Ex. 8) and includes Rageh to make it seem as if they spoke about it on 12/16/2022.

[17] Ulrich's 12/26/22 email is contrived.

employment. *Supra* at 4. Ulrich's claims of fabricated allegations of patient safety concerns cannot be reconciled with the fact that, <u>after</u> December 19, 2022, Ulrich recommended Rageh for leisure to practice medicine and surgery without reservation, and he had <u>NO</u> patient safety concerns or issues with Rageh's fitness as a medical doctor. (Ex. 9, pp. 1-4). Rageh's contract was terminated immediately because he made repeated statements that Zhang was acting in a discriminatory manner against him. (Ex. 21). On January 4, 2023, Ulrich instructed Rageh to stay home and only attend his comprehensive clinic unsupervised. Despite his false claims about patient safety, Ulrich told Rageh to attend his clinic without supervision, where Rageh would treat patients with retinal diseases and usually would not prescribe glasses. *Supra* at 19-20.

This timeline presents a genuine issue of material fact regarding Ulrich's allegations about patient safety. The decision to terminate Rageh's fellowship was based on Rageh's protected activity, and Ulrich contrived and fabricated patient safety concerns to support the immediate termination at HR's direction. As it relates to the medical boards, the evaluations submitted to the boards became defamatory after Rageh left UNC-CH. *Supra* at 4, 6. There is no non-defamatory way for this to happen. After being placed on leave, Rageh would not see patients; therefore, there is no work product for Defendants to cite in support of credible allegations of patient harm.[18] Ulrich also alleged that Rageh saw a patient on August 22, 2022, failed to

---

[18] Consider on September 13, 2023, Ulrich recommended Rageh for licensure in Tennessee. (Ex. 19, p. 3). In response to Rageh's March 29, 2024, Massachusetts application for a medical license, Ulrich *did not* recommend licensure. (Ex. 19, p. 7; P.E. 76-2: 205:12-14).

26

diagnose an infection, and this caused the patient's eye to become unsalvageable. However, this factual statement is contradicted by the record of evidence. On August 30, 2022, Ulrich informed a colleague that the patient was feeling better, inconsistent with the patient being unsalvageable or blind, as alleged in Ulrich's recent deposition. (Ex. 33; P.E. 76-2  73:3-4; 74:10:75:11).[19]

Defamation per se includes any publication that [](3) "tends to impeach a person in that person's trade or profession," or (4) "otherwise tends to subject one to ridicule, contempt or disgrace." *Renwick v. News & Observer Publ'g Co.*, 310 N.C. 312, 317, 312 S.E.2d 405 (1984). The law presumes damages from publications that are defamatory per se. *Renwick,* 310 N.C. at 316. False words that impeach a person in his trade or profession, "(1) must touch the plaintiff in his special trade or occupation, and (2) must contain an imputation necessarily hurtful in its effect on his business." *Badame v. Lampke*, 242 N.C. 755, 757, 89 S.E.2d 466 (1955). Ulrich's statements were intended to harm Rageh's ability to obtain his medical license and find employment elsewhere, which caused Rageh to spend hundreds of thousands of dollars defending his reputation before multiple state licensing boards. *Supra* at 5-6.

Lastly, Ulrich is not entitled to qualified immunity. "The existence of a privilege creates a presumption that the statement was made in good faith and without malice." *Shreve v. Duke Power Co.*, 97 N.C. App. 648, 651 (1990). The record shows that Defendants' statements were false, retaliatory, and intended to impeach Rageh in his profession. Therefore, this claim must proceed to trial.

---

[19] Plaintiff has filed a motion to compel Defendants to produce documents created during Rageh's residency that support Ulrich's new allegations.

## D. Interference with Contractual Relations

In order to recover for his claim of tortious interference with contract, Rageh must show: (1) he had a valid contract with a third person which conferred upon him a contractual right against the third person; (2) Defendants knew of the contract; (3) Defendants intentionally induced the third person not to perform the contract; (4) in doing so Defendants acted without justification; and (5) he suffered actual damage. *Holleman v. Aiken*, 193 N.C. App. 500, 668 S.E.2d 579, 589-90 (2008).

Defendants admit Rageh meets elements (1), (2), (3), or (5), but claim their actions were justified by a legitimate business purpose. However, their actions were retaliatory against Rageh's protected activity, and their assertion of qualified privilege fails because they acted in bad faith by retaliating after he filed a discrimination complaint.

## E. Tortious Interference with Prospective Economic Advantage

The only difference between a tortious interference with a contract claim and a tortious interference with prospective economic advantage claim is that the latter requires a contract that would've been entered into but for Defendants' conduct. *Beck v. City of Durham*, 154 N.C. App. 221, 232 (2002). On March 10, 2023, Rageh signed his offer letter with AIO. (Ex. 34). Ulrich made defamatory remarks to AIO about Rageh, stating that Rageh was relieved of employment due to patient safety concerns, which led to the cancellation of a signed offer. *Supra* at 6. AIO revoked its offer, based on references. (Ex. 18). Defendants' claim that Ulrich's statements were motivated by a legitimate business interest fails.

28

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment should be denied in its entirety.

13th day of April 2026.

/s/ Kirton M. Madison
Kirton M. Madison
North Carolina State Bar No.43029
MADISON LAW, PLLC
8936 Northpointe Executive Park Drive
Suite 240-260
Huntersville, NC  28078
Telephone: (704) 981-2790
kmadison@madlawpllc.com
ATTORNEY FOR PLAINTIFF

/s/Potso Byndon
Potso Mahlangeni-Byndon
North Carolina State Bar No. 43031
BYNDON LAW
2016 Fowler Avenue
Omaha, NE 68110
Telephone: (402) 570-1287
potso@byndonlaw.com
ATTORNEY FOR PLAINTIFF

29

## CERTIFICATE OF WORD COUNT

I certify that, in compliance with Dk. 75, this brief is 7,742 words according to

the word processing software used to prepare this document.

/s/Potso Byndon
Potso Mahlangeni-Byndon

30

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF System, which will send notification of the filing to all counsel of record.

On this 13th day of April 2026.
/s/ Kirton M. Madison
Kirton M. Madison
North Carolina State Bar No.43029
MADISON LAW, PLLC
8936 Northpointe Executive Park Drive
Suite 240-260
Huntersville, NC  28078
Telephone: (704) 981-2790
kmadison@madlawpllc.com
ATTORNEY FOR PLAINTIFF

Case 1:24-cv-00336-CCE-JEP    Document 76    Filed 04/13/26    Page 31 of 31