IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ABDULRAHMAN RAGEH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:24-CV-336 |
| | ) | |
| UNIVERSITY OF NORTH | ) | |
| CAROLINA AT CHAPEL HILL, JAN | ) | |
| NIKLAS ULRICH, and ALICE | ) | |
| ZHANG, in their official capacities, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Catherine C. Eagles, Chief District Judge.

Dr. Abdulrahman Rageh was a fellow at the University of North Carolina at
Chapel Hill studying to become a retina specialist. After UNC cut his fellowship short,
he sued, alleging that UNC had violated federal employment discrimination laws and that
his former supervisor, Dr. Jan Ulrich, and coworker, Dr. Alice Zhang, had committed
various state law torts against him. Dr. Zhang filed counterclaims, alleging that Dr.
Rageh had intentionally or negligently inflicted severe emotional distress upon her. The
defendants now move for summary judgment on Dr. Rageh's claims, and Dr. Rageh
moves for summary judgment on Dr. Zhang's counterclaims.

Disputed questions of material fact remain as to Dr. Rageh's claims against UNC
for retaliation, so the motion for summary judgment will be denied in part. But there are
no disputed questions of material fact as to his other claims, and UNC's motion will be

granted as to those claims. The parties have stipulated to the dismissal of Dr. Zhang's counterclaims, so Dr. Rageh's motion for summary judgment will be denied as moot.

## I.      Undisputed Facts

Dr. Rageh is a medical doctor specializing in ophthalmology. Doc. 76-1 at ¶ 3. In December 2021, UNC hired Dr. Rageh for a two-year vitreoretinal fellowship. *Id.* at ¶ 4. The vitreoretinal fellowship offers advanced training and experience in the medical and surgical treatment of diseases of the retina and vitreous. Doc. 68-1 at ¶ 5; Doc. 68-2 at ¶ 6. UNC generally only hires one fellow every two years. Doc. 68-1 at ¶ 5. Dr. Rageh began his fellowship in August 2022. *Id.* at ¶ 6.

Dr. Ulrich is a professor of ophthalmology at UNC and oversaw Dr. Rageh's fellowship program. *Id.* at ¶ 4. Dr. Zhang is an associate professor of ophthalmology at UNC and oversees the training of residents and the vitreoretinal fellow. Doc. 68-2 at ¶ 4. Dr. Ulrich was Dr. Rageh's direct supervisor, Doc. 68-1 at ¶ 6; Doc. 76-1 at ¶ 7, but Dr. Zhang was also responsible for working with Dr. Rageh and monitoring his performance. Doc. 68-2 at ¶¶ 4, 6–7; *see* Doc. 76-1 at ¶¶ 7, 10.

In November 2022, Dr. Zhang stopped working with Dr. Rageh, and Dr. Ulrich and another attending physician, Dr. Keirnan Willett, began supervising him. Doc. 68-1 at ¶ 12; Doc. 68-2 at ¶ 12; Doc. 76-1 at ¶ 13. Dr. Ulrich told Dr. Rageh in December 2022 that he would not be able to train him as a retina surgeon and that Dr. Rageh's fellowship would end in June 2023 instead of July 2024. Doc. 68-1 at ¶ 16; Doc. 76-1 at ¶ 14. Dr. Rageh objected to that decision and alleged that the decision to shorten his fellowship was discriminatory. Doc. 76-1 at ¶ 18. On January 4, 2023, Dr. Ulrich told

2

Dr. Rageh that his fellowship was terminated and that he would be limited to seeing patients during his once-weekly clinic hours. *Id*. at ¶ 19; Doc. 68-1 at ¶ 21. Dr. Rageh subsequently resigned from his position at UNC. Doc. 68-1 at ¶ 24; Doc. 76-1 at ¶ 23.

Other facts, disputed and undisputed, will be addressed in the context of the issues in which they arise.

