IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:24-CV-336

| | | |
|---|---|---|
| ABDULRAHMAN RAGEH,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, JAN NIKLAS ULRICH, and ALICE ZHANG, in their official capacities,<br><br>Defendants. | ) | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. JAY M. FINKELMAN**<br><br>(DOC. 102) |

UNC asks the Court to exclude Dr. Jay M. Finkelman's testimony in its entirety. Doc. 103 at 9. Dr. Rageh proposes a limited scope of testimony that will help the jury resolve the sole question before it. The purpose of this response is to ask the Court set that scope rather than prohibit Dr. Finkelman's testimony outright.

## STATEMENT OF FACTS

On December 16, 2022, Dr. Ulrich told Dr. Rageh that UNC would end his fellowship at the close of June 2023. Doc. 68-1 at 13; Doc. 93 at 3.

Dr. Ulrich knew the majority of all performance concerns for that decision by December 12, 2022; he had already raised the issue about Dr. Rageh's knowledge, examination and surgical skills, pager use, interpreters, and the endophthalmitis differential. Doc. 68-1 at 10–12. Dr. Zhang had stopped working with Dr. Rageh in November. Doc. 87 at 2.

Knowing those concerns, Dr. Ulrich told the department chair and administrator that he planned to let Dr. Rageh finish through June 2023 and receive a medical-retina fellowship certificate. Doc. 76-2 at 59 (P-3).

On December 19, 2022, Dr. Rageh hand-delivered a written discrimination complaint to Dr. Ulrich. Doc. 76-1 at 15–16 (P-4); Doc. 93 at 3. He reported that Dr. Zhang regarded him as difficult because of his age and could not accept his accent. *Id.* He also described her conduct toward him as discriminatory and bullying. Doc. 76-1 at 15–16. Dr. Rageh asked UNC to let him continue his fellowship under a focused plan that would support his training, safeguard his well-being, and establish fair and respectful treatment. *Id.* at 16.

On December 20, 2022, Dr. Ulrich reaffirmed to Dr. Rageh in writing the terms discussed in the December 16 meeting. Doc. 76-2 at 60 (P-6). He committed UNC to continued employment and pay through June 30, 2023; full clinical duties, including call, clinic, lectures, and conferences; continued operating-room instruction at faculty discretion; a medical-retina fellowship certificate; and six months to secure his next position. *Id.*; see Doc. 68-1 at 13. Critically, Dr. Ulrich asked Dr. Rageh to respond to the shortened fellowship plan in this December 20 email, stating: "Please let us know your intentions as soon as possible." Doc. 68-1 at 14.

While waiting for Dr. Rageh's answer, Dr. Ulrich continued to support Dr. Rageh before state licensing boards—he told Missouri that Dr. Rageh remained on track to complete postgraduate training, reported no disciplinary or corrective action, and

recommended him for unrestricted medical licensure without reservation on December 20, 2022. Doc. 76-2 at 61 (P-7). He gave Florida and Arizona the same essential account on December 21 and 22: no break in training and no discipline, investigation, or probation. *Id.* at 62–63.

On December 31, Dr. Rageh rejected Dr. Ulrich's request and asked UNC to allow him to complete his surgical retina fellowship. Doc. 76-1 at 15–16, 19. He continued to seek the opportunity to complete his fellowship under conditions that addressed the discrimination and mistreatment he had reported in his complaint on December 19. *Id.*

On January 1, 2023, Dr. Ulrich urged UNC to terminate Dr. Rageh immediately. Doc. 76-2 at 88. He stated that the plan allowing him to remain through June no longer presented a feasible option, citing Dr. Rageh's continued discrimination complaint among the reasons for the newfound need for immediate termination. Doc. 76-2 at 88. On January 2, Dr. Ulrich sent the department chair a compilation of supporting materials. He specifically identified Dr. Rageh's letter complaining of discrimination by Dr. Zhang as part of that documentation. *Id.* at 94. Dr. Ulrich confirmed that his reference to Dr. Rageh's repeated discrimination statements encompassed the December 19 complaint against Dr. Zhang and the December 31 email. Doc. 76-2 at 22:21–23:23.

Dr. Ulrich connected Dr. Rageh's discrimination complaint to the consequences that followed during their January 4 meeting. Meeting Tr. 1, 11–12 (00:01:59, 00:30:15) (P-14). He began the conversation by raising Dr. Rageh's contact with UNC's discrimination office as he explained that the fellowship would likely end earlier than

UNC had previously contemplated. *Id.* at 1 (00:00:37–00:01:59). He then told Dr. Rageh that involving the discrimination office had complicated his future at UNC. *Id.* at 1 (00:01:59). Dr. Ulrich told Dr. Rageh that the matter had moved beyond his control and identified the discrimination complaint as a particular reason for that development. *Id.* at 11–12 (00:30:15). His explanation therefore linked the complaint to the institutional process that had overtaken the earlier plan allowing Dr. Rageh to remain in the fellowship while seeking another position. *Id.* at 1–2, 11–12 (00:03:23–00:05:00, 00:30:15).