## II.    Relevant Procedural History

Earlier in this case, the defendants filed a motion to dismiss, which was granted in part. Doc. 23. The Court held Dr. Rageh had stated a claim only as to the following:

- Title VII and ADEA discrimination claims against UNC to the extent that they are based on the denial of training opportunities;

- Title VII and ADEA retaliation claims against UNC to the extent that they are based on shortening or terminating Dr. Rageh's fellowship in retaliation for protected activity;

- Claims for defamation and tortious interference with prospective economic advantage against Dr. Ulrich in his individual capacity; and

- Claims for interference with contractual relations against Dr. Ulrich and Dr. Zhang in their individual capacities.

*Id.* at 22–23. Dr. Rageh's claims against another defendant, Dr. Donald Budenz, were dismissed in full. *Id.* at 22.

The defendants now move for summary judgment on all of Dr. Rageh's remaining claims. Doc. 68. Dr. Rageh moves for summary judgment on both of Dr. Zhang's counterclaims. Doc. 70.

After the summary judgment motions were fully briefed, Dr. Rageh moved for sanctions against the defendants. Doc. 78. The Court, through Magistrate Judge Peake, found that Dr. Rageh had responded to the defendants' requests for admission, that the appropriate remedy was to deem the requests not admitted and strike the corresponding affidavit and attachments, and that sanctions were not warranted. *Id.* Doc. 83 at 1-2. The parties have also since stipulated to the dismissal of Dr. Zhang's counterclaims. Doc. 86.

## III. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing a summary judgment motion, courts "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023). The moving party has the initial burden of demonstrating the absence of any material issue of fact; once the moving party meets its initial burden, the non-moving party must come forward with evidentiary material demonstrating the existence of a genuine issue of material fact requiring a trial. *Id.* at 709–10; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## IV. Title VII and ADEA Discrimination

Title VII prohibits an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms,

4

conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a). And the ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a).

Under Title VII and the ADEA, an individual plaintiff may demonstrate discrimination either through direct evidence or the *McDonnell Douglas* burden-shifting framework. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005); *Massaro v. Fairfax Cnty.*, 95 F.4th 895, 901 (4th Cir. 2024) (explaining that claims under Title VII and the ADEA are analyzed under the same framework.). "Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested employment decision." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (cleaned up). But "stray or isolated remarks" that do not have a clear connection with the contested employment decision are less material. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010); *accord Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783 (4th Cir. 2021) (per curiam).

Absent direct evidence of intentional discrimination,[1] Title VII and ADEA claims are typically analyzed at summary judgment under the *McDonnell Douglas* burden-shifting framework. *See Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018);

---

[1] Dr. Rageh does not contend that there is direct evidence of discrimination. *See* Doc. 76 at 15–24.

*see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of employment discrimination by showing that:

> (1) he is a member of a protected class; (2) his employer took an adverse action against him; (3) he had been fulfilling his employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination.

*Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021) (cleaned up).

"Once a plaintiff makes out a prima facie case, the burden shifts to the employer" to show a nondiscriminatory reason for its actions. *Id.* at 650. "If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation was actually a pretext for discrimination." *Id.* (cleaned up).

### A. ADEA Claim

As to the first element of the prima facie case, Dr. Rageh is at least 40 years old, so he is a member of a protected class under both the ADEA. 29 U.S.C. §§ 623, 631 (prohibiting employment discrimination against persons at least 40 years old).

As to the second element, there is evidence that Dr. Zhang pared back Dr. Rageh's experiential training opportunities over the course of his fellowship, Doc. 68-1 at ¶¶ 15, 20; Doc. 76-1 at ¶¶ 9–10, 13, and that Dr. Ulrich at some point concurred in that decision. Doc. 68-1 at 13. Since training was a central purpose of the fellowship, *see* Doc. 76-1 at ¶ 6, a jury could find this was an adverse employment action. So Dr. Rageh satisfies the first two elements of the prima facie case.