The only change Dr. Ulrich cited since his original plan other than the discrimination complaint and Dr. Rageh's refusal to abandon it was another patient-safety matter. Doc. 76-2 at 88. But the unredacted messages establish that Dr. Ulrich already knew about the retinal-tear episode on December 19, when Dr. Zhang told him that Dr. Brewington had referred a patient to Dr. Rageh for laser treatment and that Dr. Rageh had found no tear and arranged follow-up in Dr. Ulrich's clinic the next morning. Ulrich–Zhang Text Messages, UNC_0008340–41. Dr. Ulrich confirmed on December 21 that he had found "[n]o tear" and described the examination as "very challenging," although he continued to criticize Dr. Rageh's failure to consult an attending before sending the patient home. *Id.* at UNC_0008345.

Dr. Ulrich filed no SAFE report despite the multiple near misses he described. Doc. 76-2 at 28:1-15. He identified no document recording the asserted concerns about communication and respect. *Id.* at 30:1–7. He told Missouri that Dr. Rageh had no

probation or remediation plan on December 20. *Id.* at 61. His later account to Human Resources asserted that faculty had placed Dr. Rageh on probation on November 10. *Id.* at 65.

## ARGUMENT

### I. Plaintiff withdraws the opinions that draw UNC's fit and motive objections.

UNC argues that Dr. Finkelman's report reaches dismissed claims and addresses UNC's state of mind. Doc. 103 at 4–5, 7–8. Plaintiff agrees that neither subject belongs before the jury and narrows Dr. Finkelman's testimony accordingly.

Plaintiff withdraws Opinions 2 and 3 to the extent they characterize retaliation as the most egregious violation and termination as the ultimate penalty. Doc. 102-1 at 5–6. Those characterizations express normative judgments that approach the legal questions reserved for the Court and jury. *Id.*

Plaintiff further withdraws Opinions 8 through 13 to the extent they address dismissed claims or purport to identify UNC's motive. *Id.* at 7. Dr. Finkelman will not tell the jury why UNC acted or offer an opinion on the ultimate question of retaliatory intent. *Id.*

Plaintiff narrows Opinion 14 to the professional consequences that interrupted fellowship training and lost credentialing opportunities can have for a physician's career potential. Doc. 102-1 at 8. Dr. Finkelman may explain those qualitative consequences through his expertise in employment and personnel practices, but Plaintiff withdraws the

report's assertion concerning lifetime income. *Id.* Plaintiff will offer no calculation of economic loss through Dr. Finkelman. *Id.*; Doc. 99 at 9.

Plaintiff also withdraws the Case Summary and Conclusion and will not offer Dr. Finkelman's report itself as a trial exhibit. Doc. 102-1 at 1, 8. These limitations leave Dr. Finkelman to perform the narrower task for which expert testimony can assist the jury: explaining personnel practices and professional consequences that fall outside ordinary lay experience, while leaving the jury to determine the facts, UNC's motive, retaliation, causation, and damages.

Plaintiff preserves the portions of Opinions 1, 6, and 7 that explain accepted human-resources practices and permit a professional assessment of UNC's process surrounding the January 2023 decision. Doc. 102-1 at 5–6; Doc. 99 at 9. He tailors those opinions to the surviving retaliation claim and the specific process subjects identified in his pretrial disclosure. Doc. 93 at 5; Doc. 99 at 9.

Plaintiff offers Opinion 6 to address the content, timing, and human-resources significance of UNC's performance documentation and corrective process. Doc. 102-1 at 6 (Op. 6); Doc. 99 at 9. Dr. Finkelman's proposed testimony will explain the professional significance of those process questions against identified, generally accepted human-resources practices. Doc. 99 at 9. Plaintiff withdraws Opinion 6's categorical assertion that Dr. Rageh received no adverse feedback and retains the proposed assessment of documentation and correction within the disclosed scope. Doc. 102-1 at 6 (Op. 6); Doc. 87 at 9 n.5; Doc. 99 at 9.

Plaintiff offers Opinion 1 to explain accepted personnel practices and the role of communicated policies and commitments in guiding an employee's expectations about training, correction, and complaint handling. Doc. 102-1 at 5 (Op. 1), 6 (Ops. 5–7); Doc. 99 at 9. Dr. Finkelman will address the applicable professional practices, and the jury will determine what UNC's written materials required and whether UNC followed them. Doc. 99 at 9. Plaintiff seeks admission of the professional comparisons upon an adequate showing of their supporting standards, relevant experience, and application to the record. Doc. 99 at 9.