6

As to the third element, Dr. Rageh testifies that at no time before his contract was shortened had he been given any written warning or provided with an evaluation identifying specific performance deficiencies. *Id.* at ¶ 16. The Court assumes without deciding that this is sufficient to show that he was meeting his employer's legitimate expectations for purposes of the prima facie showing.[2]

As to the fourth element, Dr. Rageh points to a statement that he claims Dr. Ulrich made soon after he started his fellowship and that arguably raises an inference of age discrimination. Specifically, he says that in September 2022, Dr. Ulrich told him that Dr. Zhang was "very uncomfortable with [Dr. Rageh's] age even before [he] started." Doc. 76-3 at 16–17.[3] This raises the possibility that Dr. Zhang might have limited his training opportunities because of his age.[4] The Court assumes without deciding that this evidence is sufficient to show causation at the prima facie stage.

---

[2] "It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023) (cleaned up).

[3] Dr. Zhang denies telling anyone that she was uncomfortable with Dr. Rageh's age. Doc. 68-2 at ¶ 15. The parties do not point to evidence of Dr. Ulrich admitting or denying making this statement to Dr. Rageh. For purposes of this motion, the Court assumes the statement was made.

[4] Dr. Rageh also testifies that in that same conversation in September, Dr. Ulrich told him that "we are one team" and "if one of the team is uncomfortable, we have to terminate your fellowship." Doc. 76-3 at 18–19. But in his deposition Dr. Rageh did not report mentioning any reduced training opportunities in that conversation, saying only that when Dr. Ulrich asked him how things were going, he reported that Dr. Zhang was "a little tough." *Id*. at 16–17. Nor did Dr. Rageh testify that Dr. Ulrich tied his age to training decisions. Dr. Ulrich's stray remark does not give rise to any inference of age discrimination. Dr. Rageh's inconsistent affidavit testimony later, Doc. 76-1 at ¶¶ 7–8, is entitled to no weight. *See In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512–13 (4th Cir. 2011).

7

But UNC has offered a legitimate non-discriminatory reason for its decision to reduce Dr. Rageh's training opportunities:  concerns over patient safety.  During Dr. Rageh's fellowship, Drs. Ulrich and Zhang exchanged multiple emails raising concerns about Dr. Rageh's professional competence and the safety of his patients, beginning in early September 2022.  Doc. 68-1 at 10–13, 16; Doc. 68-2 at 10–14.  These included, among other things, not knowing how to use equipment, Doc. 68-1 at 10; not communicating about cases with attending retina surgeons, *id.* at 10-11; a lack of general ophthalmological knowledge, *id.* at p. 2 ¶ 7, p. 10; insufficient attention to detail, *id.* at p. 4 ¶ 13, p. 12; failing to discuss post-operative instructions with patients, *id*. at 10; Doc. 68-2 at ¶ 9; accidentally cutting a patient's eyelid, Doc. 68-2 at p. 3 ¶ 8, p. 13; lying about using the wrong suture material to close an incision, *id.* at p. 3 ¶ 8, p. 13; and incorrectly reporting that a 58 year old patient was 35.  *Id.* at pp. 3–4 ¶ 9, p. 10.  In his deposition, Dr. Ulrich also discussed an incident in which one of Dr. Rageh's patients was left blind in one eye because of a misdiagnosed infection.  Doc. 68-4 at 23–24.

Dr. Rageh contends that these reasons were pretextual, disputing at least some of these incidents as insufficient to raise concerns.  For example, as to the suture incident, he asserts that he employed a material commonly used in ocular surgery.  Doc. 76-1 at ¶ 11. As to the patient age incident, he says that he "immediately recognized the mistake and apologized."  *Id.*  And he points out that the blinding allegation was not raised until Dr. Ulrich was deposed, thus raising the possibility of a recent fabrication.  Doc. 76 at 21–22.

But as to the many other incidents, incidents which raise obvious safety concerns, he points to no record evidence rebutting the accounts of Drs. Ulrich and Zhang.  His

other suggestions of fabrication and exaggeration are based only on speculation and unsupported inferences.[5]  Dr. Rageh has not rebutted UNC's proffer of legitimate non-discriminatory reasons for its reduction of his training opportunities.

Courts must "resist the temptation to become so entwined in the intricacies of the *McDonnell Douglas* proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination."  *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025) (cleaned up).  Here, viewing all of the evidence in its entirety and in the light most favorable to Dr. Rageh, no reasonable jury weighing a stray comment about discomfort over Dr. Rageh's age against the largely undisputed evidence of legitimate concerns over his competence and patient safety could find that age discrimination was the "but-for" cause of the denial of training opportunities.[6]  Summary judgment will be granted as to Dr. Rageh's ADEA discrimination claim.