Plaintiff offers Opinion 7 to address UNC's handling of the December 19 and December 31 complaints and the institutional response surrounding the January decision. Doc. 102-1 at 6 (Op. 7); Doc. 99 at 9; Doc. 93 at 3 & n.1. Earlier personnel materials may inform the factual context for the proposed process assessment, subject to the Court's evidentiary rulings, without requiring Dr. Finkelman to characterize earlier communications as protected activity. Doc. 102-1 at 8; Doc. 99 at 9; Doc. 93 at 3–5. His testimony will address the adequacy and timeliness of complaint handling under professional standards, leaving motive, credibility, legal conclusions, and liability to the Court and jury. Doc. 102-1 at 6 (Op. 7); Doc. 99 at 9.

The withdrawals remove the Rule 403 concerns UNC identifies, including confusion from dismissed claims and undue reliance on an expert's view of motive. Doc. 103 at 4–5. The testimony that remains is brief, limited to professional human-resources practice, and leaves motive and causation entirely to the jury. Dr. Rageh also accepts an

instruction that a departure from accepted human-resources practice does not, by itself, establish retaliation. The testimony therefore carries substantial probative value without creating a danger that substantially outweighs it. Fed. R. Evid. 403.

Plaintiff expects this direct examination to take less than one hour of his 7.25 trial hours. Minute Entry (Sept. 24, 2026).

## II. The retained testimony satisfies Rule 702.

Plaintiff must establish Dr. Finkelman's relevant qualifications, identify the professional practices he applies, demonstrate sufficient factual support, and explain the reasoning connecting each practice to each opinion within his timely disclosure. *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). The Court must then determine by a preponderance of the evidence that each proposed opinion satisfies Rule 702 before the jury hears it. Fed. R. Evid. 104(a), 702(a)–(d); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281–84 (4th Cir. 2021). The Fourth Circuit recognizes that jurors may understand the ultimate legal question yet need expert assistance to evaluate the specialized professional practices that bear on it. *Kopf v. Skyrm*, 993 F.2d 374, 377–79 (4th Cir. 1993).

The jury must decide whether UNC would have ended the fellowship in January 2023 but for Dr. Rageh's complaints. Doc. 87 at 12–13; Doc. 93 at 5; *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). UNC will say that documented patient-safety concerns drove the decision. Doc. 103 at 1. Dr. Rageh will say that UNC abandoned its own June plan the day after he rejected Dr. Ulrich's proposal and cited Dr.

Rageh's complaints in doing so. Doc. 76-2 at 88. The jury may consider the sequence leading to the challenged employment decision and any departure from the employer's ordinary procedures as evidence bearing on intent and pretext. *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 205 (4th Cir. 2016); *see Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 383 (4th Cir. 2022) (opining that a deviation from employer's usual procedure supported inference of pretext).

That is where Dr. Finkelman can be useful in this matter. Jurors cannot recognize a departure from the normal sequence without knowing what the normal sequence is. Most jurors have never investigated a discrimination complaint, designed a corrective plan, or built the paper record that ordinarily precedes a performance-based separation at a large institution. Expert testimony on such subjects "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993).

Dr. Finkelman's testimony would explain how generally accepted HR practices guide complaint handling, corrective coaching, documentation, and review of a decision to accelerate an employee's departure. Doc. 99 at 9. He can explain the professional purpose of establishing clear performance expectations, investigating discrimination complaints, and documenting the reasons for abandoning an existing continuation arrangement. *Guster-Hines v. McDonald's USA, LLC*, No. 20-CV-00117, slip op. at 21–23, 25–29 (N.D. Ill. Mar. 17, 2026), ECF No. 805. That framework directly serves the

remaining claim concerning UNC's January 2023 decision to end Dr. Rageh's fellowship immediately in retaliation for his protected complaints. Doc. 93 at 3, 5.

Dr. Finkelman can apply those identified practices to UNC's handling of concerns that Dr. Ulrich already knew during the period in which he offered continued training and supplied favorable licensing disclosures. Doc. 76-2 at 60–63, 95; Ulrich–Zhang Text Messages, UNC_0008340–45; Doc. 99 at 9. He can explain why a reliable personnel review distinguishes previously known incidents from new information, reconciles inconsistent incident dates, and documents the grounds for accelerating a previously offered departure date. Doc. 68-1 at 15; Doc. 76-2 at 88, 93; *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). His comparison would leave clinical judgments, credibility, and retaliatory motive to other evidence and the jury. Doc. 87 at 9 n.5, 13; Doc. 99 at 9.