### B.  Title VII Claim

Dr. Rageh is of Egyptian ancestry, so he is a member of a protected class under Title VII.  42 U.S.C. § 2000e-2(a) (prohibiting employment discrimination based on

---

[5] Counsel's characterizations of these events as "invent[ing] performance issues" and as showing a "discriminatory thirst for documented performance defects," Doc. 76 at 22–23, are not evidence, and such rhetoric is not particularly helpful.  And while Dr. Rageh testifies that he was never placed on a formal remediation plan or given a written warning or told he was incompetent or dangerous to patients, Doc. 76-1 at ¶¶ 16–17, he does not deny that Dr. Ulrich and others raised concerns with him about the medical care he provided.

[6] ADEA discrimination claims require proof that age was a "but-for" cause of the adverse employment action.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

national origin).  As already noted, there is evidence that his experiential training opportunities were reduced over the course of his fellowship, Doc. 68-1 at ¶¶ 15, 20; Doc. 76-1 at ¶¶ 9–10, which a jury could find was an adverse employment action.  So Dr. Rageh satisfies the first two elements of the prima facie case.  And the Court again assumes without deciding that he was meeting UNC's legitimate employment expectations.  *See supra* at 7.

But Dr. Rageh has offered no evidence that his training opportunities were reduced under circumstances that raise a reasonable inference of unlawful national origin discrimination, nor has he shown that UNC's explanations are a pretext for national origin discrimination.  He relies only on evidence that Dr. Zhang twice corrected his pronunciation of her name in a way he thought was unfair.  Doc. 76-3 at 32–33.[7] Viewing the facts in the light most favorable to Dr. Rageh, those two incidents are insufficient to show causation or pretext, and the evidence overall does not support a reasonable inference of national origin discrimination.  *See Zayas-Ortiz v. Becton Dickinson Caribe, Ltd.*, 968 F. Supp. 2d 463, 472 (D.P.R. 2013) ("[C]orrecting an individual's pronunciation is not the type of evidence that rises to the level of discriminatory comments."); *Acosta v. NovaMed Surgery Ctr. Of Orlando, LLC*, No. 12-CV-985, 2014 WL 12872623, at *13 (M.D. Fla. Aug. 28, 2014) ("Merely asking someone to repeat words or correcting a

---

[7] Dr. Rageh testified at his deposition that Dr. Zhang "mocked" his accent, Doc. 76-3 at 9, and in his affidavit that Dr. Zhang made "mocking comments about my accent" and engaged in "demeaning and aggressive interactions," Doc. 76-1 at ¶ 7, but he does not provide any details to flesh out these conclusory assertions.

10

person's word-usage, without more, is insufficient to establish national origin discrimination.").

The evidence is insufficient to support a finding by a reasonable jury that national origin discrimination played a role[8] in the decisions to limit Dr. Rageh's training opportunities. And in any event, as with his ADEA claim, he has not shown that UNC's proffered nondiscriminatory reason for reducing his training opportunities was pretextual. *See supra* at 8–9. Summary judgment will be granted as to Dr. Rageh's Title VII claim.

## V.      Title VII and ADEA Retaliation

In addition to prohibiting direct discrimination, Title VII and the ADEA also prohibit employers from retaliating against employees for reporting discrimination. The elements of a retaliation claim are that (1) the plaintiff engaged in a protected activity, (2) his employer took an adverse action against him, and (3) there was a causal link between the two events. *Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022). "A plaintiff may prove a retaliation claim either through direct evidence of retaliatory animus or via the application of the *McDonnell Douglas* burden-shifting framework." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) (cleaned up); *see also Denis v. Horry Cnty. Police Dep't*, No. 20-CV-3849, 2022 WL 4181042, at *8 n.6 (D.S.C. June 28, 2022) (Mag. J., report and recommendation), *adopted*, 2022 WL 3357883 (D.S.C. Aug. 15, 2022) ("In analyzing retaliation claims

---

[8] A Title VII plaintiff need only show that his relevant protected characteristic was a "motivating factor" in the defendant's decision. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 657 (2020) (citing 42 U.S.C. § 2000e-2(m)).