The licensing records also help define that professional trajectory. Doc. 76-2 at 61–63. Dr. Ulrich had presented Dr. Rageh to three state licensing authorities as a physician who remained in training without discipline, investigation, probation, or interruption and whom he recommended for unrestricted licensure. *Id.* Dr. Finkelman can explain why continued employment under those circumstances offered a materially different professional transition from an abrupt separation process that followed days later. Doc. 76-2 at 60–63, 88. Evidence concerning any actual effect on subsequent credentialing, employment, references, or professional opportunities can then establish the consequences that flowed from that change in status. Doc. 76-2 at 60–63, 88.

Dr. Finkelman can also offer important assistance on damages by identifying the employment position Dr. Rageh occupied immediately before UNC accelerated his separation in ways an ordinary juror might not grasp as easily. Doc. 76-2 at 60 (P-6). The December 20 arrangement gave Dr. Rageh continued employment and compensation through June 30, continued clinical responsibilities, continued call and educational participation, potential operating-room instruction, a medical-retina fellowship certificate, and six months to locate another professional position. *Id.* Those terms establish a concrete employment baseline for measuring the practical consequences of UNC's later decision to accelerate the separation. *Id.*; Doc. 76-2 at 88. That baseline can keep the damages inquiry tied closely to the surviving retaliation claim. Doc. 76-2 at 60, 88. The jury need not assume that retaliation caused every disappointment or career consequence associated with the earlier decision to shorten Dr. Rageh's surgical fellowship. Doc. 68-1 at 13–14; Doc. 76-2 at 60. The jury can instead measure the consequences that flowed from UNC's abandonment of the specific employment arrangement that remained available before Dr. Rageh persisted in his discrimination complaint. Doc. 76-1 at 19; Doc. 76-2 at 60, 88. Dr. Finkelman can help jurors recognize that distinction and understand the professional value of the employment, training, credential, and transition period that UNC's December plan preserved. Doc. 76-2 at 60.

## CONCLUSION

The Court should deny UNC's motion to the extent it seeks categorical exclusion of Dr. Finkelman's limited professional-practice testimony and reserve the admissibility

of each challenged opinion for a focused foundation determination. Denying Defendants' motion will not disturb Plaintiff's requirement to establish qualifications, helpfulness, sufficient factual support, a reliable method, and reliable application. The Court should permit each opinion that meets those requirements and enforce the express exclusions throughout the examination. This approach gives the jury access to useful professional knowledge, preserves UNC's right to challenge the testimony, and leaves legal instructions, credibility, and ultimate causation with the Court and jury in their respective roles. Fed. R. Evid. 104(a), 702(a)–(d).

This the 2nd day of October, 2026.

Respectfully submitted,

/s/ Taylor S. Hastings

Taylor S. Hastings (NC Bar No. 47048)
Thomas Sparks (NC Bar No. 19898)
Lawyers for the Plaintiff
1340 Environ Way
Chapel Hill, North Carolina 27517
Telephone: (919) 619-1152
Fax: (919) 869-1394
Email: taylor@hastingsnclaw.com

## CERTIFICATE OF WORD COUNT

I certify under Local Rule 7.3(d)(1) that this brief contains 3,027 words, including the body of the brief, headings, and footnotes, and excluding the caption, signature lines, and certificates, as counted by the word-processing software used to prepare it. The brief complies with Local Rule 7.3(d)(1) and with the Court's September 17, 2026 text order limiting Plaintiff's responses to motions in limine to 4,000 words.

/s/ Taylor S. Hastings
Taylor S. Hastings (NC Bar No. 47048)
Thomas Sparks (NC Bar No. 19898)
Lawyers for the Plaintiff
1340 Environ Way
Chapel Hill, North Carolina 27517
Telephone: (919) 619-1152
Fax: (919) 869-1394
Email: taylor@hastingsnclaw.com

## CERTIFICATE OF SERVICE

I certify that on October 2, 2026, I electronically filed the foregoing Plaintiff's Response in Opposition to Defendant's Motion to Exclude the Expert Testimony of Dr. Jay M. Finkelman with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record, including Lindsay Vance Smith and Allison C. Hawkins, North Carolina Department of Justice, and Zachary A. Padget, Office of University Counsel, counsel for Defendant University of North Carolina at Chapel Hill.

/s/ Taylor S. Hastings
Taylor S. Hastings (NC Bar No. 47048)
Thomas Sparks (NC Bar No. 19898)
Lawyers for the Plaintiff
1340 Environ Way
Chapel Hill, North Carolina 27517
Telephone: (919) 619-1152
Fax: (919) 869-1394
Email: taylor@hastingsnclaw.com