11

brought under the ADEA, courts use the same standards as those for retaliation claims brought under Title VII.").

Here, Dr. Rageh has presented direct evidence of retaliation sufficient to survive summary judgment. On December 19, 2022, Dr. Rageh told Dr. Ulrich that he felt Dr. Zhang was discriminating against him because of his age and his accent.[9] Doc. 76-1 at p. 4 ¶ 15, p. 15–16; Doc. 76-2 at 23. A jury could find that this was a protected activity. There is evidence that very soon thereafter, Dr. Ulrich decided to shorten his fellowship and limit his work to very basic tasks. Doc. 68-1 at ¶ 21.

In a January 1, 2023, email to a fellow UNC employee, Dr. Ulrich arguably linked the decision to terminate the fellowship to Dr. Rageh's complaint of discrimination and his "fail[ure] to maintain a working relationship with his attendings." Doc. 76-2 at 88. Specifically, he said:

> So since our last email there has been another patient safety concern. Dr. Rageh also has showed [sic] absolutely no understanding that all these deficiencies and issues that have been documented and discussed with him at length are his problem. He now has made repeated statements of being treated unfairly and that Dr. Zhang was acting discriminatory [sic] against him.
> Bottom line- his lack of self awareness [sic], failing to maintain a working relationship with his attendings and his actions repeatedly putting patients at risk have led to [sic] us to the decision that we need to terminate his contract ASAP. We don't think we can train him and are worried about patient safety. I know you we [sic] had originally planned on having his contract shortened to June 2023 but in light of these developments we don't think this is a feasible option.

---

[9] Although Dr. Rageh's discrimination claims lack merit, "[a]n underlying discrimination charge need not be meritorious for a plaintiff to prevail on a claim of retaliation for opposition to the perceived discrimination." *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 357 n.1 (4th Cir. 1985), *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

*Id.* This is sufficient evidence to create a disputed question of fact as to whether Dr. Rageh's discrimination complaints were a but-for cause of Dr. Ulrich's decision to end his fellowship early. *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation."); *Cole v. Family Dollar Stores of Md.*, 811 F. App'x 168, 172 (4th Cir. 2020) (stating the same as to ADEA retaliation claims).

Dr. Ulrich has testified that based on the numerous safety concerns summarized *supra*, he did not think he could safely train Dr. Rageh as a competent retina surgeon, and that was why he decided to end Dr. Rageh's fellowship early. Doc. 68-1 at ¶¶ 16, 20. As noted *supra*, Dr. Rageh has not offered evidence to dispute many of the incidents giving rise to Dr. Ulrich's concerns, and a jury may well reject Dr. Rageh's claim that UNC would not have shortened his fellowship but for his discrimination complaints. But the Court cannot say at this point that no reasonable jury would rule in Dr. Rageh's favor on the retaliation claim.

UNC's motion for summary judgment will be denied as to Dr. Rageh's retaliation claims.

## VI.     Defamation and Tortious Interference

Dr. Rageh asserted several state law causes of action against Drs. Ulrich and Zhang. His remaining claims are for tortious interference with contract against both doctors and for defamation and tortious interference with prospective economic advantage against Dr. Ulrich. Drs. Ulrich and Zhang have moved for summary judgment on all claims against them.

13

### A. Tortious Interference with Contract

The elements of tortious interference with contract are:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 700, 784 S.E.2d 457, 462 (2016) (cleaned up).

Dr. Rageh contends that Drs. Ulrich and Zhang tortiously interfered with his employment contract with UNC. Drs. Ulrich and Zhang contest only the fourth element: justification. They assert that any interference with Dr. Rageh's contract was justified because they had legitimate concerns about Dr. Rageh's job performance. *See Hubbard v. N.C. State Univ.*, 248 N.C. App. 496, 506, 789 S.E.2d 915, 922 (2016).

"When a tortious interference claim based on an employment contract is brought against the plaintiff's co-employees, the plaintiff must show that the alleged interference was unrelated to a legitimate business interest of the employee." *Schwarz v. St. Jude Med., Inc.*, 270 N.C. App. 720, 730, 842 S.E.2d 119, 127 (2020) (cleaned up). "The plaintiff's evidence must show that the defendant acted without any legal justification for his action." *Varner v. Bryan*, 113 N.C. App. 697, 702, 440 S.E.2d 295, 298 (1994). "In determining whether an actor's conduct is justified, consideration is given to the following: the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor and the contractual interests of the other party." *Peoples Sec. Life Ins. Co. v.*

*Hooks*, 322 N.C. 216, 220–21, 367 S.E.2d 647, 650 (1988). But "[i]f the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified." *Id.* at 221.

Here, the undisputed facts demonstrate that the defendants were justified in interfering with Dr. Rageh's contract with UNC. Drs. Ulrich and Zhang have identified a multitude of problems with Dr. Rageh's performance during his fellowship, many of which implicated patient safety. As discussed *supra*, Dr. Rageh disputes their accounts of some of those incidents. But he does not dispute all of them. *See supra* at 8–9.

To establish an absence of justification, a plaintiff "must show that the defendants acted without *any* legal justification for their actions." *Bloch v. The Paul Revere Life Ins. Co.*, 143 N.C. App. 228, 240, 547 S.E.2d 51, 60 (2001) (cleaned up) (emphasis added). The undisputed evidence is that at least some of Dr. Ulrich's and Dr. Zhang's safety concerns were based on legitimate problems with Dr. Rageh's treatment of patients and failure to follow established protocols for supervision, so it cannot be said that their "only motive was a malicious wish to injure" Dr. Rageh. *Peoples*, 322 N.C. at 221 (cleaned up); *see Schwarz*, 270 N.C. App. at 730 (holding that "reporting and investigating repeated complaints by patients and healthcare professionals about a co-employee's work performance is a legitimate business interest" justified interference with a contract by a co-employee and supervisor).

Because there is no dispute that Dr. Ulrich and Dr. Zhang were motivated, at least in part, by legitimate safety concerns, Dr. Rageh has not shown that they acted without

15

legal justification.  The motion for summary judgment will be granted as to Dr. Rageh's tortious interference with contract claims.

**B.  Tortious Interference with Prospective Economic Advantage**

The elements of tortious interference with prospective economic advantage are that (1) the defendant maliciously induced a person not to contract with the plaintiff, (2) the person would have contracted with the plaintiff but for the defendant's interference, and (3) the defendant's interference was not a legitimate exercise of his rights.  *Beverage Sys.*, 368 N.C. at 701.  "[A] plaintiff must produce evidence that a contract would have resulted but for a defendant's malicious intervention."  *Id.*

Dr. Rageh testifies that he had a signed employment offer with AIO Vision, which was revoked after AIO spoke with Dr. Ulrich.  Doc. 76-1 at ¶ 25.  Dr. Rageh has not said how he knows that the revocation occurred after AIO spoke with Dr. Ulrich, nor has he put forward any evidence demonstrating that AIO withdrew its offer because of Dr. Ulrich's statements, what those statements were, or that those statements were malicious.

Dr. Rageh cites an email in which someone named Michael Lutz tells someone named Janice Urato that no official offer was made to Dr. Rageh "based on references."  Doc. 76-2 at 75.  Dr. Rageh does not explain the context of this email or who Michael Lutz is.  He offers no evidence as to what "references" from whom caused this decision.  Moreover, Dr. Rageh has provided no affidavit or deposition testimony that authenticates the email, *see* Fed. R. Evid. 901, and the email is not self-authenticating, *see* Fed. R. Evid. 902, so it cannot be considered as evidence at summary judgment.  Fed. R. Civ. P. 56(c); *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) ("It is well established that

16

unsworn, unauthenticated documents cannot be considered on a motion for summary judgment.").  Even if that were not so, he has offered no evidence of malice.

The motion for summary judgment will be granted on his tortious interference with prospective economic advantage claim.

## C. Defamation

"In order to recover for defamation, a plaintiff must allege and prove that the defendant made false, defamatory statements of or concerning the plaintiff, which were published to a third person, causing injury to the plaintiff's reputation."  *Boyce & Isley, PLLC v. Cooper*, 211 N.C. App. 469, 478, 710 S.E.2d 309, 317 (2011) (cleaned up).  Defamation constitutes libel per se[10] when (1) the defendant publishes, "in writing or printing, or by signs and pictures;" (2) a defamatory statement; (3) which "without innuendo tends to subject one to ridicule, public hatred, contempt or disgrace, or tends to impeach one in his trade or profession."  *Arnold v. Sharpe*, 296 N.C. 533, 537, 251 S.E.2d 452, 455 (1979).  But "a communication to a person acting at the plaintiff's request cannot form the basis for a libel or slander claim."  *Friel v. Angell Care Inc.*, 113 N.C. App. 505, 508, 440 S.E.2d 111, 113 (1994) (cleaned up).

Here, the only statements Dr. Rageh contends were defamatory were contained in letters Dr. Ulrich sent to the Tennessee and Massachusetts state medical boards.  *See* Doc.

---

[10] In his operative complaint and subsequent filings, Dr. Rageh refers to this claim as "defamation per se."  Doc. 14 at 19; Doc. 76 at 25.  "There are two separate torts encompassed by the term 'defamation,' being libel and slander."  *Gaunt v. Pittaway*, 135 N.C. App. 442, 447, 520 S.E.2d 603, 607 (1999).  Because Dr. Rageh's claim only concerns Dr. Ulrich's written communications, Doc. 14 at ¶¶ 144–46, it will be analyzed as a libel claim.  *See Gaunt*, 135 N.C. App. at 447 ("Libel is written while slander is oral." (cleaned up)).

17

76-2 at 86–87; Doc. 14 at ¶¶ 144–45.  The parties dispute whether those statements were true, opinion, or privileged.  But all of the evidence shows that Dr. Ulrich sent the letters at the request of Dr. Rageh.  Doc. 68-1 at p. 7 ¶ 26, pp. 19–23.  Since Dr. Ulrich communicated the statements at Dr. Rageh's request, this case is indistinguishable from *Friel*, *see* 113 N.C. App. at 509, and summary judgment will be granted as to the defamation claim.

### VII.   Dr. Zhang's Counterclaims

Dr. Zhang brought counterclaims against Dr. Rageh for intentional and, in the alternative, negligent infliction of severe emotional distress.  Doc. 25 at 66–68.  The parties have since stipulated to the voluntary dismissal of those claims with prejudice.  Doc. 86.  Dr. Rageh's motion for summary judgment will be denied as moot.  *See, e.g.*, *Hale v. CNX Gas Co.*, No. 10-CV-59, 2017 WL 816147, at *3 (W.D. Va. Feb. 27, 2017).

### VIII.  Conclusion

The undisputed evidence shows that Dr. Ulrich and Dr. Zhang had serious safety concerns about Dr. Rageh's performance as a vitreoretinal fellow, and those concerns justified the reduction in his training opportunities.  No reasonable jury could find for Dr. Rageh on his discrimination claims, and his state law tort claims fail for a variety of reasons.  But he has put forward sufficient evidence to create a disputed question of material fact as to his retaliation claim.  So the defendants' motion for summary judgment will be granted in part and denied in part.  Dr. Rageh's motion for summary judgment on Dr. Zhang's counterclaims will be denied as moot, since the parties have stipulated to the dismissal of those claims.

18

It is **ORDERED** that:

1. The defendants' motion for summary judgment, Doc. 68, is **GRANTED in part** and **DENIED in part**, and all of the plaintiff's claims except the retaliation claim are **DISMISSED**.

2. The plaintiff's motion for summary judgment, Doc. 70, is **DENIED as moot**.

3. All that remains for trial is Dr. Rageh's retaliation claims based on the shortening of his fellowship.

This the 7th day of July, 2026.

_____
UNITED STATES DISTRICT JUDGE

19